JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 2590

————————————————— x
                                   :    Civil Action No.

ROYAL PARK INVESTMENTS SA/NV,   :
Individually and on Behalf of All Others      :    CLASS ACTION AND VERIFIED
Similarly Situated,                         :    DERIVATIVE COMPLAINT FOR BREACH
                                       :    OF THE TRUST INDENTURE ACT,
                  Plaintiff,        :    BREACH OF CONTRACT, AND BREACH
                                       :    OF TRUST
    vs.                                     :

U.S. BANK NATIONAL ASSOCIATION, as   :
Trustee,                                     :
                                       :
                  Defendant.      :
                                       :
————————————————— x   DEMAND FOR JURY TRIAL

RECEIVED
APR 1 1 2014
U.S.D.C. S.D. N.Y.
CASHIERS

**TABLE OF CONTENTS**

Page

I.      SUMMARY OF THE ACTION ........................................................................1

II.     JURISDICTION AND VENUE ....................................................................13

III.    PARTIES ........................................................................................................13

IV.     FACTUAL ALLEGATIONS ........................................................................16

        A.      The Securitization Process for the Mortgage Loans ...............................16

        B.      U.S. Bank's Duties as Trustee for the Covered Trusts ..........................20

                1.      U.S. Bank's Duty to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans Which Breached Their Representations and Warranties ..................................................................21

                2.      U.S. Bank's Duties Upon the Occurrence of an Event of Default ............24

                3.      Upon the Occurrence of an Event of Default, U.S. Bank's Duties to Plaintiff and the Class Are Significantly Increased, as U.S. Bank Is Required to Prudently Protect Plaintiff's and the Class' Interests as Though They Were U.S. Bank's Own Interests ........................................27

                4.      U.S. Bank's Duty of Trust to Avoid Conflicts of Interest with Plaintiff and the Class .................................................................................28

                5.      U.S. Bank's Duties and Obligations Under the TIA ................................28

        C.      The Covered Trusts Suffer from Serious Defects Because of U.S. Bank's Failure to Properly Discharge Its Duties Under the Governing Agreements, the TIA and Common Law ................................................30

                1.      U.S. Bank Discovered as Early as 2009 but in No Event Later than April 13, 2011 that the Covered Trusts Were Filled with Thousands of Mortgage Loans that Breached the Warrantors' Representations and Warranties ................................................................30

                        a.      Shortly After the Covered Trusts Were Formed Information Arose that Raised Serious Questions About the Veracity of the Warrantors' Representations and Warranties ........................30

                        b.      In 2007 and 2008, Facts Emerged Indicating that Many of the Warrantors Had Routinely Made False Representations and Warranties ..............................................................................37

**Page**

c. U.S. Bank's Review of the Mortgage Loan Files in 2006 and 2007, Coupled with the Vast Amount of Information Made Public Prior to 2009 Indicating that the Warrantors' Representations and Warranties Were False, Caused U.S. Bank to Discover Breaches with Respect to the Mortgage Loans in the Covered Trusts in 2009 ...............................................56

d. The Unprecedented, Extremely High and Persistent Mortgage Loan Default Rates Also Caused U.S. Bank to Discover Breaches of the Warrantors' Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts by 2009................................................................................58

e. Further News and Events, and U.S. Bank's Own Actions During and After 2009, Indicated that U.S. Bank Knew that the Warrantors Had Breached Their Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts........................................................................................60

f. By April 13, 2011 U.S. Bank Absolutely Knew that the Warrantors Had Breached Their Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts........................................................................................71

g. Information Available to U.S. Bank Concerning the Mortgage Loans Within the Covered Trusts Confirmed that There Were Breaches of the Warrantors' Representations and Warranties ...........................................................96

 (1) BAFC 2007-C Covered Trust ...........................................96

 (2) BNCMT 2007-2 Covered Trust.........................................97

 (3) BSABS 2006-AC2 Covered Trust....................................98

 (4) BSABS 2006-AC5 Covered Trust....................................99

 (5) GPMF 2007-AR1 Covered Trust......................................99

 (6) GPMF 2007-AR2 Covered Trust....................................100

 (7) GPMF 2007-AR3 Covered Trust....................................101

 (8) HEAT 2006-5 Covered Trust..........................................101

**Page**

(9)    HEAT 2006-6 Covered Trust...........................................102

(10)   LXS 2006-10N Covered Trust.......................................103

(11)   LXS 2006-15 Covered Trust..........................................104

(12)   LXS 2007-7N Covered Trust.........................................104

(13)   MABS 2006-HE2 Covered Trust...................................105

(14)   MLMI 2006-WMC2 Covered Trust .............................106

(15)   SARM 2006-9 Covered Trust........................................107

(16)   SASC 2006-NC1 Covered Trust...................................107

(17)   SASC 2006-WF2 Covered Trust ..................................108

(18)   SASC 2006-WF3 Covered Trust ..................................109

(19)   SASC 2007-EQ1 Covered Trust...................................110

(20)   SASC 2007-WF1 Covered Trust ..................................110

(21)   WMALT 2006-AR4 Covered Trust...............................111

(22)   WAMU 2006-AR13 Covered Trust...............................112

(23)   WAMU 2006-AR17 Covered Trust...............................112

(24)   WAMU 2006-AR19 Covered Trust...............................113

(25)   WAMU 2007-OA2 Covered Trust ................................114

2.   U.S. Bank Had Actual Knowledge of Events of Default as Early as October 2010 but in No Event Later than April 13, 2011 ......................116

a.   As Early as October 2010 U.S. Bank Knew that the Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts.......116

b.   Numerous Events that Occurred After October 2010 Further Confirmed for U.S. Bank that the Master Servicers and Servicers Were Committing Events of Default as to the Mortgage Loans in the Covered Trusts.......................148

- iii -

      c.     By April 13, 2011 U.S. Bank Absolutely Knew that the Covered Trusts' Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts ........................................................158

      d.     After April 2011 U.S. Bank Also Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit Events of Default with Respect to the Mortgage Loans in the Covered Trusts ........................................................166

   3.    U.S. Bank Has Conflicts of Interest with Plaintiff and the Class and Has Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself ....................................................201

D.   U.S. Bank Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA, and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA and Common Law ...................................................................................................202

   1.    U.S. Bank Failed to Enforce the Warrantors' Obligations to Cure, Substitute, or Repurchase Defective, Breaching Mortgage Loans as Required by the Governing Agreements and the TIA ............................203

   2.    U.S. Bank Failed to Perform Its Duties with Respect to Events of Default as Required by the Governing Agreements and the TIA ...........204

   3.    U.S. Bank Failed to Exercise All of Its Rights and Duties Under the Governing Agreements and Use the Degree of Care and Skill in Their Exercise as a Prudent Person Would in the Conduct of His or Her Own Affairs, as Required by the Governing Agreements and the TIA ........................................................................................207

   4.    U.S. Bank Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class .............................................................207

E.   Plaintiff and the Class Have Suffered Significant Damages Due to U.S. Bank's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA ........................................................................................208

F.   Plaintiff May Sue U.S. Bank as Trustee ..........................................................209

V.    CLASS ACTION ALLEGATIONS ................................................................210

VI.   DERIVATIVE ACTION ALLEGATIONS ....................................................213

**Page**

COUNT I ........................................................................................................214

    Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa *et seq.* ........................214

COUNT II .......................................................................................................217

    Breach of Contract ........................................................................................217

COUNT III ......................................................................................................219

    Breach of Trust ............................................................................................219

PRAYER FOR RELIEF ......................................................................................220

JURY DEMAND ..............................................................................................221

1.      Plaintiff Royal Park Investments SA/NV ("plaintiff" or "RPI") alleges the following based on information and belief upon the investigation of plaintiff's counsel (except as to the allegations pertaining to plaintiff, which are based on personal knowledge), which included an investigation and review of information concerning defendant U.S. Bank National Association ("U.S. Bank" or "defendant"), a review and analysis of information and data concerning the "Covered Trusts" at issue herein, the "Mortgage Loans" within the Covered Trusts at issue herein, the "Warrantors" and originators of the Mortgage Loans, and the "Master Servicers" and "Servicers" of the Mortgage Loans, as well as interviews and consultations with experts, consultants and others knowledgeable in the field of residential mortgage-backed securities ("RMBS").  Plaintiff and plaintiff's counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

2.      Plaintiff brings this action on its own behalf and on behalf of a class of all RMBS investors in the following 25 substantially similarly RMBS trusts for which defendant U.S. Bank serves as Trustee (collectively, the "Covered Trusts"):

| Covered Trust Name | Hereinafter Referred to as: |
|---|---|
| 1.   Banc of America Funding 2007-C Trust | BAFC 2007-C |
| 2.   BNC Mortgage Loan Trust 2007-2 | BNCMT 2007-2 |
| 3.   Bear Stearns Asset Backed Securities I Trust 2006-AC2 | BSABS 2006-AC2 |
| 4.   Bear Stearns Asset Backed Securities I Trust 2006-AC5 | BSABS 2006-AC5 |
| 5.   GreenPoint Mortgage Funding Trust 2007-AR1 | GPMF 2007-AR1 |
| 6.   GreenPoint Mortgage Funding Trust 2007-AR2 | GPMF 2007-AR2 |
| 7.   GreenPoint Mortgage Funding Trust 2007-AR3 | GPMF 2007-AR3 |
| 8.   Home Equity Asset Trust 2006-5 | HEAT 2006-5 |
| 9.   Home Equity Asset Trust 2006-6 | HEAT 2006-6 |
| 10.  Lehman XS Trust 2006-1ON | LXS 2006-1ON |
| 11.  Lehman XS Trust 2006-15 | LXS 2006-15 |
| 12.  Lehman XS Trust 2007-7N | LXS 2007-7N |
| 13.  MASTR Asset Backed Securities Trust 2006-HE2 | MABS 2006-HE2 |
| 14.  Merrill Lynch Mortgage Investors Trust 2006-WMC2 | MLMI 2006-WMC2 |
| 15.  Structured Adjustable Rate Mortgage Loan Trust 2006-9 | SARM 2006-9 |

| Covered Trust Name | Hereinafter Referred to as: |
|---|---|
| 16. Structured Asset Securities Corporation Mortgage Loan Trust 2006-NC1 | SASC 2006-NC1 |
| 17. Structured Asset Securities Corporation Mortgage Loan Trust 2006-WF2 | SASC 2006-WF2 |
| 18. Structured Asset Securities Corporation Mortgage Loan Trust 2006-WF3 | SASC 2006-WF3 |
| 19. Structured Asset Securities Corporation Mortgage Loan Trust 2007-EQ1 | SASC 2007-EQ1 |
| 20. Structured Asset Securities Corporation Mortgage Loan Trust 2007-WF1 | SASC 2007-WF1 |
| 21. Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-AR4 Trust | WMALT 2006-AR4 |
| 22. WaMu Mortgage Pass-Through Certificates Series 2006-AR13 Trust | WAMU 2006-AR13 |
| 23. WaMu Mortgage Pass-Through Certificates Series 2006-AR17 Trust | WAMU 2006-AR17 |
| 24. WaMu Mortgage Pass-Through Certificates Series 2006-AR19 Trust | WAMU 2006-AR19 |
| 25. WaMu Mortgage Pass-Through Certificates Series 2007-OA2 Trust | WAMU 2007-OA2 |

3.     Plaintiff sues U.S. Bank for violating the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §77aaa *et seq.*, and for breach of contract and breach of trust, in connection with the Covered Trusts.   Plaintiff and the class are beneficiaries of the Covered Trusts, which held residential "Mortgage Loans."[1] Plaintiff and the class own RMBS in the Covered Trusts, which are essentially bonds granting plaintiff and the class the right to receive monthly principal and interest payments generated by the Mortgage Loans.

4.     As the Trustee for the Covered Trusts, U.S. Bank owed plaintiff and the class certain contractual duties and obligations, and similar statutory duties imposed on it by the TIA, as well as certain duties to avoid conflicts of interest under common law.   The contractual duties and obligations are contained within the Covered Trusts' "Governing Agreements," called "Pooling and

---

[1]     Each of the Covered Trusts held hundreds to thousands of residential mortgage loans that were transferred to them.   These mortgage loans transferred to the Covered Trusts are referred to herein as the "Mortgage Loans."

Servicing Agreements" ("PSAs") or "Trust Agreements" ("TAs"). A copy of one of the Governing Agreements, the PSA for the BAFC 2007-C Trust (the "BAFC 2007-C PSA"), one of the Covered Trusts herein, is attached hereto as Ex. A. All of the Governing Agreements for the other Covered Trusts are either identical or substantially identical to the Governing Agreement for the BAFC 2007-C Covered Trust, and are incorporated herein by reference as if set forth fully herein.

5.      The purpose of having trustees, such as U.S. Bank, in RMBS securitizations like the Covered Trusts is to ensure that there is at least one independent party to the Governing Agreements that – unlike plaintiff and the class – does not face collective action, informational, or other limitations, thereby allowing the Trustee to effectively protect the interests of plaintiff and the class, and administer the Covered Trusts for the benefit of plaintiff and the class.

6.      The Governing Agreements, as modified by the TIA and common law, effectuated this purpose by imposing certain obligations and duties on U.S. Bank as Trustee that were designed to protect plaintiff's and the class' interests. U.S. Bank's discharge, or failure to discharge, such obligations and duties had a direct and material impact on the Covered Trusts and plaintiff's and the class' interests therein.

7.      Thus, the Governing Agreements granted U.S. Bank certain rights and powers, and mandated that it use those rights and powers for the benefit of plaintiff and the class. For example, the Governing Agreements contain representations and warranties from certain entities that transferred Mortgage Loans to the Covered Trusts, regarding the credit quality and characteristics of the Mortgage Loans. These transferring entities were: (1) the "Sellers" or "Sponsors" of the Mortgage Loans and RMBS securitizations (the "Loan Sellers/Sponsors");[2] and/or (2) the Mortgage Loan's originators or other entities that sold Mortgage Loans that were ultimately transferred to the

---

[2]      Typically, the Loan Sellers/Sponsors aggregated the Mortgage Loans and sold them to the Covered Trusts' "Depositors," for ultimate transfer to the Trustee and Covered Trusts.

Covered Trusts ("Other Transferors") (the Loan Sellers/Sponsors and Other Transferors are collectively referred to herein as the "Warrantors"). The Warrantors' representations and warranties attested to a wide variety of credit characteristics of the Mortgage Loans, and vouched for the accuracy of credit and other data they provided about the Mortgage Loans. Generally, these representations and warranties attested to the credit quality of the Mortgage Loans and that the Mortgage Loans were originated pursuant to law and specific underwriting standards, and were otherwise as represented in the offering documents used to sell the Covered Trusts' RMBS to investors.

8.     The veracity and accuracy of these representations and warranties were extremely important to investors and credit rating agencies because they conveyed information attesting to the credit quality of the Mortgage Loans, and thus the level of risk of investing in the Covered Trusts' RMBS. In fact, credit rating agencies relied on and assessed the quality of the RMBS and issued them credit ratings – most of which were high, "investment grade" credit ratings – based on the Warrantors' representations and warranties about the Mortgage Loans. Given the critical importance of the Warrantors' representations and warranties, the Governing Agreements obligated the Warrantors to timely cure, substitute, or repurchase any Mortgage Loan that materially breached any of their representations or warranties. Thus, the representations and warranties served as insurance that the Mortgage Loans would be as the Warrantors represented, and if they were not, the Warrantors would make them so by curing any breaches, including by substituting new non-breaching loans or repurchasing any defective Mortgage Loans.

9.     Given the importance of the Warrantors' representations and warranties, the Governing Agreements and the TIA required U.S. Bank – upon discovery of any material breach of any of the representations or warranties as to any Mortgage Loan – to promptly notify the breaching

- 4 -

Warrantor and request that such Warrantor cure the breach within a specified time.  Significantly, if the breach was not timely cured, the Governing Agreements required U.S. Bank to enforce the breaching Warrantor's obligations to either substitute or repurchase any defective Mortgage Loan.[3]

10.     As alleged more fully below, as early as 2009, but in no event later than April 13, 2011, U.S. Bank "discovered," as that term is used in the Governing Agreements, that the Warrantors had breached their representations and warranties concerning thousands of Mortgage Loans within the Covered Trusts.  However, notwithstanding U.S. Bank's discovery of these massive breaches, U.S. Bank disregarded its duties under the Governing Agreements and the TIA and failed to promptly request that the Warrantors cure their breaches.  Nor did U.S. Bank enforce the Warrantors' obligations to cure, substitute or repurchase the defective Mortgage Loans (or, in the case of the WaMu Covered Trusts, ensure the Servicer did), including many Mortgage Loans that were so obviously defective that they had already been foreclosed on, liquidated and written off as losses long before 2009 and long before April 2011.  U.S. Bank's failure to comply with the Governing Agreements by failing to enforce the Warrantors' obligations to cure, repurchase or substitute breaching Mortgage Loans has resulted in billions of dollars of damages to the plaintiff and the class, and the Covered Trusts, as those defective Mortgage Loans are in default, delinquent, in foreclosure, or otherwise already liquidated at huge losses.  Moreover, U.S. Bank's continuing failure to enforce the representation and warranty claims in breach of the Governing Agreements, even long after it discovered such claims and breaches, has caused those claims against the Warrantors to be lost to the statute of limitations.  U.S. Bank's inaction has also violated the TIA, as

---

[3]     The five WaMu Covered Trusts herein (WMALT 2006-AR4, WAMU 2006-AR13, WAMU 2006-AR17, WAMU 2006-AR19 and WAMU 2007-OA2) were slightly different, as they required U.S. Bank to notify the Depositor and Servicer of those Covered Trusts of the breaches, and the Servicer, rather than U.S. Bank, was to enforce the Warrantors' obligations.  Nonetheless, if U.S. Bank became aware that the Servicer was not enforcing the representation and warranty claims, U.S. Bank was required to remedy the situation.  This is discussed *infra*.

the TIA required U.S. Bank to perform the foregoing duties mandated by the Governing Agreements, and to give plaintiff and the class notice of the Warrantors' defaults/breaches.

11.     In addition to U.S. Bank's obligations to enforce the representation and warranty claims, U.S. Bank also owed other duties to plaintiff and the class under the Governing Agreements and the TIA.  The Governing Agreements required U.S. Bank to take steps to protect plaintiff and the class whenever it became aware of uncured loan servicing failures by the Covered Trusts' Master Servicers and Servicers that amounted to "Events of Default," as defined by the Governing Agreements.  To explain, the Governing Agreements designated certain entities to be the Master Servicers or Servicers of the Mortgage Loans within the Covered Trusts (these Master Servicers and Servicers are sometimes collectively referred to herein as "Master Servicers/Servicers").  The Master Servicers/Servicers were responsible under the Governing Agreements to ensure the proper servicing and administration of the Mortgage Loans within the Covered Trusts for the benefit of plaintiff and the class.  The Governing Agreements required the Master Servicers/Servicers (and their sub-servicers) to exercise the ***customary loan servicing practices of "prudent" loan servicers***, in servicing the Mortgage Loans on behalf of plaintiff and the class.  An "Event of Default" occurred under the Governing Agreements whenever a Master Servicer or Servicer failed to properly and prudently service and administer the Mortgage Loans.[4]

---

[4]     The Master Servicers'/Servicers' duties under the Governing Agreements included, *inter alia*, ensuring the prompt collection of payments from borrowers and remittance of the same to the Covered Trusts; ensuring the prompt sending of delinquency notices to borrowers who were late on their payments; ensuring the proper maintenance and reporting of accurate information regarding the Mortgage Loans; and ensuring the proper and prudent modification of Mortgage Loans when necessary.  In addition, the Master Servicers/Servicers were required to ensure the proper, prudent, correct, and truthful institution and prosecution of foreclosure proceedings when, and as necessary, on behalf of U.S. Bank as Trustee.  In short, the Governing Agreements required the Master Servicers/Servicers to do whatever a prudent Master Servicer/Servicer would customarily do to ensure the proper servicing and administration of the Mortgage Loans for the benefit of plaintiff and the class.  With respect to the WaMu Covered Trusts, an Event of Default also occurred whenever

12.     Under the Governing Agreements and the TIA, U.S. Bank had a number of duties to plaintiff and the class whenever it became aware of an Event of Default.  First, U.S. Bank was required to request that the offending Master Servicer or Servicer cure its default within a prescribed period of time.  Second, U.S. Bank was required to promptly give notice of Events of Default to plaintiff and the class and others, such as the credit rating agencies.  Third, U.S. Bank was allowed to take additional actions to protect plaintiff and the class if an Event of Default was not cured, including terminating and replacing the offending Master Servicer or Servicer in certain instances, or taking over the Master Servicers' or Servicers' duties.

13.     It was critically important that U.S. Bank act promptly as required by the Governing Agreements when it became aware of Master Servicers'/Servicers' Events of Default, and to quickly and correctly remedy them, because the proper and prudent servicing of the Mortgage Loans was vital to: (1) the ongoing financial viability of the Covered Trusts; (2) ensuring the Covered Trusts had sufficient cash flows to pay expenses and to fund payments to plaintiff and the class; (3) avoiding and minimizing any losses to plaintiff and the class, from defaults, delinquencies or foreclosures of the Mortgage Loans; and (4) maintaining the credit ratings for plaintiff's and the class' RMBS.  Because of this, the Governing Agreements required U.S. Bank to act to protect plaintiff and the class whenever it became aware of an Event of Default by a Master Servicer or a Servicer.

14.     As alleged more fully below, U.S. Bank obtained actual knowledge of widespread, ongoing, uncured Events of Default by the Covered Trusts' Master Servicers and Servicers with respect to the Mortgage Loans in the Covered Trusts as early as October 2010, but in no event later than April 13, 2011.  During that time, U.S. Bank obtained actual knowledge that the Master

those Covered Trusts' Servicers failed to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans which breached their representations and warranties.

Servicers and Servicers were engaging in improper and illegal foreclosures practices with respect to the Mortgage Loans, including making false statements and filing false affidavits in foreclosure proceedings in violation of federal and state laws (known as "robo-signing"), and engaging in other improper loan servicing misconduct with respect to the Mortgage Loans that injured plaintiff and the class. These improper and imprudent loan servicing practices by the Master Servicers and Servicers, which were known to U.S. Bank, were Events of Default under the Governing Agreements. Thus, they triggered U.S. Bank's duties under the Governing Agreements and the TIA to act. However, U.S. Bank failed to do the things required of it by the Governing Agreements and the TIA. U.S. Bank failed to request that the Master Servicers and Servicers cure their Events of Default, as required by the Governing Agreements and the TIA. U.S. Bank also did not notify plaintiff, the class and others of the Events of Default, as required by the Governing Agreements and the TIA. U.S. Bank further failed to take any other steps available to it to remedy the uncured Events of Default, such as terminating or replacing the offending Master Servicers and Servicers, or taking over their duties, as provided by the Governing Agreements and the TIA. In addition, despite its knowledge that Events of Default have occurred continuously *after* April 2011, U.S. Bank has continued to fail to act and thus has engaged in a continuing breach of the Governing Agreements and the TIA.

15.     U.S. Bank's failures to act have resulted in the Mortgage Loans being improperly and imprudently serviced and administered, causing massive damages to plaintiff, the class and the Covered Trusts. U.S. Bank's failures to correct the Master Servicers' and Servicers' Events of Default have resulted in, *inter alia*: (1) numerous foreclosures being invalidated and/or improperly delayed, substantially driving up the Covered Trusts' expenses and losses, and delaying, reducing or eliminating the receipt of foreclosure proceeds; (2) numerous Mortgage Loan delinquencies being

- 8 -

allowed to stretch on interminably without payments being remitted to the Covered Trusts, while the Master Servicers and Servicers continuously added improper and excessive fees and charges to such Mortgage Loans which are paid by the Covered Trusts; (3) numerous Mortgage Loans being modified or foreclosed, or not being modified or foreclosed, in a manner that financially benefitted the Master Servicers'/Servicers' interests but not plaintiff's and the class', in violation of the Governing Agreements; and (4) various and numerous other improper servicing misconduct and abuses amounting to Events of Default, that caused millions of dollars in damages to plaintiff and the class.[5]

16.     Importantly, under both the Governing Agreements and the TIA, the occurrence of an Event of Default dramatically increased U.S. Bank's duties to plaintiff and the class.  The occurrence of any Event of Default required U.S. Bank to protect plaintiff and the class by exercising all of the rights and powers vested in U.S. Bank by the Governing Agreements, and further required U.S. Bank to use a higher degree of care and skill than usual when exercising those rights and powers for the benefit of plaintiff and the class.  When an Event of Default occurred, *U.S. Bank was required by the Governing Agreements and the TIA to act as a reasonably prudent person* would under the circumstances, and as if U.S. Bank were conducting its own affairs.  In other words, U.S. Bank was required to exercise *all* of its rights and powers under the Governing Agreements as a reasonably prudent person would to protect plaintiff, the class and the Covered Trusts, as if U.S. Bank were seeking to protect its own interests.

17.     In addition, the uncured Events of Default required U.S. Bank to exercise this heightened duty of care, and to exercise all of its rights and powers under the Governing

---

[5]     With respect to the WaMu Covered Trusts, U.S. Bank's failure to act has also caused the loss of representation and warranty claims that those Covered Trusts' Servicers should have enforced against the Warrantors.

Agreements, not only as to the Master Servicers/Servicers and their Events of Default, ***but also as to all of the Warrantors that had breached their representations and warranties***. Thus, U.S. Bank was also required to enforce the representation and warranty claims against the Warrantors as a prudent person would, and seek to fully recover for those claims as though U.S. Bank was seeking to recover for itself.

18.     U.S. Bank, however, ignored these duties and obligations owed to plaintiff and the class under the Governing Agreements and the TIA, and did not exercise its rights and powers under the Governing Agreements, or exercise the degree of care and skill required of a prudent person in the conduct of his/her own affairs.  As a result of these failures by U.S. Bank, it breached the Governing Agreements and violated the TIA, and caused plaintiff, the class and the Covered Trusts to suffer billions of dollars in damages from the loss and non-prosecution of the representation and warranty claims against the Warrantors (which are now time-barred), and have further caused millions of dollars in additional damages resulting from the Master Servicers'/Servicers' uncured Events of Default, that continue unabated.  Plaintiff and the class are entitled to recover damages caused by these breaches of the Governing Agreements by U.S. Bank, and for its violations of the TIA.

19.     U.S. Bank's failure to act also breached its common law duty of trust owed to plaintiff and the class.  Under this duty, U.S. Bank was required to avoid conflicts of interest with plaintiff and the class.  U.S. Bank failed to act as required under the Governing Agreements to protect plaintiff's and the class' rights because U.S. Bank had a fundamental conflict of interest with plaintiff and the class.  U.S. Bank had ongoing and prospective business relationships with the loan originators, Loan Sellers/Sponsors, Other Transferors, Master Servicers and Servicers to the Covered Trusts (and entities related to them).  These were the entities that selected RMBS trustees for RMBS

- 10 -

trusts, and they had selected U.S. Bank to be the Trustee of many of the Covered Trusts, as well as many others.  Thus, U.S. Bank derived significant RMBS trustee business, income and profits from such relationships, and desired to continue profiting therefrom in the future.  U.S. Bank did not want to disrupt its business relationships with these entities, or anger them, as it would disrupt U.S. Bank's RMBS trustee business and the income therefrom, as well as future prospects for such financial gain.  In addition, U.S. Bank also was a loan servicer in addition to being a RMBS trustee, and U.S. Bank also derived loan servicing income and profits from such relationships and did not want to disrupt those financial relationships either, for the same reasons.

20.     Because of these relationships, U.S. Bank decided to refrain from protecting the Covered Trusts and plaintiff's and the class' interests as required by the Governing Agreements and the TIA.  Instead, U.S. Bank protected and advanced its own economic interests at the expense of plaintiff and the class.  If U.S. Bank made claims for breaches of representations and warranties against the Warrantors to the Covered Trusts, insisting that they remedy or repurchase defective Mortgage Loans, or complained to the Master Servicers/Servicers to the Covered Trusts about inadequate loan servicing or other conduct, or declared Events of Default against them, or replaced them, those entities would retaliate by withholding future trustee and loan servicing business from U.S. Bank, or by declaring loan servicing defaults against U.S. Bank where it serviced loans, or by terminating it as a loan servicer.  The Warrantors and Master Servicers/Servicers might also remove, or seek to remove, or influence others to remove, U.S. Bank as Trustee from the many RMBS trusts to which it was appointed if it acted against them, including the Covered Trusts.

21.     For these reasons, U.S. Bank chose not to enforce representation and warranty claims against the Warrantors, and did not declare Events of Default by the Master Servicers/Servicers, or replace them.  By deliberately failing to act, U.S. Bank put its own interests ahead of plaintiff's and

the class' and benefitted therefrom, violating its common law duty to plaintiff and the class to avoid conflicts of interest, thereby breaching U.S. Bank's duty of trust.

22.    Media reports and RMBS experts have confirmed these conflicts of interest.  For example, in December 2010, law professor Kurt Eggert appeared before the U.S. Senate's Banking, Housing and Urban Affairs Committee and testified that ***RMBS trustees like U.S. Bank were not likely to be of "much help for investors" because "a trustee may derive much of its income from a single lender***."  In addition, in a news article published in *The New York Times* on June 16, 2013, it was reported that "when mortgages soured, trustees declined to pursue available remedies for investors, such as pushing a [Warrantor] to buy back loans that did not meet quality standards promised when the securities were sold."  The article went on to describe why trustees like U.S. Bank did not act:

> *But because trustees are hired by the big banks that package and sell the securities, their allegiances are divided.  Sure, investors are paying the fees, but if a trustee wants to be hired by sellers of securities in the future, being combative on problematic loan pools may be unwise*.

The article concluded: "***they [the RMBS trustees] are a dog that could have barked but didn't***."

23.    Because of U.S. Bank's conflicts of interest with plaintiff and the class, U.S. Bank chose to protect its own interests to the detriment of plaintiff and the class, thereby breaching its duty of trust.  Moreover, U.S. Bank has engaged in a continuing breach of its duty by continuing to put its interests ahead of those of plaintiff and the class and by not performing its duties as required by the Governing Agreements.

24.    As a result of U.S. Bank's failures to enforce the representation and warranty claims or to act as a prudent person, as required by  the Governing Agreements and the TIA, the Mortgage Loans in the Covered Trusts have experienced historically unprecedented numbers of defaults, delinquencies, foreclosures, liquidations and losses, and plaintiff and the class have suffered billions

of dollars in damages from now time-barred but otherwise meritorious representation and warranty claims that U.S. Bank did not enforce.  As a further result of U.S. Bank's failures to act with respect to Master Servicer/Servicer Events of Default, or act as a prudent person, also as required by the Governing Agreements and the TIA, the Mortgage Loans have also experienced numerous invalid and improper foreclosures, and lengthy and expensive delays in foreclosure proceedings, extremely long delinquencies, the imposition of excessive and improper Master Servicer/Servicer fees, and the disposition of Mortgage Loans that financially benefitted the Master Servicers/Servicers but negatively impacted the interests of plaintiff and the class, causing plaintiff and the class to suffer millions of dollars in additional damages.  U.S. Bank's failure to discharge its duty of trust to plaintiff and the class has also caused the foregoing damages to plaintiff and the class.  U.S. Bank's failures to properly act as required by the Governing Agreements and the TIA have also caused failures and shortages in the payment of principal and interest to plaintiff and the class, and has further caused huge writedowns and losses of billions of dollars to the Covered Trusts and plaintiff's and the class' RMBS.  Accordingly, U.S. Bank is liable to plaintiff and the class for damages caused by its breaches of the Governing Agreements and its duty of trust, and violations of the TIA.

## II.  JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 for violations of the TIA and supplemental jurisdiction over the breach of contract and breach of trust claims.  The Court also has jurisdiction pursuant to 28 U.S.C. §1332(a).

26.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b).

## III.  PARTIES

27.    Plaintiff RPI is a limited liability company incorporated under the laws of Belgium, with its principal place of business in Brussels, Belgium.  RPI acquired RMBS in each of the

- 13 -

Covered Trusts on or about the dates indicated below, and has continuously held such RMBS since then:

| Covered Trusts | Tranche/Class | Initial Face Amount of Certificate | Date Acquired |
|---|---|---|---|
| BAFC 2007-C | M4 | $ 3,216,000 | May 6, 2010 |
| | M5 | $ 3,216,000 | May 6, 2010 |
| BNCMT 2007-2 | M4 | $ 4,000,000 | May 12, 2009 |
| BSABS 2006-AC2 | 1M3 | $ 2,944,000 | May 6, 2010 |
| BSABS 2006-AC5 | M1 | $ 6,891,000 | June 23, 2010 |
| GPMF 2007-AR1 | 3A4 | $ 20,042,000 | May 12, 2009 |
| GPMF 2007-AR2 | 2A3 | $ 30,000,000 | May 12, 2009 |
| | 2M2 | $ 11,614,000 | May 12, 2009 |
| GPMF 2007-AR3 | A3 | $ 45,914,000 | May 12, 2009 |
| | M1 | $ 10,991,000 | May 12, 2009 |
| | M2 | $ 7,993,000 | May 12, 2009 |
| HEAT 2006-5 | M2 | $ 5,000,000 | February 12, 2010 |
| HEAT 2006-6 | M1 | $ 5,500,000 | June 23, 2010 |
| LXS 2006-10N | 1A4B | $ 2,147,000 | February 12, 2010 |
| LXS 2006-15 | A5 | $ 30,000,000 | May 12, 2009 |
| LXS 2007-7N | 1A3 | $ 39,000,000 | May 12, 2009 |
| | M1 | $ 39,583,000 | May 12, 2009 |
| MABS 2006-HE2 | M2 | $ 4,900,000 | February 12, 2010 |
| MLMI 2006-WMC2 | M1 | $ 10,000,000 | May 12, 2009 |
| SARM 2006-9 | B1II | $ 8,367,000 | June 23, 2010 |
| SASC 2006-NC1 | M2 | $ 12,000,000 | February 12, 2010 |
| SASC 2006-WF2 | M6 | $ 4,000,000 | February 12, 2010 |
| SASC 2006-WF3 | M6 | $ 2,000,000 | June 23, 2010 |
| SASC 2007-EQ1 | M2 | $ 2,000,000 | May 12, 2009 |
| | M3 | $ 1,500,000 | May 12, 2009 |
| SASC 2007-WF1 | M3 | $ 1,567,000 | May 12, 2009 |
| WMALT 2006-AR4 | DA1B | $ 15,000,000 | May 6, 2010 |

| Covered Trusts | Tranche/Class | Initial Face Amount of Certificate | Date Acquired |
|---|---|---|---|
| WAMU 2006-AR13 | B2 | $  6,823,000 | February 12, 2010 |
| | B3 | $  7,436,000 | February 12, 2010 |
| WAMU 2006-AR17 | B3 | $  1,893,000 | February 12, 2010 |
| WAMU 2006-AR19 | B1 | $  4,300,000 | May 6, 2010 |
| WAMU 2007-OA2 | B3 | $  2,023,000 | May 6, 2010 |
| | B4 | $  4,719,000 | May 6, 2010 |

28.     With respect to the above RMBS which RPI acquired on or about May 12, 2009, RPI acquired such RMBS from the initial purchasers of such RMBS, and the initial purchasers acquired such RMBS at or about the time the RMBS were offered to the investing public in 2006 and 2007. These initial purchasers, when they transferred such RMBS to RPI on or about May 12, 2009, also transferred all right, title and interest in such RMBS to RPI, including all litigation rights and claims the initial purchasers had, such as to the initial purchasers' claims against U.S. Bank in this action. As to the remaining RMBS that were acquired by RPI in 2010, these RMBS were originally included within collateralized debt obligations ("CDOs") in which RPI acquired interests on or about May 12, 2009 from the initial purchasers.  RPI was assigned all right, title and interest (including litigation and claim rights) since the initial purchasers had in the interests in these CDOs at that time. Subsequently, the CDOs were liquidated in 2010 and RPI acquired the RMBS within the CDOs along with all rights, title and interest in such RMBS.  Given that the CDOs were *liquidated in full* and thus the CDOs were selling *all* rights and interests in the RMBS within them, RPI also obtained all litigation rights and claims that the CDOs and initial purchasers had in the RMBS.  Furthermore, pursuant to New York General Obligations Law §13-107, RPI obtained all rights and causes of action of all previous holders against U.S. Bank.

- 15 -

29.     Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States with its principal place of business in Minnesota.  U.S. Bank is one of the market leaders in the structured finance RMBS trustee business, as it serves as Trustee for thousands of RMBS trusts, including the Covered Trusts.  For 18 of the 25 Covered Trusts at issue herein, U.S. Bank has served as the Trustee for those Covered Trusts since they were formed.  For seven of the Covered Trusts, U.S. Bank succeeded Bank of America N.A. ("Bank of America") as Trustee prior to April 2011, and has served as Trustee for those seven Covered Trusts continuously thereafter.  These seven Covered Trusts are listed below, with the date that U.S. Bank became Trustee:

| Covered Trust | Date U.S. Bank Became Trustee |
| --- | --- |
| LXS 2006-15 | September 2009 |
| MLMI 2006-WMC2 | March 2009 |
| WMALT 2006-AR4 | March 2009 |
| WAMU 2006-AR13 | January 2011 |
| WAMU 2006-AR17 | January 2011 |
| WAMU 2006-AR19 | January 2011 |
| WAMU 2007-OA2 | January 2011 |

**IV.     FACTUAL ALLEGATIONS**

**A.     The Securitization Process for the Mortgage Loans**

30.     The Warrantors that sold the Mortgage Loans transferred into the Covered Trusts engaged in a nearly identical securitization process that was repeated thousands of times during 2006 and 2007, the time period when the Mortgage Loans were originated and transferred to the Covered Trusts.  Investor demand for RMBS was skyrocketing during this period and the Warrantors and other RMBS securitization participants were scrambling to meet that demand as fast as they could. RMBS securitizations proliferated during 2006 and 2007 and were extremely profitable for all

involved in their sale to investors.  Tens of billions of dollars of RMBS were packaged and sold to the investing public during this period and billions of dollars in profit were pocketed by the securitizers.  U.S. Bank also profited handsomely, and continues to profit, from the explosion in RMBS trusts caused by the skyrocketing sales, as it is a RMBS Trustee to thousands of RMBS trusts, including the Covered Trusts.

31.     RMBS securitizations involve the conversion of hundreds or thousands of illiquid residential mortgage loans into bond-like instruments – the RMBS at issue herein – which trade over the counter in capital markets.

32.     The first step in creating RMBS is the origination of mortgage loans to borrowers. The Mortgage Loans that were ultimately transferred to the Covered Trusts were typically originated by lenders and then were purchased by the Loan Sellers/Sponsors, or originated by the Loan Sellers/Sponsors themselves, and then ultimately transferred to the Covered Trusts.

33.     Typically, after either originating the Mortgage Loans themselves, or purchasing the Mortgage Loans from other lenders, the Loan Sellers/Sponsors then grouped the Mortgage Loans into large pools, which they then transferred and sold to the Covered Trusts' Depositors, for ultimate transfer to the Covered Trusts and U.S. Bank as Trustee.  Usually, the Depositors were shell companies related to the Loan Sellers/Sponsors.  These sales from the Loan Sellers/Sponsors to the Depositors were typically accomplished via agreements called "Mortgage Loan Purchase Agreements," "Mortgage Loan Sale Agreements," or similarly titled agreements (collectively, the "MLPAs").  In some cases, Other Transferors entered into similar agreements with either the Loan Sellers/Sponsors or the Depositors and the Mortgage Loans were ultimately transferred to the Covered Trusts (the "Other Transfer Agreements").

34.     Importantly, the Governing Agreements refer to and incorporate the MLPAs and, when relevant, the Other Transfer Agreements.  In the MLPAs and Other Transfer Agreements the respective Loan Sellers/Sponsors and Other Transferors: (i) make numerous representations and warranties concerning the credit quality and characteristics of the Mortgage Loans in the mortgage pool and the accuracy of data they communicated about the Mortgage Loans; (ii) promise to cure, substitute or repurchase Mortgage Loans that do not comply with those representations and warranties; and (iii) state that the Trustee will ultimately have the right to enforce those representations and warranties against the Loan Sellers/Sponsors and Other Transferors.  The representations and warranties by the Loan Sellers/Sponsors and Other Transferors (together, the "Warrantors"), and the remedies for breaches thereof, are specifically referenced in the Governing Agreements' PSAs and TAs.  The right to enforce those representations and warranties is expressly assigned to the Trustee for the benefit of the RMBS investors, *i.e.*, plaintiff and the class.[6]

35.     Next, after the Mortgage Loans were sold and transferred from the Warrantors to the Covered Trusts' Depositors, the Depositors then transferred the Mortgage Loans, along with the rights to enforce the Warrantors' representations and warranties, to the Covered Trusts and Trustee for the benefit of plaintiff and the class, and, in exchange, the Trustee transferred the RMBS to the Depositors.

36.     The Depositors then sold the RMBS to underwriters, typically an entity related to the Loan Sellers/Sponsors and Depositors.  The Depositors remit the money from those underwriter sales to the Loan Sellers/Sponsors (who may use it to originate or purchase more loans and repeat

---

[6]   As noted *infra*, the WaMu Covered Trusts gave the Servicers the right to enforce these claims, although U.S. Bank was required to inform others when it discovered such claims and ensure the Servicers enforced such claims.

the securitization process).  Meanwhile, the underwriter markets and sells the RMBS to investors such as plaintiff and the class and retains a portion of the purchase price as its fee.

37.     After the Covered Trusts' RMBS are sold to investors, the Mortgage Loans must be serviced.  Thus, the Governing Agreements designate certain entities to be the Master Servicers or Servicers of the Mortgage Loans, and require them to service and administer the Mortgage Loans in accordance with the customary servicing practices of "***prudent***" loan servicers.  As previously alleged, whenever a Master Servicer/Servicer fails to service the Mortgage Loans as a prudent loan servicer (or in the case of the WaMu Covered Trusts, the Servicer also fails to enforce the Warrantors' obligations to substitute or repurchase defective Mortgage Loans) an Event of Default occurs, and the Trustee is required to take certain actions to protect plaintiff and the class when it becomes aware of the Event of Default.

38.     Plaintiff's and the class' RMBS entitle them to the cash flows generated by the Covered Trusts' Mortgage Loans.  The Covered Trusts, as with other similar RMBS trusts, are structured such that the risk of loss is divided among different "classes" or "tranches" of RMBS in each Covered Trust.  Each class or tranche of the Covered Trusts has a different level of credit risk and reward (the interest or yield), including different levels and types of credit enhancement or protection, and different priorities to payment from the cash flows generated by the Mortgage Loans. Because the classes/tranches have different credit enhancements and different priorities of claim to the cash flow, they are assigned different credit ratings by the credit rating agencies, and they sell at different prices.  Most of the classes/tranches of the RMBS are required to be rated by the credit rating agencies as "investment grade" securities before they can be sold.

39.     All of the classes/tranches of the RMBS, and plaintiff, the class and all of the Covered Trusts, are dependent on the Trustee to act as required under the Governing Agreements, in order to

ensure that the Covered Trusts perform as anticipated and are profitable, and avoid and/or minimize losses and damages.  In other words, if the Covered Trusts are to operate as designed and contemplated by the Governing Agreements, the Trustee must promptly and properly discharge its duties and obligations under the Governing Agreements.  Thus, if the Trustee discovers that the Warrantors' representations and warranties are false, as is the case herein, the Governing Agreements require the Trustee act quickly and decisively to enforce those representations and warranties, by either requiring a cure, a substitution or a repurchase of any defective Mortgage Loan (or to cause the Servicer to do so for the WaMu Covered Trusts).  Similarly, if the Trustee becomes aware of Events of Default, as is the case herein, the Governing Agreements again require that the Trustee promptly take certain actions for the benefit of plaintiff and the class.  If the Trustee fails to properly perform the foregoing duties, the Trustee breaches the Governing Agreements and violates the TIA, and is liable to plaintiff and the class for damages.  Here, U.S. Bank failed to perform important duties it agreed to undertake in the Governing Agreements, and thereby breached those agreements and violated the TIA, thereby entitling plaintiff and the class to damages caused by such breaches and violations.

### B.    U.S. Bank's Duties as Trustee for the Covered Trusts

40.    The purpose of having a Trustee in an RMBS securitization is to ensure that there is at least one independent party to the Governing Agreements that, unlike plaintiff and the class, did not face collective action, informational, or other limitations, and as a result, can effectively protect the interests of plaintiff, the class and the Covered Trusts.  Thus, the Governing Agreements for each Covered Trust imposed critical duties on U.S. Bank, as Trustee, that had a direct impact on plaintiff and the class.

41.    The Governing Agreements set forth U.S. Bank's' duties and obligations to plaintiff and the class.  All of the Covered Trusts are governed by either PSAs (Pooling and Service

Agreements) or similar TAs (Trust Agreements), and certain related agreements such as the MLPAs (Mortgage Loan Purchase Agreements) and/or Servicing Agreements ("SAs"), that the PSAs and TAs reference and incorporate.  Each of the Governing Agreements for the Covered Trusts is either identical or substantially similar to, and imposes the same duties on, U.S. Bank.  Accordingly, the BAFC 2007-C PSA, which is attached hereto as Ex. A, and examples of its related MLPAs (and Other Transfer Agreements) (Exs. B and C hereto) and SAs (Ex. D hereto), are incorporated herein by reference, and are used as representative examples of all of the Governing Agreements for all of the Covered Trusts.

42.     While the Governing Agreements set forth certain rights and responsibilities in connection with the Covered Trusts, the TIA supplements those agreements.  The TIA was enacted in 1939 because Congress recognized that previous abuses by trustees had adversely affected investors and the national interest.  In enacting the TIA, Congress desired to provide minimum federal protections to investors such as plaintiff and the class, which are deemed to be incorporated into the Governing Agreements.

43.     When the Covered Trusts were formed or U.S. Bank was appointed as the Trustee to each Covered Trust, *U.S. Bank "declare[d] that it . . . [would] hold such other assets . . . in the Trust . . . in trust for the . . . use and benefit of all present and future Certificateholders*," that is, for plaintiff's and the class' use and benefit.  BAFC 2007-C PSA, §2.02.  Unfortunately, U.S. Bank failed to fulfill this duty and many others required of it by the Governing Agreements, the TIA and common law, as set forth herein.

**1.     U.S. Bank's Duty to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans Which Breached Their Representations and Warranties**

44.     As previously alleged, the Governing Agreements (through the related MLPAs and Other Transfer Agreements) contained numerous representations and warranties about the Mortgage

Loans by the Loan Sellers/Sponsors and/or the Other Transferors (collectively, the Warrantors). The representations and warranties by the Warrantors attested to the credit quality of the Mortgage Loans conveyed to the Covered Trusts and warranted the accuracy of the data the Warrantors conveyed about such Mortgage Loans. The Warrantors' representations and warranties also attested to other characteristics of the Mortgage Loans and their origination. The following is an example of the types of representations and warranties the Warrantors typically made: (1) that the data the Warrantors conveyed concerning the Mortgage Loans in mortgage loan schedules, exhibits, and other compilations of data in connection with the transfer of the Mortgage Loans to the Covered Trusts, was true, accurate and correct; (2) that the Mortgage Loans complied with and were originated in compliance with all federal, state and local lending laws; (3) that the Mortgage Loans were not "high cost" loans as defined by law; (4) that the appraisals of the properties securing the Mortgage Loans, and the appraisers who conducted them, complied with certain uniform standards and requirements; (5) that the Mortgage Loans were originated in accordance with the lender's applicable underwriting guidelines in place at the time of origination; or (6) that there was no fraud, error, omission, misrepresentation, or negligence by any person involved in the origination or sale of the Mortgage Loans. *See, e.g.*, BAFC 2007-C MLPA, §§3(a), (k), 4(a), (f), (w), (hh), (nn) (Loan Seller's/Sponsor's representations and warranties) (attached hereto as Ex. B); *see also* BAFC 2007-C Assignment, Assumption and Recognition Agreement dated March 20, 2007 ("AAR Transfer Agreement"), §§IV(H), (I), (J) and Schedule I thereto at §§(A), (G), (K) (Other Transferor's representations and warranties in Other Transfer Agreement) (attached hereto as Ex. C). The Warrantors made numerous other representations and warranties concerning the Mortgage Loans being transferred to the Covered Trusts. *See generally* BAFC 20007-C MLPA, §§3-4 (Ex. B); BAFC 2007-C AAR Transfer Agreement, §IV and Schedule I (Ex. C). While many of the

representations and warranties made by the Warrantors to the Covered Trusts were identical, for those that were not identical they were substantially similar, and they all conveyed the same thing – information about the credit quality and characteristics of the Mortgage Loans and the fact that such information was true, correct and accurate.

45.     The Warrantors' representations and warranties are specifically referenced in the Governing Agreements, along with the Warrantors' obligations to cure, substitute, and/or repurchase any Mortgage Loan that materially breaches their representations and warranties.  *See* BAFC 2007-C PSA, §2.02.

46.     The Governing Agreements further provide that "[i]t is understood and agreed that the representations and warranties relating to the Mortgage Loans set forth in the Mortgage Loan Purchase Agreement . . . shall inure to the benefit of the [RMBS]holders," *i.e.*, plaintiff and the class. *Id*.

47.     Importantly, the Governing Agreements also provide that whenever U.S. Bank discovers a breach of a Warrantor's representations or warranties that materially affect plaintiff and the class, the Trustee "shall" promptly notify the Warrantor and request that the Warrantor cure the breach within a specific time period.  *Id*.  If the Warrantor fails to do so, then the Trustee "shall enforce" that breaching Warrantor's obligations to substitute and/or repurchase the defective Mortgage Loans.  *Id*.[7]

48.     These foregoing requirements are embodied in the Governing Agreements and are illustrated in §2.02 of the BAFC 2007-C PSA.  Section 2.02 provides that:

---

[7]     The WaMu Covered Trusts are slightly different.  They require U.S. Bank to notify the Servicer and Depositor of any breaches U.S. Bank discovers, and the Servicer is then tasked with enforcing the Warrantors' obligations.  *See, e.g.*, WAMU 2006-AR19 PSA, §2.09 (Ex. E hereto).  However, if U.S. Bank becomes aware that the Servicer is not fulfilling this duty, then an Event of Default occurs, which requires U.S. Bank to act to remedy the situation, as discussed *infra* concerning the Master Servicers'/Servicers' Events of Default.  *Id*., §3.01, 7.01

> If . . . the Trustee . . . discovers a breach by . . . North Fork Bank [*i.e.*, one of the Other Transferors of the Mortgage Loans] [or] the Sponsor [*i.e.*, the Loan Seller/Sponsor] . . . of any representation, warranty or covenant under . . . the North Fork Assignment Agreements [*i.e.*, an "Other Transfer Agreement"] [or] the Mortgage Loan Purchase Agreement [*i.e*, "MLPA"] . . . in respect of any Mortgage Loan[,] and such breach materially adversely affects the interest of the [RMBS]holders in the related Mortgage Loan[,] . . . then [the Trustee] shall promptly so notify . . . the Sponsor [or] North Fork Bank . . . of such breach and request that . . . North Fork Bank [or] the Sponsor . . . cure [the] breach within 90 days of its discovery . . . . If the Trustee receives written notice that . . . the Sponsor or . . . North Fork Bank, as the case may be, has not . . . cured such defect or breach in all material respects during such period, the Trustee, on behalf of the Trust, shall enforce . . . North Fork Bank's [or] the Sponsor's . . . obligation, as the case may be, under the applicable . . . North Fork Bank Assignment Agreement [or] the Mortgage Loan Purchasing Agreement . . . and cause . . . North Fork Bank [or] the Sponsor . . . to either (a) other than in the case of North Fork Bank, substitute for the related Mortgage Loan a Substitute Mortgage Loan . . . or (b) purchase such Mortgage Loan from the Trust . . . .

BAFC 2007-C PSA, §2.02.

### 2. U.S. Bank's Duties Upon the Occurrence of an Event of Default

49. U.S. Bank also had certain obligations under the Governing Agreements whenever it learned of an Event of Default. Under the Governing Agreements, the Covered Trusts' Master Servicers are required to supervise, monitor and oversee the Covered Trusts' Servicers to ensure that the Mortgage Loans are being properly and prudently serviced and administered. If there is no Master Servicer designated under the Governing Agreements, then one or more designated Servicers are required to ensure the proper and prudent service and administration of the Mortgage Loans. Either way, the Master Servicers and Servicers, and any sub-servicers they use, have the same ultimate duties under the Governing Agreements – to ensure that Mortgage Loans are properly and prudently serviced and administered. These duties include: ensuring that the payments by borrowers are timely and properly made, collected and submitted to the Covered Trusts; ensuring appropriate notices are sent to borrowers; ensuring appropriate insurance is in place when required; ensuring accurate information about the Mortgage Loans is maintained; and otherwise ensuring that the

- 24 -

Mortgage Loans are properly and prudently serviced and administered.    The Master

Servicers/Servicers are also responsible to ensure that, when necessary, loans are properly modified,

and collection and foreclosure proceedings occur prudently and correctly.  Thus, the BAFC 2007-C

PSA states in §3.01 that:

> *For and on behalf of the [RMBS]holders*, the Master Servicer shall supervise, monitor and oversee the obligations of the Servicers to service and administer their respective Mortgage Loans in accordance with the terms of the applicable Servicing Agreement . . . . *In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with this Agreement . . . and with Customary Servicing Procedures*.

BAFC 2007-C PSA, §3.01.[8]

50.    Both the BAFC 2007-C PSA quoted above, and the "Servicing Agreement" it

references, require the Master Servicer and Servicers to use certain "Customary Servicing

Procedures" when servicing the Mortgage Loans.  "Customary Servicing Procedures" are defined in

the Governing Agreements as follows:

> With respect to (i) any Servicer, procedures (including collection procedures) that a Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account and which are in accordance with *accepted mortgage servicing practices of prudent lending institutions servicing mortgage loans* of the same type as the Mortgage Loans in the jurisdictions in which the related Mortgaged Properties are located and (ii) the Master Servicer, those master servicing procedures that constitute *customary and usual standards of practice of prudent mortgage loan master servicers*.

BAFC 2007-C PSA, §1.01 ("Defined Terms" – "Customary Servicing Procedures") (Ex. A); *see*

*also* BAFC 2007-C SA, §2.01 (Servicing Agreement provides that "the Servicer shall service and

administer the . . . Mortgage Loans in accordance with . . . Customary Servicing Procedures")

(attached hereto as Ex. D).  Thus, the Governing Agreements require that both Master Servicers and

---

[8]    As previously noted, the Servicers for the WaMu Covered Trusts are also required to enforce the Warrantors' obligations to cure, substitute, or repurchase Mortgage Loans that breach the Warrantors' representations and warranties.  *See, e.g.*, WAMU 2006-AR19 PSA, §2.09 (Ex. E hereto).

Servicers perform their Mortgage Loan servicing duties in accordance with the customary standards and practices of "***prudent***" master servicers and servicers.  *Id*.[9]

51.     Under the Governing Agreements, Master Servicers or Servicers commit an Events of Default whenever they "***fail[] . . . to observe or perform in any material respect any . . . covenants or agreements of the Master Servicer [or Servicer, as applicable] set forth . . . in this Agreement***."  BAFC 2007-C PSA, §8.01(b).  In other words, if the Master Servicer or Servicer (or their sub-servicers, if any) fail to service the Mortgage Loans in the Covered Trusts pursuant to "Customary Servicing Procedures," *i.e*., as a "prudent" master servicer or servicer, an Event of Default occurs.  *See id.*[10]

52.     Because Master Servicer/Servicer Events of Default are so harmful to plaintiff and the class, when U.S. Bank becomes aware of an Event of Default it is required by the Governing Agreements to act quickly.  Upon becoming aware of an Event of Default, U.S. Bank is required by

---

[9]     In the Governing Agreements, all Master Servicers and Servicers are required to service the Mortgage Loans as "***prudent" master servicers or servicers would***.  Thus, the fact that some Governing Agreements call that standard "Customary Servicing Procedures," while other Governing Agreements call it "Acceptable Servicing Practices" or the like, is irrelevant because the standards are identical.  Each Governing Agreement defines the substance of the required standard of care for Master Servicers/Servicers as the usual and customary standards and practices of "***prudent***" master servicers or servicers within the industry.  *See, e.g.*, MLMI 2006-WMC2 PSA, Article 1 ("Definitions") ("Accepted Servicing Practices" defined as: "The Servicer's normal servicing practices, which will conform to ***the mortgage servicing practices of prudent mortgage lending institutions that service for their own account mortgage loans*** of the same type as the Mortgage Loans in the jurisdictions in which the related Mortgage Properties are located.") and §3.01 ("the Servicer shall service and administer the Mortgage Loans in accordance with the Accepted Servicing Practices") (excerpts of the relevant portions of the MLMI 2006-WMC2 PSA are attached as Ex. F hereto).

[10]     In the Governing Agreements where only a Servicer or Servicers are designated but no Master Servicer is designated, an Event of Default is still defined in a virtually identical manner: "any failure by the Servicer to observe or perform in any material respect any . . . of the covenants or agreements . . . contained in this Agreement."  *See, e.g.*, MLMI 2006-WMC2 PSA, §7.01(ii) (Ex. F hereto).  The same is true for the WaMu Covered Trusts and the Servicers' obligation to enforce the Warrantors' breaches of their representations and warranties.  *See, e.g.*, WaMu 2006-AR19 PSA, §7.01(a)(ii) (same) (Ex. E hereto).

the Governing Agreements: (1) to notify and request that the offending Master Servicer or Servicer remedy the Event of Default promptly (BAFC 2007-C PSA, §8.01(b) (requiring default to be cured within 30 days)); and (2) to "give prompt written notice" of an uncured Event of Default "to [RMBS]holders," *i.e.*, plaintiff and the class and others, such as the credit rating agencies. *Id.*, §8.01(f)(ii). Moreover, if the offending Master Servicer or Servicer does not timely cure its Event of Default, the Governing Agreements give U.S. Bank the power to terminate and replace the offending Master Servicer or Servicer, or take over its servicing duties. *Id.*, §§8.01(f)(i), 8.05(a).

> **3.    Upon the Occurrence of an Event of Default, U.S. Bank's Duties to Plaintiff and the Class Are Significantly Increased, as U.S. Bank Is Required to Prudently Protect Plaintiff's and the Class' Interests as Though They Were U.S. Bank's Own Interests**

53.    Moreover, once U.S. Bank becomes aware that a Master Servicer or a Servicer has committed an Event of Default that is not cured, U.S. Bank's duty of care and obligations owed to plaintiff and the class under both the Governing Agreements and the TIA are significantly heightened and increased. In the case of a known, uncured Event of Default, the Governing Agreements mandate that U.S. Bank "***shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a reasonably prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs***." BAFC 2007-C PSA, §9.01.[11] In other words, when U.S. Bank learns of an Event of Default it "***shall exercise" all*** of U.S. Bank's rights and powers as Trustee under the Governing Agreements to prudently protect all of plaintiff's and the class' interests as though those interests were U.S. Bank's very own interests. *Id.*

---

[11]    As discussed *infra*, the TIA also requires the same heightened, prudent person, standard of care when a default of any kind occurs.

54.     Moreover, this heightened duty is not limited or applied only to Master Servicer/Servicer Events of Defaults.  Instead, under the Governing Agreements, once an Event of Default occurs and exists, "*[U.S. Bank] shall exercise" all* of the "*rights and powers vested in it by th[e] [Governing] Agreement[s]*," not just those pertaining to the Master Servicers/Servicers.  *Id.* Thus, U.S. Bank's heightened duty also required it to enforce the representation and warranty claims against the Warrantors as though it were seeking to protect its own interests*.

### 4.     U.S. Bank's Duty of Trust to Avoid Conflicts of Interest with Plaintiff and the Class

55.     In addition to the duties U.S. Bank owes to plaintiff and the class under the Governing Agreements and the TIA, U.S. Bank also has a common law duty of trust to plaintiff and the class.  In other words, U.S. Bank, as "'the trustee[,] is at all times obligated to avoid conflicts of interest with the beneficiaries [of the Covered Trusts, *i.e.*, plaintiff and the class].'"  *Knights of Columbus v. The Bank of New York Mellon*, No. 651442/2011, slip op. at 15 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 30, 2013) (order granting in part and denying in part motion to dismiss) (quoting *AMBAC Indem. Corp. v. Bankers Trust Co.*, 573 N.Y.S.2d 204, 206-08 (Sup. Ct. 1991)).  Under this duty to avoid conflicts of interest, U.S. Bank is prohibited from advancing its own interests at the expense of plaintiff and the class, or benefitting from such actions, both before, during and after any default.  *Id.*

### 5.     U.S. Bank's Duties and Obligations Under the TIA

56.     Like the Governing Agreements, the TIA imposes two sets of duties and obligations on U.S. Bank as Trustee of the Covered Trusts – one set "prior to default," and the other set "in case of default."

57.     Prior to a default, under the TIA a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the Governing Agreements.  15 U.S.C. §77ooo(a)(1). This requirement reflects the Governing Agreements' pre-default mandate that U.S. Bank "perform

such duties and only such duties as are specifically set forth in this Agreement."  BAFC 2007-C PSA, §9.01(a).  Thus, pursuant to this provision of the TIA, U.S. Bank was required to perform the duties and obligations specifically assigned to it under the Governing Agreements, including all pre-default obligations related to the enforcement of the Warrantors' representations and warranties concerning the Mortgage Loans.

58.     In addition, under the TIA, a Trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Thus, under the TIA, U.S. Bank consequently was required to inform plaintiff and the class of any Master Servicer or Servicer Events of Default it was aware of within 90 days.  The TIA also required U.S. Bank to notify plaintiff and the class of the Warrantors' "defaults" within 90 days of their discovery, *i.e.*, their breaches of the representations and warranties they made concerning the Mortgage Loans.

59.     Moreover, whenever U.S. Bank was aware of a default, it was required under the TIA (just like the Governing Agreements) to exercise a heightened duty of care toward plaintiff and the class.  In such cases, ***U.S. Bank was required to exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs***."  15 U.S.C. §77ooo(c).  Thus, upon the occurrence of the Master Servicer and Servicer Events of Default and the Warrantors' breaches/defaults alleged herein, U.S. Bank was obligated to exercise this heightened "prudent man" standard of care to protect plaintiff and the class and exercise ***all*** of the "rights and powers vested in it by" the Governing Agreements as through U.S. Bank were attempting to protect its own interests.

60.     As set forth herein, U.S. Bank is liable to plaintiff and the class for failing to exercise the rights, powers, and duties conferred on it by the Governing Agreements and mandated by the TIA.  When U.S. Bank discovered numerous breaches of representations and warranties by the Warrantors and knew of numerous and continuing Events of Default by the Master Servicers/Servicers, as alleged herein, U.S. Bank was required to act both by the Governing Agreements and the TIA.  U.S. Bank's failure to act breached the Governing Agreements and violated the TIA, thereby causing plaintiff, the class and the Covered Trusts to suffer damages.

**C.    The Covered Trusts Suffer from Serious Defects Because of U.S. Bank's Failure to Properly Discharge Its Duties Under the Governing Agreements, the TIA and Common Law**

**1.    U.S. Bank Discovered as Early as 2009 but in No Event Later than April 13, 2011 that the Covered Trusts Were Filled with Thousands of Mortgage Loans that Breached the Warrantors' Representations and Warranties**

**a.    Shortly After the Covered Trusts Were Formed Information Arose that Raised Serious Questions About the Veracity of the Warrantors' Representations and Warranties**

61.     As previously alleged, the Warrantors of the Mortgage Loans in the Covered Trusts made numerous representations and warranties concerning the Mortgage Loans, attesting to their credit quality and characteristics, and the accuracy of the information they provided.  *See, e.g.*, *supra* ¶44; *see also* BAFC 2007-C MLPA, §§3-4; BAFC 2007-C AAR Transfer Agreement, §IV and Schedule I.  A chart of the Warrantors (and loan originators) to the Covered Trusts is set forth below:

**Covered Trusts' Warrantors**

| Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|
| | Loan Seller/Sponsor | Other Transferors | |
| BAFC 2007-C | ▪ Bank of America | ▪ North Fork Bank (prior owner of GreenPoint Mortgage Funding, Inc.) ("GreenPoint")) (North | ▪ National City Mortgage Co. ("National City") ▪ Bank of America |

| Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
| | Loan Seller/Sponsor | Other Transferors | |
|---|---|---|---|
| | | Fork Bank was subsequently acquired by Capital One) | <ul><li>Wells Fargo Bank, N.A. ("Wells Fargo")</li><li>Countrywide Home Loans, Inc. ("Countrywide")</li><li>JPMorgan Chase Bank, N.A. ("Chase Bank")</li></ul> |
| BNCMT 2007-2 | <ul><li>Lehman Brothers Holdings, Inc. ("Lehman")</li></ul> | <ul><li>None</li></ul> | <ul><li>BNC Mortgage ("BNC")</li></ul> |
| BSABS 2006-AC2 | <ul><li>EMC Mortgage Corporation ("EMC")</li></ul> | <ul><li>None</li></ul> | <ul><li>Union Federal Bank of Indianapolis</li><li>American Home Mortgage Corp. ("AHM")</li></ul> |
| BSABS 2006-AC5 | <ul><li>EMC</li></ul> | <ul><li>None</li></ul> | <ul><li>EMC</li><li>GreenPoint</li></ul> |
| GPMF 2007-AR1 | <ul><li>Lehman</li></ul> | <ul><li>GreenPoint</li></ul> | <ul><li>GreenPoint</li></ul> |
| GPMF 2007-AR2 | <ul><li>Lehman</li></ul> | <ul><li>GreenPoint</li></ul> | <ul><li>GreenPoint</li></ul> |
| GPMF 2007-AR3 | <ul><li>Lehman</li></ul> | <ul><li>GreenPoint</li></ul> | <ul><li>GreenPoint</li></ul> |
| HEAT 2006-5 | <ul><li>DLJ Mortgage Capital, Inc.</li></ul> | <ul><li>None</li></ul> | <ul><li>EquiFirst Corporation ("EquiFirst")</li><li>Encore Credit Corporation ("Encore")</li></ul> |
| HEAT 2006-6 | <ul><li>DLJ Mortgage Capital, Inc.</li></ul> | <ul><li>None</li></ul> | <ul><li>Encore</li><li>Ownit Mortgage Solutions, Inc. ("Ownit")</li><li>Decision One Mortgage Company LLC ("Decision One")</li><li>Lime Financial Services Ltd. ("Lime")</li></ul> |
| LXS 2006-10N | <ul><li>Lehman</li></ul> | <ul><li>Countrywide</li></ul> | <ul><li>Countrywide</li></ul> |

| Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
| | Loan Seller/Sponsor | Other Transferors | |
|---|---|---|---|
| | | • IndyMac Bank, FSB ("IndyMac") (IndyMac was seized by the FDIC and purchased by OneWest Bank in March 2009)<br>• SunTrust Mortgage, Inc. ("SunTrust")<br>• Bank of America<br>• Central Pacific Mortgage<br>• Coastal Capital Corp.<br>• GMAC Mortgage Corporation ("GMAC")<br>• Meridias Capital, Inc.<br>• Mortgage Store Financial, Inc.<br>• Mylor Financial Group, Inc.<br>• Pemmtek Mortgage Services, LLC<br>• Wall Street Mortgage Bankers<br>• Wells Fargo<br>• ACT Lending Corporation | • IndyMac<br>• Bank of America<br>• Lehman Brothers Bank FSB ("Lehman Bank")<br>• SunTrust |
| LXS 2006-15 | • Lehman | • Aurora Loan Services LLC ("Aurora")<br>• AHM<br>• Alliance Bancorp<br>• American Sterling Bank<br>• Bay Capital Corporation<br>• CentralPacific Mortgage<br>• Family Lending Services, Inc.<br>• First National Bank of Nevada<br>• GreenPoint<br>• Investors Trust Mortgage and Investments<br>• Loancity<br>• National Bank of Commerce<br>• Central California Bank & Trust<br>• NBC Bank | • Lehman Bank |

| Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
| | Loan Seller/Sponsor | Other Transferors | |
|---|---|---|---|
| | | <ul><li>First Market Bank</li><li>Commerce Finance Company</li><li>Residential Mortgage Capital</li><li>SIB Mortgage Corp.</li><li>Taylor, Bean & Whitaker</li><li>IndyMac</li><li>Pinnacle Financial Corporation</li><li>GMAC</li><li>Lehman Capital</li><li>Wells Fargo</li><li>SunTrust</li><li>Pinnacle Direct Funding Corp.</li><li>Bank of America</li></ul> | |
| LXS 2007-7N | <ul><li>Lehman</li></ul> | <ul><li>AHM</li><li>Countrywide</li><li>Quicken Loans Inc. ("Quicken")</li></ul> | <ul><li>AHM</li><li>Countrywide</li><li>Quicken</li><li>Lehman Bank</li></ul> |
| MABS 2006-HE2 | <ul><li>UBS Real Estate Securities, Inc.</li></ul> | <ul><li>New Century Mortgage Corporation ("New Century")</li><li>People's Choice Home Loan, Inc. ("People's Choice")</li><li>Mandalay Mortgage ("Mandalay")</li><li>First Street Financial ("First Street")</li><li>Fremont Investment & Loan ("Fremont")</li><li>American Lending Group ("ALG")</li><li>Option One Mortgage Corporation ("Option One")</li></ul> | <ul><li>New Century</li><li>People's Choice</li><li>Mandalay</li><li>First Street</li><li>Fremont</li><li>ALG</li><li>Option One</li></ul> |
| MLMI 2006-WMC2 | <ul><li>Merrill Lynch Mortgage Lending, Inc.</li></ul> | <ul><li>WMC Mortgage Corp. ("WMC")</li></ul> | <ul><li>WMC</li></ul> |
| SARM 2006-9 | <ul><li>Lehman</li></ul> | <ul><li>Accredited Home Lenders, Inc. ("Accredited")</li></ul> | <ul><li>Countrywide</li><li>Lehman Bank</li></ul> |

| Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|
| | Loan Seller/Sponsor | Other Transferors | |
| | | ▪ Alliance Bancorp <br> ▪ AHM <br> ▪ Central Pacific Mortgage <br> ▪ Countrywide <br> ▪ CCO Mortgage Corp. <br> ▪ E-Loan Mortgage <br> ▪ Irwin Mortgage Corp. <br> ▪ Loan Link Financial Services <br> ▪ PHH Mortgage Corp. ("PHH") <br> ▪ Bishop's Gate Residential Mortgage Trust <br> ▪ Residential Mortgage Capital | |
| SASC 2006-NC1 | ▪ Lehman | ▪ NC Capital Corporation ("New Century") | ▪ New Century |
| SASC 2006-WF2 | ▪ Lehman | ▪ Wells Fargo | ▪ Wells Fargo |
| SASC 2006-WF3 | ▪ Lehman | ▪ Wells Fargo | ▪ Wells Fargo |
| SASC 2007-EQ1 | ▪ Lehman | ▪ EquiFirst | ▪ EquiFirst |
| SASC 2007-WF1 | ▪ Lehman | ▪ Wells Fargo | ▪ Wells Fargo |
| WMALT 2006-AR4 | ▪ Washington Mutual Mortgage Securities Corp. | ▪ None | ▪ Countrywide <br> ▪ GMAC <br> ▪ First Magnus Financial Corporation |
| WAMU 2006-AR13 | ▪ Washington Mutual Bank and Washington Mutual Bank fsb ("WaMu") | ▪ None | ▪ WaMu |
| WAMU 2006-AR17 | ▪ WaMu | ▪ None | ▪ WaMu |
| WAMU 2006-AR19 | ▪ WaMu | ▪ None | ▪ WaMu |
| WAMU 2007-OA2 | ▪ WaMu | ▪ None | ▪ WaMu |

62.     Many of the Warrantors also served as Master Servicers/Servicers to the Covered Trusts as well.  Thus, many Warrantors also serviced the very Mortgage Loans they originated and/or warranted.  These entities' and the Master Servicers'/Servicers' loan servicing misconduct amounting to Events of Default are alleged *infra*, in §IV.C.2.

63.     In the years following the Covered Trusts' formation and the global financial collapse that occurred immediately thereafter, numerous news stories were written on the causes of the financial catastrophe.  Most blamed the residential mortgage lending industry and Wall Street banks for the systemic corruption of lending standards, and pervasive mortgage fraud that caused the global financial collapse.  Facts began to emerge indicating endemic misconduct within the lending industry at the time the Mortgage Loans were originated and transferred to the Covered Trusts, which in turn indicated the Warrantors' representations and warranties about the Mortgage Loans were false.

64.     For example, around the time the Covered Trusts were formed, a study cited by the Mortgage Asset Research Institute found that almost ***all*** "stated income" loans exaggerated the borrower's actual income by 5% or more, ***and more than half overstated income by at least 50%***. The Covered Trusts contained numerous stated income Mortgage Loans and the reported pervasive falsification of income put the Warrantors' representations and warranties in doubt.[12]  In addition, in October 2007, Alan Hummel ("Hummel"), the Chair of the Appraisal Institute, testified to a U.S. House Committee concerning rampant, falsely inflated real estate appraisals.  Hummel testified to how ***appraisers "experience[d] systemic problems with coercion" and were "ordered to doctor***

---

[12]     "Stated income" loans were designed for self-employed borrowers who could not provide paycheck stubs which could be used to easily verify their income.  Such borrowers would "state" their income, which was then supposedly checked by the lender for reasonableness.  Unfortunately, during the time period when the Mortgage Loans in the Covered Trusts were originated, lenders abused stated income loans by using them for numerous ***non***-self-employed borrowers, and by falsely inflating their incomes.

their reports" or else they would never "see work . . . again" and/or would be placed on "'exclusionary appraiser lists.'" This was another indicator that there was endemic misconduct that would have impacted the veracity of the Warrantors' representations and warranties. In addition, on December 30, 2007, *The Kansas City Star* published an article titled "American dreams built on a shaky foundation of subprime loans." The news article reported a systematic abandonment of loan origination standards by lenders during 2005-2007, the same time period when the Mortgage Loans were originated. Kurt Eggert, a law professor and member of the Federal Reserve's Consumer Advisory Panel was quoted: "'**Originators were making loans based on quantity rather than quality . . . . They made loans even when they didn't make sense from an underwriting standpoint**.'" The news article further stated: "Mark Duda, a research affiliate at Harvard University's Joint Center for Housing Studies, said that because **brokers were so intent to quickly sell off loans to investors, they had little incentive to make sure the loans were suitable for borrowers. 'They were setting people up to fail**,' Duda said." This news of "**systemic problems**" with inflated appraisals and widespread abandonment of sensible loan underwriting standards indicated that the Warrantors' representations and warranties, about the credit quality and characteristics of the Mortgage Loans, and the circumstances of their originations, were suspect.

65.     There were numerous other news articles in 2007 and thereafter that further detailed the same and other widespread abuses within the lending industry that were occurring at the time the Mortgage Loans were originated and transferred to the Covered Trusts. These reports detailed pervasive falsifications of borrowers' incomes, assets and debts, inflated appraisals, false occupancy statuses, fake FICO scores, failures to follow applicable loan underwriting guidelines, and the lending of money to borrowers who could not afford to repay their loans or never intended to repay them. The foregoing abuses were huge "red flags" indicating that the representations and warranties

made by the Warrantors about the Mortgage Loans were likely false.  This is so because, as previously alleged, the Warrantors had represented and warranted that the Mortgage Loans had certain credit characteristics, were legally made and were originated pursuant to certain underwriting guidelines, and that all of the information they provided about the Mortgage Loans was true and correct.  The rampant lending fraud that was being reported throughout the industry at the time the Mortgage Loans were originated and transferred to the Covered Trusts put the veracity of those representations and warranties in grave doubt.

66.     The facts that were publicly available to U.S. Bank in the period immediately after the Covered Trusts were formed indicated that the truth of the Warrantor's representations and warranties about the Mortgage Loans in the Covered Trusts was questionable.   Additional information became public thereafter which made it certain that the Warrantors' representations and warranties were false.

**b.     In 2007 and 2008, Facts Emerged Indicating that Many of the Warrantors Had Routinely Made False Representations and Warranties**

67.     During 2007 and thereafter, additional information about the specific Warrantors and loan originators to the Covered Trusts began to become public, indicating that any representations and warranties about their Mortgage Loans were likely false.  For example, in March 2007, the FDIC issued a "cease and desist" order (the "FDIC March 7 Order") against Fremont, a Warrantor and loan originator for at least one of the Covered Trusts formed in 2006.  The FDIC required Fremont to end its subprime loan business, due to "unsafe or unsound banking practices and violations of law," including operating with "a large volume of poor quality loans"; "unsatisfactory lending practices"; "excessive risk"; and "inadequate capital."   FDIC March 7 Order at 2-3; *see also* U.S. Senate Permanent Subcommittee on Investigations Report entitled "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse," issued on April 13, 2011 (hereinafter the "Senate Report") at 238.

The FDIC determined that Fremont lacked effective risk management practices, lacked adequate mortgage underwriting criteria, and was "approving loans . . . with loan to-value ratios approaching or exceeding 100 percent of the value of the collateral."  FDIC March 7 Order at 4; Senate Report at 23.  In addition, the FDIC concluded that Fremont had been engaging in predatory lending practices, by "*marketing and extending [ARM] products to subprime borrowers in an unsafe and unsound manner" that "greatly increase[d] the risk that borrowers will default*."  FDIC March 7 Order at 3.  The FDIC further found that Fremont was "*approving borrowers without considering appropriate documentation and/or verification of their income . . . [and] making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms*."  *Id.* at 3-4.  The FDIC's findings indicated that any representations of warranties concerning Fremont loans were likely false.

68.     In addition, on October 4, 2007, the Massachusetts Attorney General brought an enforcement action against Fremont.  The action against Fremont was for "unfair and deceptive business conduct" *on a broad scale*.  Complaint, *Commonwealth of Massachusetts v. Fremont Investment & Loan, et al.*, No. SUCV2007-4373 (Mass. Super. Ct., Suffolk Cnty. Oct. 4, 2007) (the "*Fremont* Complaint"), ¶1.  According to the *Fremont* Complaint, *Fremont: (a)"approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; (b)"approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; (c)"failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; (d)"approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; (e)"consistently failed to monitor or*

- 38 -

*supervise brokers' practices or to independently verify the information provided to Fremont by brokers"; and (f)"ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores*." *Fremont* Complaint, ¶¶24-25, 35, 139. These charges further indicated that representations and warranties concerning Fremont's loans were likely false.[13]

69.     Then, in August 2007, a lawsuit was filed against the parent company of Accredited, a Warrantor for at least one of the Covered Trusts formed in 2006. Shareholders of Accredited's parent company, Accredited Home Lenders Holding Co., sued, alleging that the defendants committed securities fraud by lying about the company's financial condition. *See* Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *Atlas v. Accredited Home Lenders Holding Co., et al.*, No. 3:07-cv-00488-H-RBB (S.D. Cal. Aug. 24, 2007) (the "*Atlas* Complaint"). In the *Atlas* Complaint, the plaintiffs cited to reports from at least 12 former Accredited employees. Those former employees reported a pervasive and systematic disregard by Accredited of its loan underwriting guidelines, and thus its representations and warranties, including the following:

- According to a former Corporate Underwriter who worked at Accredited between June 2004 and March 2005, "*the Company approved risky loans that did not comply with its own underwriting guidelines*"; his *rejections of loans "were frequently overridden by managers* on the sales side of the business"; and his overridden loan rejections involved *loans containing improper "'straw borrower[s],'" employment*

---

[13]   On December 9, 2008, a Massachusetts appeals court affirmed the lower court's order enjoining Fremont from foreclosing on thousands of its loans issued to Massachusetts residents. The appellate court found that the factual record supported the lower court's conclusions that "*Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow*." *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556, 558 (Mass. 2008. The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009. These findings by the courts further supported the conclusion that any representations or warranties that Fremont or anyone else made about its mortgage loans were probably false.

*that could not be verified, inflated incomes, and violations of Accredited's debt-to-income ("DTI"), credit score, loan-to-value ("LTV") and employment history requirements*. *Atlas* Complaint, ¶¶48-49.

- According to a former Accredited employee from 1998 until December 2006, *pressure to approve loans, regardless of quality, was especially bad from mid-2005 until the time she left the company at the end of 2006*, and Accredited's growing *issues with problem loans was due to management's overrides of the underwriting and appraisal processes*. *Id.*, ¶¶50-51.

- According to a former Corporate Underwriter at Accredited from August 2003 until February 2006, *her decisions to reject loans were constantly overridden by management, and that such overrides "were rampant."* *Id.*, ¶¶56-57.

- According to a former Accredited Regional Manager who worked at the company throughout 2005, "*the Company's underwriting guidelines were frequently overridden by senior management*." *Id.*, ¶¶58-60.

- According to other former Accredited employees who worked at the company during 2004-2007, *management frequently overrode underwriters' decisions to reject loans that did not comply with the underwriting guidelines. According to one underwriter, when underwriters challenged the overrides they were told by management: ""You have to go forward with it." If you made a big stink about it, they would raise their eyebrows and say "Do you want a job?"""* Other former employees *recounted loan applications that were approved with inflated incomes, inflated appraisals, and suspicious verifications of employment*. *Id.*, ¶67.

- Several former Accredited employees who worked with appraisals reported that the company *management overrode licensed appraisers' decisions and approved many loans based on inflated appraisals*. *Id.*, ¶77.

- A former Accredited employee reported that Accredited frequently made exceptions to their underwriting guidelines. According to this former employee, *it was common to see multiple exceptions per loan*. *Id.*, ¶83.

Accredited ultimately paid $22 million to settle the lawsuit in 2010. The foregoing accounts by former Accredited employees made it clear that, given Accredited's culture, any representations or warranties about its loans were probably false.

70.     In November 2007, news reports surfaced about WaMu, which was a Warrantor and loan originator for at least five Covered Trusts through itself and its subsidiary Washington Mutual Mortgage Securities Corp. *Dow Jones News Service* reported that the Attorney General of New

York had sued WaMu and another firm, alleging that WaMu and the other firm "'collud[ed]' . . . to inflate the appraisal values of homes." This was an indicator that WaMu's representations and warranties were likely false.

71.     Furthermore, defendant U.S. Bank admitted, in a lawsuit that it filed in 2009, that in "*early 2008*" it had become aware of massive breaches of representations and warranties by GreenPoint, a Warrantor and/or loan originator for at least six Covered Trusts through itself or its one-time owner, North Fork Bank. According to U.S. Bank's lawsuit, it sought the repurchase of "*nearly 30,000 residential mortgage loans*" by GreenPoint due to breaches of GreenPoint's representations and warranties. *U.S. Bank alleged that it was "informed" in "early 2008" that an astounding "93% of a sample of 1,030 Loans . . . did not comply with GreenPoint's representations and warranties*." Complaint, *U.S. Bank, N.A., et al. v. GreenPoint Mortgage Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 5, 2009), ¶¶1, 35. U.S. Bank further alleged in the complaint that the breaches of GreenPoint's representations and warranties consisted of "*pervasive*" misrepresentations concerning borrowers' incomes, assets and employment, "*pervasive violations of GreenPoint's own underwriting guidelines*," numerous misrepresentations about borrowers' intent to occupy the properties, and many falsely inflated appraisals. *Id.*, ¶35. U.S. Bank asserted in the complaint that GreenPoint could not be trusted when it came to the truthfulness of any of its representations and warranties: "*The large number and seriousness of the breaches . . . suggest a pervasive pattern of malfeasance, misconduct and/or negligence in connection with GreenPoint's loan-origination practices as a whole*." *Id.*, ¶36. U.S. Bank demanded that GreenPoint repurchase "all" of the "nearly 30,000 residential mortgage loans" warranted by

GreenPoint. *Id.*, ¶¶1, 34 and "Prayer for Relief," ¶A.  Thus, U.S. Bank believed by "early 2008" that representations and warranties by GreenPoint "*as a whole*" were false. [14]

72.     In the same complaint U.S. Bank filed against GreenPoint in 2009, U.S. Bank also acknowledged its grave concerns about the veracity of Countrywide, another Warrantor and/or loan originator for at least five Covered Trusts.  In the complaint, U.S. Bank cited to another lawsuit against Countrywide alleging fraudulent lending practices, and quoted portions of the court's May 2008 decision denying a motion to dismiss that case by Countrywide.  U.S. Bank alleged that in May 2008 the court "*not[ed] that former Countrywide employees credibly 'tell what is essentially the same story – a rampant disregard for underwriting standards' and 'support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards*.'"  *Id.*, ¶15 n.8.  U.S. Bank further alleged that Countrywide also could not be trusted: "*Countrywide and its management are currently subject to myriad investigations and actions, some of which have already settled, for having engaged in systematic fraud in connection with the origination of residential mortgage loans*."  *Id.*, ¶15.  Thus, U.S. Bank believed in February 2009 (when it filed the complaint), that Countrywide's "*systematic fraud in*

___

[14]   U.S. Bank's knowledge that GreenPoint's representations and warranties were false "as a whole" was reconfirmed in another, subsequent lawsuit U.S. Bank filed against GreenPoint in July 2013.  In that lawsuit, U.S. Bank, as trustee of a different RMBS trust, again sued GreenPoint for breach of its representations and warranties.  U.S. Bank alleged that a review of the loans in that case revealed that *at least 82% of the loans breached GreenPoint's representations and warranties*.  *See* Complaint, *U.S. Bank N.A. v. GreenPoint Mortgage Funding, Inc.*, No. 13-cv-4707 (S.D.N.Y. July 8, 2013), ¶¶6, 37.  U.S. Bank alleged that there were numerous breaching loans due to lending fraud, misrepresentations and omissions, and the failure to comply with GreenPoint's underwriting guidelines.  *Id.*, ¶65.  U.S. Bank also confirmed its knowledge that GreenPoint's representations and warranties were generally and uniformly false by alleging that the breaches it found were "*systemic," "numerous" and "material*."  *Id.*, ¶¶65, 74, 84, 87.  Given U.S. Bank's allegations against GreenPoint and the extremely high breach rates it found – 93% and 82% – U.S. Bank *knew* that GreenPoint's representations and warranties about the Covered Trusts' Mortgage Loans were similarly false.

*connection with the origination of residential mortgage loans*," would logically result in **systematic** false representations and warranties about Countrywide's loans.[15]

73.      Also in early 2008 (and in 2009), Wells Fargo – a Warrantor and/or loan originator for at least six of the Covered Trusts – was sued by two cities alleging that Wells Fargo abandoned its underwriting guidelines and made fraudulent loans.  In 2008, the lawsuit titled *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A. et al.*, No. 08-cv-00062-JFM (D. Md.) ("*City of Baltimore*") was filed, wherein the City of Baltimore alleged that Wells Fargo extended loans without regard to "the borrower's ability to repay."  Third Amended Complaint, *City of Baltimore*, ¶3.  The lawsuit also alleged that borrowers' incomes were falsified.[16]  The *City of Memphis* and *City of Baltimore* complaints **included sworn declarations from former Wells Fargo employees** which provided direct evidence of illegal predatory lending and the abandonment of underwriting guidelines, both breaches of Wells Fargo's loan representations and warranties.  For instance, Camille Thomas, a loan processor at Wells Fargo from January 2004 to January 2008, stated under oath that loans were granted based on inflated appraisals, which allowed borrowers to get larger

---

[15]    Based on this apparent knowledge, U.S. Bank, as trustee of another RMBS trust, subsequently filed a lawsuit against Countrywide in 2011 for breaches of its loan representations and warranties. U.S. Bank alleged that a sample of the loans in the trust at issue in that case revealed that *66% of the loans breached Countrywide's representations and warranties*.  *See* Complaint, *U.S. Nat'l Bank, N.A. v. Countrywide Home Loans, Inc., et al.*, No. 652388/2011 (N.Y. Sup. Ct., N.Y. Cnty. Aug. 29, 2011).  U.S. Bank alleged that "*[d]uring the time period in which Countrywide originated the Loans, it completely ignored its underwriting guidelines*."  *Id.*, ¶36.  U.S. Bank further alleged that the breaches were caused by "*Countrywide's systemic failure to comply with its underwriting guidelines*," that U.S. Bank had "clear evidence of *pervasive* misrepresentations throughout the mortgage pool," and that the documentation Countrywide provided about the loans were "*replete with untrue statements and omissions of material fact*," thereby requesting the Court to order Countrywide to repurchase *every single loan in the trust*.  *Id.*, ¶¶64-65.  This lawsuit also graphically illustrated that U.S. Bank *knew* Countrywide generated "systemic[ally]" false representations and warranties.

[16]    On April 7, 2010, the City of Memphis filed its First Amended Complaint in *City of Memphis v. Wells Fargo Bank N.A.*, No. 09-cv-02857-STA-CGE (W.D. Tenn. Apr. 7, 2010), alleging that Wells Fargo "fail[ed] to underwrite African-American borrowers properly."  *Id.*, ¶7.

loans than they could otherwise qualify for or afford due to the falsely inflated appraisals' impacts on the LTV ratio calculations. Thomas also stated that some loans were granted based on falsified income documents. Similarly, another affidavit by Doris Dancy, a credit manager at Wells Fargo from July 2007 to January 2008, stated that managers put pressure on employees to convince people to apply for loans, even if the person could not afford the loan or did not qualify for it. She was also aware that loan applications contained false data, used to qualify customers for loans. The foregoing evidence, along with additional, similar affidavits by other former Wells Fargo employees that were filed in the cases, indicated that any representations or warranties by Wells Fargo concerning its mortgage loans were probably false.

74.     Similarly, on February 5, 2008, *The Oregonian* published a news story on Encore, a loan originator for at least two of the Covered Trusts. Encore is ultimately owned by JPMorgan Chase & Co. ("JPMorgan"), which also owns Warrantors and/or loan originators Chase Bank, EMC and WaMu and its former subsidiaries. The news article documented that Encore ignored its stated underwriting guidelines, falsified incomes, did not determine whether borrowers could afford to repay their loans, forged documents, and put borrowers into loans they obviously could not afford to repay. *The Oregonian* recounted the story of borrower Paul Hoffhine Jr., a mentally disabled man who subsisted on Social Security payments of $624 per month. Hoffhine had inherited a house from his parents in the 1980s that was completely paid for. In February 2004, Encore cold-called Hoffhine and talked him into taking out a loan on the property so that Hoffhine could take equity out of the property in the form of cash. The loan had monthly payments of $489.46. Thus, Hoffhine's DTI ratio was over 78% based solely on the mortgage loan extended by Encore (the $489.46 loan payment divided by Hoffhine's monthly $624 Social Security payment equals 78.4%). Hoffhine's other debts were not used to calculate the 78+% DTI ratio above, and therefore, if he had other

- 44 -

debts, his DTI ratio would have been even higher.  However, the 78%+ DTI ratio was far in excess of any lender's underwriting guidelines at that time, and far in excess of Encore's underwriting guidelines limits of between 50% and 55%.  Clearly, Encore was not following its stated underwriting guidelines.

75.     Even worse, according to *The Oregonian*, a few months later, in December 2004, Encore persuaded Hoffhine to refinance and take out a new loan.  The monthly payment on the new loan increased to $617 per month, just $7 less than Hoffhine's entire monthly income, thus generating a DTI ratio of over 98%.  Thus, on the second loan, Encore again ignored its stated underwriting guidelines requiring DTI ratios of 55% or less, and gave Hoffhine a loan which generated a DTI ratio of over 98%, far in excess of the stated DTI ratio maximums under Encore's underwriting guidelines, and far beyond Hoffhine's ability to repay.

76.     Even more disturbing was the fact that Encore had engaged in forgery.  *The Oregonian* reported that, in Hoffhine's loan file, there was "a document claiming that Hoffhine was earning $3,500 a month as a handyman . . . [u]nderneath [which was] a scrawled signature – Paul Hauck Hoffhine Jr."  The news article reported that Hoffhine denied making the statement or signing the document, which was an obvious forgery containing fraudulent information.  The article quoted Hoffhine as follows concerning the bogus document: "'They forged my signature, [and] they inflated my income.'"  After being threatened with a lawsuit, Encore quickly and quietly settled with Hoffhine.  The foregoing conduct by Encore indicated that any representations or warranties made about its loans would in all likelihood be false.

77.     Also in February 2008, the examiner in the bankruptcy of New Century – a Warrantor and loan originator for two of the Covered Trusts through its related companies – filed a detailed report concerning New Century's demise, after reviewing "a large volume of documents" from

- 45 -

numerous sources and interviewing over 100 fact witnesses.  *See* Final Report of Michael J. Missal,

*In re: New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr. D. Del. Feb. 29, 2008) ("Examiner's

Report") at 14, 16.   The examiner confirmed that New Century had a culture that encouraged

ignoring its underwriting guidelines and the making of false representations and warranties.   The

examiner, after his comprehensive fact-gathering process, "conclude[d] that New Century engaged

in a number of significant improper and imprudent practices related to its loan originations."  *Id.* at

2.   Among other things, the examiner found that:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy . . . and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.'" *Id.* at 3.

- "***The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007***."  *Id.*

- "***New Century . . . layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers***."  *Id.*

- A New Century employee had informed the company's senior management that, ***under New Century's underwriting guidelines***, "'***we are unable to actually determine the borrowers' ability to afford a loan***.'"  *Id.*

- "***New Century also made frequent [unmerited] exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan***," so much so that a senior officer of New Century warned internally that the "'number one issue is exceptions to guidelines.'"  *Id.* at 3-4.

- New Century's Chief Credit Officer had noted as early as 2004 that ***New Century had* "'*no standard for loan quality***.'"  *Id.* at 4  "'[L]oan quality'" referred to "New Century's loan origination processes, which were supposed to ensure that New Century loans met its own internal underwriting guidelines."  *Id.* at 109.

- "***Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of [New Century's] Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized . . . .***"  *Id.* at 4.

- ***A large number of New Century's loans did not meet its underwriting guidelines, suffering from defects such as "defective appraisals, incorrect credit reports and missing documentation*.**"  *Id.* at 109.

- From 2003 forward, New Century's Quality Assurance and Internal Audit departments identified "significant flaws in New Century's loan origination processes."  *Id.* at 110.

- Notwithstanding all the foregoing facts, New Century's Board of Directors and Senior Management did little to nothing to remedy the company's abandonment of its stated underwriting guidelines.  *Id.*

The foregoing findings by the bankruptcy examiner revealed that New Century routinely originated loans without following its underwriting guidelines, thereby likely rendering any representations and warranties about its loans false.

78.     In March 2008, *The Oregonian* published another news article on lending abuses, this time on Chase Bank, a loan originator for at least one Covered Trust, and a wholly owned subsidiary of JPMorgan.  *The Oregonian* reported that it had obtained a copy of an internal Chase Bank memo which was titled "'Zippy Cheats & Tricks.'"  According to *The Oregonian*, the Chase Bank memo was "a primer [for loan brokers] on how to get risky mortgage loans approved by Zippy, Chase's in-house automated loan underwriting system.  ***The secret to approval?  Inflate the borrowers' income or otherwise falsify their loan application***."  The news article reported that the Chase Bank memo coached brokers on how to conceal disqualifying information on loan applications and encouraged the false inflation of borrowers' incomes and assets.  The article further stated: "***The Chase memo is 'a perfect example of one of the big five banks out and out telling mortgage brokers to commit fraud*,**' said Todd Williams, a broker . . . in Portland.  '***And this has been going on for years***.'"  The foregoing information indicated that Chase Bank had a routine business practice that made it likely that its loan representations or warranties would be false.  Also, given that Chase Bank was owned and controlled by JPMorgan, any loan representations and warranties by the other JPMorgan-

controlled affiliates at that time, such as Warrantor EMC,  and loan originator Encore, were likely false too.

79.    Also in March 2008, an article appeared in *The Wall Street Journal* concerning the criminal conviction of AHM sales executive Kourash Partow.  AHM was a Warrantor and/or loan originator for at least four of the Covered Trusts.  Partow admitted that he falsified borrowers' incomes and assets in order to get loans approved.  After his conviction, Partow, who worked for Countrywide before joining AHM, sought a lighter sentence on the grounds that both of his former employers – ***Countrywide (which was also a Warrantor and/or loan originator to at least five of the Covered Trusts) and AHM – had knowledge of the falsified incomes and assets and <u>in fact encouraged manipulation by intentionally misrepresenting the performance of the loans and the adequacy of how the loans were underwritten</u>***.  The import of this article was that AHM's and Countrywide's regular business practices made it likely that any representations and warranties about their loans were false.

80.    In May 2008, *National Public Radio* broadcast a segment on a company called Watterson-Prime.  Watterson-Prime was hired by numerous Wall Street RMBS securitizers – including nearly all of the Loan Sellers/Sponsors to the Covered Trusts – to test samples of the loans they were securitizing.  Watterson-Prime's job was to identify any loans which did not comply with the applicable underwriting guidelines or had other defects.  In the radio broadcast, a former Watterson-Prime employee, Tracy Warren, was interviewed and stated that Watterson-Prime's largest customer was Bear Stearns, which included EMC and Encore, Warrantors and/or loan originators for at least four Covered Trusts (Bear Stearns was owned by JPMorgan at the time of the broadcast).  She recounted obvious fraudulent loan applications where hotel workers claimed $15,000 per month in income.  She stated that whenever she would reject deficient loan files, her

supervisors would usually overrule her and approve the loans.  She recalled loans to borrowers with terrible credit scores and falsified incomes which she rejected, only to be overruled by her supervisors who would say "'Oh, it's fine.  Don't worry about it.'"  *Warren stated that about 75% of the loans which should have been rejected were purchased and securitized nonetheless*.  This information confirmed that EMC's and Encore's normal business practices made it likely that any representations and warranties about their loans would be false.

81.    In June 2008, WMC – a Warrantor and loan originator for at least one of the Covered Trusts – was charged by the state of Washington for lending misconduct.  Washington filed a Statement of Charges against WMC (*see* Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit from Industry, Impose Fine, Order Restitution and Collect Investigation Fee, No. C-07-557-08-SC01 (Wash. Dep't Fin. Inst. June 4, 2008)), for deceptive and unfair lending practices.  The Statement of Charges alleged that *the Washington State regulator reviewed 86 loans extended by WMC and found that 76 of them were defective or otherwise violated Washington State law – a defect rate of over 88%*.  This indicated that any representations or warranties made concerning WMC loans were probably false.

82.    Also in June 2008, the Massachusetts Attorney General sued Option One – a Warrantor and loan originator for at least one Covered Trust.  The Massachusetts Attorney General alleged that, beginning in 2004, Option One "increasingly disregarded underwriting standards, created incentives for loan officers and brokers to *disregard the interests of the borrowers and steer them into high-cost loans, and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay*, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."  *See* Complaint, *Commonwealth of*

*Massachusetts v. H&R Block, Inc., et al.*, No. SUCV2008-2474 (Mass. Super. Ct., Suffolk Cnty. June 3, 2008), ¶4. The Massachusetts Attorney General alleged that *Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home*," and that *Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices*." *Id.*, ¶8. As a result, *Option One's "origination policies . . . employed from 2004 through 2007 have resulted in an explosion of foreclosures*." *Id.*, ¶10. Option One's routine business practices indicated that any representations or warranties concerning its loans were probably false.[17]

83.       Further, on June 30, 2008, the Center for Responsible Lending ("CRL") issued a report by Mike Hudson, entitled "IndyMac: What Went Wrong? How an 'Alt-A' Lender Fueled its Growth with Unsound and Abusive Mortgage Lending" (the "CRL Report"). The subject of the report – IndyMac – was a Warrantor and/or loan originator for two of the Covered Trusts. The CRL Report, which was based on information obtained from 19 former IndyMac employees, concluded that *IndyMac "engaged in unsound and abusive lending" and "routinely [made] loans without regard to borrowers' ability to repay*." CRL Report at 2. According to the CRL Report, IndyMac's normal loan origination process – which consisted of ignoring borrowers' ability to repay the loans as well as IndyMac's underwriting guidelines – was *not "caused by rogue brokers or by borrowers who lied*." *Id*. at 1. Instead, this institutionalized practice was "*spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul*." *Id.* Indeed, the CRL Report described the atmosphere at IndyMac as one "*where the hunger*

_____

[17]   In November 2008, the Suffolk County Superior *Court granted a preliminary injunction in favor of the Massachusetts Attorney General, finding that "certain mortgage loans [issued by Option One] were 'presumptively unfair,' because they posed an unreasonable risk of default and foreclosure." The preliminary injunction was subsequently affirmed on appeal*, and Option One's parent company eventually agreed to *pay $125 million to settle the suit*.

*to close loans ruled" and the routine "push[ing] through [of] loans based on bogus appraisals and*

*income data that exaggerated borrowers' finances*." *Id.* at 2.  The CRL Report contained accounts

from former IndyMac employees which clearly demonstrated the bank's institutional disregard for

its own stated underwriting and appraisal guidelines as well as borrowers' abilities to repay their

loans.  Among other things, the CRL Report provided the following information:

- Audrey Streater, a former underwriter and underwriting team leader for IndyMac in New Jersey, stated in an interview: "'***I would reject a loan and the insanity would begin,' . . . 'It would go to upper management and the next thing you know it's going to closing. . . . I'm like, "What the Sam Hill? There's nothing in there to support this loan*.'''"  *Id.* at 3.

- According to a former IndyMac vice president, former IndyMac CEO ("Chief Executive Officer") Michael Perry ("Perry") and other ***top managers "focused on increasing loan volume 'at all costs,' putting pressure on subordinates to disregard company policies and simply 'push loans through*.'''  *Id.*

- According to another former IndyMac employee, Perry once told him "'"business guys rule"'" and "'[expletive deleted] you to compliance guys,'" from which this former employee concluded that IndyMac was about "'"production and nothing else.'"  *Id.* at 4.

- According to Wesley E. Miller, a former underwriter for IndyMac in California, "***when he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed*."  *Id.* at 9.

- According to Scott Montilla, a former underwriter for IndyMac in Arizona, "***when salespeople went over his head to complain about loan denials, higher-ups overruled his decisions roughly half of the time*."  *Id.*

- Montilla further stated in an interview: "'I would tell them: "If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it" . . . . ***There were some loans that were just blatantly overstated*.'"  *Id.* at 10.

The foregoing information made it clear that IndyMac's institutionalized lending abuses made it

likely that representations and warranties about its loans were false.[18]

---

[18]   Subsequently, on July 11, 2008, IndyMac was closed by the Office of Thrift Supervision ("OTS") and taken under the control of the Federal Deposit Insurance Corporation ("FDIC").  On February 26, 2009, the Office of Inspector General ("OIG") of the U.S. Department of Treasury issued a report, entitled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the

84.     In November 2008, *Business Week* published an expose on the mortgage industry based on the accounts of numerous former industry participants.  It confirmed that a systemic breakdown in lending standards and rampant fraud occurred when the Mortgage Loans were originated and transferred to the Covered Trusts.  The *Business Week* article reported that "[c]ourt documents and interviews with scores of industry players suggest that [loan] wholesalers . . . ***offered bribes*** to fellow employees [to approve unacceptable loan applications], ***fabricated documents, and coached brokers on how to break the rules***. . . .  [Loan] [b]rokers, who work directly with borrowers, ***altered and shredded documents***.  [Loan] [u]nderwriters, the bank employees who actually approve mortgage loans, also skirted boundaries, ***demanding secret payments from wholesalers to green-light loans they knew to be fraudulent***."  The *Business Week* article quoted a former Wells Fargo loan wholesaler (Wells Fargo was a Warrantor and/or loan originator for six of the Covered Trusts) who admitted "***he regularly used the copiers at a nearby Kinko's to alter borrowers' pay stubs and bank account statements.  He would embellish job titles – turning a gardener, for instance, into the owner of a landscaping company – and inflate salaries***."  This former Wells Fargo employee stated: "'***I knew how to work the system***.'"  The same *Business Week*

---

"OIG Report").  The OIG Report, like the CRL Report, found that "***IndyMac's business model was to produce as many loans as possible and sell them in the secondary market,*** *i.e.*, to banks such as the Covered Trusts' Loan Sellers/Sponsors".  OIG Report at 21.  According to the OIG Report, "***[t]o facilitate this level of [loan] production . . . IndyMac often did not perform adequate underwriting***."  *Id.*  Indeed, IndyMac frequently made loans with "***little, if any, review of borrower qualifications, including income, assets, and employment***."  *Id.* at 11.  As a result, the OIG concluded that ***IndyMac's loans "were made to many borrowers who simply could not afford to make their payments***."  *Id.* at 2.  Moreover, according to the OIG Report, "[a]ppraisals obtained by IndyMac on underlying collateral were often questionable as well."  *Id.*  The OIG Report found that "IndyMac officials accepted appraisals that were not in compliance with [the industry standard,] the Uniform Standard of Professional Appraisal Practice," and in some instances, IndyMac even "allowed the borrowers to select the appraiser" and/or accepted "appraisals where the property valuation was made without physical site inspection of the subject property or comparable properties."  *Id.* at 12, 26.  These findings further established that any loan representations or warranties concerning IndyMac loans were probably false.  After the FDIC seized IndyMac, most of it was subsequently acquired by OneWest Bank.

article also recounted the situation of Rachel Steinmetz, a senior loan underwriter for GreenPoint, another Warrantor and/or loan originator for at least six of the Covered Trusts through itself or its former owner, North Fork Bank.  Ms. Steinmetz had filed a wrongful termination lawsuit against GreenPoint in which she alleged that ***GreenPoint asked "her to approve loans . . . 'that the borrower did not qualify for'" and when "she told her superiors that the applications contained suspect details and that the loan files didn't have enough paperwork to back up borrowers' claims . . . 'management overrode her decisions' and approved the loans anyway***."  It was reported that in "April 2006, Steinmetz . . . rejected a loan application that inflated the borrower's income and the home's appraised value [yet] her superiors signed off on the loan" and funded it anyway.  The *Business Week* article further reported on another lawsuit by Coleen Colombo against BNC, a loan originator for one of the Covered Trusts.  Ms. Colombo, a senior loan underwriter at BNC, alleged she was harassed and then terminated because she reported to her superiors that ***a loan wholesaler had tried to bribe her to approve a loan application that contained "'fraudulent information***.'"  The foregoing information about BNC, GreenPoint and Wells Fargo, which collectively warranted Mortgage Loans in at least nine Covered Trusts through themselves or their related companies, indicated that their abusive lending practices likely rendered any representations or warranties about their loans false.

85.     Also in November 2008, *The New York Times* published an article concerning WaMu entitled "Was There a Loan It Didn't Like?"  WaMu and its subsidiaries were Warrantors and/or loan originators for at least five of the Covered Trusts.  Former WaMu senior mortgage underwriter Keysha Cooper, who worked at WaMu from 2003 until 2007, stated: "'At WaMu it wasn't about the quality of the loans; it was about the numbers' . . . . '***They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?' . . . 'I***

- 53 -

*swear 60 percent of the loans I approved I was made to'* . . . *'If I could get everyone's name, I would write them apology letters*.'"  This was a clear indicator that representations and warranties concerning WaMu loans were probably false.

86.   On November 13, 2008, the Office of the Comptroller of the Currency ("OCC") released a report entitled the "Worst Ten in the Worst Ten."  The report identified the ten metropolitan areas in the United States with the highest foreclosure rates in the first half of 2008, and identified the lenders that made these loans.  The report studied loans originated between 2005 through 2007 – the same time period when the Mortgage Loans in the Covered Trusts were originated – and revealed that they had astoundingly high foreclosure rates.  *From 13.9% to 22.9% of the loans were in foreclosure in the ten areas during the first half of 2008.  These foreclosure rates were stunning because "[p]rior to 2007, the foreclosure rate was historically less than 1%*."  Financial Crisis Inquiry Commission Report ("FCIC Report") at 402.  These extremely high foreclosure rates were another indicator that the lending industry in general was involved in widespread lending fraud and the making of massive numbers of false representations and warranties.  The list of offending lenders identified in the OCC report were a "who's who" of the Warrantors and loan originators to the Covered Trusts.  *Nearly every lender identified in the OCC's report was a loan originator and/or a Warrantor, or an affiliate of a loan originator or Warrantor, to the Covered Trusts*.  The OCC's list included AHM, BNC, Countrywide, Decision One, Merrill Lynch (through its lender First Franklin Corporation), Fremont, GreenPoint, IndyMac, WaMu (through its subsidiary Long Beach Mortgage Company), New Century, Option One, Ownit, People's Choice, Wells Fargo and WMC – *all* Warrantors or loan originators of the Mortgage Loans in the Covered Trusts.  Collectively, these Warrantors and loan originators had originated Mortgage Loans and/or made representations and warranties about Mortgage Loans in 23 of the 25 Covered

Trusts through themselves and their related companies.  This was a clear sign that the Mortgage Loans in the Covered Trusts were probably in breach of the Warrantors' representations and warranties, given the large number of Warrantors and loan originators to the Covered Trusts involved, the number of Covered Trusts affected, and the extremely high foreclosure rates.

87.     A news article in *The San Diego Union-Tribune* on November 16, 2008 summed up the industry-wide nature of the lending abuses that had been repeatedly reported on: "Bankruptcy specialists say part of what led to the housing market collapse ***was systemic.  Lenders set themselves up for problems by not requiring buyers to prove they could afford the loans*** . . . ."

88.     In December 2008, *The New York Times* published another article on WaMu.  The news article revealed that WaMu, which was now owned by JPMorgan, routinely made loans to borrowers with insufficient income to repay their loans.  The article was based on the account for a former WaMu employee, John D. Parsons, a former WaMu supervisor at a mortgage processing center.  He told *The New York Times* that he "***was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'.  He rarely questioned them.  A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes." The news article further reported on the case of a borrower "claiming a six-figure income and an unusual profession: mariachi singer.  Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit.  The photo went into a WaMu file.  Approved***." This information was yet another indicator that any representations or warranties concerning WaMu Mortgage Loans were probably false.

c.     **U.S. Bank's Review of the Mortgage Loan Files in 2006 and 2007, Coupled with the Vast Amount of Information Made Public Prior to 2009 Indicating that the Warrantors' Representations and Warranties Were False, Caused U.S. Bank to Discover Breaches with Respect to the Mortgage Loans in the Covered Trusts in 2009**

89.     There were many additional news stories, lawsuits and other events throughout 2008 indicating that the lending industry was plagued by lending abuses and fraud, and that therefore representations and warranties made by the Warrantors about the Mortgage Loans were likely false. In light of the number of these reports concerning pervasive, bold, and open lending fraud that had been engaged in by many of the Covered Trusts' Warrantors and loan originators, and other events alleged herein, U.S. Bank discovered in 2009 that there were breaches of the Warrantors' representations and warranties concerning thousands of the Mortgage Loans in the Covered Trusts. Supporting this conclusion is the fact that, for the 18 Covered Trusts that U.S. Bank has served as Trustee since their inception, U.S. Bank had previously inspected the Mortgage Loan files shortly after receiving them when the Covered Trusts were formed in 2006 and 2007. In fact, the Governing Agreements required U.S. Bank (or its custodian) to review each Mortgage Loan file to ensure certain required documentation was in the file and certain documents were properly endorsed. *See e.g.,* BAFC 2007-C PSA, §§2.01, 2.02 (Trustee, or Trustee's custodian, to review Mortgage Loan Files within 90 days of execution of Governing Agreement). Given the transparent nature of the lending abuses occurring at the time the Mortgage Loans were originated, U.S. Bank's Mortgage Loan file review for 18 of the Covered Trusts revealed to it numerous and obvious breaches of the Warrantors' representations and warranties. Given this prior review, and the continuous, subsequent revelations of widespread lending fraud by many of the Warrantors to the Covered Trusts throughout 2008 and 2009, U.S. Bank knew of systemic breaches of the Warrantors' representations and warranties concerning the Mortgage Loans by the beginning of 2009.

90.     Indeed, *both a trial court and an appellate court in the state of Washington held that U.S. Bank's required Mortgage Loan file review in 2007 concerning one of the Covered Trusts at issue herein – the GPMF 2007-AR1 Covered Trust – would have revealed obvious breaches by Warrantor GreenPoint*, given the fact that the Mortgage Loan before those courts was fraudulently obtained, was not properly secured, and violated state lending laws.  *See Collings v. City First Mortg. Servs., LLC*, 317 P.3d 1047 (Wash. Ct. App. 2013).  In *Collings*, U.S. Bank intervened into an action seeking a declaration that its security interest in a Mortgage Loan in the GPMF 2007-AR1 Covered Trust was superior to that of other claimants and that U.S. Bank was entitled to full payment of the debt secured by its deed of trust.  However, both the Washington state trial court and the appeals court held that U.S. Bank, during its required 2007 review of the Mortgage Loan file at issue, "would have found" and "should have discovered" that: (1) neither U.S. Bank nor the Covered Trust held superior title to the Mortgage Loan at issue; and (2) "the [Mortgage] Loan amounted to illegal equity skimming," in violation of Washington state's lending laws.  *Id.* at 1052, 1059-64.  *Either one of these discrepancies, which the courts held would have been readily apparent during U.S. Bank's 2007 review, were clear and obvious breaches of the Warrantor's representations and warranties concerning the Mortgage Loan*.  The Washington state trial court ordered, and the appeals court affirmed, the entry of judgment against U.S. Bank.  The trial court also declared that the deed of trust held by U.S. Bank on behalf of the GPMF 2007-AR1 Covered Trust was void and unenforceable, and permanently enjoined U.S. Bank from foreclosing on the mortgaged property, while quieting title in other claimants and against U.S. Bank, all of which the court of appeals affirmed.  *See generally id.*  Thus, U.S. Bank's 2006 and 2007 reviews of the Mortgage Loan files for the 18 Covered Trusts in which U.S. Bank served as Trustee

since their inception,[19] coupled with the massive amount of public information available to it in 2008 and 2009 concerning the Covered Trusts' Warrantors' and loan originators' participation in widespread lending abuses amounting to breaches of their representations and warranties, caused U.S. Bank to discover by 2009 that there were breaches of the Warrantors' representations and warranties concerning thousands of the Mortgage Loans in the Covered Trusts.

> **d.     The Unprecedented, Extremely High and Persistent Mortgage Loan Default Rates Also Caused U.S. Bank to Discover Breaches of the Warrantors' Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts by 2009**

91.     Further establishing that U.S. Bank knew in 2009 of massive breaches of the Warrantors' representations and warranties concerning the Mortgage Loans in the Covered Trusts, is the fact that, by January 2009, the Covered Trusts had been experiencing chronic, continual and shockingly high Mortgage Loan default rates.[20]  It was clearly evident by January 2009 that the extremely high Mortgage Loan default rates were due to the fact that the Mortgage Loans were not as the Warrantors had represented and warranted.   By early 2009, the Mortgage Loans were defaulting at astounding rates.  For example, in January 2009, all of the 25 Covered Trusts except one had double-digit Mortgage Loan default rates.  Most of the Covered Trusts had Mortgage Loan default rates is excess of 20%, with the majority of the Covered Trusts having default rates greater than 30%.  Incredibly, five of the Covered Trusts had default rates in excess of 50%, while at least two Covered Trusts had Mortgage Loan default rates of over 62% – ***nearly two of every three***

---

[19]   The 18 Covered Trusts are: BAFC 2007-C, BNCMT 2007-2, BSABS 2006-AC2, BSABS 2006-AC5, GPMF 2007-AR1, GPMF 2007-AR2, GPMF 2007-AR3, HEAT 2006-5, HEAT 2006-6, LXS 2006-1ON, LXS 2007-7N, MABS 2006-HE2, SARM 2006-9, SASC 2006-NC1, SASC 2006-WF2, SASC 2006-WF3, SASC 2007-EQ1 and SASC 2007-WF1.

[20]   "Default rates," as used in this Complaint, refers to the percentage of the Mortgage Loans' aggregate principal balance for each Covered Trust that is delinquent, in bankruptcy, in foreclosure or "real estate owned" ("REO").

***Mortgage Loans were in default***.  These high default rates had existed even before 2009 so they were no surprise to U.S. Bank in January 2009.  U.S. Bank was also acutely aware of the hundreds of millions of dollars of losses the Covered Trusts had sustained by January 2009, which were caused by the defective Mortgage Loans.  The chart below sets forth the Mortgage Loan default rates and the cumulative realized losses for each Covered Trust reported in January 2009:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in January 2009 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| BAFC 2007-C | 6.6% | $   5,662,610 |
| BNCMT 2007-2 | 40.0% | $  43,687,362 |
| BSABS 2006-AC2 | 24.9% | $  17,362,487 |
| BSABS 2006-AC5 | 35.4% | $   7,226,895 |
| GPMF 2007-AR1 | 28.7% | $  34,902,670 |
| GPMF 2007-AR2 | 26.8% | $  20,942,642 |
| GPMF 2007-AR3 | 18.7% | $   2,756,002 |
| HEAT 2006-5 | 53.2% | $  70,669,373 |
| HEAT 2006-6 | 53.8% | $  73,003,180 |
| LXS 2006-1ON | 35.5% | $  31,651,222 |
| LXS 2006-15 | 36.8% | $  39,442,389 |
| LXS 2007-7N | 20.0% | $  17,435,415 |
| MABS 2006-HE2 | 63.5% | $  67,353,056 |
| MLMI 2006-WMC2 | 62.2% | $171,652,842 |
| SARM 2006-9 | 19.1% | $   5,928,586 |
| SASC 2006-NC1 | 54.6% | $  98,522,062 |
| SASC 2006-WF2 | 39.2% | $  67,551,378 |
| SASC 2006-WF3 | 40.2% | $  55,147,285 |
| SASC 2007-EQ1 | 42.0% | $  24,472,404 |
| SASC 2007-WF1 | 42.2% | $  28,943,985 |
| WMALT 2006-AR4 | 47.4% | $  24,104,753 |
| WAMU 2006-AR13 | 19.7% | $   8,000,217 |
| WAMU 2006-AR17 | 22.0% | $   3,367,013 |
| WAMU 2006-AR19 | 22.1% | $   8,072,552 |
| WAMU 2007-OA2 | 21.9% | $   8,740,917 |
| **Covered Trusts' Total Realized Losses:** | | **$930,936,687** |

92.     Given these huge, unprecedented default rates and staggering losses, coupled with:

(1) U.S. Bank's 2006-2007 review of the Mortgage Loan files which at least two Washington courts

held would have revealed irregularities that amounted to breaches of the Warrantors' representations and warranties; (2) U.S. Bank's further knowledge through news and press reports of widespread and numerous lending abuses involving many of the Warrantors; and (3) U.S. Bank's direct experience with breaching Warrantors (such as with GreenPoint, where U.S. Bank previously alleged that GreenPoint had "*a pervasive pattern" of representation and warranty breaches "as a whole*," and Countrywide, where U.S. Bank alleged it engaged in "*systemic*" breaches); U.S. Bank discovered in 2009 that the Warrantors had breached their representations and warranties as to thousands of Mortgage Loans in the Covered Trusts.  Nonetheless, U.S. Bank chose to ignore the breaches and did nothing.

> **e.      Further News and Events, and U.S. Bank's Own Actions During and After 2009, Indicated that U.S. Bank Knew that the Warrantors Had Breached Their Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts**

93.      Additional news indicating the systemic nature of the Warrantors' breaches continued throughout 2009, 2010, 2011, and beyond, repeatedly corroborating the fact that the Warrantors had made false representations and warranties about the Mortgage Loans.  For example, in March 2009, at a hearing of the U.S. House of Representatives Subcommittee investigating the nation's mortgage meltdown, Representative Jeb Hensarling from the State of Texas was extremely blunt about the universal abandonment of underwriting guidelines: "*Mortgage fraud ran rampant for a decade, on the lenders' side and on the borrowers' side . . . .  We know that mortgage fraud ran rampant* . . . ."

94.      Also in March 2009, a class action lawsuit was filed against JPMorgan on behalf of purchasers of its RMBS, alleging false and misleading statements in connection with the offering and sale of RMBS in numerous RMBS trusts.  That action contained allegations concerning AHM and Chase Bank – two of the Warrantors or loan originators for five of the Covered Trusts.  The

complaint alleged that AHM and Chase Bank failed to follow their loan underwriting guidelines and fabricated loan information, obvious breaches of their representations and warranties, when originating mortgage loans during the same period the Mortgage Loans in the Covered Trusts were originated.  In 2010, an amended complaint was filed, which contained detailed statements from numerous former AHM and Chase Bank employees indicating the wholesale abandonment of AHM's and Chase Bank's origination guidelines and the widespread fabrication of false loan data.  *See* Second Amended Complaint for Violation of §§11, 12 and 15 of the Securities Act of 1933, *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co., et al.*, No. 1:09-cv-03701-JGK (S.D.N.Y. July 8, 2010), ¶¶78-116.

95.     In addition, in April 2009, the SEC instituted fraud charges against the former top executives of AHM's parent company, American Home Investment Corp. ("American Home"), for their role in misleading investors regarding AHM's systematic disregard of sound underwriting standards and risky lending practices that led to the lender's bankruptcy in August of 2007.  AHM was a Warrantor or loan originator for at least four of the Covered Trusts.  "'These senior [American Home] executives did not just occupy a front row seat to the mortgage meltdown – *they were part of the show*,'" said Robert Khuzami, Director of the Securities and Exchange Commission's ("SEC") Division of Enforcement in a press release.  The SEC charged that AHM was not the "prime" lender it claimed to be, but rather routinely issued high-risk loans to borrowers with poor credit in order to drive growth and capture additional market share.  American Home's former CEO subsequently paid $2.5 million to settle the SEC's fraud charges.  In May 2009, a reporter for *The New York Times* published a news report, recounting his experience in obtaining a loan from AHM.  The reporter revealed how AHM actively concealed and omitted negative information on his loan application in

order to qualify him for a loan.  Not surprisingly, shortly after obtaining the AHM loan – a loan the reporter could not afford – the reporter defaulted.

96.    In June 2009, the SEC initiated a securities fraud action against former Countrywide executives Angelo Mozilo ("Mozilo"), David Sambol ("Sambol") and Eric Sieracki ("Sieracki"). Countrywide was a Warrantor and/or loan originator for at least five of the Covered Trusts.  On September 16, 2010, the court denied the Countrywide executives' motions for summary judgment and held that *the SEC had raised genuine issues of fact* as to whether the defendants had misrepresented the quality of Countrywide's underwriting processes from 2005-2007, the same time period when the Mortgage Loans were originated.  Specifically, the court held that *the SEC presented evidence that Countrywide "routinely ignored its official underwriting guidelines to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," i.e., to the Covered Trusts' Loan Sellers/Sponsors and that "a significant percentage (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines.*"  *SEC v. Mozilo*, No. CV 09-3994-JFW (MANx), 2010 U.S. Dist. LEXIS 98203, at *33-*34 (C.D. Cal. Sept. 16, 2010).  *The court held that the evidence presented was such that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines.*"  *Id.* at *35.  In 2010, Mozilo, Sambol and Sieracki paid over $73.1 million to settle the charges.

97.    Also in 2009, a False Claims Act lawsuit was brought by the U.S. Government against Countrywide and real estate appraisal firm Land Safe Appraisal Services, Inc. ("Land Safe"), confirming that Countrywide routinely and falsely inflated appraisals.  *See* Complaint, *United States, ex rel. Kyle W. Lagow v. Countrywide Fin. Corp.*, No. 1:09-cv-02040-RJD-JMA (E.D.N.Y. May 13, 2009) ("*Lagow* Complaint").  According to the allegations of this action, which are based on the

testimony of Kyle Lagow, a former LandSafe employee, Countrywide and LandSafe conspired together to systematically inflate appraisals.  According to Lagow, Countrywide and LandSafe systematically inflated appraisals for Countrywide loans by, among other things: (a) paying above-market fees to appraisers who provided inflated appraisals; (b) rewarding appraisers that provided inflated appraisals with significant amounts of additional work; (c) black-listing, retaliating against and firing appraisers that refused to provide inflated appraisals; (d) improperly requiring appraisers to rely on information outside the relevant market that justified inflated appraisals; (e) providing appraisers with false information concerning "comparable" properties that led to inflated appraisals; and (f) retaliating against anyone who questioned or criticized Countrywide's and LandSafe's appraisal inflation scheme.  *Lagow* Complaint, ¶9.  This action was settled, as part of a global $1 billion settlement, with Countrywide's parent company Bank of America, another Warrantor/loan originator to the Covered Trusts.

98.     In 2009, MBIA Insurance Corp. ("MBIA"), an insurer to numerous RMBS trusts, sued Warrantors and loan originators Countrywide and Bank of America, alleging massive breaches of their representations and warranties with respect to tens of thousands of loans in 15 different RMBS trusts.  The case was ultimately settled by Bank of America, paying MBIA $1.7 billion.

99.     U.S. Bank's knowledge of pervasive breaches of representations and warranties by the Warrantors at issue herein is also demonstrated ***by its own actions*** in September 2009.  To explain, in 2008, Lehman, a Loan Seller/Sponsor for 13 of the Covered Trusts, filed for bankruptcy. In September 2009, U.S. Bank filed claims in the bankruptcy action against Lehman for breaches of representations and warranties as to ***all*** of the Mortgage Loans in 12 of those 13 Covered Trusts[21]

---

[21]   Bank of America, U.S. Bank's predecessor trustee, had similarly filed claims against Lehman for one of the 13 Covered Trusts, for the LXS 2006-15 Covered Trust.  These 13 Covered Trusts are: BNCMT 2007-2, GPMF 2007-AR1, GPMF 2007-AR2, GPMF 2007-AR3, LXS 2006-1ON, LXS

*even though Lehman was not liable for all of the Mortgage Loans in most of those Covered Trusts, and in fact there were many other Warrantors to those Covered Trusts who had made representations and warranties for those Mortgage Loans and were thus liable for them*.  U.S. Bank's "omnibus" claim for breach of representations and warranties as to all of the Mortgage Loans in all of those 12 Covered Trusts, including for Mortgage Loans that Lehman was not even potentially liable for, and in fact other Warrantors were, demonstrates U.S. Bank's knowledge of pervasive breaches by ***all*** of the Warrantors to those 12 Covered Trusts.  Nonetheless, U.S. Bank has not pursued most of those other Warrantors to enforce representation and warranty claims as to the thousands of breaching Mortgage Loans in those Covered Trusts. [22]

100.    With respect to Wells Fargo – a Warrantor and/or loan originator for at least six Covered Trusts – in 2009, it was sued by the Attorney General of Illinois.  *See People v. Wells Fargo & Co.,* No. 09-ch-26434 (Ill. Cir. Ct., Cook Cnty. July 31, 2009).  In the action, Wells Fargo was charged with "engag[ing] in unfair and deceptive business practices by *misleading Illinois borrowers about their mortgage terms,*" and *placing borrowers into loans that were "unaffordable*

---

2006-15, LXS 2007-7N, SARM 2006-9, SASC 2006-NC1, SASC 2006-WF2, SASC 2006-WF3, SASC 2007-EQ1 and SASC 2007-WF1.

[22]  Given that U.S. Bank (and Bank of America for Covered Trust LXS 2006-15) filed claims against Lehman in the bankruptcy case for those 13 Covered Trusts, plaintiff does not allege that U.S. Bank breached the Governing Agreements by failing to make representation and warranty claims *against Lehman* for the 13 Covered Trusts.  In addition, for one of those 13 Covered Trusts, the SASC 2006-NC1 Covered Trust, the only Warrantor besides Lehman for that Trust – New Century – went bankrupt in 2007, well before U.S. Bank discovered any breaches.  Thus, for such Covered Trust, plaintiff does not allege that U.S. Bank improperly failed to make representation and warranty claims.  Moreover, for another one of those Covered Trusts – the BNCMT 2007-2 Covered Trust – only Lehman made representations and warranties and thus plaintiff does not allege that U.S. Bank failed to make representation and warranty claims as to that Covered Trust either.  However, plaintiff *does allege* that U.S. Bank breached the Governing Agreements by failing to make representation and warranties claims against *the many other Warrantors to those remaining 11 Covered Trusts at issue herein in which Lehman served as a Loan Seller/Sponsor*, as well as to the 12 *other* Covered Trusts at issue in this case that do not involve Lehman at all.

*and unsustainable*," both violations of law and breaches of the representations and warranties Wells

Fargo made.  Also in 2009, Wells Fargo was sued in a class action on behalf of RMBS purchasers

alleging that Wells Fargo had misrepresented that the loans in its RMBS trusts were originated in

conformance with Wells Fargo's underwriting guidelines.  *See In re Wells Fargo Mortg. Backed*

*Certificates Litig.*, No. C 09-01376 SI (N.D. Cal.).  On April 22, 2010, the court denied Wells

Fargo's motion to dismiss, which alleged a company-wide series of reckless lending practices at

Wells Fargo.  As the court found:

> Plaintiffs allege that the Offering Documents contained numerous false and misleading statements and omissions.  First, plaintiffs state that the documents misstated Wells Fargo's underwriting process and loan standards.  According to plaintiffs, ***Wells Fargo often extended loans to borrowers who did not meet its creditworthiness standards, resulting in a low-quality mortgage pool***.  *Id.* at ¶¶70, 76. Plaintiffs cite statements by several confidential witnesses ("CWs") who assert that Wells Fargo placed "intense pressure" on its loan officers to close loans, including by ***coaching borrowers to provide qualifying income information, accepting blatantly implausible or falsified income information, and lowering its standards near the end of the calendar year***.  *Id.* ¶¶83-88.  Plaintiffs allege that the third-party loan originators ***disregarded Wells Fargo's stated underwriting standards "in order to approve as many mortgages as possible***."  *Id.* ¶94.
>
> . . . One of plaintiff's CWs states that approximately 70% of the loans he signed off on while working as a Wells Fargo underwriter involved mortgages worth more than 95% of the home's value.  *Id.* ¶108.
>
> *       *       *
>
> Plaintiffs allege, in other words, that the true loan-to-value ratio frequently exceeded 100% because the homes were actually worth far less than their stated appraisal value.  *Id.* ¶100.
>
> Plaintiffs again support their allegations primarily with statements from confidential witnesses.  *Id.* ¶103 ("CW 2 confirmed that, at Wells Fargo Home Mortgage, ***representatives constantly pushed the appraisers they worked with to inflate the value of the real estate underlying the mortgage loans"); ¶107 ("CW 1 remarked that 'appraisals were very inflated*,' and observed that the retail officers 'always managed to get the value they wanted'"); ¶108 (CW 7, a former Senior Underwriter with Wells Fargo Home Mortgage, "estimated that 70% of the loans CW7 worked with had an LTV over 95%").  Plaintiffs additionally cite to a 2007 survey which "***found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through***,"

- 65 -

and to congressional testimony in which Alan Hummel, Chair of the Appraisal Institute, stated that loan appraisers had "experience[d] systemic problems of coercion." *Id*. ¶104-05. Plaintiffs' allegations concerning the allegedly improper appraisal practices are sufficiently specific to state a claim with respect to the securities at issue in this case. In particular, plaintiffs have alleged that ***Wells Fargo's practices permitted the*** <u>***pervasive and systematic***</u> ***use of inflated appraisals, affecting all types of mortgages***.

*In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d 958, 962-72 (N.D. Cal. 2010).

Given Wells Fargo's improper lending practices were "***pervasive and systematic***," its representations and warranties were also pervasively and systematically false. In May 2011, Wells Fargo agreed to pay $125 million to settle the claims. In yet another lawsuit filed against Wells Fargo in 2009, entitled *Sound Appraisal and Savage Appraisal Services, Inc. v. Wells Fargo Bank, N.A.*, No. 09-CV-01630 CW (N.D. Cal. Apr. 14, 2009), it was further confirmed that Wells Fargo engaged in systematic conduct that rendered its representations and warranties false. A real estate appraiser sued after being black-balled by Wells Fargo for refusing to engage in appraisal fraud. The lawsuit confirmed Wells Fargo's regular practice of pressuring and intimidating appraisers into providing falsely inflated appraisals that met Wells Fargo's objectives, but obviously breached its representations and warranties. Specifically, the complaint in *Sound Appraisal* alleged:

> As part of its ***corporate objective to abandon underwriting standards*** in order to maximize market share and profits, ***Wells Fargo and Rels Valuation have together*** <u>***engaged in a practice***</u> ***of pressuring and intimidating appraisers into using appraisal techniques that produce appraisals that meet Wells Fargo's business objectives even if the use of such appraisal techniques is improper and in violation of industry and regulatory standards***. If appraisers fail to "play ball" as Wells Fargo demands, Wells Fargo, through Rels Valuation, removes the appraiser from the list of approved appraisers, which essentially "blacklists" the appraiser. Once an appraiser is blacklisted, Wells Fargo and Rels Valuation will no longer request appraisals or accept appraisals from these persons and companies.

*Id.*, ¶7. Finally, in 2011, the Federal Reserve issued a consent cease and desist order against Wells Fargo and assessed an $85 million penalty against it. According to the Federal Reserve's press release, the order addressed allegations that Wells Fargo's "sales personnel falsified information

- 66 -

about borrowers' incomes to make it appear that the borrowers qualified for loans when they would not have qualified based on their actual incomes." It was clear that Warrantor Wells Fargo's normal business practices rendered the representations and warranties about its mortgage loans uniformly false.

101. With respect to EMC, a Warrantor and loan originator for two of the Covered Trusts, in 2010 several former EMC employees confirmed that EMC did not comply with its stated underwriting guidelines, did not evaluate its borrowers' repayment abilities, and thereby breached its representations and warranties. According to a May 2010 news article in *The Atlantic*, ***former EMC employee Matt Van Leeuwen, a mortgage analyst at the company from 2004-2006, and another former EMC employee, each revealed that EMC routinely provided false information about its loans and told employees to make up loan data. They reported that EMC concocted borrower FICO scores and provided false information about the loan types (i.e., whether the loans were full documentation loans or low documentation or other types of loans)***. The article quoted one former EMC analyst as stating that employees falsified data because EMC did not "'want to waste the resources on deep investigation,'" in its rush to securitize the loans. *The Atlantic* article further confirmed that EMC also provided falsified loan data to the credit rating agencies: "After they prepped the rating agencies for what they 'thought' the loans would look like, they would buy loans in bulk, and then ***spend a day scrubbing them***," removing negative loan data, thereby misleading the credit rating agencies and falsifying loan information that they then warranted was true in connection with EMC's representations and warranties to RMBS trustees, such as U.S. Bank. More recently, a former underwriter for Clayton Holdings, Inc. ("Clayton") and Watterson-Prime was deposed, and testified under oath in *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 2, 2011), a breach of representation and warranty case. The former

employee confirmed systematic breaches by EMC of its representations and warranties. To explain, Clayton and Watterson-Prime tested loans for EMC to determine whether they complied with the applicable underwriting guidelines. *The former underwriter testified under oath that he/she[23] was required to "approve loans that often did not satisfy the underwriting guidelines," to ignore defects in loan applications, to code defective loans as non-defective, and to change many of the grades on loans that were coded as defective to reflect that they were non-defective*. For example, the former underwriter testified:

- During the due diligence process, *Clayton and Watterson-Prime underwriters were directed to overlook defects and to grade defective loans as non-defective. These instructions came from EMC* and were conveyed to underwriters by their supervisors.

- *Clayton and Watterson-Prime underwriters were directed by EMC not to look for fraud in the loan files and to overlook any fraudulent documents*.

- *Clayton and Watterson-Prime underwriters were directed by EMC to grade loans as non-defective, even where the underwriters determined the borrowers' incomes listed on loan applications were unreasonable*.

- Clayton and Watterson-Prime performed "1003/1008 underwriting," a practice whereby an underwriter does not verify the information on the borrower's loan application, when reviewing loans for EMC.

- *Clayton and Watterson-Prime were instructed by EMC to grade defective loans as non-defective by utilizing "compensating factors" that were not supported by the data in the loan files*.

- Clayton underwriters used the phrase "'*Bear don't care*'" to describe EMC's attitude towards the due diligence underwriting review process (EMC was a division of Bear Stearns).[24]

---

[23]  The former employee's name was redacted in documents filed with the court, presumably because his/her testimony is so damaging to EMC.

[24]  Moreover, in 2011 and 2012, numerous insurers and trustees of EMC-sponsored RMBS trusts sued EMC for breach of its representations and warranties concerning the loans within the trusts. *All of these lawsuits consistently alleged that 70% to 90% of the loans breached EMC's representations and warranties*. One insurer, Ambac Assurance Corp. ("Ambac"), alleged that EMC's breaching of its representations and warranties was routine and deliberate – *Ambac alleged*

102.     It has also recently come to light that Bear Stearns and ***EMC employees referred to the mortgage loans in their RMBS trusts as "SACK[S] OF SHIT" and "DOG[S]***," due to their extremely poor quality, contradicting EMC's representations and warranties about the loans.  It has also recently been revealed that EMC employees concealed that they were aware of numerous breaches of their representations and warranties, and yet still manufactured a way to secretly profit from it.  In many cases, EMC purchased the loans it transferred to RMBS trusts from other loan originators, including many of the loan originators to the Covered Trusts.  When it acquired the loans, EMC obtained representations and warranties from the loan originators that were very similar or identical to the ones EMC made to the Covered Trusts when it sold loans to RMBS depositors. After EMC sold and transferred the loans to the RMBS trusts (and made its own representations and warranties concerning the loans to RMBS trusts, depositors and trustees), EMC subsequently discovered breaches of *its* representations and warranties to the RMBS trusts, depositors and trustees which were also breaches of the loan originators' representations and warranties to EMC.  ***EMC then secretly made breach of representation and warranty claims against the loan originators and settled with them for millions of dollars, which EMC then pocketed without informing anyone and without forwarding the settlement money to the RMBS trusts as it was required to do***.  The foregoing business practices by EMC confirmed that EMC's representations and warranties were systematically false.

103.     With respect to Warrantor and loan originator WMC, in September 2009, Glen Pizzolorusso, a former manager for WMC, was interviewed for a National Public Radio broadcast.

---

*that EMC "perpetrated a massive fraud that deceived investors and financial guarantors, such as Ambac, into believing that the mortgage loans backing [Bear Stearns/EMC's] securitizations were originated pursuant to established underwriting guidelines and were therefore of good quality*." First Amended Complaint, *Ambac Assurance Corp., et al. v. EMC Mortgage LLC, et al.*, No. 651013/2012 (N.Y. Sup. Ct., N.Y. Cnty. Aug. 14, 2012), ¶1.

Pizzolorusso discussed the horrible loans WMC made to borrowers: "'*We looked at loans, these people didn't have a pot to piss in. . . . [T]hey could barely make the car payment, and now we're giving them a $300,000 to $400,000 house*.*"* In addition, the U.S. Government's Federal Housing Finance Agency ("FHFA") sued General Electric Company ("GE"), WMC's parent company, and others in 2011. *See FHFA v. General Electric Company, et al.*, No. 652439/2011 (N.Y. Sup. Ct., N.Y. Cnty. Sept. 2, 2011). The FHFA sued GE for misrepresentations that WMC originated loans pursuant to its underwriting guidelines. ***The FHFA alleged that WMC had abandoned its underwriting guidelines and extended loans to borrowers who could not afford them***, which indicated that WMC's representations and warranties were false. GE settled with the FHFA for an undisclosed amount.

104.    Further proof that U.S. Bank knew of massive breaches by the Warrantors is found in a lawsuit U.S. Bank filed against WMC and another Warrantor/loan originator. In the lawsuit filed in 2011, U.S. Bank alleged that WMC and fellow Warrantor/loan originator EquiFirst (EquiFirst was a Warrantor and/or loan originator for at least two Covered Trusts) routinely breached their loan representations and warranties. *See* Complaint, *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp., et al.*, No. 11-CV-02542-PAM-TNV (D. Minn. Sept. 2, 2011). In that action, U.S. Bank alleged that loans within a RMBS trust acquired from WMC and EquiFirst were fraudulent, did not comply with the stated underwriting guidelines, and did not determine whether the borrowers could afford to repay their loans, all in breach of WMC's and EquiFirst's representations and warranties. A sample of 200 loans within the trust were reviewed and it was found that 150 of those loans breached the Warrantors' representations and warranties. ***In other words, a stunning 75% of the loans breached WMC's and EquiFirst's representations and warranties***. Moreover, in 2012, another trustee sued WMC for breach of its representations and

- 70 -

warranties. *See* Complaint, *Deutsche Bank National Trust Co. v. WMC Mortgage LLC, et al.*, No. 3:12-cv-00933-CSH (D. Conn. June 25, 2012). In that action, the RMBS trustee commissioned an expert to **review the actual loan files** for over 1,400 loans within the trust. **The expert found that a remarkable 99.7% of the reviewed loans breached the representations and warranties WMC had made, a nearly 100% breach rate**. *Id.*, ¶¶7-8. These cases indicated that WMC and EquiFirst habitually engaged in lending abuses and therefore their representations and warranties were false.

105.    In December 2010, law professor Kurt Eggert testified before a U.S. Senate Committee and confirmed the ubiquitous nature of the false representations and warranties. Professor Eggert cited to JPMorgan's own analysts who had estimated "'that put-back risk,'" for loan warrantors, *i.e.*, loans subject to repurchase demands due to breaches of representations and warranties, ranged **from $60 to $110 billion for RMBS trusts like the Covered Trusts**. The sheer magnitude of the estimates of liability for the breaches made it certain that many of the Mortgage Loans in the Covered Trusts were similarly affected.

> **f.    By April 13, 2011 U.S. Bank Absolutely Knew that the Warrantors Had Breached Their Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts**

106.    If there was any doubt that the Warrantors had made false representations and warranties concerning the Mortgage Loans in the Covered Trusts, the FCIC Report and the Senate Report laid those doubts to rest. On January 27, 2011, the 633-page long FCIC Report was first made available to the public, and between February 11 and 13, 2011, the FCIC also made public nearly 2,000 pages of supporting documentary evidence and more than 300 witness interviews. The FCIC Report was supported by voluminous, detailed evidence, and confirmed most if not all of the previous news accounts of habitual lending abuses.

107.    The FCIC Report confirmed the systemic breakdown in residential loan underwriting standards during the time period when the Mortgage Loans were originated and transferred to the Covered Trusts.  The FCIC Report described in detail the collapse of prudent lending standards and the lending abuses that were universal.  In addition, *for the first time, the FCIC Report disclosed the pervasive, deliberate and intentional __fraud__ that was occurring with respect to RMBS sales to* investors, along with the loans underlying them.  The FCIC Report *specifically identified many of the actual wrongdoers, which included __all__ of the Covered Trusts' Loan Sellers/Sponsors, and most of the other Warrantors and loan originators to the Covered Trusts, as being participants in the fraud*.

108.    The FCIC also reported on the extraordinary numbers of false mortgage loan representations and warranties it had discovered.  The representations and warranties that the FCIC Report discussed were identical or very similar to those made by the Warrantors to the Covered Trusts.  In that vein, the FCIC first quoted from a report published years earlier discussing what loan representations and warranties meant and required:

> "Creditors that package and securitize their home equity loans must comply with a series of representations and warranties.  These include creditors' representations that they have complied with strict underwriting guidelines concerning the borrower's ability to repay the loan."

FCIC Report at 77.  The FCIC found, in light of the pervasive lending abuses that it had discovered during the period the Mortgage Loans were originated (2005-2007), that "*in the years [thereafter], these representations and warranties would prove to be inaccurate*." *Id.*

109.    The FCIC Report supported its findings by citing to evidence of massive loan representation and warranty breaches by many of the very Warrantors to the Covered Trusts.  The FCIC reported that these Warrantors had breached their representations and warranties concerning billions of dollars of mortgage loans they sold to U.S. governmental agencies Fannie Mae and

Freddie Mac.   The FCIC Report stated that "during the three years and eight months ending August 31, 2010, *Freddie [Mac] and Fannie [Mae] required sellers to repurchase 167,000 loans totaling $34.8 billion*." *Id*. at 224.  This included Warrantor Bank of America which faced *over $7.3 billion in repurchase claims* from Freddie Mac and Fannie Mae due to breaches of its loan representations and warranties.  *See id*. at 224-25.[25]  Given the huge number of false representations and warranties to Freddie Mac and Fannie Mae, it was clear that this was a regular business practice of Bank of America.  Bank of America warranted Mortgage Loans for at least four Covered Trusts through itself and its subsidiary Merrill Lynch Mortgage Lending, Inc.  In addition, according to the FCIC Report, Wells Fargo, a Warrantor for at least five Covered Trusts, faced *$3.5 billion in repurchase claims* from Freddie Mac and Fannie Mae because of its pervasive representation and warranty breaches.  FCIC Report at 224-25.  JPMorgan, which through its related companies, was a Warrantor for at least seven Covered Trusts, faced *$3.3 billion in repurchase claims* because of its pattern and practice of false representations and warranties.  *Id.*  The FCIC further revealed that Countrywide – a Warrantor for at least three Covered Trusts – *was facing repurchase claims of $1.9 billion from Freddie Mac due to its systemic breaches*.  *Id*.  And SunTrust, a Warrantor for two of the Covered Trusts, was being *required by Fannie Mae to repurchase $898 million of its loans because of its repeated representation and warranty breaches*.  *Id.*  The Warrantors identified above by the FCIC had made very similar, if not identical, representations and warranties themselves (or through their related companies) concerning Mortgage Loans in at least 16 of the 25 Covered

---

[25]    The FCIC Report revealed that Bank of America subsequently reached a settlement with Fannie Mae and Freddie Mac, paying them *more than $2.5 billion*.  FCIC Report at 225.  Furthermore, in May 2011, the New York Attorney General announced that it was investigating Bank of America for violating several New York state statutes.  The New York Attorney General's investigation found that Bank of America had engaged in "*repeated false representations in [RMBS] Governing Agreements that the quality of the mortgages sold into the Trusts would be ensured," and "repeatedly breached representations and warranties regarding loan quality*."

Trusts.  The sheer magnitude of the repurchase claims reported by the FCIC indicated that these Warrantors routinely issued false representations and warranties in the normal course of their businesses.  Indeed, the FCIC Report illustrated the proliferation of false representations and warranties industry-wide by pointing to the fact that "[a]s of mid-2010, *court actions embroiled almost all major loan originators and underwriters [and] there were more than 400 lawsuits related to breaches of representations and warranties*."  *Id.* at 225.  Given the ubiquity of the false representations and warranties by these Warrantors, U.S. Bank knew that the Mortgage Loans in the Covered Trusts were similarly affected and that there were thousands of breaches by such Warrantors.

110.  *The FCIC also "conclude[d] that there was untrammeled growth in risky mortgages [and] [u]nsustainable, toxic loans polluted the financial system and fueled the housing bubble" while government regulators "failed to . . . establish and maintain prudent mortgage lending standards and to protect against predatory lending*."  FCIC Report at 101.  The FCIC Report confirmed that "*[l]ending standards collapsed, and there was a significant failure of accountability and responsibility throughout each level of the lending system*."  *Id.* at 125.  In addition, testimony released in connection with the FCIC Report also confirmed "*systemic*" misconduct which led to widespread falsity of loan representations and warranties at the time the Mortgage Loans were originated and warranted.  In testimony given to the FCIC, former Clayton executive D. Keith Johnson ("Johnson") testified that he had previously worked at WaMu – one of the most infamous Warrantors at issue herein – as well as at WaMu's equally infamous subsidiary, Long Beach Mortgage Company ("Long Beach"), prior to working for Clayton.  When Johnson moved to Clayton, he was exposed to the lending practices of nearly all lenders in the mortgage loan industry because Clayton was hired by Wall Street investment banks, *including all of the Loan*

*Sellers/Sponsors to the Covered Trusts*, to sample and test mortgage loans the banks were purchasing from numerous lenders throughout the nation and then selling and transferring to RMBS trusts, including the Covered Trusts.  WaMu and Long Beach routinely engaged in egregiously fraudulent lending practices, as documented in the Senate Report discussed *infra*.  Johnson testified to the FCIC concerning the lending practices he observed both before and after he worked at WaMu/Long Beach:

> *I had a really unique perspective working in an environment that turned out bad loans, Long Beach, right?  Then I go to Clayton and I'm dealing with the top factories in the world.  And you know what?  They're just like Long Beach. There's no difference.  I mean, this was not a one-off situation; it was systemic. And all of them – a lot of them had quality control departments internal, but eventually all of those internal quality control departments become compromised*.

111.    The FCIC Report further revealed that, in 2005, federal examiners and agencies conducted a "confidential . . . study of mortgage practices at six companies that together had originated . . . *almost half the national total*" of mortgage loans in 2005.  FCIC Report at 172.  *The study "'showed a very rapid increase in the volume of these irresponsible loans, very risky loans*,'" according to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation.  *Id*.  *For "[a] large percentage of the[] loans" reviewed, "the underwriting standards . . . had deteriorated*."  *Id*.  The FCIC Report further revealed that the lenders involved in the making these "irresponsible, very risky loans" were the very Warrantors and loan originators to the Covered Trusts – Bank of America, Countrywide, Wells Fargo and WaMu. *Id*.  These Warrantors and their related companies made representations and warranties about Mortgage Loans in at least 14 of the 25 Covered Trusts.

112.    The FCIC Report also confirmed the industry-wide use of falsely inflated appraisals during the period when the Mortgage Loans were originated, which also resulted in false representations and warranties.  According to the FCIC Report, "*[a]s the housing market expanded,*

*another problem emerged, in subprime and prime mortgages alike: inflated appraisals*." FCIC Report at 91. Testimony released with the FCIC Report confirmed the customary use of falsely inflated appraisals – which were a breach of the Warrantors' representations and warranties – during the time the Mortgage Loans were originated. Jim Amorin, the President of the Appraisal Institute, testified to the FCIC that "*[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again. . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice*.'"

113. The FCIC Report confirmed that many of the Warrantors and loan originators to the Covered Trusts were deeply involved in the lending abuses which resulted in breaches of the representations and warranties they made about their loans. For example, Countrywide was singled out by the FCIC for its rampant lending abuses:

> *Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop*.

FCIC Report at xxii.

114. According to evidence in the FCIC Report, Countrywide's loan products were simply not designed to evaluate borrowers' repayment abilities. Indeed, one of Countrywide's loan products was described as "'*[p]oison*'" by the lender's own co-founder and CEO, Mozilo, who stated in an April 17, 2006 e-mail: "'*In all my years in the business I have never seen a more toxic [product]*' . . . ." FCIC Report at 20. According to information contained in the FCIC Report, the reason Countrywide was willing to offer such products was because its sole focus was "'originating

what was salable in the secondary market,'" *i.e.*, to the Loan Sellers/Sponsors of the Covered Trusts, that then transferred the toxic Mortgage Loans into trusts such as the Covered Trusts.  *Id*. at 105.

115.    Moreover, former Countrywide employee Eileen Foster ("Foster") confirmed, in an interview with the FCIC, that fraud was rampant in connection with Countrywide's origination of loans.  Foster worked as a mortgage fraud investigator at Countrywide, and confirmed that loans Countrywide's fraud investigators or underwriters rejected due to fraud or non-conformance with the underwriting guidelines were regularly overruled and approved by Countrywide's sales unit, as "*the rules were bent and broken and twisted regularly and it was . . . an accepted mode of doing business*."    FCIC Staff Audiotape of Interview with Eileen Foster, Countrywide, http://fcic.law.stanford.edu/interviews/view/381.  Foster further stated that "all of the fraud that may have been taking place [was] being managed out by the sales units," or in other words, "'*concealed*.'"  *Id*.  She suspected that "there was quite a bit of fraud taking place" in connection with Countrywide's loan originations, which her audit manager "confirmed to [her]."  *Id*.  According to the FCIC, Countrywide had tens of thousands of internal company referrals of potentially fraudulent activity in connection with its mortgage business during the period from 2005-2007, when the Mortgage Loans were originated.  FCIC Report at 162.  The FCIC Report established that *Countrywide's "accepted mode of doing business" resulted in its representations and warranties being uniformly false*.

116.    Darcy Parmer, a former quality assurance and fraud analyst for Wells Fargo, another Warrantor to the Covered Trusts at issue herein, reported to the FCIC that she was aware of "'*hundreds and hundreds and hundreds of fraud cases*'" in Wells Fargo's home equity loan division.  FCIC Report at 162.  She also told the FCIC that "'*at least half the loans she flagged for*

*fraud were nevertheless funded, over her objections*.'"  *Id*.  This obviously led to "hundreds and hundreds and hundreds" of false loan representations and warranties.

117.    The FCIC Report specifically found that loan originator Chase Bank's parent company JPMorgan's due diligence practices concerning the loans it was securitizing were woefully, if not intentionally, inadequate.  FCIC Report at 168.  The FCIC Report stated that "[s]ome mortgage securitizers did their own due diligence, but seemed to devote only limited resources to it. . . .  JP Morgan . . . had only [a] small due diligence team[]," *id.*, notwithstanding the fact that it was securitizing millions of loans.  This lack of due diligence led to massive numbers of false representations and warranties.

118.    The FCIC found that Warrantor/loan originator Fremont had a company policy whereby any loan that was rejected by a securitizer because it did not comply with Fremont's underwriting guidelines (and therefore its representations and warranties) was nonetheless put into a subsequent pool of Fremont loans and offered for sale to another securitizer.  These defective loans remained in the pools until they were either sold or were rejected by securitizers at least three times.  This practice ensured that loans that did not comply with Fremont's representations and warranties were included into RMBS trusts like the Covered Trusts.  Johnson, the former President of Clayton, called this practice the "'three strikes, you're out rule.'"  FCIC Report at 168.  In another instance, the FCIC reported on the case of a real estate appraiser in Bakersfield, California, that had discovered multiple instances of lending fraud.  When he contacted a quality assurance officer at Fremont to inform it of the fraudulent activity he was told: "'Don't put your nose where it doesn't belong.'"  *Id*. at 14-15.  This indicated that Fremont intentionally made false representations and warranties.

119.     The FCIC found that Warrantor/loan originator New Century "ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence."  FCIC Report at 157.  The FCIC reported that New Century's Quality Assurance staff "had found severe underwriting errors," while New Century's Internal Audit department "identified numerous deficiencies in loan files," with ***seven out of nine reviews of the company's loan production department resulting in "'unsatisfactory'" ratings***.  *Id.*  New Century's senior management's reaction to this information establishing that New Century's representations and warranties were false was not what one would expect.  Instead of making efforts designed to bring the company into compliance with its underwriting guidelines and representations and warranties, New Century's management directed that the negative results be removed from the company's loan performance tracking system, that the Quality Assurance department be dissolved, and that the Internal Audit department's budget be cut.  *Id.*  In addition, Patricia Lindsay ("Lindsay"), a former fraud specialist for New Century, told the FCIC that New Century's definition of a "good" loan changed over time: "'The definition of a good loan changed from "one that pays" to "one that could be sold."'"  *Id.* at 105.  The import of this statement was that New Century was not following its stated underwriting guidelines (and thus breaching its representations and warranties) because it knew it could sell the loans to RMBS securitizers regardless.  Lindsay also confirmed to the FCIC that New Century's appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  Testimony of Patricia Lindsay for the FCIC Hearing (Apr. 7, 2010), http://fcic.law.stanford.edu/hearings/testimony/subprime-lending-and-securitization-and-enterprises.  The FCIC Report confirmed that New Century's fraudulent business practices guaranteed that it would also make false representations and warranties.

120.     *The FCIC Report also revealed for the first time the customary and regular practice by all of the Loan Sellers/Sponsors to the Covered Trusts and many of the other Warrantors, to deliberately transfer thousands of mortgage loans that did not comply with the applicable underwriting guidelines (and therefore breached any representations and warranties made about them) into RMBS trusts offered and sold to investors.* **This widespread intentionally fraudulent practice occurred during the exact same time period when the Mortgage Loans were originated and transferred to the Covered Trusts.** This startling revelation – that the Covered Trusts' Warrantors' regular business practices included *deliberately filling RMBS trusts with breaching loans* – was based on Clayton's "Trending Reports," which were provided to the FCIC. As previously alleged, Clayton was hired by virtually every RMBS securitizer – *including all of the Loan Sellers/Sponsors to the Covered Trusts* – during 2006 and 2007 to perform due diligence on mortgage loans that were being securitized and transferred to RMBS trusts. Clayton tested samples of the loans during the period from January 2006 through June 2007 to determine whether the loans complied with the applicable underwriting guidelines – guidelines that were designed to evaluate whether the borrowers could afford to repay the loans – or determine whether the loans were otherwise defective. Clayton's Trending Reports revealed that large percentages of the sampled loans *for every Loan Seller/Sponsor to the Covered Trusts* did not comply with the applicable underwriting guidelines or were otherwise defective, *i.e.*, they were in breach of representations and warranties they made about the loans. **Incredibly, even after being informed of the specific defective loans, the Loan Sellers/Sponsors to the Covered Trusts "waived," i.e., transferred, the breaching loans into the RMBS trusts and sold them to investors.** These same Loan Sellers/Sponsors also did no further testing of the remaining loans – even though it was logical to expect they would have the same defect rates as the sampled loans – and bought the loans sight

unseen and dumped them into the RMBS trusts they were selling to investors.  Based on the Clayton

Trending Reports, the FCIC Report specifically identified **all** of the very Loan Sellers/Sponsors and

**many** of the other Warrantors to the Covered Trusts and indicated that they deliberately and

intentionally transferred breaching mortgage loans into trusts just like the Covered Trusts.  The

following chart summarizes the FCIC's findings concerning the Covered Trusts' Loan

Sellers/Sponsors, Warrantors and loan originators and their deliberate inclusion of breaching loans

into RMBS trusts:

| Covered Trust Loan Seller/Sponsor or Other Warrantor | Percentage of Loans in Test Samples that Did Not Comply with Stated Underwriting Guidelines, *i.e.*, Breached Representations and Warranties | Percentage of Loans that Breached Representations and Warranties but Were "Waived" into the RMBS Trusts and Sold to Investors |
|---|---|---|
| Bank of America | 30% | 27% |
| Barclays (includes Warrantor/ loan originator EquiFirst, which was purchased by Barclays in 2007) | 27% | 28% |
| Countrywide | 26% | 12% |
| Credit Suisse (includes wholly owned Loan Seller/Sponsor DLJ Mortgage Capital, Inc. and wholly owned loan originator Lime) | 32% | 33% |
| EMC (includes affiliated loan originator Encore) | 14% | 50% |
| Lehman | 26% | 37% |
| Merrill Lynch (includes wholly owned Loan Seller/Sponsor Merrill Lynch Mortgage Lending, Inc. and partially owned loan originator Ownit) | 23% | 32% |
| UBS (includes wholly owned Loan Seller/Sponsor UBS Real | 20% | 33% |

| Covered Trust Loan Seller/Sponsor or Other Warrantor | Percentage of Loans in Test Samples that Did Not Comply with Stated Underwriting Guidelines, *i.e.*, Breached Representations and Warranties | Percentage of Loans that Breached Representations and Warranties but Were "Waived" into the RMBS Trusts and Sold to Investors |
|---|---|---|
| Estate Securities, Inc.) | | |
| WaMu (includes wholly owned subsidiary and Loan Seller/Sponsor Washington Mutual Mortgage Securities Corp.) | 21% | 32% |

121.    These Loan Sellers/Sponsors and other Warrantors identified by the FCIC made representations and warranties about Mortgage Loans in one or more of *every one of the 25 Covered Trusts at issue herein*.  Thus, given the fact the Loan Sellers/Sponsors and other Warrantors had engaged in this deliberate practice regularly and systematically, it was certain that they had also transferred breaching Mortgage Loans into the Covered Trusts.  Indeed, given the extremely high Mortgage Loan default rates and losses for the Covered Trusts, there was no doubt.  This conclusion was further made certain by the fact that all the transfers of breaching loans identified by Clayton occurred during 2006 and 2007 *during the same time period when the Mortgage Loans were transferred the Covered Trusts*.

122.    The FCIC Report, via the Clayton Trending Reports, also specifically identified other Warrantors and/or loan originators to the Covered Trusts, including Chase Bank (through its parent company JPMorgan[26]), New Century, Fremont and Decision One,[27] and established that they also

---

[26]    Twenty-seven percent (27%) of JPMorgan's loans failed to meet the underwriting standards (and thus breached its representations and warranties) yet *51%* of those defective loans were intentionally transferred into JPMorgan's RMBS trusts.

[27]    Decision One was owned by HSBC, which also used Clayton.  According to the Clayton Trending Reports, 27% of HSBC's loans did not comply with the underwriting guidelines, and thus

had transferred mortgage loans that breached their representations and warranties into RMBS trusts at the same time the Covered Trusts had defective Mortgage Loans transferred to them by these Warrantors.  Finally, the FCIC Report, again through the Clayton Trending Reports, made it clear that the inclusion of defective, breaching mortgage loans into RMBS trusts was not limited only to those Warrantors and loan originators specifically identified in the FCIC Report, but rather was ubiquitous.  Clayton's Trending Reports included information about "All Others" that originated loans for RMBS trusts, or in other words, those lenders which had not been specifically identified in Clayton's reports.  Such information showed that all the other unidentified loan originators and warrantors had also transferred defective loans into RMBS trusts.  The FCIC Report therefore established that false loan representation and warranties were being made by ***virtually the entire RMBS industry*** from January 2006 through June of 2007, the exact same time period the Covered Trusts had defective Mortgage Loans transferred to them, and the false representations and warranties affected virtually every RMBS trust created during that time period.  Thus, U.S. Bank unequivocally knew from the FCIC Report that the Warrantors had breached their representations and warranties concerning the Mortgage Loans in the Covered Trusts, particularly after comparing the soaring default rates of the Mortgage Loans to historical averages.

123.    After the FCIC Report was publicly released, the Senate Report was then made public on April 13, 2011.  The Senate Report further confirmed for U.S. Bank that the Warrantors to the Covered Trusts – particularly WaMu – had uniformly breached their representations and warranties. The 635-page long Senate Report was supported by thousands of pages of documentary evidence and the testimony of numerous witnesses subpoenaed by the Senate Subcommittee on Investigations. The Senate Report not only confirmed the FCIC Report's findings but also provided extremely

---

breached HSBC's representations and warranties, yet HSBC intentionally waived ***62%*** of the defective loans into its RMBS trusts.

detailed additional evidence that the Warrantors had breached their representations and warranties. The Senate Report also provided an inside look at a lending industry run amok during the period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  In fact, the Senate Report provided a "case study" on Covered Trust Warrantor/loan originator WaMu and its subsidiary Long Beach, exposing a mortgage loan factory that uniformly churned out thousands of breaching, defective mortgage loans.  WaMu, or its subsidiary Washington Mutual Mortgage Securities Corp., were Warrantors of Mortgage Loans for the five WaMu Covered Trusts.[28]

124.    First, the Senate concluded and confirmed that "***[l]enders introduced new levels of risk into the U.S. financial system by selling . . . home loans with . . . poor underwriting***" and that "***a host of financial institutions . . . knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans***."  Senate Report at 12, 50.

125.    The Senate Report identified many of these abusive lenders that made loans that breached their representations and warranties.  Not surprisingly, the Senate Report singled out Covered Trust Warrantors and/or loan originators WaMu (and its subsidiary Long Beach), Countrywide, IndyMac, New Century and Fremont and reported the following about them:

> ***The fact is that each of these lenders issued billions of dollars in high risk, poor quality home loans. By allowing these lenders, for years, to sell and securitize billions of dollars in poor quality, high risk home loans, regulators permitted them to contaminate the secondary market and introduce systemic risk throughout the U.S. financial system***.

Senate Report at 239.  These Warrantors had made representations and warranties concerning Mortgage Loans in at least 11 Covered Trusts.

126.    The Senate Report also confirmed that Covered Trust Warrantors WaMu (and its subsidiary Long Beach), New Century and Fremont "***were known for issuing poor quality subprime***

---

[28]   Washington Mutual Mortgage Securities Corp. served as a warehouse "that held WaMu loans intended for later securitization."  Senate Report at 118 n.434.

*loans,"* but *"[d]espite their reputations for poor quality loans, leading investment banks [such as the Loan Sellers/Sponsors] continued to do business with them and helped them sell or securitize hundreds of billions of dollars in home mortgages*." Senate Report at 21.

127.   With respect to WaMu and its subsidiary Long Beach, the Senate Report made it clear that they were prolific issuers of billions of dollars of defective, breaching Mortgage Loans:

> *WaMu and Long Beach engaged in a host of poor lending practices that produced billions of dollars in poor quality loans. Those practices included offering high risk borrowers large loans; steering borrowers to higher risk loans; accepting loan applications without verifying the borrower's income; using loans with low teaser rates to entice borrowers to take out larger loans; promoting negative amortization loans which led to many borrowers increasing rather than paying down their debt over time; and authorizing loans with multiple layers of risk. WaMu and Long Beach also exercised weak oversight over their loan personnel and third party mortgage brokers, and tolerated the issuance of loans with fraudulent or erroneous borrower information.*

*     *     *

> *Internal documentation from WaMu shows that senior management at the bank was fully aware of Long Beach's shoddy lending practices, but failed to correct them*.

Senate Report at 75.

128.   *The Senate Report further concluded that "WaMu and . . . Long Beach . . . used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors*." Senate Report at 50.  The U.S. Senate investigation further found that *"WaMu and Long Beach too often steered borrowers into home loans they could not afford*," *id.* at 51, *and also "securitized not just poor quality loans, but also loans that its own personnel had flagged as containing fraudulent information.  That fraudulent information included, for example, misrepresentations of the borrower's income and of the appraised value of the mortgaged property*." *Id.* at 125.

- 85 -

129.    The Senate Report detailed numerous instances where WaMu and Long Beach ignored their underwriting guidelines and engaged in outright lending fraud.  Senate Report at 48-160.

130.    Concerning WaMu, the U.S. Senate's investigation found:

> *WaMu's combination of high risk loans, shoddy lending practices, and weak oversight produced hundreds of billions of dollars of poor quality loans that incurred early payment defaults, high rates of delinquency, and fraud*.

Senate Report at 49.

131.    The Senate Report also documented the following concerning WaMu:

> *WaMu management knew of evidence of deficient lending practices, as seen in internal emails, audit reports, and reviews.  Internal reviews of WaMu's loan centers, for example, described "extensive fraud" from employees "willfully" circumventing bank policy.  An internal review found controls to stop fraudulent loans from being sold to investors were "ineffective."  On at least one occasion, senior managers knowingly sold delinquency-prone loans to investors. . . . WaMu's President Steve Rotella described WaMu's prime home loan business as the "worst managed business" he had seen in his career*.

> \*        \*        \*

> *From 2004 to 2008, WaMu originated a huge number of poor quality mortgages, most of which were then resold to investment banks and other investors hungry for mortgage backed securities. . . . WaMu and Long Beach churned out a steady stream of high risk, poor quality loans and mortgage backed securities that later defaulted at record rates*.

Senate Report at 49.

132.    The U.S. Senate investigation confirmed that on multiple occasions WaMu did not originate loans pursuant to its stated underwriting guidelines, thereby issuing loans in breach of its representations and warranties.   For example, *while "WaMu required its loan personnel to determine whether a loan applicant's stated income was reasonable . . . evidence obtained by the Subcommittee indicates that requirement was not effectively implemented*." Senate Report at 91.

- 86 -

***WaMu's ignoring of this underwriting guideline led to borrowers obtaining loans with "an income that was insufficient to support the mortgage amount being requested***." *Id.* at 92.

133.    The Senate Report also found that a 2006 WaMu investigation of loans purchased by WaMu through its subprime conduit uncovered that ***the loans were "not underwritten to [WaMu's underwriting] standards***."  Senate Report at 89.

134.    Numerous former employees are quoted in the Senate Report establishing many instances of departures from WaMu's underwriting guidelines.  The Senate Report concluded that "WaMu's compensation policies," which rewarded employees for making loans instead of turning them down, "were rooted in the bank culture that put loan sales ahead of loan quality."  Senate Report at 143.  As a result, employees regularly ignored the lending guidelines and made loans that breached WaMu's representations and warranties.  As reported to the Senate Subcommittee, WaMu's Chief Credit Officer complained to the company's president that "'[a]ny attempts to enforce [a] more disciplined underwriting approach were continuously thwarted by an aggressive, and often times abusive group of Sales employees within the organization.'"  *Id*.

135.    The Senate Report made it clear that WaMu and its subsidiaries were infested with fraudulent loans that breached their representations and warranties.  These loans were subsequently sold and securitized into RMBS trusts like those at issue herein.  Senate Report at 125.  The U.S. Senate investigation noted several investigations within WaMu concerning fraudulent loans that confirmed extensive fraudulent lending by WaMu employees.  Yet "***when senior management was informed of loans containing fraudulent information, [they] did little to stop the fraud***."  *Id.* at 95. The Senate Report cited two investigations occurring in 2005 in Downey and Montebello, California, where it was found and reported to WaMu management that 58% and 83% of the loans reviewed from those respective offices had been fraudulently made and that WaMu employees were

involved in the fraud.  *Id*. at 96-101.  The Senate Report found that nothing was done by WaMu's management – no one was fired or disciplined.  Instead the employees involved in the fraudulent activity were allowed to continue to make loans and did so with a vengeance – subsequently winning company awards for high lending volumes.  *Id.*

136.    The Senate Report noted another investigation of the two California offices occurred two years later, in 2007, and again high levels of fraudulent loans were found.  The Senate Report noted that this investigation found "*[e]xamples of fraudulent loan information uncovered in the 2007 review included falsified income documents, unreasonable income for the stated profession, false residency claims, inflated appraisal values, failure of the loan to meet [WaMu's underwriting] guidelines, suspect social security numbers, misrepresented assets, and falsified credit information*."  Senate Report at 99.  WaMu's loans clearly did not comport with the representations and warranties it made about them.

137.    The Senate Report also cited a 2005 internal WaMu investigation of two high volume loan centers in Southern California that accepted loans from brokers.  The investigation found that "'*78% of the funded retail broker loans reviewed were found to contain fraud*.'"  Senate Report at 89.

138.    The Senate Report also noted at least one instance where a WaMu sales associate confessed that he or she, and other WaMu sales associates, routinely falsified bank documents and asset statements of borrowers in order to get loans approved.  The confessor stated that they did so because they were under extreme pressure to get loans funded and were instructed to do "'whatever it took.'"  Senate Report at 101.

139.    The U.S. Senate investigation uncovered numerous internal communications repeatedly documenting Long Beach's engagement in outright lending fraud, which were obvious

- 88 -

breaches of WaMu's and Long Beach's representations and warranties.  A sample of those documents contained the following quotes concerning Long Beach's misconduct:

- "*'[The review] confirmed fraud on 115 [loan applications]* . . . .'"

- "*'[U]nderwriting deficiencies is a repeat finding*.'"

- "*'(71%) [of] stated income loans were identified for lack of reasonableness of income*.'"

- "*'(71%) had credit evaluation or loan decision errors* . . . .'"

- "*'(31%) had appraisal discrepancies or issues that raised concerns that the value was not supported*.'"

- "*'[T]he overall system . . . has deficiencies related to multiple, critical origination and underwriting processes* . . . .'"

- "*'Underwriting guidelines established to mitigate risk of unsound underwriting decisions are not always followed* . . . .'"

- "*'[A]ccurate reporting and tracking of exceptions to policy does not exist*.'"

Senate Report at 84-85.

140.   At a hearing before the U.S. Senate Subcommittee former WaMu Chief Risk Officer Jim Vanasek was asked if it was fair to say that WaMu was not worried about the risk associated with Long Beach's loans because it sold those loans and passed the risk of such loans onto investors. Mr. Vanasek's answer was "*'Yes, I would say that was a fair characterization*.'"  Senate Report at 85.  This statement confirmed that neither WaMu nor Long Beach were worried about making true representations and warranties.

141.   The Senate also reported extensively on WaMu's/Long Beach's problems with their "early payment default," or "EPD" loans – loans that breached WaMu's and Long Beach's representations and warranties.  *By early 2005, the Senate Report noted that*

*a number of Long Beach loans experienced 'early payment defaults,' meaning that the borrower failed to make a payment on the loan within three months of the loan being sold to investors.  That a loan would default so soon after origination*

*typically indicates that there was a problem in the underwriting process.  **Investors who bought EPD loans often demanded that Long Beach repurchase them, invoking the representations and warranties clause in the loan sales agreements**.*

Senate Report at 77.

142.     WaMu's and Long Beach's breaching EPD loans continued throughout 2006 and 2007, the time period when the Mortgage Loans were originated and transferred to the Covered Trusts.  In April 2006, after reviewing Long Beach's awful lending operations, WaMu executives exchanged e-mails which warned of major problems: "'***[D]elinquencies are up 140% and foreclosures close to 70%. . . .  First payment defaults are way up and the 2005 vintage is way up relative to previous years.  It is ugly***.'"  Senate Report at 80.

143.     The Senate Report further revealed that:

> According to a memorandum later written by an FDIC examination specialist, "***[d]uring 2006, more than 5,200 [Long Beach] loans were repurchased, totaling $875.3 million.***"  ***Even though, in January 2006, the bank had ceased executing whole loan sales which allowed an automatic repurchase in the event of an EPD, 46% of the repurchase volume was as a result of EPDs.  Further, 43% of the repurchase volume resulted from first payment defaults (FPDs) in which the borrower missed making the first payment on the loan after it was sold.  Another 10% of the repurchases resulted from violations related to representation and warranties (R&W) not included in the EPD or FPD numbers . . . .***

Senate Report at 81.

144.     According to the Senate Report, "***R&W [i.e., representation and warranty] repurchase requests and loss reserves continued to be an issue at Long Beach.  The fourth quarter of 2006 saw another spike in R&W repurchase requests, and in December the required amount of R&W loss reserves jumped from $18 million to $76 million***."  Senate Report at 81.  The Senate Report revealed that 2007 was no better for WaMu and Long Beach as EPD repurchases due to breaches of Long Beach's representations and warranties continued to climb.  *Id*. at 82-83.  In fact, in 2007 WaMu was considering how to dispose of $433 million in second lien loans.  One suggestion was to securitize them, which was quickly shot down by a WaMu employee due to

- 90 -

concerns the defective loans would only lead to massive representation and warranty claims against WaMu:

> "'***Investors are suffering greater than expected losses from subprime in general as well as subprime 2nd lien transactions. As you know, <u>they are challenging our underwriting representations and warrant[ie]s</u>***.'"

*Id*. at 83.

145.    ***The Senate Report concluded that, as a result of the massive number of loan "repurchase claims" due to Long Beach's repeated breaches of its representations and warranties, the impact of the claims "damaged its parent corporation's [i.e., WaMu's] financial results*** ." Senate Report at 75.

146.    Given the foregoing revelations by the Senate Report conclusively establishing that WaMu and its subsidiaries had an enterprise-wide practice of originating defective and fraudulent mortgage loans which did not comport with their representations and warranties, U.S. Bank discovered, no later than April 13, 2011, that WaMu and its subsidiaries had breached their representations and warranties concerning Mortgage Loans in the five WaMu Covered Trusts, wherein WaMu or its subsidiary Washington Mutual Mortgage Securities Corp. were Warrantors. The five WaMu Covered Trusts were WMALT 2006-AR4, WAMU 2006-AR13, WAMU 2006-AR17, WAMU 2006-AR19 and WAMU 2007-OA2.

147.    By April 13, 2011, based on the tsunami of corroborating information that had become available, particularly the FCIC and Senate Reports and the volumes of evidence they disclosed, U.S. Bank absolutely "discovered" and had "actual knowledge," as those terms are used in the Governing Agreements, that there were pervasive breaches of the Warrantors' representations and warranties concerning thousands of Mortgage Loans in the Covered Trusts.  Indeed, once U.S. Bank became aware of the FCIC and Senate Reports, there was ***no doubt*** that it knew the Warrantors were in breach.  This is so because the FCIC and Senate Reports identified ***the very same***

*Warrantors that originated, sold and warranted the Mortgage Loans to the Covered Trusts as the main participants in the wholesale abandonment of loan origination guidelines, and systematic fraudulent lending and falsification of real estate appraisals, LTV ratios, DTI ratios, FICO scores, owner occupancy data, borrowers' incomes, assets and debts, and other loan data.  These Warrantors' customary business practices as set forth in the FCIC and Senate Reports established that they made millions of representations and warranties concerning mortgage loans that were deliberately false, and were the main players in the intentional transfer and deliberate concealment of such defective mortgage loans into thousands of RMBS trusts, including the Covered Trusts.*

148.    Further confirming the industry-wide nature of false representations and warranties in general, and the Warrantors' business models in particular, a settlement was announced just a few months after the Senate Report was released.  In a graphic illustration of two Warrantors' routine issuances of uniformly false and deceptive representations and warranties, Bank of America agreed to settle claims in June 2011 that it and another Covered Trust Warrantor – Countrywide – had breached representations and warranties they made about tens of thousands of mortgage loans. *Bank of America agreed to pay a stunning $8.5 billion to settle breach of representation and warranty claims for a staggering 530 different RMBS trusts*.  This was further confirmation that these Warrantors to the Covered Trusts issued blanket false representations and warranties, which included the Mortgage Loans in the Covered Trusts.

149.    Moreover, in October 2013, a federal jury in Manhattan found Bank of America and former Countrywide executive Rebecca Mairone guilty of civil fraud for making fraudulent representations and warranties about Countrywide loans sold to government sponsored enterprises Fannie Mae and Freddie Mac.  The U.S. Attorney's complaint alleged, among other things, that

**Countrywide and Mairone "knew that numerous representations about the loans were false at the time of sale, including that the loan[s] complied with all applicable guidelines**." *See* Second Amended Complaint of the United States of America, *United States v. Countrywide Financial Corp., et al.*, No. 1:12cv01422-JSR (S.D.N.Y. Sept. 6, 2013), ¶106.  The complaint further alleged that Countrywide's refusal to repurchase loans that breached its representations and warranties "**saddled Fannie Mae with approximately $14 billion in outstanding repurchase requests**." *Id.*, ¶138.  The government is seeking $2.1 billion in penalties in this case.  These subsequent events were additional corroboration that Warrantors Bank of America and Countrywide had breached their representations and warranties regarding the Mortgage Loans in the Covered Trusts.

150.    There was also additional corroboration for JPMorgan Warrantors EMC's and WaMu's uniformly false representations and warranties.  First, in November 2013, JPMorgan announced a $13 billion settlement with various governmental agencies in which it acknowledged that its employees made misrepresentations about JPMorgan's and EMC's loans.  Second, also in November 2013, JPMorgan offered to pay $4.5 billion to settle representation and warranty claims as to **thousands of mortgage loans in 330 different RMBS trusts**, demonstrating the pervasiveness of their false representations and warranties.  (As of this time, the settlement has not been accepted by all RMBS trustees, nor has it been approved by a court.  Two of the Covered Trusts – the BSABS 2006-AC2 and the BSABS 2006-AC5 Covered Trusts – are among the 330 RMBS trusts at issue.)  Then, in February 2014, JPMorgan entered into a consent judgment with the United States agreeing to pay $614 million for making false representations concerning the quality of loans to the U.S. Department of Housing and Urban Development and Veterans Administration.  One month later, in March 2014, JPMorgan agreed to pay insurer Syncora Guarantee Inc. $400 million to settle several lawsuits alleging breaches of representations and warranties as to thousands of loans by EMC.

These subsequent events were just additional proof that the JPMorgan Warrantors such as EMC and WaMu made false representations and warranties about the Mortgage Loans in the Covered Trusts.

151. Further supporting the fact that thousands of the Mortgage Loans breached the Warrantors' representations and warranties is that at or about the time the Senate Report was released in April 2011, the Mortgage Loans in the Covered Trusts had continued to default at historically unprecedented rates, and in fact the defaults were accelerating in most cases, as were the Covered Trusts' losses, due to the numerous, defective, breaching Mortgage Loans in them. For example, all of the Covered Trusts now had double-digit default rates, with 24 of the 25 Covered Trusts having default rates in excess of 30%. The majority of Covered Trusts had default rates in excess of 40%, and several had default rates in excess of 50%. It should be noted that the foregoing default rates actually *understate* the actual default rates for *all* of the Mortgage Loans that were originally within the Covered Trusts. To explain, the foregoing default rates are derived from the monthly trustee reports which disclose the default rates *for only those Mortgage Loans still remaining within the Covered Trusts*. In other words, these default rates *do **not** include all those Mortgage Loans that were originally within the Covered Trusts which had been in default and were already liquidated and therefore removed from the Covered Trusts at the time the specific trustee report was issued*. Thus, the aggregate default rates for all of the Mortgage Loans that were in the Covered Trusts at the time they were formed is actually much, much higher.

152. Moreover, the Covered Trusts' losses had mushroomed from approximately $930 million in January 2009 (*see supra* ¶91) , to *over $4.1 billion* by April 2011, due to all the defective, breaching Mortgage Loans that were within the Covered Trusts that U.S. Bank failed to compel the Warrantors to replace. U.S. Bank was aware of this information that further corroborated that the Warrantors had breached their representations and warranties concerning thousands of Mortgage

Loans.  The default rates and losses were unprecedented and clearly informed U.S. Bank that many of the Mortgage Loans were defective.  The chart below sets forth the Covered Trusts' Mortgage Loan default rates and cumulative realized losses as reported in April 2011, further supporting the conclusion that the Warrantors made numerous false representations and warranties about the Mortgage Loans:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in April 2011 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| BAFC 2007-C | 17.6% | $    88,753,297 |
| BNCMT 2007-2 | 51.3% | $  200,523,780 |
| BSABS 2006-AC2 | 36.7% | $    57,639,233 |
| BSABS 2006-AC5 | 48.0% | $    32,160,968 |
| GPMF 2007-AR1 | 41.5% | $  328,845,114 |
| GPMF 2007-AR2 | 39.4% | $  270,467,604 |
| GPMF 2007-AR3 | 42.4% | $    85,670,716 |
| HEAT 2006-5 | 45.3% | $  209,407,660 |
| HEAT 2006-6 | 45.6% | $  228,285,871 |
| LXS 2006-1ON | 36.9% | $  213,910,430 |
| LXS 2006-15 | 41.0% | $  145,713,977 |
| LXS 2007-7N | 44.4% | $  281,480,155 |
| MABS 2006-HE2 | 52.0% | $  157,132,516 |
| MLMI 2006-WMC2 | 64.7% | $  312,486,031 |
| SARM 2006-9 | 30.1% | $    45,521,465 |
| SASC 2006-NC1 | 40.9% | $  255,600,526 |
| SASC 2006-WF2 | 35.9% | $  202,351,512 |
| SASC 2006-WF3 | 37.7% | $  208,795,531 |
| SASC 2007-EQ1 | 37.9% | $  138,032,396 |
| SASC 2007-WF1 | 39.2% | $  151,840,165 |
| WMALT 2006-AR4 | 58.4% | $  154,748,044 |
| WAMU 2006-AR13 | 37.7% | $  106,471,256 |
| WAMU 2006-AR17 | 40.4% | $    80,758,771 |
| WAMU 2006-AR19 | 36.5% | $  105,689,042 |
| WAMU 2007-OA2 | 43.6% | $    92,814,075 |
| **Covered Trusts' Total Realized Losses:** | | **$4,155,100,135** |

- 95 -

**g.**    **Information Available to U.S. Bank Concerning the Mortgage Loans Within the Covered Trusts Confirmed that There Were Breaches of the Warrantors' Representations and Warranties**

153.    Plaintiff has obtained information concerning several of the Mortgage Loans within the Covered Trusts from bankruptcy filings by the borrowers of such Mortgage Loans. This same information was available to U.S. Bank and in fact U.S. Bank was aware of it since it made appearances in or monitored bankruptcies by the Mortgage Loans' borrowers. This information, as set forth below, shows that the Warrantors' representations and warranties were untrue and that the Warrantors were in breach thereof. Below, plaintiff provides one example of a Mortgage Loan for each Covered Trust. Each example illustrates how the information about the Mortgage Loans the Warrantors provided and warranted as true was instead false; how the loan origination underwriting guidelines that the Warrantors represented were followed were instead ignored; and how, contrary to the Warrantors' representations that the Mortgage Loans did not violate predatory lending or mortgage fraud laws, in fact they violated those laws. They also illustrate that U.S. Bank knew of the Warrantors' breaches because, given that the borrowers in each of the following examples went bankrupt, and U.S. Bank presumably filed a claim or relief from stay on behalf of the affected Covered Trusts in those bankruptcies or monitored them. U.S. Bank learned the following information and therefore knew of widespread breaches by the Warrantors. The following Mortgage Loan examples are not isolated incidents or aberrations. Rather, they are representative examples of many of the Mortgage Loans within the Covered Trusts.

**(1)    BAFC 2007-C Covered Trust**

154.    A borrower obtained a Mortgage Loan for $492,000 in 2007 which was contained within the BAFC 2007-C Covered Trust. The borrower had income of $6,570 per month in 2007 according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt***

- 96 -

*payments were at least $10,025, far in excess of the borrower's monthly income*.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated under any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations and warranties.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (2)　　BNCMT 2007-2 Covered Trust

155.　　A borrower obtained a Mortgage Loan for $307,954 in 2007 which was contained within the BNCMT 2007-2 Covered Trust.  The borrower had income of $458 per month and other income of $66 per month in 2007 according to the borrower's sworn bankruptcy filings.  Accordingly, the borrower had a total of $524 per month to pay her debts and expenses.  *However, the borrower's monthly debt payments were at least $2,823, far in excess of the borrower's monthly income*.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations and warranties.  The foregoing also appears to show that the

Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

**(3)    BSABS 2006-AC2 Covered Trust**

156.    A borrower obtained a Mortgage Loan for $760,000 in 2006 which was contained within the BSABS 2006-AC2 Covered Trust.  The borrower had income of $5,167 per month in 2005 and 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $7,544, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and such a loan was not originated under any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.    In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to be a violation of mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2006.

- 98 -

### (4)  BSABS 2006-AC5 Covered Trust

157.   Borrowers obtained a Mortgage Loan for $369,600 in 2006 which was contained within the BSABS 2006-AC5 Covered Trust.  The borrowers had joint income of $3,550 per month in 2006 according to the borrowers' sworn bankruptcy filings.  *However, the borrowers' monthly debt payments were at least $6,819, far in excess of the borrowers' monthly income*.  The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, the borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrowers clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrowers' income and/or debts that must have occurred to "qualify" these borrowers for the Mortgage Loan in the first place appear to violate mortgage fraud laws, and contradicts that the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrowers declared bankruptcy shortly after obtaining the loan at issue, in 2008.

### (5)  GPMF 2007-AR1 Covered Trust

158.   A borrower obtained a Mortgage Loan for $565,900 in 2006 which was contained within the GPMF 2007-AR1 Covered Trust.  The borrower had income of $3,187 per month in 2006 according to the borrower's sworn bankruptcy filings.  *However, the borrower's monthly debt payments were at least $5,072, far in excess of the borrower's monthly income*.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not

afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (6)     GPMF 2007-AR2 Covered Trust

159.     A borrower obtained a Mortgage Loan for $308,000 in 2007 which was contained within the GPMF 2007-AR2 Covered Trust.  The borrower had income of $0 per month and rental income of $3,000 per month in 2007 according to the borrower's sworn bankruptcy filings.  Accordingly, the borrower had a total of $3,000 per month to pay his debts and expenses. ***However, the borrower's monthly debt payments were at least $25,577, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate

mortgage fraud laws, and contradicts that the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (7)     GPMF 2007-AR3 Covered Trust

160.    Borrowers obtained a Mortgage Loan for $228,800 in 2007 which was contained within the GPMF 2007-AR3 Covered Trust.  The borrowers had joint income of $12,239 per month in 2007 according to the borrowers' sworn bankruptcy filings.  ***However, the borrowers' monthly debt payments were at least $24,053, far in excess of the borrowers' monthly income***.  The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, these borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrowers clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrowers' income and/or debts that must have occurred to "qualify" the borrowers for the Mortgage Loan in the first place appears to violate the mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they supplied was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrowers declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (8)     HEAT 2006-5 Covered Trust

161.    A borrower obtained a loan for $415,200 in 2006 which was contained within the HEAT 2006-5 Covered Trust.  The borrower had income as an independent contractor of $4,000 per

month in 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $5,658, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (9)   HEAT 2006-6 Covered Trust

162.    A borrower obtained a Mortgage Loan for $401,400 in 2006 which was contained within the HEAT 2006-6 Covered Trust.  The borrower had income of $2,615 per month in 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $6,852, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan in violation of

law since the borrower clearly could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2006.

### (10)    LXS 2006-10N Covered Trust

163.    A borrower obtained a Mortgage Loan for $207,875 in 2006 which was contained within the LXS 2006-10N Covered Trust.  The borrower had joint employment income with his wife of $1,613 per month for 2005 and individual income of $3,275 per month for 2006 according to the borrower's and his wife's sworn bankruptcy filings.  Accordingly, the borrower had a total of $1,613 to $3,275 per month to pay his debts and expenses.  ***However, the borrower's monthly debt payments were at least $4,297, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower clearly could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that

the borrower and his wife declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (11)    LXS 2006-15 Covered Trust

164.    A borrower obtained a Mortgage Loan for $768,000 in 2006 which was contained within the LXS 2006-15 Trust.  The borrower had income of $2,910 per month from employment 2006 according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $9,317, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate the mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (12)    LXS 2007-7N Covered Trust

165.    Borrowers obtained a Mortgage Loan for $576,000 in 2007 which was contained within the LXS 2007-7N Covered Trust.  The borrowers had joint year-to-date income of $870 per month and other year-to-date income of $2,732 per month in 2007 according to the borrowers' sworn bankruptcy filings.  Accordingly, the borrowers had a total of $3,602 per month to pay their

debts and expenses.  ***However, the borrowers' monthly debt payments were at least $5,746, far in excess of the borrowers' monthly income***.  The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, these borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan because the borrowers obviously could not afford it.  In addition, the apparent misrepresentation of the borrowers' income and/or debts that must have occurred to "qualify" the borrowers for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrowers declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (13)    MABS 2006-HE2 Covered Trust

166.    A borrower obtained a Mortgage Loan for $572,000 in 2006 which was contained within the MABS 2006-HE2 Covered Trust.  The borrower had income of $0-$583 per month and other income of $0-$83 per month in 2006 according to the borrower's sworn bankruptcy filings.  Accordingly, the borrower had a total of $0-$666 per month to pay her debts and expenses.  ***However, the borrower's monthly debt payments were at least $7,147, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an

illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (14)    MLMI 2006-WMC2 Covered Trust

167.    A borrower obtained a Mortgage Loan for $352,000 in 2006 which was contained within the MLMI 2006-WMC2 Covered Trust.  ***The borrower had income of $0 per month*** and other income of $350 per month in 2006 according to the borrower's sworn bankruptcy filings.  Accordingly, the borrower had a total of $350 per month to pay her debts and expenses.  ***However, the borrower's monthly debt payments were at least $3,751, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties

occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2006.

### (15)    SARM 2006-9 Covered Trust

168.    A borrower obtained a Mortgage Loan for $650,000 in 2006 which was contained within the SARM 2006-9 Covered Trust.  The borrower had income of $0 per month and rental income of $6,830 per month in 2006 according to the borrower's sworn bankruptcy filings.  Accordingly, the borrower had a total of $6,830 per month to pay his debts and expenses. ***However, the borrower's monthly debt payments were at least $29,998.07, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2008.

### (16)    SASC 2006-NC1 Covered Trust

169.    A borrower obtained a Mortgage Loan for $664,000 at the very end of 2005 or the beginning of 2006 which was contained within the SASC 2006-NC1 Covered Trust.  The borrower had income of $8,083 per month for 2005 and $0 through October of 2006 according to the

borrower's sworn bankruptcy filings.  Accordingly, the borrower had a total of $0-$8,083 per month to pay her debts and expenses.  ***However, the borrower's monthly debt payments were at least $10,659, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2006.

### (17)    SASC 2006-WF2 Covered Trust

170.    Borrowers obtained a Mortgage Loan for $616,250 and one of the two borrowers obtained another Mortgage Loan for $212,500 in 2006 which were both contained within the SASC 2006-WF2 Covered Trust.  The borrowers had joint income of $6,619 per month in 2006 according to the borrowers' sworn bankruptcy filings.  ***However, the borrowers' monthly debt payments were at least $9,053, far in excess of the borrowers' monthly income***.  The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, these borrowers could not afford to repay these Mortgage Loans, and the Mortgage Loans were not originated pursuant to any lenders' underwriting guidelines for such loans, contrary to the Warrantors' representations.  The foregoing

also appears to show that the Mortgage Loans were illegal predatory loans since the borrowers obviously could not afford them.  In addition, the apparent misrepresentation of the borrowers' income and/or debts that must have occurred to "qualify" the borrowers for the Mortgage Loans in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrowers declared bankruptcy shortly after obtaining the Mortgage Loans at issue, in 2007.

### (18)   SASC 2006-WF3 Covered Trust

171.   A borrower obtained a Mortgage Loan for $663,294 in 2006 which was contained within the SASC 2006-WF3 Covered Trust.  ***The borrower had income of $0 per month in 2006 according to the borrower's sworn bankruptcy filings.  However, the borrower's monthly debt payments were at least $5,244, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

**(19)    SASC 2007-EQ1 Covered Trust**

172.    A borrower obtained a Mortgage Loan for $382,400 in 2006 which was contained within the SASC 2007-EQ1 Covered Trust.  The borrower had income from employment of only $474 per month in 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $3,561, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

**(20)    SASC 2007-WF1 Covered Trust**

173.    A borrower obtained a Mortgage Loan for $900,000 in 2006 which was contained within the SASC 2007-WF1 Covered Trust.  ***The borrower had income of $0 per month in 2006 according to the borrower's sworn bankruptcy filings.  However, the borrower's monthly debt payments were at least $8,020, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not

afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations. The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct. The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (21)   WMALT 2006-AR4 Covered Trust

174.    A borrower obtained a Mortgage Loan for $650,000 in 2006 which was contained within the WMALT 2006-AR4 Covered Trust. The borrower had income of $5,122 per month in 2006 according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $7,761, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations. The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct. The fact that the foregoing

breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2008.

### (22)    WAMU 2006-AR13 Covered Trust

175.    A borrower obtained a Mortgage Loan for $600,000 in 2006 which was contained within the WAMU 2006-AR13 Covered Trust.  The borrower had income of $1,857 per month in 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $3,043, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (23)    WAMU 2006-AR17 Covered Trust

176.    A borrower obtained a Mortgage Loan for $547,200 in 2006 which was contained within the WAMU 2006-AR17 Covered Trust.  The borrower had income of $1,416 per month from employment in 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $2,545, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly

expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations. The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct. The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (24)    WAMU 2006-AR19 Covered Trust

177.    A borrower obtained a Mortgage Loan for $233,910 in 2006 which was contained within the WAMU 2006-AR19 Covered Trust. *The borrower had income of $0 per month and other income of only $18 per month in 2006 according to the borrower's sworn bankruptcy filings. Accordingly, the borrower had a total of $18 per month to pay his debts and expenses. However, the borrower's monthly debt payments were at least $5,761, far in excess of the borrower's monthly income*. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated pursuant to any lenders' underwriting guidelines for such a loan, contrary to the Warrantors' representations. The foregoing also appears to show that the Mortgage Loan was an illegal predatory loan since the borrower obviously could not afford it. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the

borrower for the Mortgage Loan in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower along with his wife declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (25)    WAMU 2007-OA2 Covered Trust

178.    A borrower obtained two Mortgage Loans for $525,000 and $546,000 in 2006 which were contained within the WAMU 2007-OA2 Covered Trust.  The borrower had employment income of $3,333 per month in 2006 according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $22,771, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay these Mortgage Loans, and the Mortgage Loans were not originated pursuant to any lenders' underwriting guidelines for such loans, contrary to the Warrantors' representations.  The foregoing also appears to show that the Mortgage Loans were illegal predatory loans since the borrower obviously could not afford them.  In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loans in the first place appears to violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct.  The fact that the foregoing breaches of the Warrantors' representations and warranties occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loans at issue, in 2008.

179.    As the foregoing demonstrates, Mortgage Loans in the Covered Trusts were extended to borrowers who clearly did not have the ability to repay them.  This was due to lenders ignoring

their stated underwriting guidelines, outright mortgage fraud by either lenders or borrowers or both, and/or predatory lending practices by lenders. The result of these widespread practices was the origination and transfer to the Covered Trusts of thousands of defective Mortgage Loans which breached the Warrantors' representations and warranties. U.S. Bank was obviously aware of these breaches through all of the public news and private information available to it as alleged herein, along with the abysmal performance of the Mortgage Loans, and the numerous bankruptcies of borrowers of the Mortgage Loans and the information those bankruptcies conveyed to U.S. Bank. Accordingly, U.S. Bank knew that the Warrantors' representations and warranties concerning the Mortgage Loans were false.

180.    Despite U.S. Bank's discovery of these massive breaches of the Warrantors' representations and warranties concerning thousands of Mortgage Loans in the Covered Trusts, U.S. Bank did not act and has continued to fail to act in accordance with its obligations under the Governing Agreements and the TIA, and has failed to enforce the Warrantors' obligations to cure, substitute or repurchase the thousands of defective Mortgage Loans, or in the case of the WaMu Covered Trusts, failed to notify the Servicer of such breaches or ensure that the Servicer enforced such claims against the Warrantors. U.S. Bank's continuing failure to act after learning of the breaches has caused the loss of billions of dollars in meritorious representation and warranty claims to the statute of limitations. By these failures, U.S. Bank breached and has continued to breach the Governing Agreements and violated the TIA, and has caused plaintiff, the class and the Covered Trusts to suffer massive damages.

2.    **U.S. Bank Had Actual Knowledge of Events of Default as Early as October 2010 but in No Event Later than April 13, 2011**

    a.    **As Early as October 2010 U.S. Bank Knew that the Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

181.    As previously alleged, U.S. Bank was also required by the Governing Agreements and the TIA to act when it became aware of Events of Default.  Whenever U.S. Bank became aware that the Master Servicers or Servicers failed to service and administer the Mortgage Loans in the Covered Trusts as "prudent" master servicers or servicers would, an Event of Default occurred under the Governing Agreements, and U.S. Bank was then required to take certain actions.  For example, U.S. Bank was required to request that the offending Master Servicer or Servicer remedy the default, and notify plaintiff and the class if the default was not cured.  U.S. Bank was also permitted to terminate or replace the Master Servicer or Servicer if the Event of Default was not cured, or take over the offending Master Servicers'/Servicers' responsibilities.  However, as alleged more fully below, even though U.S. Bank had actual knowledge of Master Servicer/Servicer Events of Default with respect to the Mortgage Loans in the Covered Trusts as early as October 2010 it breached the Governing Agreements and violated the TIA by failing to take the actions described above.[29]

182.    The Master Servicers and Servicers to the Covered Trusts, as designated in the Governing Agreements are set forth in the chart below.  None of these Master Servicers or Servicers have been terminated or replaced by U.S. Bank due to an Event of Default:

---

[29]    With respect to the WaMu Covered Trusts, U.S. Bank also knew the Servicers for those trusts had also committed Events of Default by failing to enforce the Warrantors' obligations to cure, substitute, or repurchase Mortgage Loans which breached their representations and warranties by as early as 2009 but in no event later than April 13, 2011, as alleged *supra*.

**Covered Trusts' Master Servicers and Servicers**

| Covered Trust | Original Master Servicers | Original Servicers |
|---|---|---|
| BAFC 2007-C | ▪ Wells Fargo | ▪ Bank of America<br>▪ Chase Bank<br>▪ National City (bought by PNC Bank)<br>▪ Wells Fargo |
| BNCMT 2007-2 | ▪ Aurora | ▪ Chase Bank |
| BSABS 2006-AC2 | ▪ Wells Fargo | ▪ EMC<br>▪ Harbourside Mortgage Corporation<br>▪ HSBC Mortgage Corporation (USA) ("HSBC")<br>▪ American Home Mortgage Servicing<br>▪ Waterfield<br>▪ Wells Fargo |
| BSABS 2006-AC5 | ▪ Wells Fargo | ▪ EMC<br>▪ GreenPoint<br>▪ National City |
| GPMF 2007-AR1 | ▪ Aurora | ▪ GreenPoint<br>▪ GMAC<br>▪ Aurora |
| GPMF 2007-AR2 | ▪ Aurora | ▪ GreenPoint<br>▪ GMAC<br>▪ Aurora |
| GPMF 2007-AR3 | ▪ Aurora | ▪ GreenPoint<br>▪ Aurora |
| HEAT 2006-5 | ▪ None | ▪ Wells Fargo<br>▪ Chase Bank<br>▪ Select Portfolio Servicing |
| HEAT 2006-6 | ▪ None | ▪ Wells Fargo<br>▪ Select Portfolio Servicing |
| LXS 2006-10N | ▪ Aurora | ▪ Aurora<br>▪ Bank of America<br>▪ Countrywide Home Loans Servicing LP ("CHLS") (CHLS was renamed to BAC Home Loans Servicing LP ("BACHLS") after Bank of America acquired Countrywide)<br>▪ GMAC<br>▪ IndyMac<br>▪ SunTrust<br>▪ Wells Fargo |
| LXS 2006-15 | ▪ Aurora | ▪ Aurora |
| LXS 2007-7N | ▪ Aurora | ▪ CHLS/BACHLS<br>▪ Aurora<br>▪ American Home Mortgage Servicing |

| Covered Trust | Original Master Servicers | Original Servicers |
|---|---|---|
| MABS 2006-HE2 | ▪ Wells Fargo | ▪ Wells Fargo<br>▪ New Century |
| MLMI 2006-WMC2 | ▪ None | ▪ Wilshire Credit Corp. |
| SARM 2006-9 | ▪ Aurora | ▪ Aurora<br>▪ CHLS/BACHLS<br>▪ PHH |
| SASC 2006-NC1 | ▪ Aurora | ▪ Wells Fargo |
| SASC 2006-WF2 | ▪ Aurora | ▪ Wells Fargo |
| SASC 2006-WF3 | ▪ Aurora | ▪ Wells Fargo |
| SASC 2007-EQ1 | ▪ Aurora | ▪ Wells Fargo<br>▪ HomeEq Servicing |
| SASC 2007-WF1 | ▪ Aurora | ▪ Wells Fargo |
| WMALT 2006-AR4 | ▪ None | ▪ WaMu |
| WAMU 2006-AR13 | ▪ None | ▪ WaMu |
| WAMU 2006-AR17 | ▪ None | ▪ WaMu |
| WAMU 2006-AR19 | ▪ None | ▪ WaMu |
| WAMU 2007-OA2 | ▪ None | ▪ WaMu |

183.   Prior to the end of October 2010, numerous news reports and governmental investigations and actions revealed widespread loan servicing misconduct, including foreclosure abuses and other improper loan servicing practices that injured RMBS investors.  The news stories and other events indicated that loan servicers were engaging in industry-wide practices amounting to foreclosure fraud and other abuses which injured RMBS investors.  The reports also indicated that many of the Master Servicers and Servicers to the Covered Trusts were involved in these improper practices and abuses.  Importantly, these news stories and governmental activity also indicated that the loan servicing industry in general, and many of the Master Servicers and Servicers in particular, were not servicing mortgage loans in a "prudent" manner, as required by the Governing Agreements and thus were engaging in Events of Default.

184.   For example, as early as March 2008, news reports surfaced concerning Select Portfolio Servicing, a Servicer for at least two of the Covered Trusts.  The reports revealed that Select Portfolio Servicing had been sued by a RMBS investor alleging that Select Portfolio Servicing

had engaged in predatory loan servicing practices, charging improper fees to borrowers, and making servicing advances that improperly diverted money from RMBS investors to Select Portfolio Servicing.  This conduct would have breached Select Portfolio Servicing's duty to service the mortgage loans as a "prudent" servicer for the benefit of plaintiff and the class under the Governing Agreements, and amounted to an Event of Default.

185.    In September 2008, U.S. Bank was made aware of improper loan servicing practices by another Servicer to the Covered Trusts that amounted to Events of Default.  In September 2008, the Federal Trade Commission ("FTC") announced that EMC – a Servicer (and Warrantor as well) for at least two of the Covered Trusts – had agreed to settle charges that EMC and its related company Bear Stearns had "misrepresented the amounts borrowers owed, charged unauthorized fees, such as late fees, property inspection fees, and loan modification fees, and engaged in unlawful and abusive collection practices."  The FTC's complaint alleged that EMC and Bear Stearns "neglected to obtain timely and accurate information on consumers' loans, made inaccurate claims to consumers, and engaged in unlawful collection and servicing practices."  The FTC charged EMC and Bear Stearns with violating the FTC Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Truth in Lending Act's Regulation Z.  This type of illegal conduct was a clear Event of Default under the Governing Agreements.  EMC paid $28 million to settle the charges.  Given that EMC and Bear Stearns were owned by JPMorgan by this time, and JPMorgan also owned fellow Covered Trusts Servicers Chase Bank and WaMu, which together with EMC serviced Mortgage Loans in at least ten Covered Trusts, U.S. Bank was put on notice that this type of misconduct could also be occurring with respect to many of the Mortgage Loans in the Covered Trusts.

186.     By early 2009, due to the previously alleged systematic abandonment of lending standards and proliferation of fraudulent lending, massive numbers of mortgage loans were in default or foreclosure (and had been for some time), including numerous Mortgage Loans within the Covered Trusts.   RMBS trustees such as U.S. Bank were working with master servicers and servicers to foreclose on hundreds of thousands of defaulted mortgage loans, including many of the Mortgage Loans in the Covered Trusts.   Pursuant to the Governing Agreements, the Master Servicers and Servicers initiated, directed, prosecuted and oversaw the foreclosures on behalf of RMBS trustees because the Master Servicers and Servicers possessed the information concerning non-payment or default by the borrowers due to their servicing of the loans, and dealt with the administration of the loans and borrowers on a regular basis.   Thus, RMBS trustees acted primarily through the master servicers and servicers to foreclose on mortgage loans.   U.S. Bank did so with respect to the Mortgage Loans, using the Covered Trusts' Master Servicers/Servicers to foreclose.

187.     In 2008 and 2009, and even before, RMBS trustees, including U.S. Bank, were having major difficulties foreclosing on defaulted mortgage loans because of widespread servicing misconduct by master servicers and servicers.   Courts were denying, delaying, halting, and even invalidating many foreclosures because of extremely shoddy and often fraudulent conduct by the loan servicers, conduct that was antithetical to "prudent" loan servicing.   Because of the loan servicers' shoddy and/or illegal foreclosure practices – practices that were Events of Default under the Governing Agreements – RMBS trustees were having difficulty establishing that they owned the mortgages at the time they foreclosed, as was required by law, and thus were having problems and facing long delays in foreclosing on loans.   This was due to faulty mortgage documentation provided by loan servicers, and also because of the frequent assertion of false facts by the loan servicers, and their filing of numerous false affidavits, certifications and documents in connection with those

proceedings.  Such loan servicing practices were clearly not the practices of "prudent" loan servicers as required by the Governing Agreements and were in fact Events of Default.

188.    As early as mid-2008, widespread improper and imprudent loan servicing practices in foreclosure proceedings were already so severe that at least two RMBS trustees (Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas) sent a memo to *all* of their loan servicers –which included many of the Master Servicers and Servicers to the Covered Trusts herein – warning those loan servicers that their foreclosure actions were being "scrutinized" by courts and others and requesting that such servicers be more "mindful" of complying with the law and industry standards, while also threatening the loan servicers with liability for failing to comply with their servicing obligations to the trusts.

189.    U.S. Bank was also directly aware of improper and imprudent loan servicing practices by most loan servicers by 2008 and 2009 because U.S. Bank was experiencing it firsthand in many cases where it acted as a RMBS trustee.  For example, in April 2007, U.S. Bank was acting as a trustee for a RMBS trust when U.S. Bank's attorneys received instructions from the trust's loan servicer, directing the initiation of foreclosure proceedings against a borrower named Antonio Ibanez located in Massachusetts.  *See U.S. Bank Nat'l Ass'n v. Ibanez*, No. 08 Misc. 384283, 2009 Mass. LCR LEXIS 134, at *42-*43 & n.38 (Oct. 14, 2009), *aff'd*, 941 N.E.2d 40 (Mass. Sup. Ct. 2011). The trust's loan servicer directed U.S. Bank's attorneys to begin foreclosure proceedings against Ibanez "'in the name of U.S. Bank National Association, as Trustee.'"  *Id*. at *43.  Based on the loan servicer's directions, a complaint was filed in April 2007 in which "***U.S. Bank represented that it was the 'owner (or assignee) and holder' of the mortgage given by Ibanez for the property***."  941 N.E.2d at 47; *see also* 2009 Mass. LCR LEXIS 134, at *43-*44 & n.38.   Based on this representation, judgment was entered in U.S. Bank's favor in June 2007 allowing the foreclosure to

- 121 -

proceed.  At the further direction of the loan servicer, "U.S. Bank also caused to be published in the Boston Globe [a] notice of the foreclosure sale" in June 2007 which "*identified U.S. Bank as the 'present holder' of the mortgage*."  941 N.E.2d at 47; *see also* 2009 Mass. LCR LEXIS 134, at *43-*46.  However, the foregoing statements directed by the loan servicer – that U.S. Bank was the owner and holder of the Ibanez mortgage in 2007 – "*were false*" at the time they were made because U.S. Bank had not been assigned the mortgage nor did it hold it at that time.  941 N.E.2d at 54; *see also* 2009 Mass. LCR LEXIS 134, at *45-*46 (such representations were "incorrect").

190.    Nonetheless, neither U.S. Bank nor the trust's loan servicer ever notified the court of these falsehoods in 2007.  Instead, they proceeded to foreclose on the Ibanez mortgage in July 2007, with U.S. Bank purchasing the property at the foreclosure sale.  *Over a year later,* in September 2008, U.S. Bank filed an action in Massachusetts "Land Court" seeking: (1) a judgment that all of Ibanez's right, title and interest in the foreclosed property had been extinguished; (2) a declaration that there was no cloud on the property's title from publication of the notice of foreclosure sale; and (3) a declaration that title to the property was vested in U.S. Bank in fee simple.  941 N.E.2d at 44.  In this new action, *U.S. Bank admitted for the first time that the statements directed by the loan servicer and which had been made in the previous Ibanez action and foreclosure were false*.  U.S. Bank now admitted, contrary to previous representations in the first foreclosure complaint and in the notice of foreclosure sale, that it was not the owner or holder of the Ibanez mortgage in 2007 when it made those statements and that it did not hold the mortgage at the time of foreclosure.  U.S. Bank admitted in this new lawsuit that in fact it had not been assigned the Ibanez mortgage until much later, in September 2008, 14 months *after* the foreclosure sale, and 17 months *after* it had previously and falsely asserted that U.S. Bank was the owner and holder of the Ibanez mortgage.  Nonetheless,

U.S. Bank requested that the Land Court hold that the foreclosure was proper and that U.S. Bank held proper title to the property.

191.    In March 2009, the Massachusetts Land Court rejected U.S. Bank's requests and entered judgment against it, holding that the 2007 foreclosure on the Ibanez mortgage was improper and invalid.  The court held that the foreclosure was invalid because U.S. Bank was not the owner and holder of the Ibanez mortgage as it claimed (at the direction of the loan servicer) in 2007 when it published the notice of foreclosure sale and foreclosed on the mortgage, as required by Massachusetts law.  *See U.S. Bank Nat'l Ass'n v. Ibanez*, No. 384283, 2009 Mass. LCR LEXIS 41 (Mar. 26, 2009).  U.S. Bank thereafter moved to vacate the judgment, which the Land Court denied. *See* 2009 Mass. LCR LEXIS 134.  U.S. Bank then appealed.  On January 7, 2011, the Massachusetts Supreme Court affirmed the Land Court's rulings in full.  *See* 941 N.E.2d 40.  The Massachusetts Supreme Court held that because U.S. Bank "did not have [its] assignment[] to the Ibanez . . . mortgage[] at the time of the publication of the notice[] and sale[], [U.S. Bank] lacked authority to foreclose . . . and [its] published claims to be the present holder[] of the mortgage[] *were false*." *Id.* at 54.  *Dow Jones Business News* reported that **one Supreme Court justice stated that it was "'surprising'" to see the "'utter carelessness with which the plaintiff banks documented the titles to their assets**.'"

192.    The *Ibanez* case was not an isolated incident of loan servicer misconduct that U.S. Bank was aware of and involved in.  U.S. Bank had directly experienced or deliberately participated in such shoddy or fraudulent loan servicing in thousands, if not tens of thousands, of cases.  For example, in the state of Florida, due to loan servicer errors or misconduct, there are at least three reported decisions by Florida appellate courts reversing summary judgments of foreclosure in U.S. Bank's favor.  In each case, the foreclosure was overturned because false, erroneous, or otherwise

- 123 -

inadequate affidavits or other foreclosure documents were filed by the loan servicers. *See, e.g.*, *Viola v. U.S. Bank N.A.*, No. 4D11-2719, 2014 Fla. App. LEXIS 149 (Fla. Dist. Ct. App. Jan. 8, 2014); *Gee v. U.S. Bank N.A.*, 72 So. 3d 211 (Fla. Dist. Ct. App. 2011); *Servedio v. U.S. Bank Nat'l Ass'n*, 46 So. 3d 1105 (Fla. Dist. Ct. App. 2010). In another case in Florida, a trial court judge held U.S. Bank in contempt for its (and presumably its loan servicer's) misconduct in connection with the foreclosure of a mortgage loan taken out by a borrower named Dimitri Jansen. *See U.S. Bank N.A. v. Jansen, et al.*, No. 2007 CA 004769 SC (Fla. Cir. Ct., Sarasota Cnty. Dec. 28, 2012).

193.    Similarly, throughout the nation, there were many cases where U.S. Bank's foreclosures were delayed, denied, invalidated, or otherwise neutralized due to defective or false affidavits that were filed by its loan servicers or even U.S. Bank itself, and because of other loan servicer misconduct. Indeed, it appears that U.S. Bank actually acquiesced in or actively participated in the loan servicing misconduct of its master servicers and servicers, which led to numerous delays and invalidations of its foreclosures. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Nelson*, No. 2013AP755, 2014 Wisc. App. LEXIS 168 (Wis. Ct. App. Feb. 27, 2014) (summary judgment of foreclosure in favor or U.S. Bank reversed due to insufficient affidavit of Servicer Wells Fargo; Wells Fargo employee lacked personal knowledge concerning how foreclosure records were created); *U.S. Bank Nat'l Ass'n v. De Los Rios*, No. 09-37317, 2014 N.Y. Misc. LEXIS 218, at *11 (N.Y. Sup. Ct. Jan. 9, 2014) (denying U.S. Bank's motion for summary judgment in part, based on insufficient affidavit from Servicer Wells Fargo; no explanation in affidavit "as to why a different version of the note" was produced at different times during the litigation); *Bank of Am. N.A. v. Lam*, No. 0115035/2009, 2013 N.Y. Misc. LEXIS 6239 (N.Y. Sup. Ct. Dec. 9, 2013) (U.S. Bank's (U.S. Bank succeeded Bank of America as Trustee) motion for summary judgment denied; Servicer Wells Fargo's affidavit was defective); *U.S. Bank Nat'l Ass'n v. Steinberg*, No. 3234/12, 2013 N.Y. Misc.

LEXIS 5869, at *14-*15 (N.Y. Sup. Ct. Nov. 29, 2013) (court denies U.S. Bank's motion for summary judgment of foreclosure, holding loan servicer's affidavit "is patently insufficient to establish [U.S. Bank's] standing" to foreclose; court further holds servicer's affidavit is "conclusory" and not based on affiant's "personal knowledge");*U.S. Bank Nat'l Ass'n v. Nicholson*, No. 17679/2008, 2013 N.Y. Misc. LEXIS 5542, at *18 (N.Y. Sup. Ct. Nov. 12, 2013) (denying U.S. Bank's motion for order of reference due to loan servicer Chase's affidavit being "insufficient to establish [U.S. Bank] had physical possession of the note at any time"); *US Bank Nat'l Ass'n v. Gioia*, No. 25441/2011, 2013 N.Y. Misc. LEXIS 6406 (N.Y. Sup. Ct. Nov. 6, 2013) (court denies U.S. Bank's motion to discontinue foreclosure action; finds U.S. Bank failed to meet several court deadlines, did not negotiate in good faith as required by New York law, and failed to timely prosecute action; as a result, all interest owed by borrower from start of action in 2011 until referee determination was tolled and not collectible by U.S. Bank/servicer); *Dernier v. Mortg. Network, Inc.*, No. 12-226, 2013 Vt. LEXIS 99, at *7-*10 (Vt. Oct. 18, 2013) (Vermont Supreme Court partially reverses dismissal of action by borrowers against U.S. Bank, holding that borrowers sufficiently alleged that U.S. Bank engaged in fraud in transfer of note and mortgage; court holds that assignment chain for note is "confusing" and "certainly perplexing," and that for assignment of mortgage, "the picture is no clearer," as some assignment "language appears to be clearly wrong"); *U.S. Bank Nat'l Ass'n v. Guy*, 977 N.Y.S.2d 670, 2013 N.Y. Misc. LEXIS 4127, at *11 (Sup. Ct. 2013) (court grants borrower's motion to dismiss U.S. Bank's foreclosure action with prejudice; holds that affidavits of Servicer Select Portfolio Servicing were not based on personal knowledge and "inconsistent with [U.S. Bank's] complaint");*U.S. Bank, N.A. v. Shinaba*, 977 N.Y.S.2d 671, 2013 N.Y. Misc. LEXIS 3990, at *25-*26 (Sup. Ct. 2013) (The court sanctions U.S. Bank, holding that U.S. Bank and its Servicer Bank of America violated the Home Affordable Modification

- 125 -

Program ("HAMP") and New York laws; court further holds: "***In this particular case [U.S. Bank's] and [Bank of America's] dilatory, and dishonest, conduct is troubling. . . . [U.S. Bank] and [Bank of America] provided conflicting information, made several misrepresentations[,] . . . disobeyed several court orders[,] and unduly delayed the review of Shinaba's HAMP . . . application without a valid explanation, only to ultimately refuse to render any decision on her HAMP application, and instead, offer her an in-house modification with less favorable terms***."); *Brown v. U.S. Bank Nat'l Ass'n*, 117 So. 3d 823 (Fla. Dist. Ct. App. 2013) (denial of borrowers' motion to quash service of process reversed on appeal due to U.S. Bank's concession that trial court committed reversible error; process server (presumably hired by U.S. Bank's loan servicer) put wrong date on summons); *Juárez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 279 (1st Cir. 2013) (Court of Appeals reverses in part dismissal of Massachusetts borrower's lawsuit against U.S. Bank and Servicer Select Portfolio Servicing, holding that "even a perfunctory scrutiny of the 'Corporate Assignment of Mortgage'. . . reveals that we are before a document that was executed ***after*** the foreclosure" and therefore borrower might have a claim under *Ibanez*); *U.S. Bank, N.A. v. McGinn*, No. S-12-004, 2013 Ohio App. LEXIS 2, at *9 (Ohio Ct. App. Jan. 4, 2013) (summary judgment of foreclosure in U.S. Bank's favor reversed; court holds that Servicer GMAC's affidavit in support of summary judgment was not based on personal knowledge and "inconsistency between the copy of the note that was attached to the complaint and the copy of the note that was attached to U.S. Bank's motion for summary judgment" created genuine issues of fact concerning whether U.S. Bank possessed note prior to filing complaint); *U.S. Bank, N.A. v. Moore*, 278 P.3d 596, 598 (Okla. 2012) (reversing and remanding summary judgment of foreclosure in U.S. Bank's favor; court holds that assignment of note executed ***after*** U.S. Bank filed complaint in foreclosure was insufficient to establish U.S. Bank's right to foreclose; U.S. Bank's complaint falsely alleged it was "'the present holder of said

- 126 -

Note'"); *U.S. Bank Nat'l Ass'n v. Kimball*, 27 A.3d 1087, 1093 (Vt. Sup. Ct. 2011) (court holds that Servicer GMAC employee ***Jeffrey Stephan's (the "robo-signer" alleged herein infra at ¶¶202, 204, 229)*** affidavit was insufficient to establish U.S. Bank's standing to foreclose; court points out "***contradictory and uncertain documentation***" submitted by U.S. Bank); *U.S. Bank Nat'l Ass'n v. Spencer*, No. BER-F-10591-10, 2011 N.J. Super. Unpub. LEXIS 746, at *35 (N.J. Super. Ct. Mar. 22, 2011) (court denies U.S. Bank's motion for summary judgment of foreclosure and grants borrower's cross-motion for summary judgment and dismisses case; court holds that U.S. Bank failed to prove it had standing to foreclose and had "no competent witness [that] has brought forth admissible evidence"); *In re Parker*, 445 B.R. 301 (Bankr. D. Vt. 2011) (court denies U.S. Bank's motion for summary judgment requesting dismissal of borrower's claim that U.S. Bank lacks standing to enforce mortgage; court holds that U.S. Bank failed to provide evidence establishing it was holder of note at time bankruptcy case was commenced); *In re Phillips*, No. 08-11442-MAM-7, 2011 Bankr. LEXIS 1737, at *7-*8 (Bankr. S.D. Ala. May 9, 2011) (court denies U.S. Bank's and Servicer Aurora's motion to dismiss borrowers' adversary action insofar as it alleged U.S. Bank and Aurora filed false pleadings with the court; borrowers alleged that Aurora and U.S. Bank committed a "Fraud on the Court" by fraudulently asserting in motion that they should receive relief from bankruptcy stay because Aurora was "a creditor and the holder of the mortgage"; court notes that "[t]here is no document that supports [U.S. Bank's and Aurora's] assertions other than a statement in a [PSA]"); *U.S. Bank Nat'l Ass'n v. Duvall*, No. 94714, 2010 Ohio App. LEXIS 5461 (Ohio Ct. App. Dec. 30, 2010) (court affirms dismissal of U.S. Bank's action to foreclose; court holds that affidavits by Servicer Wells Fargo were insufficient to prove U.S. Bank owned mortgage at the time it filed the foreclosure action); *U.S. Bank Nat'l Ass'n v. Mathon*, 920 N.Y.S.2d 245, 2010 N.Y. Misc. LEXIS 5816, at *4, *9, *11-*12 (Sup. Ct. 2010) (court grants borrowers' motion to stay foreclosure; court

- 127 -

holds that affidavit of servicer Chase Home Finance LLC (an affiliate of Covered Trusts' Servicer Chase Bank) contradicted other affidavits submitted by U.S. Bank, and that servicer engaged in improper attempts to disavow loan modification and negotiations; court holds that such conduct "*is considerably troubling to this Court*"; court also notes U.S. Bank's failure to abide by CPLR 3408 and holds "*the Court has serious and grave concerns regarding [U.S. Bank's] conduct in this matter, which appears to be rife with bad faith," "spurious claims," and lacking "even a scintilla of good faith*"; court sets a hearing to determine whether U.S. Bank should be sanctioned); *U.S. Bank, N.A. v. Emmanuel*, 910 N.Y.S.2d 766, 2010 N.Y. Misc. LEXIS 983 (Sup. Ct. 2010) (order dismissing U.S. Bank's foreclosure action with prejudice; court holds that affidavits filed by U.S. Bank's attorneys were insufficient to establish standing to foreclose; court also notes potential of conflict of interest by U.S. Bank's attorneys by their execution of assignments); *In re Weisband*, 427 B.R. 13, 19, 21 (Bankr. D. Ariz. 2010) (court denies U.S. Bank's Servicer GMAC's motion for relief from bankruptcy stay; court holds that evidence submitted by GMAC was insufficient to prove it was holder of note, observing that GMAC submitted evidence "completely inconsistent" with its allegations, submitted a defective "allonge," and holding that "GMAC's documents . . . provide no evidence of actual transfers of the Note and [deed of trust] to . . . the Trust"); *U.S. Bank Nat'l Ass'n v. Harpster*, No. 51-2007-CA-6684ES (Fla. Cir. Ct., Pasco Cnty. Mar. 25, 2010) (court sanctions U.S. Bank and dismisses its complaint with prejudice "*based on the fraud intentionally perpetrated upon the Court by [U.S. Bank]"; court holds that mortgage assignment submitted by U.S. Bank "was . . . created and the execution date and notarial date were fraudulently backdated, in a purposeful, intentional effort to mislead the Defendant and this Court*"); *U.S. Bank v. Videjus*, 862 N.Y.S.2d 818, 2008 N.Y. Misc. LEXIS 2426 (Sup. Ct. 2008) (court denies U.S. Bank's application for order of reference; court holds that U.S. Bank's servicer's affidavit and verified complaint are

insufficient and "defective"); *U.S. Bank Nat'l Ass'n v. Lewis, et al.*, No. 21101/2007 (N.Y. Sup. Ct., Kings Cnty. Dec. 27, 2007) (court denies U.S. Bank's application for order of reference; court holds Servicer Select Portfolio Servicing's affidavit is insufficient); *U.S. Bank Nat'l Ass'n v. Maynard, et al.*, No. 18007/2006 (N.Y. Sup. Ct., Kings Cnty. Nov. 26, 2007) (U.S. Bank's motion for judgment of foreclosure denied; court holds Servicer Wells Fargo's affidavits and limited power of attorney were "defective" and raised issue whether Wells Fargo affiant "might be engaged in a subterfuge"; court also notes that U.S. Bank and Wells Fargo failed to file all relevant servicing agreements); *U.S. Bank Nat'l Ass'n v. Grant, et al.*, No. 22160/2006 (N.Y. Sup. Ct., Kings Cnty. Nov. 9, 2007) (order denying U.S. Bank's motion for judgment of foreclosure; court hold that loan servicer Chase Home Finance's (an affiliate of Covered Trust Servicer Chase Bank) and U.S. Bank's affidavits were defective and insufficient and that U.S. Bank and servicer failed to file documents establishing U.S. Bank's right to foreclosure); *U.S. Bank Nat'l Ass'n v. Moss, et al.*, No. 22751/2006 (N.Y. Sup. Ct., Suffolk Cnty. Nov. 5, 2007) (court denies U.S. Bank's motion for judgment of foreclosure; court holds that evidence submitted did not prove U.S. Bank was owner of mortgage and note when action was commenced).[30]

194.    Given the widespread misconduct by U.S. Bank's loan servicers, and either U.S. Bank's active participation or acquiescence in such misconduct, U.S. Bank was well aware of these Events of Default in 2008 and 2009.  In addition, given the widespread nature and magnitude of this misconduct, U.S. Bank was also experiencing it as to the Mortgage Loans in the Covered Trusts and

---

[30]    In addition, in Colorado, *The Denver Post* reported in May 2013 that U.S. Bank withdrew its foreclosure action against borrower Lisa Brumfiel.  *The Denver Post* had discovered that when U.S. Bank filed the case in September 2011 it had asserted that it had been assigned Brumfiel's deed of trust when in fact that was not true, as the assignment did not occur until a month later.  Because of this, U.S. Bank was required to file a new foreclosure action in 2013, and was not able to obtain an order allowing the foreclosure until 2014, thus adding years of delay and extra expense before the loan could be foreclosed.

therefore had actual knowledge of Events of Default concerning the Mortgage Loans.  Moreover, even though in some of the cases the errors or false affidavits were eventually cured, the time required to do so, as well as the expense involved, caused plaintiff and the class to incur substantial damages due to these Events of Default.

195.    U.S. Bank itself was also very attuned to and aware of these problems in 2008 and 2009 because, in addition to being a RMBS trustee, U.S. Bank was itself also a loan servicer and was ***itself engaging in the very same loan servicing misconduct as other loan servicers***.  U.S. Bank, like all the other loan servicers, was filing false affidavits and other false documents in foreclosure proceedings.  Moreover, in addition to robo-signing, U.S. Bank was also involved in the abusive loan servicing practice of improperly denying borrowers loan modifications under HAMP.  As one Georgia state court held, U.S. Bank agreed to participate in the HAMP program and to provide loan modifications to qualified borrowers.  *See Phillips v. U.S. Bank, NA*, No. 11 CV 00504 (Ga. Super. Ct., Carroll Cnty. Nov. 2, 2011).  Nonetheless, U.S. Bank was alleged to have improperly denied modifications without any explanation and "cannot . . . contract with our government to provide a service to the taxpayer, violate that agreement, and then say no one on earth can sue them for it. . . . Such argument is absurd."  *Id.* at 4 (denying U.S. Bank's motion to dismiss).  U.S. Bank knew that the robo-signing and foreclosure fraud, and improperly failing to modify qualifying loans under HAMP, were not proper loan servicing practices, let alone "prudent" loan servicing practices, and also knew that such misconduct was rampant throughout the loan servicing industry.  Nonetheless, U.S. Bank allowed it to go on, and even participated in it with its loan servicers, including the Master Servicers/Servicers to the Covered Trusts with respect to the Mortgage Loans.

196.    The numerous erroneous and/or false statements and documents that were filed by or at the direction of the Covered Trusts' loans servicers gave U.S. Bank firsthand knowledge of the

improper and illegal loan servicing practices that were being systemically engaged in throughout the nation. It also gave U.S. Bank firsthand knowledge that loan servicers were generally not servicing loans "prudently" in connection with foreclosure proceedings, as required by the Governing Agreements, and therefore that such practices were Events of Default under the Governing Agreements. As a result of the foregoing, U.S. Bank had direct, firsthand knowledge of industry-wide improper loan servicing practices amounting to Events of Default as early as 2008 and 2009.

197.    U.S. Bank also knew that these improper loan servicing practices were not isolated to U.S. Bank but rather were endemic to the loan servicing industry. This is so because, Wells Fargo, another RMBS trustee, had a case virtually identical to the *Ibanez* case discussed above that was heard with the *Ibanez* case before the same Massachusetts Land Court, and Wells Fargo received the same result as U.S. Bank did in *Ibanez* – an invalidated foreclosure. In the Wells Fargo case, Wells Fargo, like U.S. Bank, received directions from the trust's loan servicer to institute a foreclosure action against borrowers with the surname of Larace. *See* 2009 Mass. LCR LEXIS 134, at *43-*45. Wells Fargo was instructed by the loan servicer to allege in the foreclosure complaint that Wells Fargo "currently held" the Larace mortgage. *Id.* On April 27, 2007, Wells Fargo filed the complaint and represented that it was "'the owner (or assignee) and holder of [the Larace] mortgage.'" *Id.* at *48. Also at the loan servicer's direction, Wells Fargo published a notice of foreclosure sale stating that it was the "present holder" of the Larace mortgage. *Id.* Judgment was entered in Wells Fargo's favor, and it foreclosed, acquiring the Larace property at the foreclosure sale. *Id.* In October 2008, Wells Fargo, like U.S. Bank, filed a second action seeking a declaration that the Laraces' title had been extinguished and that Wells Fargo was the fee simple owner. 941 N.E.2d at 44, 49. In this second action, like U.S. Bank had also done, Wells Fargo admitted for the first time that it was not the owner or holder of the Larace mortgage at the time it filed the first Larace action, published the

foreclosure sale notice, or when it foreclosed, thus revealing that the prior statements it made at the direction of its loan servicer were false.  2009 Mass. LCR LEXIS 134, at *46-*48 & n.38.  Wells Fargo further admitted that it had been assigned the Larace mortgage ten months **after** the foreclosure sale.  *Id.*  Thus, the Massachusetts Land Court entered judgment against Wells Fargo and invalidated the Larace foreclosure just as it had done with U.S. Bank and the Ibanez mortgage. Wells Fargo appealed and lost just as U.S. Bank did, and the Massachusetts Supreme Court affirmed, holding that Wells Fargo's prior statements also "were false."  941 N.E.2d at 54.

198.    The *Larace* case was not an isolated incident for Wells Fargo either.  In July 2011, *Reuters* reported that it had "found cases in which Wells Fargo didn't obtain mortgage assignments – and hence the right to foreclose – until well after it had filed foreclosure cases," just as had happened in the *Larace* action (and the *Ibanez* case for U.S. Bank).  *Reuters* also reported that "a bankruptcy appellate panel of the federal Ninth Circuit Court of Appeals overturned a decision to allow Wells Fargo to foreclose . . . [because] there was no evidence that the note and mortgage had ever been turned over to Wells Fargo as trustee."  *Reuters* further reported that in "court files of Florida foreclosure cases by Wells Fargo . . . none of the promissory notes filed as exhibits in [the] 10 cases found by *Reuters* had any endorsements on them."  This demonstrated the broad scope of the loan servicing industry's misconduct.

199.    In addition, there were numerous other similar foreclosure proceedings by many other RMBS trustees, involving numerous loan servicers, at the time that U.S. Bank and Wells Fargo were experiencing these issues.  U.S. Bank was well aware of these numerous other foreclosure proceedings and further knew that all RMBS trustees were experiencing the same systematic problems that it and Wells Fargo had experienced in the *Ibanez* and *Larace* cases.  For example, U.S. Bank was aware that, in October and November 2010, a New York state court had issued scores of

orders adjourning foreclosures by it and many other RMBS trustees and loan servicers because of these very issues. *See* Ex. G hereto (numerous orders from Justice Tanenbaum of the Supreme Court of New York). Indeed, given that U.S. Bank also serviced loans and was in engaged in the same improper practices, U.S. Bank knew full well that these improper and illegal loan servicing practices were not unique or isolated incidents but rather were endemic to the industry.

200.    In light of U.S. Bank's direct experience in the *Ibanez* case and in many other similar cases, as well as its knowledge of pervasive loan servicer misconduct through Wells Fargo's *Larace* action and the many other similar actions by other RMBS trustees throughout the nation, and U.S. Bank's direct participation in this misconduct either as a loan servicer itself or as a participating or acquiescing RMBS trustee, U.S. Bank knew in early 2009 that industry-wide loan servicer misconduct was causing numerous foreclosure delays and invalidations that were resulting in staggering losses to RMBS trusts. Given the pervasiveness of the misconduct, by early 2009 U.S. Bank knew that the Mortgage Loans in the Covered Trusts had and were being similarly mis-serviced by the Master Servicers and Servicers, and therefore Events of Default had and were occurring as to the Mortgage Loans. U.S. Bank also knew by early 2009 that all of the delays in and invalidations of the foreclosures were causing plaintiff and the class to suffer massive damages, as was evidenced by the escalating losses being realized by the Covered Trusts. *See supra* ¶91 (chart showing Covered Trusts' losses exceeded $930 million in January 2009).

201.    By 2010, numerous news stories were reporting on these illegal, improper and abusive foreclosure practices by the loan servicing industry. For example, in June 2010, the United States Trustee Program ("USTP") announced that it had been conducting an investigation (with the FTC) of Servicer CHLS (Bank of America's Countrywide Home Loans Servicing LP) and its successor BACHLS (BAC Home Loans Servicing LP, which was also owned by Bank of America).

CHLS and its successor BACHLS were Servicers for at least three of the Covered Trusts.[31]   The USTP revealed that it had started its investigation of CHLS/BACHLS "after receiving **complaints of chronic . . . irregularities by mortgage servicing companies**."   The USTP and FTC charged CHLS/BACHLS with "improper business practices," and "improper accounting and billing practices," including **the filing of false and improper claims in bankruptcy proceedings** against borrowers, inflating mortgage claims, failing to credit borrowers with payments that they made, and failing to notify borrowers of extra charges added to their bills.   These practices were clearly not the practices of "prudent" loan servicers and amounted to Events of Default under the Governing Agreements.   The USTP also noted that, in 2009, **U.S. bankruptcy trustees had taken "more than 9,000 formal and informal consumer protection actions, including <u>a large number of actions against mortgage servicing companies</u>**."   This demonstrated the enormity and reach of the improper servicing practices and the fact that they were also affecting the Covered Trusts' Servicers and the Mortgage Loans in the Covered Trusts.   As a result of the USTP's and the FTC's investigations, CHLS/BACHLS entered into a consent order whereby they agreed to reform their loan servicing practices, compensate borrowers, establish internal controls to ensure that the Servicers' bills and their claims in bankruptcy were accurate, and provide better information to borrowers.   **The USTP also stated in its 2010 Annual Report that there were "<u>pervasive and longstanding problems regarding mortgage loan servicing</u>**," again revealing that these improper loan servicing practices were widespread.   CHLS/BACHLS paid $108 million to settle these charges.   These events informed U.S. Bank that these two Servicers to the Covered Trusts had been engaging in company-wide improper loan servicing practices that amounted to Events of Default under the Governing

---

[31]   In addition to CHLS/BACHLS, Bank of America also owned Wilshire Credit Corp., another Servicer to the Covered Trusts.   Together, these Servicers serviced Mortgage Loans for at least five of the Covered Trusts.

Agreements and that such Events of Default were likely infecting the Covered Trusts' Mortgage Loans. It also put U.S. Bank on notice that these Servicers' parent company, Covered Trust Servicer Bank of America, and their sister company, Covered Trust Servicer Wilshire Credit Corp., were also likely committing Events of Default as to the Mortgage Loans.

202.     In July 2010, excerpts of the deposition of the infamous "robo-signer" Jeffrey Stephan, an employee of GMAC, a Servicer for Mortgage Loans for at least three Covered Trusts, were made publicly available. The deposition excerpts established that GMAC had a pattern and practice of signing and filing false foreclosure affidavits without confirming the facts within them were true, without checking to ensure the correct exhibits were attached, and without personal knowledge of the facts asserted in the affidavits. Below are excerpts from Stephan's deposition:

> Q: In your capacity as the team leader for the document execution team, do you have any role in the foreclosure process, other than the signing of documents?
>
> A: No.
>
> *          *          *
>
> **Q: When you sign a summary judgment affidavit, do you check to see if all of the exhibits are attached to it?**
>
> **A: No**.
>
> **Q: Does anybody in your department check to see if all the exhibits are attached to it at the time that it is presented to you for your signature?**
>
> **A: No**.
>
> **Q: When you sign a summary judgment affidavit, do you inspect any exhibits attached to it?**
>
> **A: No**.
>
> *          *          *
>
> **Q: Is it fair to say when you sign a summary judgment affidavit, you don't know what information it contains, other than the figures that are set forth within it?**

*A: Other than the borrower's name, and if I have signing authority for that entity, that is correct.*

　　　　　　　*　　*　　**

*Q: Mr. Stephan, do you recall testifying in your Florida deposition in December with regard to your employees, and you said, quote, they do not go into the system and verify that the information is accurate?*

*A: That is correct.*

This unequivocally established that GMAC filed false foreclosure affidavits as a part of its usual and customary business practices, and thus it was committing Events of Default as to the many Mortgage Loans in the Covered Trusts it was servicing.

203.    By the fall of 2010, news stories proliferated about foreclosure abuses occurring throughout the nation, recounting misconduct identical to that which U.S. Bank had just gone through in *Ibanez* and many other cases, Wells Fargo had just gone through in *Larace*, and other RMBS trustees had also widely experienced.  Reports surfaced that loan servicers or RMBS trustees routinely made false statements, and routinely used false or back-dated mortgage documents and affidavits, many signed by fictitious persons, to improperly foreclose on thousands of borrowers. This misconduct became widely known as the "robo-signing" scandal.  Robo-signing included the mass signing of foreclosure affidavits or certifications containing false information and false exhibits, which were signed by fictitious persons or by people with fictitious titles, and which further falsely claimed that the affiant had personal knowledge of the facts in the affidavits.  Robo-signing was clearly not the practice of a prudent loan servicer and was an Event of Default under the Governing Agreements.  Many of the Master Servicers and Servicers to the Covered Trusts were implicated in the robo-signing scandal in news stories during 2010.

204.    For example, in October 2010, GMAC was sued for fraud by the Attorney General of Ohio.  The Ohio Attorney General **charged GMAC with routinely filing false affidavits in**

*connection with foreclosure proceedings*.  The Ohio Attorney General stated that improper foreclosure filings in that state were happening "over and over again."  He also stated that: "***This isn't just sloppy paperwork.  This is fraud being perpetrated against the courts*.**"  The Ohio Attorney General added:  "***The most important thing that lenders need to recognize is the seriousness of the situation.  They can't pretend this is a fourth-grade student not quite filling in the oval on a test.  This is fraud*.**"  Later, in December 2010, in testimony before the U.S. House Judiciary Committee, Thomas Cox, an attorney for the Maine Attorneys Saving Homes project, presented compelling evidence against GMAC, revealing that it was engaged in systemic foreclosure fraud.  ***Cox revealed how GMAC used thousands of false foreclosure affidavits signed by the aforementioned "robo-signer" Jeffrey Stephan, which falsely attested under oath that he had personal knowledge of the facts in his affidavits, that he had custody and control of loan documents, and that the documents attached to his affidavits were "true and accurate" copies of notes or mortgages.  Cox testified that GMAC "filed <u>thousands of Stephan's [false] affidavits in foreclosure cases all over the country in cases involving its own loans</u> <u>as well in cases where it was servicing loans for Fannie Mae, Freddie Mac, and trustees of mortgage-backed securitized trusts</u>*.**"  This information confirmed that GMAC's standard servicing practices amounted to Events of Default and that the Mortgage Loans were being so affected.

205.    Cox also testified to instances of blatant foreclosure fraud by JPMorgan, which along with its related companies, Servicers Chase Bank, EMC and WaMu Bank, were Master Servicers or Servicers to at least ten of the Covered Trusts.  Cox recounted several cases where ***JPMorgan used "fraudulently created facts" and attempted to commit "fraud upon the court" in connection with its foreclosures***.  Cox recounted a case where the U.S. Trustee was required to intervene into a bankruptcy case in New York to file a motion for sanctions against JPMorgan, whereupon JPMorgan

admitted to submitting false facts to the court.  Based on his observations of JPMorgan's routine foreclosure practices, *Cox testified that "JPMorgan Chase has engaged in pattern of filings in the Bankruptcy Court for the Southern District of New York that is simply breathtaking in the scope of dishonest and deceptive practices it reveals*."  This information established that the JPMorgan Master Servicers and Servicers engaged in a pattern and practice of fraudulent loan servicing which were Events of Default under the Governing Agreements, and that the Mortgage Loans in the Covered Trusts were similarly mis-serviced.

206.    Cox also testified to the prevalence of foreclosure fraud by the loan servicing industry in general: "*I know from my personal experience over the past two and one half years that this kind of servicer fraud-on-the-court activity is not isolated to GMAC Mortgage.  It has been the norm across the entire foreclosure industry, including the other servicers represented here today, JPMorgan Chase and Bank of America*."  Bank of America and JPMorgan and their related companies were Servicers to at least nine of the Covered Trusts.  Cox's testimony expressly reported that fraudulent foreclosure practices amounting to Events of Default were occurring "*across the entire foreclosure industry*" and were thus not isolated.  Given these universal practices, U.S. Bank obtained knowledge that the Mortgage Loans in the Covered Trusts were being similarly mis-serviced by the Master Servicers and Servicers.  Indeed, over two years later, after the massive scope of this misconduct became known to those outside of the loan servicing and RMBS trustee industries, Yale Law School Professor Raymond Brescia stated: "'*I think it's difficult to find a fraud of this size on the U.S. court system in U.S. history . . . .  I can't think of one where  you have literally tens of thousands of fraudulent documents filed in tens of thousands of cases*.'"

207.    In October 2010, the Ohio Attorney General was also scrutinizing other loan servicers and had sent them letters seeking information about their robo-signing practices.  The loan servicers

receiving letters from the Ohio Attorney General included Covered Trust Master Servicers/Servicers Bank of America (which included its related Servicers CHLS/BACHLS and Wilshire Credit Corp.), JPMorgan (which included its related Servicers Chase Bank, EMC and WaMu Bank) and Wells Fargo.  The above three Master Servicers/Servicers receiving letters from the Ohio Attorney General serviced (through themselves and their related companies) Mortgage Loans in 21 of the 25 Covered Trusts.  Together with GMAC (which, as alleged above, had already been sued by the Ohio Attorney General for false foreclosure affidavits), the Ohio Attorney General was thus investigating widespread misconduct amounting to Events of Default by the Master Servicers and Servicers for 23 of the 25 Covered Trusts at issue herein, or in other words, ***virtually all of the Covered Trusts***.  It was also announced in October 2010 that the U.S. House Judiciary Committee had sent similar letters to most of the major loan servicers demanding the production of documents relating to their robo-signing and foreclosure practices.  The Master Servicers and Servicers to the Covered Trusts receiving letters from the House Judiciary Committee included JPMorgan, Wells Fargo, PNC (which included its Servicer, National City), GMAC and Bank of America.  These servicers and their related companies were Master Servicers or Servicers to ***most of the Covered Trusts***.  These events caused U.S. Bank to know that the Master Servicers and Servicers to nearly all of the Covered Trusts were implicated in widespread loan servicing misconduct amounting to Events of Default in October 2010, and because of the scope of the misconduct U.S. Bank also knew that the Mortgage Loans in the Covered Trusts were undoubtedly experiencing Events of Default.

208.    In fact, on October 4, 2010, California state assemblyman Ted Lieu, who had written a series of mortgage-related bills, was interviewed about the rash of improper loan servicing and foreclosure issues.  He reported that he had requested that the State of California institute a moratorium on foreclosures there due to an epidemic of foreclosure fraud by loan servicers, and

further elaborated on the reach of their misconduct: "*[W]at we have here is massive fraud being perpetrated on the courts. . . . We're talking about hundreds of thousands of foreclosures that are now at risk because of what these robo-signers are doing. . . . [Credit rating agency] Fitch . . . has come out and stated that they believe that this is an <u>industry wide practice</u>. . . . [Y]ou just had [a] basic level failure to follow existing laws. And you have people that are falsifying documents in front of judges. . . . You imagine what is going on in 27 other [non-judicial foreclosure] states where you don't have <u>any</u> judicial oversight**." This clearly communicated the nationwide scope of the misconduct and confirmed that the Mortgage Loans in the Covered Trusts were affected.

209.    There was yet additional corroborating information disseminated in October 2010 that caused U.S. Bank to know that the Master Servicers and Servicers were committing Events of Default with respect to the Mortgage Loans in the Covered Trusts. For example, in October 2010, an article in the *Miami Daily Business Review* reported on a Florida attorney who had 150 deposition transcripts from people who signed foreclosure affidavits for loan servicers. The news article reported that the deposition transcripts included testimony from employees of Aurora, JPMorgan, Countrywide, American Home Mortgage Servicing and Wells Fargo, each a Master Servicer or Servicer to one or more of the Covered Trusts. ***In fact, these five Master Servicers/Servicers (and their related companies) serviced Mortgage Loans in one or more of <u>each of the 25 Covered Trusts at issue herein</u>***. The attorney was quoted as saying that the 150 depositions "prove flawed foreclosure documents are ***part of a fraudulent system***, not sloppy procedures" by loan servicers. The attorney stated: "'***We are not talking about a mistake. We are talking about perjury, crime . . . . <u>This is system-wide</u>*** . . . .'" The *Miami Daily Business Review* article reported the following information concerning Wells Fargo, a Master Servicer or Servicer to at least 12 Covered Trusts:

In one of the depositions provided by [attorney] Tiktin, a Wells Fargo employee, Xee Moua, admitted signing 300 to 500 documents including affidavits, substitutions of plaintiff, deeds and judgment affidavits in a two hour period on any given day.

Moua said she only attended six months of college before dropping out.  She then worked as an office clerk and customer service representative at a medical supplies firm and a blinds and shades company in North Carolina before she was hired by Wells Fargo as a document processor.  ***According to the transcript of the deposition, asked if she checked the information on the documents she was signing, Moua said, "I do not.  That's not part of my job***."

She said she only checked to see if her own information, such as her title, was correct.

Her understanding, she said, was that either the law firm handling the foreclosure or a Wells Fargo processor assigned to the loan had checked the information.   Yet, she was the person authorized by the bank to sign the documentation.

***The documents she signed identified her as vice president of loan documentation, according to the transcript, but that wasn't her actual title***.

***She said she was given that title to sign documents.  She said other employees were given the same title for signing court documents***.

This news article established that the Master Servicers and Servicers to the Covered Trusts were engaging in Events of Default as a matter of course, and therefore were also committing Events of Default as to the Mortgage Loans in all of the Covered Trusts.

210.   Further confirming that the Covered Trusts were experiencing Events of Default at the hands of the Covered Trusts' Master Servicers and Servicers were the numerous news articles in late October 2010 reporting that U.S. banking regulators were investigating virtually the entire loan servicing industry.   As one news report stated, U.S. banking regulators were "conducting an intensive probe of reportedly false foreclosure affidavits used by major U.S. financial institutions to evict thousands of American homeowners."   Although it was not publicly known at that time which loan servicers were being investigated, U.S. Bank knew that its own loan servicing practices, as well

as those of most of the Master Servicers and Servicers to the Covered Trusts, were part of the investigation.

211.   Also in October 2010, U.S. congressmen and women from the state of Connecticut wrote to the U.S. Attorney General asking for a full investigation of the loan servicing industry. They stated:

*With foreclosure rates at record levels and disturbing reports of malfeasance coming to light daily, we are writing to support your effort to examine improper and potentially illegal actions of financial institutions in dealing with mortgage modifications and foreclosures*.  We urge you to use all the tools at your disposal to fully investigate this matter.

*Recently JP Morgan Chase, Ally Financial [i.e., GMAC], and Bank of America, among others, have come under fire for practices such as "robo-signing," signing foreclosure forms without even reading them, and even forging documents outright.  Such practices have led to wrongful foreclosures on an untold number of households that have not defaulted on their mortgages*.

Connecticut's Attorney General Richard Blumenthal has called for a 60 day moratorium on all foreclosures until we learn more about the extent of these practices.  Officials across the country have followed suit – in Texas, where the Attorney General has ordered a suspension of foreclosures; in Massachusetts, where the Attorney General has also called for [a] moratorium; in Ohio, where the Attorney General has filed suit against Ally Financial [GMAC], and in many other states.  We applaud these actions and believe a moratorium on foreclosures is essential until the integrity of this process is evaluated.

*Unfortunately, improper actions on the part of banks and financial lenders are something we have witnessed with increasing frequency.  In the past two years, the number of foreclosure cases we have received in our respective offices has increased significantly. . . .  We have routinely dealt with unprofessional behavior on the part of the banks, including strategically mismanaging paperwork; tacking on extra fees; or stringing families along through trial periods only to deny modifications*.

*After their practices helped bring about a financial and economic crisis, JP Morgan Chase, Ally Financial [GMAC], and Bank of America were all saved by the taxpayers.  Now the practices of these financial institutions are continuing to drag down the economy as they try to maintain their bottom line at the expense of American families.  We urge you to hold these institutions accountable and to conduct a full investigation into their practices*.

212.    It was also reported in October 2010 that the Attorney Generals of all 50 states were similarly investigating "whether mortgage lenders falsified affidavits attesting to their review and verification of foreclosure documents, as well as whether they failed to sign the affidavits in the presence of a notary public."  Numerous news stories reported on the investigation.  *CNNMoney* reported:  "The [50-state] inquiry will be led by Iowa Attorney General Tom Miller."  Attorney General Miller stated: "'This group has the backing of nearly every state in the nation to get to the bottom of this foreclosure mess, and we plan to work together as thoroughly and expeditiously as possible . . . .'"  The *Washington Post* further reported:

> *Indiana Attorney General Greg Zoeller said investigators initially will focus on whether industry employees – so-called "robo-signers" – signed off on thousands of foreclosures every month without reviewing the files as legally required.  Homeowner attorneys also allege that lenders forged signatures and improperly notarized documents*.

> *Such actions might have violated laws against unfair and deceptive trade practices*, which could result in civil penalties.  Typically the laws have been used to protect consumers from false advertising, but state officials say they could also be applied to foreclosure.

The *Independent* reported:

> *North Carolina yesterday joined a number of states pursuing legal efforts to slow the tide of repossessions and protect homeowners from what several attorneys general now say are improper foreclosure procedures.  What began as a trickle of stories about unusual administrative practices by lenders and the firms they use to process foreclosure documents, has unleashed a torrent of public and political anger that threatens to derail banks' efforts to recoup losses on delinquent mortgages*.

> *Already, several major banks have suspended foreclosure work in states where a repossession must be approved by the courts* . . . .

> North Carolina Attorney General Roy Cooper said his office expanded its inquiry into improper foreclosure processes, and asked the state's 15 largest mortgage lenders to suspend home repossessions in the state.

> *Investigators are particularly concerned that banks have signed large numbers of foreclosure affidavits without conducting a proper review, or ensuring that the foreclosures fully comply with state law*, Mr. Cooper said.  "Foreclosures

- 143 -

have to happen when people don't pay, but homeowners deserve a fair shot at keeping their homes when possible."

> *On Tuesday, Texas Attorney General Greg Abbott wrote to 30 of the biggest lenders demanding they stop evictions and the sale of foreclosed homes until they can provide assurances that they are acting in full compliance with the law.*

Illinois Attorney General Lisa Madigan demanded that 25 loan servicers – including nearly all of the Master Servicers and Servicers to the Covered Trusts – provide her with information about their foreclosure practices.  Attorney General Madigan stated:  "***The same mortgage giants and big banks that fraudulently put people into unfair loans are now fraudulently throwing people out of their homes.  They should not be above the law.  Illinois homeowners are legally entitled to a foreclosure process that is transparent, accurate and fair***."

213.    Similarly, throughout the month of October 2010, multiple additional news reports surfaced about many of the specific Master Servicers or Servicers to the Covered Trusts, reporting that they were widely and routinely engaged in robo-signing and other improper loan servicing practices.  For example, during October 2010, it was reported that American Home Mortgage Servicing, a Servicer to at least two of the Covered Trusts, was using false, robo-signed foreclosure documents.  There was a separate news report also in October 2010 revealing that IndyMac, a Servicer for at least one Covered Trust, was also using false affidavits in foreclosure proceedings, even after IndyMac had been taken over by the FDIC.  The *Providence Journal* reported that the former IndyMac employee involved in signing the false affidavit had previously admitted in a deposition to signing about 6,000 documents a week which she did not read before signing.  Also, during October 2010, it was reported that Wells Fargo, a Master Servicer or Servicer to at least 12 of the Covered Trusts, admitted that its employees signed hundreds of foreclosure documents daily without reading them.

214.     Several Master Servicers and Servicers to the Covered Trusts were forced to temporarily shut down their foreclosures in October 2010.  Covered Trust Servicers Bank of America, JP Morgan, National City (through its owner PNC) and GMAC – which collectively serviced Mortgage Loans in 16 of the 25 Covered Trusts through themselves and their related companies – were among those halting their foreclosures on tens of thousands of mortgage loans.  It was reported that JPMorgan alone halted foreclosures on 56,000 loans.  Bank of America was also reported to have frozen its foreclosure sales, and was re-submitting 102,000 affidavits in its foreclosure proceedings.  Covered Trust Master Servicer/Servicer Wells Fargo was reported to have submitted additional documents for approximately 55,000 of its foreclosures.  These delays and re-submissions of documents caused massive losses to RMBS trusts and investors, including plaintiff and the class, as the delays and resubmissions allowed the losses from defaulted loans to grow, and were accompanied by the inclusion of improper and excessive additional fees and costs (such as additional court fees, attorneys' fees, taxes, insurance and maintenance costs) the Servicers improperly assessed during the delays *caused by their own misconduct*.  This caused escalating losses to RMBS investors, including plaintiff and the class.  As the FHFA stated:  "Delays in foreclosures add cost and other burdens for [RMBS] investors . . . ."  A report by Amherst Securities Group LP in February 2012 noted that the average delinquency time for liquidated loans had grown from 21 months in September 2010 to 26 months by February 2012, and the average delinquency time for non-performing (*i.e.*, not liquidated yet) loans had grown from 19 months in September 2010 to 24 months by February 2012, which *demonstrated "the delay created by the [loan servicers'] robo-signing actions*."  The report further stated that "*we believe the remaining loans will stay in the [delinquency] pipeline for another 12-15 months*," further demonstrating the compounding delays caused by robo-signing and the massive losses it caused plaintiff, the class and

- 145 -

the Covered Trusts.  Law professor Frank Alexander commented on the reasons these Servicers were forced to shut down their foreclosures: "'It reflects that the lenders have a low level of confidence in their paperwork. . . .  It also shows a low level of confidence in their own ability to do it and to do it right.'"  Alexander said it also raised a serious question: "'Does the lender have a legal right to do a foreclosure?'"  This demonstrated that these Servicers' shoddy practices were not only Events of Default but were also causing plaintiff and the class massive losses.

215.    Also in October 2010, as a result of widespread foreclosure fraud in the state of New York, the courts there instituted new requirements for foreclosure proceedings, requiring that attorneys first verify that their foreclosure documents were accurate.

216.    On October 31, 2010, the *Houston Chronicle* reported that the SEC had sent letters to loan servicers "urg[ing] [them] to disclose their expected losses from flawed foreclosure documents."  The *Houston Chronicle* further reported:

> *The letter was sent because of "concerns about potential risks and costs associated with mortgage and foreclosure-related activities," the SEC said.*
>
> *Federal regulators and attorneys general from all 50 states are investigating whether loan-servicing companies used improper procedures during foreclosure proceedings, including so-called "robosigners" who didn't check documentation.  Investors such as Pacific Investment Management Co. have demanded that banks buy back faulty loans that were bundled into bonds.*
>
> Banks should set aside funds for litigation and "other contingencies when it is probable" that they will have losses, the letter said.  If companies can't estimate losses, then they should say so, the SEC said.
>
> *JP Morgan Chase & Co., Bank of America Corp., Wells Fargo & Co. and Citigroup have set aside a combined $10 billion to cover buybacks*.  SEC spokesman John Nester declined to say which banks received the letter.

The magnitude of these loan servicers' loss reserves was yet another confirmation that the Covered Trusts' Mortgage Loans were experiencing Events of Default.

217.    Further evidence establishing that the Master Servicers and Servicers to the Covered Trusts were committing Events of Default as to the Mortgage Loans is found in the Covered Trusts' accelerating losses.    The delays and invalidations of foreclosures caused by the Master Servicers'/Servicers' robo-signing, other foreclosure chicanery, and other loan servicing misconduct, were causing the Covered Trusts to incur extremely large losses by October 2010, as the costs to attempt to correct the Master Servicers' and Servicers' Events of Default were extremely high. Moreover, large additional losses were caused when the Master Servicers' and Servicers' misconduct caused numerous foreclosures on Mortgage Loans to be invalidated.  In addition, the long delays caused by the Master Servicers'/Servicers' misconduct allowed them to improperly charge excessive additional servicing fees and costs to the Covered Trusts, thereby further adding to the Covered Trusts' accelerating losses.  As a result, the Covered Trusts' realized losses had more than tripled, from approximately $930 million in January 2009, ***to over $3.5 billion*** by October 2010, due in part to the Master Servicers'/Servicers' Events of Default.  The chart below sets forth the Covered Trusts' cumulative loses, as reported in October 2010, which were caused in part by Events of Default committed by the Master Servicers and Servicers with respect to the Mortgage Loans:

| Covered Trusts' Cumulative Realized Losses Reported in October 2010 | |
|---|---|
| **Covered Trust** | **Cumulative Realized Losses** |
| BAFC 2007-C | $    64,736,543 |
| BNCMT 2007-2 | $  177,167,446 |
| BSABS 2006-AC2 | $    49,878,286 |
| BSABS 2006-AC5 | $    28,326,051 |
| GPMF 2007-AR1 | $  272,132,506 |
| GPMF 2007-AR2 | $  219,080,070 |
| GPMF 2007-AR3 | $    62,821,194 |
| HEAT 2006-5 | $  190,687,910 |
| HEAT 2006-6 | $  202,873,816 |
| LXS 2006-1ON | $  187,821,076 |
| LXS 2006-15 | $  125,152,424 |
| LXS 2007-7N | $  210,081,201 |

| Covered Trusts' Cumulative Realized Losses Reported in October 2010 | |
| --- | --- |
| **Covered Trust** | **Cumulative Realized Losses** |
| MABS 2006-HE2 | $  147,318,294 |
| MLMI 2006-WMC2 | $  301,196,801 |
| SARM 2006-9 | $    34,228,128 |
| SASC 2006-NC1 | $  235,085,536 |
| SASC 2006-WF2 | $  176,712,854 |
| SASC 2006-WF3 | $  183,330,681 |
| SASC 2007-EQ1 | $  115,214,504 |
| SASC 2007-WF1 | $  130,272,863 |
| WMALT 2006-AR4 | $  134,238,561 |
| WAMU 2006-AR13 | $    87,034,430 |
| WAMU 2006-AR17 | $    68,768,305 |
| WAMU 2006-AR19 | $    84,875,698 |
| WAMU 2007-OA2 | $    75,982,192 |
| **Covered Trusts' Total Realized Losses:** | **$3,565,017,370** |

218.    Given the numerous public events occurring from the beginning of 2008 through the end of October 2010 involving widespread loan servicing misconduct ***by nearly all of the Master Servicers and Servicers to the Covered Trusts, which impacted the Mortgage Loans in the Covered Trusts***, the expansive scope of the federal and state investigations concerning most of the Covered Trusts' Master Servicers and Servicers that were ongoing, U.S. Bank's direct experience with loan servicing defaults, and the Covered Trusts' mushrooming losses, U.S. Bank acquired actual knowledge that the Master Servicers and Servicers to the Covered Trusts were committing Events of Default with respect to the Mortgage Loans as early as the end of October 2010.

> **b.    Numerous Events that Occurred After October 2010 Further Confirmed for U.S. Bank that the Master Servicers and Servicers Were Committing Events of Default as to the Mortgage Loans in the Covered Trusts**

219.    Nonetheless, even after October 2010, numerous amounts of additional public information came to light which confirmed to U.S. Bank that the Master Servicers and Servicers had and were continuing to commit Events of Default as to the Mortgage Loans in the Covered Trusts. For example, in November 2010, U.S. Treasury Department Assistant Secretary Michael Barr

provided an update on the investigation of loan servicers by U.S. banking regulators.  Barr announced that they were uncovering "***widespread*" and "*inexcusable*" *breakdowns in the industry's loan servicing practices*.  Barr stated: "*These problems must be fixed." Given that U.S. Bank knew it and the Master Servicers/Servicers were the targets of that investigation, this confirmed for U.S. Bank that the Master Servicers and Servicers were committing Events of Default concerning Mortgage Loans in the Covered Trusts.*

220.    Also in November 2010, Legal Services of New Jersey provided a report to the New Jersey Supreme Court that was made public, detailing numerous instances of robo-signing, false certifications and affidavits, in connection with foreclosure proceedings in New Jersey and throughout the nation.  The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents, and other evidence of fraud, ***concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings*.**"  The report noted that the "***[c]ommon practices and characteristics*"** that Legal Services of New Jersey found in foreclosure proceedings throughout the nation consisted of: (a) affiants claiming personal knowledge of facts that the affiant had no personal knowledge of; (b) failure to review documents and evidence on which certifications were based; (c) actual false statements about when and how a loan has been transferred; (d) false identification of signatory (*e.g*., an employee of a servicer will be identified as a vice president, or similar title, of the foreclosing mortgagee); (e) forged signatures; and (f) improperly notarized documents.  The report further specifically implicated many of the Master Servicers and Servicers to the Covered Trusts in the nationwide misconduct, including GMAC, Bank of America, JPMorgan, EMC, Wilshire Credit Corp., Wells Fargo and IndyMac, ***and even noted that U.S. Bank was involved in a number of the***

- 149 -

*fraudulent foreclosure cases*.  Given U.S. Bank's involvement in numerous fraudulent foreclosures involving most of the Covered Trusts' Master Servicers and Servicers, U.S. Bank *knew* that there were Events of Default occurring with respect to the Mortgage Loans in the Covered Trusts.

221.    Thereafter, on December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  The order was directed at, among others, Aurora, PHH, PNC (and therefore its Servicer National City) and SunTrust, all Master Servicers or Servicers to the Covered Trusts.  *The order was also directed at U.S. Bank*, because it had been involved in numerous questionable foreclosures and also because it was a loan servicer.  Judge Grant's order cited specific instances of improper foreclosures by Covered Trust Master Servicers/Servicers Bank of America, JPMorgan, GMAC, IndyMac (through OneWest Bank) and Wells Fargo, which, through themselves and their related companies collectively serviced Mortgage Loans in *23 of the 25 Covered Trusts*.  That same day, Judge Jacobson of the Superior Court of New Jersey in Mercer County *issued an order to show cause* directed at GMAC, Bank of America, BACHLS (and therefore its predecessor CHLS), Chase Bank, Wells Fargo and IndyMac (through OneWest Bank), among others.  *In the Matter of Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. F-059553-10, Order to Show Cause (N.J. Super. Ct., Mercer Cnty. Dec. 20, 2010) These Master Servicers and Servicers serviced Mortgage Loans for at least *17 of the Covered Trusts*.  Judge Jacobson ordered these Master Servicers and Servicers to show cause why Judge Jacobson "should not suspend the processing of all foreclosure matters involving" them.  *Id*. at 2. ***The order to show cause further held that these Master Servicers and Servicers were selected for scrutiny because of their "public record of questionable practices that this court must address now***

- 150 -

*in its supervisory capacity over the processing of foreclosure matters*." *Id.*  The court further held that "*deposition testimony provided by employees" of these Master Servicers and Servicers "raised serious questions about the accuracy and reliability of documents submitted to courts by lenders and service providers in support of foreclosure complaints*." *Id.* at 3. *Further, the court held that "it appear[ed] that the execution of affidavits, certifications, assignments, and other documents in numerous residential mortgage foreclosure actions in New Jersey and elsewhere may not have been based on personal knowledge in violation of the Rules of Court and may thus be unreliable*." *Id.*  These events also caused U.S. Bank to know that there were Events of Default by the Master Servicers and Servicers with respect to the Mortgage Loans in the Covered Trusts.

222.    Information also began to surface concerning loan servicers' improper servicing practices that put their financial interests ahead of the RMBS investors.  Such loan servicing practices were obvious Events of Default because the servicers were required to service the loans for the benefit – not detriment – of the RMBS investors.  For example, in December 2010, in a U.S. Senate Banking, Housing and Urban Affairs Committee hearing, law professor Kurt Eggert testified concerning the financial incentives the loan servicers had to service mortgage loans in RMBS trusts to their financial advantage and against RMBS investors' interests.  Professor Eggert testified that loan servicers were incentivized to initiate foreclosures and then extend them since it allowed the servicers to add improper and excessive "junk fees" to the amount owed by borrowers.  Then, when the mortgages were finally foreclosed and the properties sold, the loan servicers' improper "junk fees" would be paid first, before any remaining amount was remitted to the RMBS trusts, thus generating substantial fees for the servicers but taking money away from RMBS investors like plaintiff and the class.  Professor Eggert further testified about how loan servicers were incentivized

in many cases to attempt to foreclose on a loan, rather than to seek a modification which might inure to RMBS investors' financial benefit.

223.     Professor Eggert also pointed out that, in many instances, the loan servicers were also the originators and warrantors of the mortgage loans in the trusts, and therefore would have firsthand knowledge of any breaches of their representations and warranties.  As previously alleged, many of the Warrantors to the Covered Trusts were also the Master Servicers or Servicers of the very same Mortgage Loans they warranted.  Under the Governing Agreements, the Master Servicers and Servicers were required to notify U.S. Bank (and others) when they discovered breaches of even their own representations and warranties concerning the Mortgage Loans.  *See, e.g.*, BAFC 2007-C PSA, §2.02 (Warrantor/Servicer Bank of America to notify U.S. Bank of Bank of America's breaches of representations and warranties under MLPA)  Yet these Master Servicers and Servicers did not notify anyone of their breaches as required by the Governing Agreements because they would basically be "ratting" themselves out, and therefore would have to pay for their own breaches, by curing, substituting or repurchasing the defective Mortgage Loans.  Of course, as alleged above, U.S. Bank already knew of the breaches itself.  It further knew the Master Servicers/Servicers breached the Governing Agreements by failing to disclose their own breaches.  This caused the Covered Trusts to be filled with numerous defective, breaching, non-performing Mortgage Loans.

224.     The chart below sets forth the Covered Trusts and the Warrantors (and their related companies) that also serviced or master serviced the very same Mortgage Loans which they had warranted:

| Covered Trust | Warrantors | | Master Servicers and Servicers |
|---|---|---|---|
| | Loan Seller/Sponsor | Other Transferors | |
| BAFC 2007-C | ▪ Bank of America | | ▪ Bank of America |
| BNCMT 2007-2 | ▪ Lehman | | ▪ Aurora (owned by Lehman until 2012) |
| BSABS 2006-AC2 | ▪ EMC | | ▪ EMC |
| BSABS 2006-AC5 | ▪ EMC | | ▪ EMC |

| Covered Trust | Warrantors | | Master Servicers and Servicers |
|---|---|---|---|
| | Loan Seller/Sponsor | Other Transferors | |
| GPMF 2007-AR1 | ▪ Lehman | ▪ GreenPoint | ▪ Aurora (Lehman)<br>▪ GreenPoint |
| GPMF 2007-AR2 | ▪ Lehman | ▪ GreenPoint | ▪ Aurora (Lehman)<br>▪ GreenPoint |
| GPMF 2007-AR3 | ▪ Lehman | ▪ GreenPoint | ▪ Aurora (Lehman)<br>▪ GreenPoint |
| HEAT 2006-5 | ▪ DLJ Mortgage Capital, Inc. (owned by Credit Suisse) | | ▪ Select Portfolio Servicing (also owned by Credit Suisse) |
| HEAT 2006-6 | ▪ DLJ Mortgage Capital, Inc. (owned by Credit Suisse) | | ▪ Select Portfolio Servicing (also owned by Credit Suisse) |
| LXS 2006-10N | ▪ Lehman | ▪ Countrywide<br>▪ IndyMac<br>▪ SunTrust<br>▪ Bank of America<br>▪ GMAC<br>▪ Wells Fargo | ▪ Aurora (Lehman)<br>▪ CHLS (owned by Countrywide)<br>▪ IndyMac<br>▪ SunTrust<br>▪ Bank of America<br>▪ GMAC<br>▪ Wells Fargo |
| LXS 2006-15 | ▪ Lehman | ▪ Aurora | ▪ Aurora (Lehman) |
| LXS 2007-7N | ▪ Lehman | ▪ AHM<br>▪ Countrywide | ▪ Aurora (Lehman)<br>▪ American Home Mortgage Servicing (owned by AHM)<br>▪ CHLS (Countrywide) |
| MABS 2006-HE2 | | ▪ New Century | ▪ New Century |
| MLMI 2006-WMC2 | ▪ Merrill Lynch Mortgage Lending, Inc. (owned by Bank of America) | | ▪ Wilshire Credit Corp. (owned by Bank of America) |
| SARM 2006-9 | ▪ Lehman | ▪ Countrywide<br>▪ PHH | ▪ Aurora (Lehman)<br>▪ CHLS (Countrywide)<br>▪ PHH |
| SASC 2006-NC1 | ▪ Lehman | | ▪ Aurora (Lehman) |
| SASC 2006-WF2 | ▪ Lehman | ▪ Wells Fargo | ▪ Aurora (Lehman)<br>▪ Wells Fargo |
| SASC 2006-WF3 | ▪ Lehman | ▪ Wells Fargo | ▪ Aurora (Lehman)<br>▪ Wells Fargo |

| Covered Trust | Warrantors | | Master Servicers and Servicers |
| --- | --- | --- | --- |
| | Loan Seller/Sponsor | Other Transferors | |
| SASC 2007-EQ1 | ▪ Lehman | ▪ EquiFirst (owned by Barclays) | ▪ Aurora (Lehman)<br>▪ HomEq Servicing (also owned by Barclays) |
| SASC 2007-WF1 | ▪ Lehman | ▪ Wells Fargo | ▪ Aurora (Lehman)<br>▪ Wells Fargo |
| WMALT 2006-AR4 | ▪ Washington Mutual Mortgage Securities Corp. (owned by WaMu) | | ▪ WaMu |
| WAMU 2006-AR13 | ▪ WaMu | | ▪ WaMu |
| WAMU 2006-AR17 | ▪ WaMu | | ▪ WaMu |
| WAMU 2006-AR19 | ▪ WaMu | | ▪ WaMu |
| WAMU 2007-OA2 | ▪ WaMu | | ▪ WaMu |

225.    As the foregoing shows, there were either Master Servicers or Servicers that serviced the very same Mortgage Loans that they had warranted in every Covered Trust, or related companies that both warranted and serviced the very same Mortgage Loans in every Covered Trust. This guaranteed that the Master Servicers and Servicers would not admit to their own breaches. Indeed, with respect to the five WaMu Covered Trusts, since WaMu or its subsidiary both warranted and serviced the Mortgage Loans in those Covered Trusts, and WaMu was *also* supposed to enforce the representation and warranty claims against itself under those Covered Trusts' Governing Agreements, it was a foregone conclusion that no representation and warranty claims would be made. In addition, in an outrageous conflict of interest, and to ensure that U.S. Bank (or its predecessor or successor Trustees) would not seek to ensure the enforcement of representation and warranty claims against WaMu, WaMu also paid U.S. Bank's trustee fees for the WaMu Covered Trusts, thereby buying U.S. Bank's silence and inaction which further injured plaintiff and the class. This led to the situation pointed out by Professor Eggert where the Master Servicers and Servicers would further breach their duties under the Governing Agreement by failing to declare their own breaches of their representations and warranties. In any event, as previously alleged, U.S. Bank

*already knew of the Warrantors' massive breaches, and therefore also knew that the Warrantors who were also Master Servicers/Servicers had not disclosed their breaches*.  These failures to disclose by the Master Servicers/Servicers were also Events of Default of which U.S. Bank was aware.

226.    Professor Eggert also testified that loan servicers owned large numbers of second lien loans while the RMBS trusts owned the majority of first lien loans.  This incentivized loan servicers to refuse to modify first lien loans in ways that benefitted RMBS investors because it would harm the servicers' interests in their second lien loans, which second liens were typically extinguished in a modification, thus causing losses to the loan servicers.  These perverse incentives, which caused loan servicers to service the mortgage loans in ways which hurt RMBS investors instead of benefitting them as required by the Governing Agreements, were yet additional Events of Default under the Governing Agreements.  U.S. Bank undoubtedly knew of this misconduct because *it was a loan servicer itself* and was either directly involved in such misconduct, or at least could easily spot such Events of Default.  Given the long delinquencies and delayed and invalidated attempts to foreclosure many of the Mortgage Loans in the Covered Trusts, U.S. Bank knew that the Master Servicers/Servicers to the Covered Trusts were committing these Events of Default also.

227.    The FCIC Report released in January 2011 further confirmed the existence of loan servicers' conflicts of interests with RMBS investors which led to Events of Default by the Covered Trusts' Master Servicers/Servicers.  The FCIC reported that loan servicers were improperly denying borrowers loan modifications under the U.S. Government's HAMP program, a program which was created to assist borrowers with obtaining mortgage loan modifications and avoid foreclosures.  FCIC Report at 405.  Most of the Master Servicers and Servicers had joined the HAMP program and had agreed to modify qualifying loans and borrowers in exchange for monetary compensation.  The

FCIC Report noted that Diane Thompson of the National Consumer Law Center testified before the U.S. Senate's Banking, Housing, and Urban Affairs Committee that "'[o]nly a very few of the potentially eligible borrowers have been able to obtain permanent modifications.  ***Advocates continue to report that borrowers are denied improperly for HAMP . . . and that some servicers persistently disregard HAMP applications***.'"  *Id.*  The FCIC Report also noted that a Moody's Investors Service managing director "***learned that a survey of servicers indicated that very few troubled mortgages were being modified***."  *Id.* at 223.

228.    As previously alleged, loan modifications in many cases were beneficial to RMBS investors because a borrower which continued to make loan payments – even reduced modified payments – could be much more profitable to RMBS investors over time than a borrower who had ceased making payments and who was foreclosed on in a depressed real estate market.  The FCIC Report also confirmed that loan servicers had incentives to push loans into foreclosure rather than to modify them in a manner that would benefit RMBS investors because the servicers collected large fees from foreclosures.  The FCIC also reported on how loan servicers have been sued by RMBS investors because loan servicers were encouraging borrowers to make payments on their second lien loans owned by the servicers, instead of making payments on the first lien loans owned by the RMBS trusts.  FCIC Report at 406.  The FCIC concluded that there were "powerful competing interests, including those of the holders of first and second mortgages and of mortgage servicers," *id.* at 410, which were contributing to the financial crisis and leading to large losses by the RMBS trusts.

229.    In addition, the FCIC Report further re-confirmed the robo-signing scandal, and even specifically identified the previously alleged GMAC employee and   FCIC-described "'robo-signer[]'" Jeffrey Stephan.  FCIC Report at 407.  The FCIC reported that Stephan "said that he

signed 10,000 affidavits in a month – roughly 1 per minute, in a 40-hour workweek – making it highly unlikely that he verified payment histories in each individual case of foreclosure." *Id.* The FCIC Report also noted testimony given by New York State Supreme Court Justice F. Dana Winslow to the U.S. House Judiciary Committee. Justice Winslow testified that the loan servicing issues had become so prevalent that a RMBS trustee's standing to foreclose had "'become . . . a pervasive issue.'" *Id.* The FCIC Report further documented numerous other improper loan servicing practices that Justice Winslow had observed in foreclosure cases, such as:

> *[T]he failure to produce the correct promissory notes in court during foreclosure proceedings; gaps in the chain of title, including printouts of the title that have differed substantially from information provided previously; retroactive assignments of notes and mortgages in an effort to clean up the paperwork problems from earlier years; questionable signatures on assignments and affidavits attesting to the ownership of the note and mortgage; and questionable notary stamps on assignments.*

*Id.* at 407-08.

230.     In February 2011, news reports surfaced concerning more robo-signing issues with yet another Servicer to the Covered Trusts. On February 25, 2011, *Dow Jones Business News* reported that SunTrust, a Servicer to at least one of the Covered Trusts, had "discovered problems" with 4,000 of its foreclosures and that "'robo-signing'" was involved, including false statements by SunTrust employees that they had verified certain facts when in fact they had not.

231.     The events that occurred from November 2010 until February 2011 further corroborated and further confirmed to U.S. Bank that the Master Servicers and Servicers were committing widespread Events of Default that undoubtedly reached the Mortgage Loans in the Covered Trusts. However, by April 13, 2011, there was absolutely no doubt that the Master Servicers and Servicers committed Events of Default concerning the Mortgage Loans in the Covered Trusts.

       **c.**      **By April 13, 2011 U.S. Bank Absolutely Knew that the Covered Trusts' Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

232.    On April 13, 2011, major events transpired that conclusively established that the Master Servicers and Servicers to the Covered Trusts were systematically engaged in deliberate and large scale practices which were Events of Default under the Governing Agreements, and that such misconduct extended to the Mortgage Loans in the Covered Trusts.  On April 13, 2011, the U.S. Government released a report entitled "Interagency Review of Foreclosure Policies and Practices" (hereinafter the "Government Foreclosure Report") and took sweeping actions against 14 loan servicers, which together represented nearly 70% of the entire loan servicing industry and nearly 36.7 million serviced mortgage loans.  ***The government agencies found "foreclosure-processing weaknesses that [had] occurred <u>industrywide</u>***."  The Government stated that it was taking action against the 14 loan servicers because it had identified "***unsafe and unsound [foreclosure] practices and violations of applicable . . . law***."  Among the offending 14 loan servicers were ***nearly all*** of the Master Servicers and Servicers to the Covered Trusts (and their related companies) ***and U.S. Bank too***.  Each had entered into consent cease and desist orders or consent orders with the U.S. Treasury's OCC, the Federal Reserve, the OTS and/or the FDIC wherein they ***all*** essentially admitted to (*i.e.*, they did not deny or contest) facts that conclusively established that they had systematically failed to service mortgage loans prudently or in accordance with the standards set forth in the Governing Agreements.  In other words, nearly all of the Master Servicers and Servicers to the Covered Trusts admitted that they had engaged in systematic Events of Default under the Governing Agreements.  Acting Comptroller of the Currency John Walsh stated the following concerning the Government's action:  "***We found significant deficiencies*** . . . .  ***This is a very serious problem that servicers are going to have to do substantial work . . . to fix***."

233.    The Master Servicers and Servicers to the Covered Trusts are set forth again in the

chart below, and those that entered into consent orders with the Government appear in bold, italics

and underline:

**Covered Trusts' Master Servicers and
Servicers Entering into Consent Orders**

| Covered Trust | Master Servicers | Original Servicers |
|---|---|---|
| BAFC 2007-C | • ***Wells Fargo*** | • ***Bank of America***<br>• ***Chase Bank***<br>• ***National City (bought by PNC Bank, which entered into a consent order)***<br>• ***Wells Fargo*** |
| BNCMT 2007-2 | • ***Aurora (Aurora entered into the consent order through its parent company, Aurora Bank)*** | • ***Chase Bank*** |
| BSABS 2006-AC2 | • ***Wells Fargo*** | • ***EMC***<br>• Harbourside Mortgage Corporation<br>• ***HSBC (HSBC's parent company entered into the consent order)***<br>• American Home Mortgage Servicing<br>• Waterfield<br>• ***Wells Fargo*** |
| BSABS 2006-AC5 | • ***Wells Fargo*** | • ***EMC***<br>• GreenPoint<br>• ***National City*** |
| GPMF 2007-AR1 | • ***Aurora*** | • GreenPoint<br>• ***GMAC***<br>• ***Aurora*** |
| GPMF 2007-AR2 | • ***Aurora*** | • GreenPoint<br>• ***GMAC***<br>• ***Aurora*** |
| GPMF 2007-AR3 | • ***Aurora*** | • GreenPoint<br>• ***Aurora*** |
| HEAT 2006-5 | • None | • ***Wells Fargo***<br>• ***Chase Bank***<br>• Select Portfolio Servicing |
| HEAT 2006-6 | • None | • ***Wells Fargo***<br>• Select Portfolio Servicing |
| LXS 2006-10N | • ***Aurora*** | • ***Aurora***<br>• ***Bank of America***<br>• ***CHLS/BACHLS (CHLS's parent company,*** |

| Covered Trust | Master Servicers | Original Servicers |
|---|---|---|
| | | *Bank of America entered into the consent order)*<br>▪ *GMAC*<br>▪ *IndyMac (seized by FDIC and bought by OneWest Bank, which entered into the consent order)*<br>▪ *SunTrust*<br>▪ *Wells Fargo* |
| LXS 2006-15 | ▪ *Aurora* | ▪ *Aurora* |
| LXS 2007-7N | ▪ *Aurora* | ▪ *CHLS/BACHLS*<br>▪ *Aurora*<br>▪ American Home Mortgage Servicing |
| MABS 2006-HE2 | ▪ *Wells Fargo* | ▪ *Wells Fargo*<br>▪ New Century |
| MLMI 2006-WMC2 | ▪ None | ▪ *Wilshire Credit Corp. (Wilshire Credit Corp.'s parent, Bank of America, entered into the consent order)* |
| SARM 2006-9 | ▪ *Aurora* | ▪ *Aurora*<br>▪ *CHLS/BACHLS*<br>▪ PHH |
| SASC 2006-NC1 | ▪ *Aurora* | ▪ *Wells Fargo* |
| SASC 2006-WF2 | ▪ *Aurora* | ▪ *Wells Fargo* |
| SASC 2006-WF3 | ▪ *Aurora* | ▪ *Wells Fargo* |
| SASC 2007-EQ1 | ▪ *Aurora* | ▪ *Wells Fargo*<br>▪ HomeEq Servicing |
| SASC 2007-WF1 | ▪ *Aurora* | ▪ *Wells Fargo* |
| WMALT 2006-AR4 | ▪ None | ▪ *WaMu (WaMu's parent, JPMorgan, entered into the consent order)* |
| WAMU 2006-AR13 | ▪ None | ▪ *WaMu* |
| WAMU 2006-AR17 | ▪ None | ▪ *WaMu* |
| WAMU 2006-AR19 | ▪ None | ▪ *WaMu* |
| WAMU 2007-OA2 | ▪ None | ▪ *WaMu* |

234.    As the chart above shows, ***nearly all of the Master Servicers and Servicers to the Covered Trusts entered into consent orders with the Government***.  The chart also demonstrates that ***one or more Master Servicers or Servicers to each Covered Trust engaged in Events of Default, thus demonstrating that Mortgage Loans in every Covered Trust were affected***.  The servicing misconduct that these Master Servicers and Servicers essentially admitted to was so widespread and so prevalent that it was clear that it reached the Mortgage Loans in the Covered Trusts.  Indeed,

*every* Covered Trust had at least one or more Master Servicers or Servicers that signed the consent orders.  The admitted misconduct was an unequivocal Event of Default under the Governing Agreements.

235.   In the 14 consent orders, which were either identical or virtually identical to one another, each consenting Master Servicer and Servicer did not dispute the Government's findings that they had engaged in the following illegal and improper loan servicing practices (or misconduct substantially similar to it): (a) engaging in "unsafe or unsound practices in residential mortgage servicing and . . . foreclosure proceedings"; (b) filing false affidavits in foreclosure proceedings in "which the affiant represented that the assertions in the affidavit were made based on personal knowledge . . . when . . . they were not based on . . . personal knowledge"; (c) filing false affidavits in foreclosure proceedings which were "not properly notarized"; (d) "fail[ing] to devote to [their] foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training"; (e) "fail[ing] to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services"; and (f) "engag[ing] in unsafe or unsound banking practices."

236.   The OCC, Federal Reserve, OTS and FDIC typically do not always publicly disclose their examination findings, but given the gravity of the misconduct and its far-reaching nature, they did so this time.  Thus, it was stunning to learn that ***nearly the entire loan servicing industry had essentially admitted that they systematically engaged in widespread robo-signing, filing false affidavits and other foreclosure documents, and illegal conduct***.  Indeed, the Government's revelations of the vast scope of the admitted uniform misconduct and its deliberate, fraudulent nature, as well as the fact that it had infected virtually the entire industry, was extremely shocking.  Moreover, given the large number of participants in and the systematic nature of the admitted

misconduct – misconduct that was clearly an Event of Default – it was also clear that all of the Covered Trusts' Master Servicers and Servicers had uniformly committed Events of Default with respect to the Mortgage Loans in the Covered Trusts.  Indeed, in the consent orders, the Master Servicers and Servicers to the Covered Trusts essentially admitted that they had committed Events of Defaults, by consenting with the Government to form an action plan to "***ensure compliance with . . . [the loan] servicing guides of . . . investors," an admission that they had not been complying with their duties mandated by the Governing Agreements***.

237.   The Master Servicers'/Servicers' improper servicing practices were so widespread and so egregious that the Government required sweeping reforms.  The Master Servicers/Servicers (and their related companies) were required by the consent orders to:

- submit a plan to the Government to strengthen their board of directors' oversight of loan servicing;

- submit a "comprehensive action plan" describing how they would comply with the consent orders and properly service loans;

- submit a compliance program designed to ensure the proper servicing and foreclosure of mortgage loans;

- submit policies and procedures to ensure the proper supervision of third-party vendors and outside law firms;

- submit a plan to ensure proper controls over and supervision of the Mortgage Electronic Registration System used by the Master Servicers/Servicers in connection with loan servicing, foreclosures and title transfers;

- retain an independent outside consultant to conduct a review of the Master Servicers'/Servicers' past foreclosure practices and submit a report to the Government concerning such review;

- submit a plan to ensure the proper functioning of the Master Servicers'/Servicers' MIS systems and the accuracy of loan data;

- submit a plan to ensure proper, timely and effective communications with borrowers and to prevent the impedance or discouragement of loan modifications;

- submit a risk assessment and management plan concerning the Master Servicers'/Servicers' loan servicing operations; and

- submit a quarterly progress report detailing all actions taken to comply with the consent orders.

238. These sweeping reforms the Government required of all the affected Master Servicers and Servicers illustrated how serious and ubiquitous their misconduct was.

239. In light of the above information, U.S. Bank had actual knowledge, no later than April 13, 2011, that Events of Default had been committed by the Master Servicers and Servicers with respect to Mortgage Loans within the Covered Trusts.

240. Further confirming that the Master Servicers and Servicers had committed Events of Default with respect to the Mortgage Loans in the Covered Trusts, the Government also simultaneously released the Government Foreclosure Report. The Government Foreclosure Report, written by the Federal Reserve, OCC and OTS, was released at the same time as the consent orders. Among other things, the Government Foreclosure Report found that the loan servicing industry – including the Master Servicers and Servicers and U.S. Bank – had engaged in "***violations of applicable federal and state law requirements***," and "***notary practices which failed to conform to state legal requirements***." These findings that the Master Servicers and Servicers violated the law were absolute Events of Default. Moreover, the Government Foreclosure Report's revelation that the violations of the law were occurring on an "***industry-wide***" basis, made it clear to U.S. Bank in April 2011 that ***all*** of the Master Servicers/Servicers of the Mortgage Loans to the Covered Trusts were not abiding by the Governing Agreements' requirements to prudently service the Mortgage Loans, and therefore they were all engaging in Events of Default.

241. The Government Foreclosure Report also specifically focused on facts that gave U.S. Bank actual knowledge of numerous other Events of Default committed by the Master Servicers and Servicers with respect to the Mortgage Loans in the Covered Trusts. For example, the Government

Foreclosure Report revealed the following "industrywide" misconduct by the Master Servicers and Servicers to the Covered Trusts that amounted to Events of Default under the Governing Agreements: (1) "*violations of applicable federal and state law requirements*" such as violations of the Servicemembers Civil Relief Act, the bankruptcy laws, and "notary practices which failed to conform to state legal requirements"; (2) "*inadequate* organization and staffing of foreclosure units"; (3) "*inadequate* policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process"; (4) "*inadequate* monitoring and controls" over third-party vendors; (5) "*lack of sufficient audit trails*" between information contained in affidavits and "the servicers' internal records"; (6) "*inadequate* quality control and audit reviews to ensure compliance with legal requirements"; (7) "*inadequate* identification of financial, reputational, and legal risks" by "boards of directors and senior management"; (8) *false affidavits*; (9) *false mortgage documents*; (10) *improper notarizations*; and (11) "*weaknesses in quality-control procedures at all servicers, which resulted in servicers not . . . ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed*."  Government Foreclosure Report at 3, 11.

242. ***The Government Foreclosure Report also specifically found that the Master Servicers' and Servicers" "industrywide" misconduct "pose[d] a variety of risks to [RMBS] investors*,*" Government Foreclosure Report at 6, *because they had failed to satisfactorily "evaluat[e] and test[] compliance with applicable. . . pooling and servicing agreements*." *Id.* at 9, 11.  This finding unequivocally established that the Master Servicers and Servicers were not complying with the Governing Agreements – *a clear Event of Default*.  Thus, between the numerous consent orders entered into by the specific Master Servicers and Servicers to the Covered Trusts on April 13, 2011 admitting to Events of Default, and the Government Foreclosure Report's simultaneous finding that such Events of Default "occurred industrywide," U.S. Bank absolutely

- 164 -

*knew* of Events of Default committed by the Master Servicers and Servicers concerning the Mortgage Loans in the Covered Trusts *no later than April 13, 2011*.

243.    Finally, it is relevant to note that U.S. Bank had *unique and direct knowledge and insight* into the improper loan servicing practices of the industry and the Master Servicers and Servicers to the Covered Trusts. *U.S. Bank obtained this unique knowledge because it was also a loan servicer that was then engaged in the very same misconduct. U.S. Bank was one of the 14 loan servicers that consented, on April 13, 2011, to the entry of a cease and desist consent order against it by the U.S. Government. Indeed, on April 13, 2011, both U.S. Bank and its parent company, U.S. Bancorp, consented to the entry of consent cease and desist orders against U.S. Bank by the U.S. Government wherein they did not dispute or contest that U.S. Bank had engaged in "unsafe or unsound practices in residential mortgage servicing and . . . foreclosure proceedings," filed false affidavits that were not based on personal knowledge or properly notarized, failed to devote adequate oversight, policies, controls, procedures, management and training in connection with its foreclosure processes, and failed to sufficiently oversee outside counsel and third-party providers handling foreclosure-related services, all of which resulted in "unsafe or unsound banking practices*." U.S. Bank was thus engaged in the same Events of Default as all the other Master Servicers and Servicers to the Covered Trusts and U.S. Bank knew from its participation in the loan servicing industry that such practices were occurring "industrywide," as the Government reported.[32]

244.    Notwithstanding U.S. Bank's actual knowledge of Events of Default by the Master Servicers and Servicers, U.S. Bank: (1) never attempted to remedy the situation by demanding that

---

[32]   Later, it was announced that the consent orders had been amended, with U.S. Bank and many of the Master Servicers and Servicers paying $3.6 billion to borrowers in cash and providing them with another $5.2 billion in relief through loan modifications and forgiveness, for a total of $8.8 billion in relief for their loan servicing abuses.

the Master Servicers and Servicers cure their defaults as required by the Governing Agreements and the TIA;[33] (2) never notified plaintiff and the class and others of the uncured Events of Default as required by the Governing Agreements and the TIA; (3) never took additional steps, such as terminating or replacing the Master Servicers and Servicers or taking over their duties, as allowed by the Governing Agreements and the TIA; and (4) never exercised the heightened degree of care required of it, that is, the degree of care a prudent person would exercise under the circumstances in the conduct of his/her own affairs, also as required by the Governing Agreements and the TIA. U.S. Bank's failure to act breached the Governing Agreements and violated the TIA, and caused plaintiff and the class to suffer millions of dollars in damages, as foreclosures were stopped, withdrawn, denied, delayed, or invalidated due to the Master Servicers' and Servicers' defaults, and millions in bogus and excessive fees and costs were improperly charged to the Covered Trusts by the Master Servicers and Servicers during these delays. Moreover, the Master Servicers' and Servicers' practice of servicing the Mortgage Loans for their own financial benefit instead of plaintiff's and the class, and as to the WaMu Covered Trusts, the Servicers' failure to enforce the representation and warranty claims, were also Events of Default of which U.S. Bank was aware and failed to act on, thereby also breaching the Governing Agreements and violating the TIA, and causing plaintiff, the class and the Covered Trusts to suffer additional massive damages.

> **d.    After April 2011 U.S. Bank Also Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

245.    Incredibly, even ***after*** the U.S. Government's sweeping actions against the Master Servicers and Servicers to the Covered Trusts on April 13, 2011, and even ***after*** they promised to

---

[33]    With respect to the WaMu Covered Trusts, this includes U.S. Bank's failure to demand that Servicer WaMu enforce the representation and warranty claims against the Warrantors, *i.e.*, itself.

stop, ***the Master Servicers and Servicers then continued to engage in the same improper and illegal Events of Default***.  And, even though U.S. Bank had actual knowledge of these continuing Events of Default, it did nothing and has allowed the Events of Default to go on unabated.  U.S. Bank thereby continues to breach the Governing Agreements and violate the TIA.

246.    After April 13, 2011, there were numerous additional news reports revealing that robo-signing and other improper and illegal loan servicing practices amounting to Events of Default were continuing to be committed by the Master Servicers and Servicers to the Covered Trusts.  For example, just two months after the consent orders, in June 2011, Bank of America entered into a $8.5 billion settlement with the trustee of 530 RMBS trusts.  The settlement was based in part on claims of loan servicing abuses, like those alleged herein, in those 530 trusts by Covered Trust Servicers Bank of America and CHLS/BACHLS.  Given the expansive scope of the settlement – ***530 RMBS trusts*** consisting of tens of thousands of loans – it was clear CHLS/BACHLS, and their parent company Bank of America, were continuing to engage in an enterprise-wide practice of committing Events of Default.

247.    On June 23, 2011, also barely two months after the April 13, 2011 consent orders were entered, the Illinois Department of Financial and Professional Regulation issued a press release announcing that it had fined PHH – a servicer to one Covered Trust – $240,000 for signing foreclosure affidavits that the company knew would later be altered by its attorneys and for signing affidavits using someone else's name.  In other words, PHH was also engaged in improper robo-signing Events of Default just like its co-Master Servicers/Servicers.  Among other things, the Illinois regulator found that "at least four different people used one employee's name to sign . . .

- 167 -

affidavits," and also "discovered other evidence of improprieties on the part of PHH employees." It further found that PHH had violated Illinois law.[34]

248.    In addition, in July 2011, the *Associated Press* reported that "*[m]ortgage industry employees are still signing documents they haven't read and using fake signatures more than eight months after big banks and mortgage companies promised to stop the illegal practices that led to a nationwide halt of home foreclosures*." The *Associated Press* article further reported:

> *County officials in at least three states say they have received thousands of mortgage documents with questionable signatures since last fall, suggesting that the practices, known collectively as "robo-signing," remain widespread in the industry.*

> *            *            *

> *Lenders say they are working with regulators to fix the problem but cannot explain why it has persisted*.

> Last fall, the nation's largest banks and mortgage lenders, including JPMorgan Chase, Wells Fargo, Bank of America and an arm of Goldman Sachs, suspended foreclosures as they investigated how corners were cut to keep pace with the crush of foreclosure paperwork.

> *Critics say the new findings point to a systemic problem with the paperwork involved in home mortgages and titles.  And they say it shows that banks and mortgage processors haven't acted aggressively enough to put an end to widespread document fraud in the mortgage industry*.

> *"Robo-signing is not even close to over," says Curtis Hertel, the recorder of deeds in Ingham County, Mich., which includes Lansing.  "It's still an epidemic*."

---

[34]    Later, in December 2013, PHH demonstrated that its Events of Default discussed above were not isolated events but rather a common course of conduct.  On December 4, 2013, *The Star-Ledger* reported that the New Jersey Attorney General had charged PHH with misleading borrowers and violating New Jersey law by "not giving homeowners accurate information about how long it would take to process loan modifications, misleading them about foreclosure proceedings and imposing improper fees."  PHH paid $6.35 million to settle the charges which involved misconduct affecting "[a]t least 2,000 borrowers," demonstrating a company-wide practice that also affected the Mortgage Loans in the Covered Trust serviced by PHH.

249.    Also in July 2011, Michael Calhoun, the President of the Center for Responsible Lending, provided the U.S. Senate Banking, Housing and Urban Affairs Committee with shocking testimony concerning how the loan servicing industry's abuses were so imbedded in the industry's culture that it would be almost impossible to reform them.  Calhoun testified that "***[a]busive [loan servicing] practices have become so ingrained in the servicing culture that they are now endemic to the industry***."  He then testified concerning multiple ongoing servicing abuses he had observed, such as: (1) "dual track[ing]," an improper servicing practice where the borrower is foreclosed on in the middle of ongoing loan modification negotiations or after a trial modification was agreed to and being performed by the borrower; (2) "[f]oreclosing even when [RMBS] investors would receive more from a sustainable modification"; (3) "[i]mproper denial and delay of loan modification requests . . . because fees, which eventually flow directly to servicers . . . continue to accrue"; (4) "[f]orcing homeowners into multiple temporary modifications [which is] a best-of-both-worlds situation for servicers, who continue to charge fees"; (5) "[f]orce-placed insurance [which is] very expensive . . . often driving an otherwise current borrower into delinquency and even foreclosure"; (6) "[i]mproper fees"; (7) "[m]isapplication of borrower payments"; (8) "[m]ismanaged escrow accounts"; (9) "[f]ailing or refusing to provide payoff quotations to borrowers"; (10) "[a]buses in the default and delinquency process"; and (11) "fail[ure] to adhere to loss mitigation requirements of [RMBS] investors," *i.e.*, failures to abide by the Governing Agreements.  Calhoun pleaded with the Committee for stronger governmental oversight.  This testimony made it clear that Master Servicer and Servicer Events of Default were continuing and were not ceasing any time soon.

250.    On July 18, 2011, a *Reuters* investigative report also confirmed that Master Servicers and Servicers were continuing to engage in Events of Default on a grand scale.  *Reuters*' investigation found that loan servicers "***continue[d] to file questionable foreclosure documents with***

*courts and county clerks*."  The article explained, that in recent months, "*servicers have filed thousands of documents that appear to have been fabricated or improperly altered, or have sworn to false facts*."  *Reuters* also reported that "*[o]ne of the industry's top representatives admits that the federal settlements [in April 2011] haven't put a stop to questionable practices.  Some loan servicers 'continue to cut corners,' said David Stevens, president of the Mortgage Brokers Association*."  In fact, the article confirmed that the main architect of the April 2011 consent orders, the OCC, conceded that it was still receiving complaints indicating that the "questionable practices continue[d]."  *Reuters*' investigation found that "*many are still taking the same shortcuts they promised to shun, from sketchy paperwork to the use of 'robo-signers*.'"  The *Reuters* investigative report cited multiple examples of improper loan servicing by multiple loan servicers, including many of the Master Servicers and Servicers to the Covered Trusts.  *Reuters* specifically identified the following Covered Trusts' Master Servicers/Servicers as still being involved in robo-signing and other misconduct amounting to Events of Default – Bank of America, HSBC, Wells Fargo, Select Portfolio Servicing, GMAC and IndyMac (through its successor OneWest Bank).  Together, these six Master Servicers/Servicers serviced Mortgage Loans in at least 17 of the 25 Covered Trusts, through themselves and their related companies.  *Reuters* reported that OneWest Bank (successor to Servicer IndyMac) was attempting to foreclose on an 87-year-old, semi-invalid, woman and had "*recently filed a court document that appears riddled with discrepancies*."  *Reuters* reported that OneWest Bank also filed two purported copies of the borrower's promissory note that should have been identical but were not – one had an endorsement to (by-then) defunct IndyMac; the second had the endorsement removed.  IndyMac's successor, OneWest Bank, was continuing to robo-sign and commit Events of Default.

251.    HSBC was also highlighted in the *Reuters* article.  HSBC was a Servicer for at least one Covered Trust.  It was reported that "a New York State court judge in Brooklyn, threw out an attempt by HSBC to foreclose on a Brooklyn house" because of its use of foreclosure documents signed by what the court called "a 'known robo-signer.'"  According to the article, "[t]hat and other red flags prompted the judge to take the extraordinary step of threatening to sanction HSBC's chief executive officer."  HSBC was reported to have been using infamous "sub-servicer" Ocwen Financial Corporation which, as discussed *infra*, is now purchasing the servicing rights to the Mortgage Loans and succeeding the Master Servicers/Servicers as a new Master Servicer/Servicer to the Covered Trusts.

252.    The July 2011 *Reuters*' article also exposed the fact that the Covered Trust Servicer Select Portfolio Servicing was also engaging in misconduct amounting to an Event of Default.  The article first pointed out that Select Portfolio Servicing was improperly and deceptively agreeing to trial loan modifications with borrowers only to suddenly foreclose on them even when the borrowers were making the agreed to payments.  In addition, the article also revealed that Select Portfolio Servicing was also filing false foreclosure documents with the court.  The article pointed to a situation where Select Portfolio Servicing filed two purportedly identical copies of the borrower's promissory note.  However, one copy contained an endorsement from a completely different bank and was signed by a completely different person then the other purported "copy" of the note.

253.    In addition, the *Reuters* article cited to instances where Master Servicers/Servicers Wells Fargo and GMAC had assigned mortgages from New Century to others in 2011, four years *after* New Century ceased existing.  *Reuters* reported: "Securitization lawyers say it is technically impossible for a defunct company to directly assign a mortgage over to another owner."

254.    Bank of America was also singled out by the *Reuters* article:

*Bank of America, meanwhile, is coming under fire from a New York federal bankruptcy judge.*

*Last Tuesday, Judge Robert Drain ordered an investigation involving a foreclosure case brought by the bank. Two earlier copies of a promissory note filed in court had lacked any endorsement, but then one appeared on the note when bank lawyers produced the original.*

*The judge said the sudden appearance of an endorsement, and his own close look at it, raised questions about whether it had been added illegally to make the note look legitimate.*

*It "raises a sufficiently serious issue as to when and more importantly by whom this note was endorsed," the judge said.*

255.    The *Reuters* article then confirmed that Events of Default were still endemic:

Reuters reviewed records of individual county clerk offices in five states – Florida, Massachusetts, New York, and North and South Carolina – with searchable online databases. Reuters also examined hundreds of documents from court case files, some obtained online and others provided by attorneys.

*The searches found more than 1,000 mortgage assignments that for multiple reasons appear questionable: promissory notes missing required endorsements or bearing faulty ones; and "complaints" (the legal documents that launch foreclosure suits) that appear to contain multiple incorrect facts.*

The upshot of the *Reuters* article was that there were still extensive, nationwide loan servicing abuses amounting to Events of Default that were ongoing, and that the abuses were being committed on a wholesale basis by most of the Covered Trusts' Master Servicers and Servicers.

256.    In August 2011, Covered Trust Servicers Bank of America and BACHLS were again caught engaging in Events of Default. In states providing for non-judicial foreclosures, Bank of America and BACHLS utilized a subsidiary of Bank of America called ReconTrust Company, N.A. ("ReconTrust"), to foreclose on homeowners. On August 4, 2011, *the Attorney General for the State of Washington filed an action against ReconTrust alleging that the company "failed to comply with the procedures of [Washington state foreclosure laws]* <u>*in each and every foreclosure it has conducted since at least June 12, 2008*</u>*," and "systematically conceals, misrepresents or*

inaccurately divulges the true parties to the mortgage transaction," including misrepresenting Bank of America's ownership of mortgage notes.  Complaint for Injunctive and Other Relief Under the Consumer Protection Act, *Washington v. ReconTrust Co., N.A.*, 11-2-26867-5 SEA (Wash. Super. Ct., King Cnty. Aug. 4, 2011), ¶¶4.3, 5.12.  The Washington Attorney General further alleged that the company engaged in such misconduct "*as a matter of practice*."  *Id.*, ¶5.2.

257.    Also in August 2011, *American Banker* reported that "*the largest mortgage servicers are still fabricating documents*" filed in foreclosure proceedings.  The article reported the following:

> *Several dozen documents reviewed by American Banker show that as recently as August some of the largest U.S. banks, including Bank of America Corp., Wells Fargo & Co., Ally Financial Inc. [Servicer GMAC's parent], and OneWest Financial Inc. [successor to Servicer IndyMac], were essentially backdating paperwork necessary to support their right to foreclose.*

> *Some of documents reviewed by American Banker included signatures by current bank employees claiming to represent lenders that no longer exist.*

> \*       \*       \*

> "*It's one thing to not have the documents you're supposed to have even though you told investors and the SEC you had them,*" *says Lynn E. Szymoniak, a plaintiff's lawyer in West Palm Beach, Fla. "But they're making up new documents.*"

> \*       \*       \*

> *North Carolina consumer bankruptcy lawyer O. Max Gardner III says servicers and trustees often submit promissory notes in court without proper endorsements, which show the chain of title from one lender to another. Then, after the fact, there will be "a magically appearing note with a stamped endorsement," Gardner said.*

> *When plaintiff's lawyers then try to depose the person whose name is stamped on the endorsement, "we're being told the person is no longer employed by the servicer or by the party for whom they signed," Gardner says.*

> *Linda Tirelli, a New York bankruptcy lawyer, calls such mortgage documents "Ta-Da!" assignments because they seem to appear out of nowhere.*

> "*Why are they creating their own assignments to begin with?*" *asks Tirelli, who represents borrowers. "Why is this even an issue?*"

258.     On October 6, 2011, Neil Barofsky ("Barofsky"), former Special Inspector General for the Troubled Asset Relief Program ("TARP"), testified before the U.S. House Financial Services Subcommittee on Insurance, Housing and Community Opportunity concerning TARP, HAMP and their effectiveness in improving the economy.[35]   In his prior position as Special Inspector General ("SIG") of TARP he had gained firsthand experience with the practices and misconduct of the loan servicing industry.  He cited to a May 2011 Government Accountability Office ("GAO") survey of housing counselors who worked with borrowers seeking HAMP loan modifications.  Barofsky testified that the GAO survey "*confirmed the widespread anecdotal evidence of [loan] servicers' failures*" to properly process (and therefore service) mortgage loan modifications.  According to the GAO survey, borrowers frequently complained of the loan servicers purportedly "losing" documents to avoid modifications, borrowers going through long "'trial periods'" without modifications, servicers being virtually impossible to contact, and servicers making numerous "'wrongful denials'" of loan modifications.  As previously alleged, in many cases loan modifications were financially beneficial for RMBS investors but not the loan servicers and thus this information re-confirmed that these Events of Default were ongoing by the loan servicing industry, including by the Covered Trusts' Master Servicers/Servicers.  In fact, Barofsky confirmed that "*[o]ther studies and investigations [in addition to the GAO survey], including the important work of ProPublica and anecdotal evidence from [the SIG office's] hotline, confirm the* <u>*widespread abuse suffered . . . at the hands of the mortgage servicers*</u> *. . . .  Sadly, accountability for these deficiencies has gone largely unaddressed . . . even though [the Government] has been aware of servicer misconduct*

---

[35]   TARP was the financial aid package from the U.S. Government that bailed out the "too-big-to-fail" banks, which included most of the Warrantors and Master Servicers/Servicers herein.  HAMP was started to help borrowers obtain mortgage loan modifications, avoid foreclosure and stay in their homes.  As alleged more fully herein, loan servicers were financially incentivized to foreclose on borrowers rather than to modify their loans.  This misconduct was also an Event of Default because while it benefitted the loan servicers it was not in the best interests of RMBS investors.

*since 2009*." In other words, the former SIG confirmed that these Events of Default were continuing unabated, the Government did not have the ability to stop them, and the fact that such abuses were confirmed by multiple sources as "widespread," meant that the Mortgage Loans in the Covered Trusts were still being subjected to such Events of Default.

259.    Former SIG Barofsky further confirmed that the three main Master Servicers/Servicers to the Covered Trusts – Bank of America, JPMorgan and Wells Fargo, who through themselves and their related companies serviced Mortgage Loans in 21 of the 25 Covered Trusts – had been engaged in these Events of Default for some time, with the Government trying to *unsuccessfully* stop them in June 2011, through financial sanctions. Barofsky stated, "*[o]f course, the three sanctioned servicers had essentially already agreed to stop violating HAMP rules in a previous unrelated settlement with regulators*," yet continued their misconduct thereafter, thus demonstrating their recalcitrance and single-mindedness to continue engaging in Events of Default, regardless what the Government did to try and stop them. Finally, Barofsky made it clear that this Event-of-Default conduct was ubiquitous and ongoing, by stating "*the rampant mortgage servicer abuse that has so strongly characterized the [financial] crisis, both inside and outside of HAMP, continues to go unpunished*."

260.    On November 10, 2011, New York's Department of Financial Services announced it had entered into an agreement with American Home Mortgage Servicing, a Servicer to at least two Covered Trusts, and several other loan servicers, to reform their loan servicing practices. Benjamin Lawsky, Superintendent of Financial Services, stated: "'*Today's agreements are an important step forward in cleaning up some of the mortgage industry's most troubling practices*.'" According to the Department of Financial Services' press release, the agreements were made to address the following misconduct by these loan servicers:

- 175 -

- ■ "Robo-signing," where servicer staff signed affidavits stating they reviewed loan documents when they had not actually done so.

- ■ Weak internal controls and oversight that compromise the accuracy of foreclosure documents.

- ■ Referring borrowers to foreclosure at the same time as those borrowers are attempting to obtain modifications of their mortgages or other loss mitigation.

- ■ Improper denials of loan modifications.

- ■ Failing to provide borrowers with access to a single customer service representative, resulting in delays or failure of the loss mitigation process.

- ■ Imposition of improper fees by servicers.

The press release further outlined the servicers' agreements to reform their practices as follows:

1.      End Robo-signing and impose staffing and training requirements that will prevent Robo-signing.

2.      Require servicers to withdraw any pending foreclosure actions in which filed affidavits were Robo-signed or otherwise not accurate.

3.      End "dual tracking," i.e., referring a borrower to foreclosure while the borrower is pursuing loan modification or loss mitigation, and prohibit foreclosures from advancing while denial of a borrower's loan modification is under an independent review, which is also required by the agreements.

4.      Provide a dedicated single point of contact representative for all borrowers seeking loan mitigation or in foreclosure so borrowers are able to speak to the same person who knows their file every time they call.

5.      Require servicers to ensure that any force-placed insurance be reasonably priced in relation to claims incurred, and prohibit force-placing insurance within an affiliated insurer.

6.      Impose more rigorous pleading requirements in foreclosure actions to ensure that only parties and entities possessing the legal right to foreclose can sue borrower.

7.      For borrowers found to have been wrongfully foreclosed, require servicers to ensure that their equity in the property is returned, or, if the property was sold, compensate the borrower.

8.      Impose new standards on servicers for application of borrowers' mortgage payments to prevent layering of late fees and other servicer fees and use of suspense accounts in ways that compounded borrower delinquencies and defaults.

- 176 -

9. Require servicers to strengthen oversight of foreclosure counsel and other third party vendors, and impose new obligations on servicers to conduct regular reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose document practices are problematic or who are sanctioned by a court.

This further confirmed that Covered Trust Master Servicers and Servicers were continuing to commit Events of Default.

261. On December 15, 2011, an article was published on Politico.com by Matt Stoller, who worked on the Dodd-Frank financial reform act as a staffer for Representative Alan Grayson from Florida. In the article, the vast reach of robo-signing and other servicing abuses alleged herein were discussed. Stoller recounted the following lawsuits throughout the nation to stop and prevent these current and future Events of Default by Master Servicers and Servicers to the Covered Trusts:

> *Massachusetts Attorney General Martha Coakley recently filed the first broad civil suit against five major banks and the Mortgage Electronic Registration Systems for foreclosure fraud. Her suit alleges that mortgage servicers routinely backdated and falsified documents to expedite foreclosures. In many cases, they foreclosed on loans they did not even own.*

> This is one of a series of suits that state officials are bringing against leading financial institutions. *Nevada Attorney General Catherine Cortez Masto last month indicted two employees of the foreclosure specialist Lender Processing Services, which works with the big banks, on 606 felony and misdemeanor counts of fraud.*

> Delaware Attorney General Beau Biden is also suing MERS . . . for unfair and deceptive practices.

> *           *           *

> *What is behind these suits? Simple: Crime by mortgage servicers and their contractors.*

> *           *           *

> This fraud is now coming back to haunt our courts – for example, in the falsified foreclosure paperwork required to cover up the corner-cutting of the subprime lenders and the banks that funded them.

> *The banks themselves have confessed to breaking the law. The Veterans Affairs Committee held a hearing early this year when JPMorgan was found to be*

- 177 -

*illegally foreclosing on 18 U.S. military families – a violation of the Servicemember Civil Relief Act.*

This law bans foreclosing on active duty troops.  Knowingly violating the ban carries up to one year in prison for each count.  JPMorgan apologized for its violations, because for banks, being sorry when caught is what really counts.  The families were compensated by JP Morgan financially, but no one at the bank got jail time or had to plead guilty.

*Bank regulators have now found that up to 5,000 military families may have been foreclosed on illegally, as The Financial Times reported last month.  Yet the Justice Department settled with Bank of America for alleged violations of the service member act.  BofA, like JPMorgan, doesn't have to admit to wrongdoing – but it says it is very sorry anyway.*

"The SCRA is not some obscure legal technicality," said Rep. Brad Miller (D-N.C.), who wrote the law, "that might just have escaped the attention of mortgage servicers.  *Those servicers are all affiliates of the biggest banks. . . .  Servicing mortgages is all they do, and they really don't have that many laws to keep up with. They have got to have known what the law required and consciously decided that they could just ignore it, the same way they apparently decided it was OK to file false affidavits in legal proceedings*."

262.    It was also reported that, in December 2011, an Alabama federal bankruptcy court judge ruled that Wells Fargo, a Master Servicer or Servicer to at least 12 Covered Trusts, had filed *at least 630 sworn affidavits containing false facts*, including claims that borrowers were in arrears for amounts not due.  The *Chicago Tribune* reported that Judge Margaret A. Mahoney had declared that "Wells Fargo 'took the law into its own hands'" and disregarded perjury laws.  The number of false affidavits filed by Wells Fargo indicated a pattern and practice of committing Events of Default.

263.    In January 2012, the *Chicago Tribune* also reported that large scale, widespread foreclosure abuses were still continuing:

*Foreclosure-related case files in just one New York federal bankruptcy court, for example, hold at least a dozen mortgage documents known as promissory notes bearing evidence of recently forged signatures and illegal alterations, according to a judge's rulings and records reviewed by Reuters.  Similarly altered notes have appeared in courts around the country.*

> *Banks in the past two years have foreclosed on the houses of thousands of active-duty U.S. soldiers who are legally eligible to have foreclosures halted. Refusing to grand foreclosure stays is a misdemeanor under federal law.*

> *The U.S. Treasury confirmed in November that it is conducting a civil investigation of 4,500 such foreclosures. Attorneys representing service members estimate banks have foreclosed on up to 30,000 military personnel in potential violation of the law.*

*     *     *

> *And in thousands of cases, documents required to transfer ownership of mortgages have been falsified. Lacking originals needed to foreclose, mortgage servicers drew up new ones, falsely signed by their own staff as employees of the original lenders – many of which no longer exist.*

264.    On February 9, 2012, the U.S. Department of Justice and 49 states announced that they had obtained "*a landmark $25 billion settlement,*" "*the largest federal-state civil settlement ever obtained*," against the nation's five largest loan servicers for continuing "*mortgage loan servicing and foreclosure abuses*" (hereafter the "National Mortgage Settlement").  In a press conference announcing the settlement, U.S. Attorney General Eric Holder called the servicers' conduct "*reckless and abusive mortgage practices*."  The loan servicing misconduct covered by the National Mortgage Settlement encompassed loan servicing abuses occurring *after* April 2011, as the settlement agreement included misconduct that had occurred up to and including February 2012, thus revealing that *widespread loan servicing abuses were continuing long after the April 2011 consent orders were entered.  In addition, the five offending loan servicers charged by the U.S. and state governments were repeat-offenders – they had previously entered into the April 2011 consent orders.  These five serial offenders were Bank of America, JPMorgan, Wells Fargo, Citigroup and Ally Financial (which was formerly GMAC)*.  Four of these five serial loan mis-servicers – Bank of America, JPMorgan, Wells Fargo and GMAC – were Master Servicers or Servicers for *virtually all of the 25 Covered Trusts*, as they serviced (through themselves and their related companies) Mortgage Loans in 23 of the 25 Covered Trusts.  Moreover, the misconduct they

- 179 -

were charged with by the federal government and 49 states was a ***continuation*** of the same prior misconduct they were taken to task for by the OCC, Federal Reserve, OTS and FDIC in April 2011, and which they had promised to cease but obviously had not.  The Government's press release confirmed this repeat misconduct by reporting that Bank of America, JPMorgan, Wells Fargo and GMAC engaged in

> ***violations of state and federal law[;] . . . [the] use of "robo-signed" affidavits in foreclosure proceedings; deceptive practices in the offering of loan modifications; failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages; and filing improper documentation in federal bankruptcy court***.

This demonstrated and confirmed that these Master Servicers and Servicers were continuing to engage in a blatant disregard of the law through a continuing pattern and practice of Events of Defaults as a part of their normal businesses practices.  As a result, a monitor was appointed to periodically determine whether these serial offenders were complying with the National Mortgage Settlement.  U.S. Bank knew from this settlement in February 2012 that these Master Servicers and Servicers to the majority of the Covered Trusts were continuing to commit Events of Default concerning the Mortgage Loans in the Covered Trusts.

265.    Moreover, also in February 2012, the New York Attorney General sued many of the largest Master Servicers and Servicers to the Covered Trusts – Wells Fargo, Bank of America, BACHLS, Chase Bank and EMC, which collectively serviced Mortgage Loans for at least 21 of the 25 Covered Trusts by themselves and through their related companies.  The New York Attorney General also sued MERSCORP Inc. and its subsidiary Mortgage Electronic Registration Systems, Inc. (collectively, "MERS").  MERS was created by the lending and loan servicing industry as a private mortgage registration system to speed the transfer mortgages amongst themselves to facilitate RMBS securitizations and foreclosures and to avoid the cost of traditionally recording the mortgages with county recorders.  The New York Attorney General's lawsuit alleged that these Master

Servicers/Servicers exercised complete control over MERS and that its mortgage database was riddled with errors and inaccuracies, thus leading to the massive amounts of foreclosure fraud that was ongoing.  The lawsuit further alleged that the Master Servicers and Servicers and MERS repeatedly submitted documents to courts in foreclosure proceedings that contained misleading and false information.  The New York Attorney General stated: "'***The banks created the MERS system as an end-run around the property recording system, to facilitate the rapid securitization and sale of mortgages.  Once the mortgages went sour, these same banks brought foreclosure proceedings en masse based on deceptive and fraudulent court submissions, seeking to take homes away from people with little regard for basic legal requirements or the rule of law*** . . . .'"  The Attorney General charged the Master Servicers and Servicers with "deceptive and illegal" business practices that violated New York state laws.  The lawsuit charged these Master Servicers/Servicers with the following illegal conduct:

- MERS had filed over 13,000 foreclosure actions against New York homeowners listing itself as the plaintiff, but in many instances, ***MERS lacked the legal authority to foreclose and did not own or hold the promissory note, despite saying otherwise in court submissions***.

- ***MERS certifying officers, including employees and agents of JPMorgan Chase, Bank of America, and Wells Fargo, have repeatedly executed and submitted in court legal documents purporting to assign the mortgage and/or note to the foreclosing party.   These documents contain numerous defects, including affirmative misrepresentations of fact, which render them false, deceptive and/or invalid.  These assignments were often automatically generated and "robosigned" by individuals who did not review the underlying property ownership records, confirm the documents' accuracy, or even read the documents.  These false and defective assignments often masked gaps in the chain of title and the foreclosing party's inability to establish its authority to foreclose, and as a result have misled homeowners and the courts***.

- MERS' indiscriminate use of non-employees "certifying officers" to execute vital legal documents has confused, misled, and deceived homeowners and the courts and made it difficult to ascertain whether a party actually has the right to foreclose.  MERS certifying officers have regularly executed and submitted in court mortgage assignments and other legal documents on behalf of MERS without disclosing that they are not MERS employees, but instead are employed by other entities, ***such as***

*the mortgage servicer filing the case or its counsel*.  The signature line just indicates that the individual is an "Assistant Secretary," "Vice President" or other officer of MERS.  Indeed, these documents' failure to track the designation of certifying officers and the scope of their authority to act, individuals have executed legal documents on behalf of MERS, such as mortgage assignments and loan modifications, when they were either not designated as a MERS certifying officer at the time or were not authorized to execute documents on behalf of MERS with respect to the subject loan.

- *MERS and its members have deceived and misled borrowers about the importance and ramifications of MERS' role with respect to their loans by providing inadequate disclosures*.

- *The MERS system is riddled with inaccuracies which make it difficult to verify the chain of title for a loan or the current title holder, and creates confusion among stakeholders who rely on the information.  In addition, as a result of these inaccuracies, MERS has filed mortgage satisfactions against the wrong property*.

266.    Also in February 2012, PNC, which had acquired National City, a Servicer for at least two Covered Trusts, reported that it was accruing $240 million of expenses related to "residential mortgage foreclosure-related expenses, primarily as a result of ongoing governmental matters," a confession that it was engaged in widespread Events of Default.

267.    On March 5, 2012, U.S. Secretary of Housing and Urban Development, Shaun Donovan, stated in televised comments that "*as high as 60 percent of foreclosures were [still] being done wrong*."

268.    On March 30, 2012, Jamie Dimon, CEO of JPMorgan, which owned and controlled Covered Trust Servicers Chase Bank, EMC and WaMu, Servicers for ten of the Covered Trusts, sent a letter to JPMorgan's shareholders admitting that these Servicers engaged in robo-signing.  Dimon wrote:

*Our servicing operations left a lot to be desired:  There were too many paperwork errors, including affidavits that were improperly signed because the signers did not have personal knowledge about what was in the affidavits but, instead, relied on the company's processes*.

- 182 -

269.    On June 7, 2012, law professor Adam Levitin testified before the U.S. House Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises concerning, among other things, the National Mortgage Settlement with Covered Trusts Master Servicers/Servicers Bank of America, JPMorgan, Wells Fargo and GMAC (as previously alleged, these Master Servicers/Servicers serviced Mortgage Loans in 23 of the 25 Covered Trusts either directly or through their related companies).  Professor Levitin first testified to the fact that *the National Mortgage Settlement would "not deter future consumer fraud by [these] too-big-to-fail" Master Servicers/Servicers*, and then confirmed the massive scope of the Master Servicers'/Servicers' Events of Default, calling it "*one of the most pervasive violations of procedural rights in history" supported by "evidence of widespread fraud [which] was too great to ignore*."  Professor Levitin, who was not a proponent of the settlement because, in his view it was just "a slap on the wrist" for the Master Servicers and Servicers, then testified concerning the terms of the settlement and how those terms were likely to lead to yet more loan servicing abuses and Events of Default.  Professor Levitin focused on the fact that $10 billion of the $25 billion settlement was not in the form of a cash payment from these serial mis-servicers, but instead consisted of $10 billion in principal reductions they were required to give to borrowers.  Professor Levitin further stated: "Critically for the purposes of this hearing, *the settlement permits the banks to receive credit under the settlement by reducing principal or refinancing on mortgages that they service, but <u>do not own</u>" and therefore "servicers have strong incentives not to engage in principal write-downs on loans they own"; instead, "it appears likely that most of the principal reductions will come from <u>investor-owned mortgages</u>," i.e., Mortgage Loans like those in the Covered Trusts*.  Professor Levitin concluded: "*I would expect servicers to perform some [principal reductions] that violate*

***PSAs in order to get . . . settlement credit***."  Of course, Professor Levitin was correct, as the loan servicing abuses injuring plaintiff, the class and other RMBS investors continued.

270.    In January 2013, it was reported that Bank of America was still committing Events of Default, as it had to pay Fannie Mae $1.3 billion "to make up for dropping the ball on servicing mortgages . . . by delaying contacts with delinquent borrowers or failing to process foreclosures properly."

271.    In addition, in February 2013, in connection with the court's consideration of whether to approve the previously alleged $8.5 billion settlement between Bank of America and the trustee of 530 RMBS trusts concerning, *inter alia*, improper loan servicing by Covered Trust Servicers Bank of America and CHLS/BACHLS, objectors to the settlement provided evidence to the court establishing that these Servicers had breached the PSAs for 468 of the 530 trusts by improperly failing to repurchase modified mortgage loans.  In addition, evidence was presented establishing that these Servicers were also modifying first lien loans owned by the trusts, and thus causing losses to the investors, while simultaneously refusing to modify second lien loans the Servicers owned in order to avoid losses to themselves.

272.    In June 2013, the *Charlotte Business Journal* reported that the monitor that was appointed to ensure loan servicers were complying with terms of the National Mortgage Settlement found that Covered Trust Servicer Bank of America was not complying with the servicing standards required by the settlement.  The article stated: "***These aren't new allegations***."  This demonstrated that Bank of America was still engaged in Events of Default.  *The New York Times* reported that, in addition to Bank of America, Master Servicers/Servicers JPMorgan, Wells Fargo and GMAC (through Ally Financial) were also not complying with the settlement and were also still committing Events of Default.  These Events of Default were obviously also affecting the Mortgage Loans in the

- 184 -

Covered Trusts, as *The New York Times* reported that the servicers had received "**almost 60,000 complaints**" from borrowers about their servicing misconduct.  And while the servicers' robo-signing misconduct had improved somewhat, the article reported that many other improper servicing practices continued:

> *But state officials have expressed deep disappointment with the banks' performance in other areas.  Last month, lawyers in the office of Martha Coakley, the attorney general of Massachusetts, detailed what they said were hundreds of violations of the settlement, including a failure to adhere to the required timetable or provide reasons for the denial of an application.*
>
> *They also pointed to cases where they said banks had improperly inflated the value of a loan before writing it down so as to claim a greater amount of relief, or where they had reverted to a higher interest rate while delaying, for months, the decision to make a trial loan modification permanent.*
>
> *Soon after, Eric T. Schneiderman, the attorney general of New York, announced plans to sue Bank of America and Wells Fargo, saying they were repeatedly violating the terms of the settlement.*
>
> *Lisa Madigan, the attorney general of Illinois, said there was an "alarming pattern" of violations of the servicing standards.  In a review of servicer handling of loan modification requests in Illinois, she found that in 60 percent, servicers failed to comply with the time frame for notifying borrowers of missing documents and in 45 percent they made multiple requests for the same documents.*
>
> *Pam Bondi, the attorney general of Florida, has written letters to Bank of America and Wells Fargo detailing similar complaints that are resolved only by the intervention of her office.*

This demonstrated that the Master Servicers and Servicers to the Covered Trusts were continuing to commit Events of Default as a matter of course and without regard to what they had promised to do.

273.    Also in June 2013, there was additional information that came to light showing that Bank of America was still engaged in widespread servicing practices that were Events of Default.  It was reported by *CBC News* on June 18, 2013 that former employees of Bank of America had filed sworn affidavits in cases against Bank of America alleging widespread improper denials of loan

modifications, and other servicing misconduct amounting to Events of Default.  According to the news article:

> *Former Bank of America employees say in court documents that the bank routinely lies to customers about their mortgages, and denies their requests for modifications without even looking at the paperwork.*
>
> *In sworn affidavits, four former employees, for example, describe policies in place at the bank that they say are designed to subvert the Home Affordable Modification Program (HAMP), 2009 government-sponsored initiative that was designed to keep distressed homeowners above water during the depths of the housing crises.*
>
> *The affidavits are part of multiple court cases against the bank brought by homeowners who say they were unfairly foreclosed upon.*
>
> *   *   *
>
> *The former workers allege there's a bank-wide policy that encourages mortgage officers to delay and avoid that process as much as possible, to foreclose on customers who shouldn't have been, and to generally lie and mislead.*
>
> *According to one affidavit, a mortgage processor who put 10 or more houses into foreclosure in any given month was eligible for a $500 cash bonus, or gift cards at a major retailer.*
>
> *The sworn affidavits were made public recently on the website of ProPublica, an independent, non-profit news service that produces investigative journalism in the public interest.*
>
> *The employees say the bank also went out of its way to mislead, stall and delay paperwork so that customers would be denied changes to their mortgages, and forced into arrangements that were more profitable to the bank than HAMP arrangements were.*
>
> *"We were told to lie to customers and claim that Bank of America had not received documents it had requested, and that it had not received trial payments [when in fact it had]," said Simone Gordon, a senior collector of loss mitigation at the bank for five years until early 2012.*
>
> *Another ex-worker, Theresa Terrelonge, agreed that subverting HAMP to the bank's benefit was an overarching goal for the bank.*
>
> *"Based on what I observed, Bank of America was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP," she said.*

*          *          *

> "*It was well known among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible.*"

> *She also said that Bank of America "collectors" who failed to meet their quotas were fired for not putting enough customers into foreclosure. "Several of my colleagues were terminated on that basis," she said.*

> *Another former employee, William Wilson, said the bank would routinely delay filing appropriate paperwork after receiving it, in order to have certain penalties kick in. After waiting 60 days, the bank would automatically reject them all.*

> "*During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than the documents were more than 60 days old," Wilson said.*

> "*Once an applicant was finally rejected after a long delay, the bank would offer them an alternative. Bank of America would charge a higher interest rate . . . .*"

> *Wilson alleges he was fired in August 2012 for refusing to go along with the scheme any longer.*

*          *          *

> *The employees allege the bank would routinely file false paperwork to [the] government suggesting it had far more HAMP-backed loans on its books than was the reality.*

> "*It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true," Steven Cupples said. Cupples worked at the bank until June 2012. He previously worked at Countrywide, the lender at the center of America's subprime mortgage crisis that was subsequently taken over by Bank of America.*

274.    These affidavits established that Bank of America's conduct of committing Events of Default was an established business practice that was ongoing, and thus, it was also affecting the Mortgage Loans in the Covered Trusts.

275.    Also in June 2013, it was reported that the National Mortgage Settlement monitor had also found that Covered Trust Master Servicers and Servicers Wells Fargo and JPMorgan were also

not complying with the settlement, and thereby continuing the commission of Events of Default. The *Charlotte Observer* reported that the monitor told it: "'***What [this] shows to me is we still have some work to do.*'**  **The Charlotte Observer also reported that the monitor's office had received "tens of thousands of complaints" about servicing misconduct from borrowers***.  Wells Fargo and JPMorgan and its related companies serviced Mortgage Loans in many of the Covered Trusts.  This news indicated that such Master Servicers/Servicers were continuing to commit Events of Default as to Mortgage Loans in the Covered Trusts.

276.    In October 2013, the Attorney General for the State of New York sued Wells Fargo for failing to comply with the National Mortgage Settlement.  The New York Attorney General alleged that Wells Fargo "engaged in widespread breaches" of the terms of the settlement, including improper delays and obstructions of loan modifications, repetitious demands for paperwork that had already been provided, providing borrowers with inaccurate and contradictory information, and the charging of improper fees.  At the same time, the New York Attorney General also announced that he had reached an agreement with Bank of America to suspend a similar enforcement action against it for similar misconduct, and that Bank of America had agreed to implement yet additional servicing reforms.  These events corroborated that these Master Servicers/Servicers to the Covered Trusts were continuing to commit Events of Default.

277.    The *Chicago Tribune* reported that, in October 2013, Covered Trust Servicer SunTrust had paid a substantial amount to settle claims which included improper loan servicing practices:

> Atlanta, Georgia-based SunTrust in October agreed to pay nearly $1.2 billion to resolve investigations from several U.S. authorities into its mortgage practices. The claims relate to certain mortgage loans backed by the Federal Housing Administration that the bank made between January 2006 and March 2012, and to ***problems in the mortgage servicing practices***.

278.     As previously alleged, in November 2013, JPMorgan announced that it was willing to pay $4.5 billion to settle representation and warranty claims for loans in 330 RMBS trusts, *including two of the Covered Trusts*.  *See supra* ¶150.  Part of that settlement offer *also included the settlement of loan servicing claims for all 330 RMBS trusts*, thus establishing the JPMorgan Master Servicer/Servicer Events of Default also reached the Covered Trusts.

279.     Also in November 2013, it was reported that Standard & Poors had estimated the largest loan servicers' liability for improper loan servicing at roughly $30 billion, thus establishing the enormity and scope of the Events of Default.

280.     In December 2013, the monitor for the National Mortgage Settlement reported that Servicer Bank of America (which also owned Co-Servicers CHLS/BACHLS and Wilshire Credit Corp.) and JPMorgan (which owned Servicers Chase Bank, EMC and WaMu) were still not complying the servicing standards required by settlement.  This demonstrated their recalcitrant nature and their continued engagement in Events of Default.

281.     Beginning as early as June 2012, many of the Master Servicers and Servicers to the Covered Trusts began selling their servicing rights to the Mortgage Loans to Nationstar Mortgage LLC ("Nationstar").  For example, in June 2012, Aurora – a Master Servicer or Servicer to at least 13 Covered Trusts – was acquired by Nationstar and Nationstar started servicing the Mortgage Loans in those Covered Trusts.  In addition, in 2013, Nationstar acquired $215 billion in loan servicing rights from Servicer Bank of America – a Servicer for at least five Covered Trusts, through either itself or its related companies.  However, both before and after it did, Nationstar committed Events of Default and has continued to commit Events of Default with respect to the Mortgage Loans.  For example, in 2011, Nationstar was sued by a class of borrowers in West Virginia whose loans were serviced by Nationstar.  *See* Complaint, *Triplett v. Nationstar Mortgage, LLC*, No.

3:11cv238 (S.D. W.Va. Feb. 15, 2011).  The borrowers alleged that Nationstar was violating several West Virginia laws by assessing excessive late fees, by threatening to collect its "expense of collection," and by returning partial loan payments prior to accelerating the loans.  None of these alleged loan servicing practices were "prudent"; instead, they were Events of Default under the Governing Agreements.  ***Discovery in the case revealed thousands of violations of West Virginia law by Nationstar***.  In 2012, Nationstar settled the case, paying $1.5 million.

282.    Thereafter, on March 4, 2013, a class of nationwide borrowers sued Nationstar for improper loan servicing practices, alleging that Nationstar violated state and federal laws by making "repeated misrepresentations" and engaging in "deceptive" business practices in connection with improperly denying loan modifications required by it under the HAMP program.  *See* Class Action Complaint for Damages and Injunctive Relief, *Burton v. Nationstar Mortgage LLC*, No. 1:13-cv-00307 (E.D. Cal. Mar. 4, 2013).  ***The borrowers alleged that Nationstar operated "a system designed to wrongfully" deny borrowers loan modifications***.  *Id*., ¶8.  Moreover, just days later, on March 7, 2013, Nationstar was sued again, this time by a RMBS investor.  The RMBS investor alleged that Nationstar was "not fulfill[ing] its duties as Master Servicer, but rather has engaged in practices to enrich itself at the expense of the . . . certificateholders."  *See* Complaint and Demand for Jury Trial, *KIRP, LLC v. Nationstar Mortgage LLC*, No.650794/2013 (N.Y. Sup. Ct., N.Y. Cnty. Mar. 7, 2013), ¶5.  ***The investor alleged that Nationstar was breaching its master servicing agreement with the RMBS trust and engaging in a "blatant abdication of its servicing duties under the governing contracts" by "auctioning off the trusts' mortgage loans in bulk . . . for amounts that are a fraction of the loans' unpaid balances or the value of the properties securing the loans*."*  *Id*., ¶¶1-2.  The investor alleged these actions profited Nationstar, which recouped the fees it advanced, but injured investors.  The foregoing acts by Nationstar were blatant Events of

Default under the Governing Agreements. ***The court overseeing the case immediately issued a temporary restraining order against Nationstar and ordered it to stop selling the loans***. Nationstar thereafter quickly settled the case. In January 2014, another class action was filed against Nationstar in Nevada, again alleging that it improperly refused to honor loan modification agreements, as well as "assessed unwarranted penalties and costs." Finally, very recently on March 5, 2014, it was reported that New York State's Department of Financial Services Superintendent Benjamin Lawsky sent a letter to Nationstar stating: "***We have received hundreds of complaints from New York consumers about your company's mortgage modifications, including problems related to mortgage modifications, improper fees, lost paperwork, and numerous other issues***." Lawsky demanded that Nationstar provide information concerning its loan servicing practices. Notwithstanding all the news indicating that Nationstar engaged in serial Events of Default, U.S. Bank did nothing to prevent Nationstar from becoming a Master Servicer/Servicer to the Covered Trusts, nor did anything required by the Governing Agreements. Given the frequency and scope of Nationstar's loan servicing misconduct, U.S. Bank knew that Nationstar was continuing to commit Events of Default as to the Mortgage Loans in the Covered Trusts.

283.    Moreover, another successor to the Master Servicers/Servicers has been purchasing the servicing rights to the Mortgage Loans. Wells Fargo has very recently agreed to sell its loan servicing rights to Ocwen Loan Servicing, LLC and/or its parent company, Ocwen Financial Corporation (collectively, "Ocwen"). As previously alleged, Wells Fargo serviced or master-serviced Mortgage Loans for at least 12 Covered Trusts. Ocwen has been a prolific acquirer of loan servicing rights (along with Nationstar), as Ocwen has previously acquired the loan servicing rights of Covered Trust Servicers American Home Mortgage Servicing, GMAC, JPMorgan, HomeEq Servicing and EMC – Servicers to at least 15 Covered Trusts through themselves or their related

companies.  But beginning as early as December 2010, Ocwen has also proved that it is a prolific mis-servicer of mortgage loans, as its business model is designed to commit widespread Events of Default, just like the Master Servicers/Servicers it has or plans to succeed.  For example, in December 2010, the Florida Attorney General's office had compiled a presentation titled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases," according to the *Palm Beach Post* in an article published in January 2011.  The *Palm Beach Post* reported that the Florida Attorney General's presentation contained "copies of allegedly forged signatures, false notarizations, bogus witnesses and improper mortgage assignments," including documents signed by Ocwen employee Scott Anderson.  Anderson's signatures had been signed by at least four different persons, an obvious variation of the robo-signing scandal.  Then in March 2011, Ocwen announced that the FTC was investigating the company's foreclosure practices and had demanded the production of documents relating to Ocwen's loan servicing activities.  A few months later, in June 2011, the U.S. Treasury Department found that Ocwen's servicing practices were in need of "substantial improvement."  A month later, in July 2011, a foreclosure action by a RMBS trustee was dismissed with prejudice by a New York State court judge, in large part because three Ocwen employees had improperly "robo-signed" foreclosure documents in the case.  *See HSBC Bank USA, N.A. v. Taher*, 932 N.Y.S.2d 760, 2011 N.Y. Misc. LEXIS 3171 (Sup. Ct. 2011).  The court specifically singled out the aforementioned Ocwen employee, Scott Anderson, and noted that it too had observed that there were at least four different variations of his signatures in the cases before the court.  Then, on September 1, 2011, the New York Department of Financial Services entered into an agreement with Ocwen wherein Ocwen agreed to reform its robo-signing practices by, among other things, ensuring that foreclosure affidavits were true, accurate, and correct and were based on personal knowledge and properly notarized, and by withdrawing any of its pending foreclosure proceedings that used

false affidavits, as well as agreeing to a host of other reforms designed to stop its improper loan servicing activities. Thereafter on December 5, 2012, the New York Department of Financial Services announced that Ocwen was violating the agreement. The Department's press release stated:

> "*[W]e conducted a targeted exam of Ocwen's performance and discovered gaps in the company's compliance. The Department is requiring the company to hire a monitor so that we can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure*."

*        *        *

> *The Department's examination of Ocwen's mortgage servicing practices found that, in some instances, the company failed to demonstrate that it had sent out required 90-day notices before commending foreclosure proceedings or even that it had standing to bring the foreclosure actions. The exam also revealed gaps in Ocwen's Servicing Practices, including indications that in some instances it failed to provide the single point of contact for borrowers; pursued foreclosure against borrowers seeking a loan modification; failed to conduct an independent review of denials of loan modifications; and failed to ensure that borrower and loan information was accurate and up-to-date.*

284. These findings by the New York Department of Financial Services demonstrated that Ocwen – like the Covered Trusts' other Master Servicers/Servicers – was also a serial, repeat Event of Default-committing loan servicer. This was confirmed again in December 2013, when Ocwen entered into a consent order with the U.S. Government's Consumer Financial Protection Bureau ("CFPB"), 49 states and the District of Columbia. Pursuant to the consent order, Ocwen did not dispute or contest any facts alleged against it by the Government, and it agreed to provide borrowers with *$2 billion in principal reduction, and further refund $127.3 million to nearly 185,000 borrowers it improperly foreclosed on*. The misconduct covered by the consent order extended through December 2013, demonstrating that Ocwen had engaged in Events of Default right up to the time it entered into the consent order. The huge size of the relief agreed to by Ocwen ($2,127,300,000), and the broad geographic scope and huge number of borrowers affected, confirmed that Ocwen's misconduct was a company-wide and nationwide practice and course of

conduct infecting all of its loan servicing operations.  The CFPB's press release announcing the settlement confirmed that Ocwen engaged in "***years of systemic***" Events of Default:

> ***Today, the Consumer Financial Protection Bureau (CFPB), authorities in 49 states, and the District of Columbia filed a proposed court order requiring the country's largest nonbank mortgage loan servicer, Ocwen Financial Corporation and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in principal reduction to underwater borrowers.  The consent order addresses Ocwen's <u>systemic misconduct at every stage of the mortgage servicing process</u>.***

*       *       *

> ***The CFPB and its partner states believe that <u>Ocwen was engaged in significant and systemic misconduct that occurred at every stage of the mortgage servicing process</u>***.  According to the complaint filed in federal district court in the District of Columbia, Ocwen's violations of consumer financial protections ***put thousands of people across the country at risk of losing their homes***.  Specifically, the complaint says that Ocwen:

- Took advantage of homeowners with servicing shortcuts and unauthorized fees:  Customers relied on Ocwen to, among other things, treat them fairly, give them accurate information, and appropriately charge for services.  According to the complaint, Ocwen violated the law in a number of ways, including:

  - Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;

  - Charging borrowers unauthorized fees for default-related services;

  - Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; and

  - Providing false or misleading information in response to consumer complaints.

- Deceived consumers about foreclosure alternatives and improperly denied loan modifications:  Struggling homeowners generally turn to mortgage servicers, the link to the owners of the loans, as their only means of developing a plan for payment.  Ocwen failed to effectively assist, and in fact impeded, struggling homeowners trying to save their homes.  This included:

  - Failing to provide accurate information about loan modifications and other loss mitigation services;

- 194 -

- Failing to properly process borrowers' applications and calculate their eligibility for loan modifications;

- Providing false or misleading reasons for denying loan modifications;

- Failing to honor previously agreed upon trial modifications with prior servicers; and

- Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer.

- Engaged in illegal foreclosure practices. One of the most important jobs of a mortgage servicer is managing the foreclosure process. But Ocwen mishandled foreclosures and provided consumers with false information. Specifically, Ocwen is accused of:

  - Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen; and

  - Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.

285.    However, even after the settlement with the CFPB and others, Ocwen continued to commit Events of Default. In February 2014, news reports revealed that huge investors Pimco and BlackRock were considering legal action against Ocwen concerning its servicing misconduct relating to loan modifications. On February 27, 2014, *Bloomberg Businessweek* reported:

> ***As of mid-February, American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen – the highest number of any non-bank servicer, according to data from the Consumer Financial Protection Bureau in Washington.***

> *       *       *

> "***Ocwen is one of the most complained about servicers when we ask housing counselors and lawyers what they are seeing," said Kevin Stein, associate director of the California Reinvestment Coalition, a San Francisco-based consumer advocacy group. "We're hearing a lot about foreclosing because of bad servicing practices***."

286.    And in March 2014, a New York federal court denied Ocwen's motion to dismiss and allowed a class action to proceed against it and others alleging that Ocwen misled borrowers about loan modifications.  *See Dumont v. Litton Loan Servicing, LP*, No. 12-cv-2677-ER-LMS, 2014 U.S. Dist. LEXIS 26880 (S.D.N.Y. Mar. 3, 2014).   As Ocwen's history shows, it has a culture that repeatedly commits Events of Default in the normal course of its business.

287.    In January 2014, *HousingWire* reported that the CFPB found that loan "[s]ervicers [were] still engaged in unfair or deceptive practices."  The *HousingWire* article reported that the CFPB had required loan servicers to pay $2.6 million to resolve misconduct.  The CFPB identified a number of issues at loan servicers, such as failing to honor loan modification agreements, demanding unfair waivers of claims against the loan servicers, deceptive payment practices, and other misconduct.  This demonstrated that the loan servicing industry was continuing to engage in abuses that amounted to Events of Default.

288.    The *Consumerist* reported in February 2014 that the succession of new master servicers and servicers, such as Nationstar and Ocwen to the Covered Trusts, was leading to a surge in borrower complaints, as borrowers were sloppily shuffled from one servicer to another, leading to failures by the new servicers to honor or locate the paperwork from prior loan modification agreements.  The article also pointed out that Ocwen and Nationstar were approving much smaller numbers of loan modifications than others in the industry.   This confirmed that Ocwen and Nationstar were either failing to comply with loan modification rules and agreements, or were deliberately foreclosing instead, since it was in their financial interests but not plaintiff's and the class'.

289.    On February 18, 2014, *The New York Times* reported that "[s]hoddy paperwork, erroneous fees and wrongful evictions – the same abuses that dogged the nation's largest banks and

- 196 -

led to [the National Mortgage Settlement] – are now cropping up among the specialty firms [such as Nationstar and Ocwen], according to dozens of foreclosure lawsuits and interviews with borrowers, federal and state regulators and housing lawyers." The article contained statements from state and federal regulators, and at least two borrowers whose loan was serviced by Nationstar, demonstrating that the successor Master Servicers/Servicers to the Covered Trusts – Nationstar and Ocwen – were continuing the Events of Default.

290.    In February 2014, Steven Antonakes, Deputy Director of the CFPB, confirmed that the loan servicing industry as a whole was continuing its servicing abuses and Events of Default. At the Mortgage Bankers Association's National Mortgage Servicing Conference in February 2014, Antonakes gave a speech which took the industry to task, stating: "***Nearly eight years have passed and I remain deeply disappointed by the lack of progress the mortgage servicing industry has made***." Antonakes stated that ***the CFPB was still receiving "around 4,900 complaints per month" concerning mortgage servicing and "too many [borrowers] continue to receive erratic and unacceptable treatment. . . . This kind of continued sloppiness is difficult to comprehend and not acceptable. It is time for the paper chase to end. . . . . It has felt like 'Groundhog Day' with mortgage servicing for far too long***." Antonakes also said the pervasive practice of successor servicers failing to honor loan modification agreements with prior servicers "would not be tolerated" and that the servicing industry's continuing deceptive practices would not be allowed: "***There will be no more shell games where the first servicer says the transfer ended all of its responsibility . . . and the second servicer" claims ignorance about the modification***. Antonakes summed up his speech as follows, which clearly indicated that the industry still had not stopped committing Events of Default:

> *My message to you today is a tough one. I don't expect a standing ovation when I leave. But I do want you to understand our perspective. I would be remiss if I did not share it with you.*
>
> *In our view, the intense human suffering inflicted on American consumers by an all-too-frequently indifferent mortgage servicing system has required us to change the paradigm in mortgage servicing forever. Frankly, the notion that government intervention has been required to get the mortgage industry to perform basic functions correctly – like customer service and record keeping – is bizarre to me but, regrettably, necessary* . . . .
>
> *But please understand: if you choose to operate in this space, the fundamental rules have changed forever. It's not just about collecting payments. It's about recognizing that you must treat Americans who are struggling to pay their mortgages fairly before exercising your right to foreclose. We have raised the bar in favor of American consumers and we are ready, willing and able to vigorously enforce that bar.*
>
> *Ultimately, these profound changes will be good for all Americans, including industry. But please understand, business as usual has ended in mortgage servicing. Groundhog Day is over. Thank you.*

291.    In February 2014, SunTrust, a Servicer for at least one Covered Trust, announced it might be subject to "'substantial penalties'" from government investigations into whether SunTrust harmed borrowers and violated the law by failing to properly process loan modifications under HAMP.  Also in March 2014, a federal court denied Servicer SunTrust's motion to dismiss a nationwide class of borrowers who alleged that SunTrust reneged on loan modifications agreements, assessed improper fees, failed to credit the borrowers' accounts, and improperly sent foreclosure notices.  These, too, were obvious Events of Default.

292.    In March 2014, *The Washington Post* reported on a foreclosure lawsuit filed in federal court in New York, in which an internal Wells Fargo "foreclosure manual" was filed.  The borrower's attorney asserted that the internal manual instructed attorneys working for Servicer Wells Fargo about how to essentially perform robo-signing and create false foreclosure documents.  The borrower's attorney was reported to have stated: "'***This is a blueprint for fraud.'* . . . *'The idea that this bank is instructing people how to produce these documents is appalling*.'"  *The*

*Washington Post* further reported that **the borrower's attorney "has long suspected Wells Fargo of manufacturing documents.  A number of her past cases involving the bank featured mortgage notes that were not endorsed by anyone, but when she brought it to Wells Fargo's attention the bank would 'magically' produce[] the document."  It happened so frequently to this attorney and her colleagues "that they started to call paperwork 'ta-da' documents**."  This was unequivocal evidence that Wells Fargo – a Master Servicer/Servicer for at least 12 Covered Trusts – had an established, uniform and **written** practice manual that directed the company-wide commission of robo-signing, a clear Event of Default.

293.    Finally, also in February 2014, HSBC, a Servicer to one of the Covered Trusts, and Citi Mortgage were sued by a class of New York borrowers, alleging HSBC and  Citi Mortgage violated New York laws by "routinely" failing to timely file mortgage satisfactions, needlessly clouding title to properties in "thousands, if not tens of thousands," of instances.  *See* Complaint, *Brennan v. HSBC Mortgage Corp. (USA)*, No. 1:14cv20753 (S.D. Fla. Feb. 28, 2014).   The borrowers alleged that HSBC engaged in this servicing misconduct from February 2008 to the present.  This information indicated that HSBC had been "routinely" violating the law for years – a clear Event of Default – on a very large scale, and thus implicated the Mortgage Loans in the Covered Trusts it was servicing.

294.    As the foregoing shows, the Master Servicers and Servicers to the Covered Trusts and their successors engaged in and have continued to engage in systemic Events of Default.  Such conduct is so ingrained in their cultures that they do not know of any other way to "service" mortgage loans.  Given this widespread, repetitive and brazen misconduct which has caused long delays in foreclosures of the Mortgage Loans in the Covered Trusts, extremely long delinquencies, and excessive and improper fees and expenses added by the Master Servicers/Servicers, the Covered

Trusts have experienced astronomical cumulative losses.  These huge losses corroborate that the Mortgage Loans are continuing to suffer from pervasive Events of Default by the Master Servicers and Servicers, and U.S. Bank knows it.  Indeed, the persistently high Mortgage Loan default rates, which include many long delinquencies and extended foreclosures, and the huge losses for the Covered Trusts reported in February 2014 confirm the Events of Default.  As of February 2014, due to the pervasive and unremedied Master Servicer and Servicer Events of Default (and the never asserted representation and warranty claims), the majority of the Covered Trusts continue to have default rates in excess of 30%,[36] while *the Covered Trusts' losses exceed $6.7 billion* due to U.S. Bank's failures to act.  The chart below sets forth the Mortgage Loan default rates and the Covered Trusts' cumulative realized loss, as reported in February 2014:

| Covered Trusts' Mortgage Loans Default Rates and Cumulative Realized Losses Reported in February 2014 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| BAFC 2007-C | 17.7% | $226,893,334 |
| BNCMT 2007-2 | 34.4% | $395,720,713 |
| BSABS 2006-AC2 | 35.9% | $93,856,554 |
| BSABS 2006-AC5 | 46.4% | $61,091,827 |
| GPMF 2007-AR1 | 29.6% | $509,180,805 |
| GPMF 2007-AR2 | 27.5% | $447,417,371 |
| GPMF 2007-AR3 | 24.2% | $175,773,021 |
| HEAT 2006-5 | 39.9% | $264,596,670 |
| HEAT 2006-6 | 40.3% | $288,238,361 |
| LXS 2006-1ON | 30.1% | $321,910,430 |
| LXS 2006-15 | 28.1% | $203,861,702 |
| LXS 2007-7N | 34.0% | $649,831,504 |
| MABS 2006-HE2 | 44.3% | $197,268,292 |
| MLMI 2006-WMC2 | 49.6% | $388,916,895 |
| SARM 2006-9 | 24.6% | $85,693,829 |
| SASC 2006-NC1 | 39.7% | $337,728,134 |

---

[36]   As previously noted, these default rates are understated as they are the rates for the Mortgage Loans that remain in the Covered Trusts, and do not consider the thousands of Mortgage Loans that were already liquidated long before February 2014 and therefore are no longer part of the Covered Trusts.

| Covered Trusts' Mortgage Loans Default Rates and Cumulative Realized Losses Reported in February 2014 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| SASC 2006-WF2 | 35.1% | $287,779,450 |
| SASC 2006-WF3 | 38.4% | $318,164,221 |
| SASC 2007-EQ1 | 35.4% | $209,304,163 |
| SASC 2007-WF1 | 35.7% | $240,227,908 |
| WMALT 2006-AR4 | 35.5% | $258,512,426 |
| WAMU 2006-AR13 | 19.7% | $233,611,577 |
| WAMU 2006-AR17 | 24.2% | $176,014,397 |
| WAMU 2006-AR19 | 21.8% | $204,429,471 |
| WAMU 2007-OA2 | 25.9% | $185,178,661 |
| **Covered Trusts' Total Realized Losses:** | | **$6,761,201,716** |

> **3.    U.S. Bank Has Conflicts of Interest with Plaintiff and the Class and Has Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself**

295.    As previously alleged, U.S. Bank owes a duty of trust to plaintiff and the class. As such, U.S. Bank is required to avoid conflicts of interest with plaintiff and the class. This means that U.S. Bank is not permitted to put its interests ahead of plaintiff's and the class', nor is U.S. Bank permitted to benefit therefrom.

296.    U.S. Bank provided trustee services and loan servicing services to the RMBS industry and derived substantial income from RMBS trusts set up and "sponsored" by the Loan Sellers/Sponsors, Other Transferors, and Master Servicers/Servicers to the Covered Trusts, and their related companies. The Warrantors to the Covered Trusts (and their related companies) handpicked U.S. Bank for the RMBS trustee and loan servicing positions, as they knew that U.S. Bank would not cause trouble for them by making significant representation and warranty claims against them, to plaintiff's and the class' detriment. The Master Servicers and Servicers (and their related companies) also handpicked U.S. Bank because they knew U.S. Bank would not accuse them of committing Events of Default, or replace them, as they too provided substantial RMBS trustee and loan servicing business to U.S. Bank. Indeed, with respect to the five WaMu Covered Trusts, the

- 201 -

Servicer for each of those Covered Trusts – WaMu – which had also originated the Mortgage Loans therein (through itself or its subsidiary), and had also warranted the Mortgage Loans, ***was also responsible for enforcing the representation and warranty claims against itself***.  To make matters even worse and to ensure that U.S. Bank would not require WaMu to make good on its Mortgage Loan representation and warranty breaches or WaMu's other Events of Default, ***WaMu also agreed in the Governing Agreements that WaMu would pay for U.S. Bank's trustee fees for the WaMu Covered Trusts, a clear conflict of interest that guaranteed U.S. Bank would not act against WaMu's interests or protect plaintiff's and the class' interests***.

297.    Because the Warrantors and Master Servicers/Servicers to the Covered Trusts and their related companies were the source of substantial income for U.S. Bank, U.S. Bank did not seek to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans in the Covered Trusts which breached their representations and warranties, or declare Events of Default against the Master Servicers and Servicers or replace them.  By doing so, U.S. Bank put its own interests ahead of plaintiff's and the class'.  Moreover, U.S. Bank benefitted by doing so.

**D.    U.S. Bank Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA, and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA and Common Law**

298.    Despite its discovery, and actual knowledge, of information requiring U.S. Bank to act to protect plaintiff and the class under the Governing Agreements and the TIA, U.S. Bank failed to act as required by the Governing Agreements and the TIA and thus breached the Governing Agreements and violated the TIA.  Moreover by failing to avoid conflicts of interest with plaintiff and the class, U.S. Bank breached the duty of trust it owed to plaintiff and the class.  U.S. Bank's failures to act, and its breaches and violations alleged herein, were grossly negligent and were willful malfeasance by U.S. Bank.

1.      **U.S. Bank Failed to Enforce the Warrantors' Obligations to Cure, Substitute, or Repurchase Defective, Breaching Mortgage Loans as Required by the Governing Agreements and the TIA**

299.     As alleged above, U.S. Bank discovered breaches of the Warrantors' representations and warranties concerning thousands of the Mortgage Loans, yet failed to enforce the Warrantors' obligations to cure, substitute or repurchase the breaching Mortgage Loans as it was required to by the Governing Agreements (or in the case of the WaMu Covered Trusts, U.S. Bank failed to ensure Servicer WaMu did so).  Also, as previously alleged, U.S. Bank discovered the breaches of the Warrantors' representations and warranties concerning the Mortgage Loans through:

- The numerous news reports, congressional testimony and other information that indicated that the lending industry in general was engaging in widespread lending abuses during the time the Mortgage Loans were originated and warranted, thus making it highly likely that any representations and warranties by the Warrantors concerning the Mortgage Loans were false;

- The numerous news stories, reports, lawsuits and governmental actions concerning most of the specific Warrantors to the Covered Trusts indicating that their representations and warranties were systematically false;

- The many lawsuits filed by others against the Warrantors detailing the high number of defective loans in their securitizations that breached their representations and warranties, with claims in many cases that the breach rates were from 70%-90% and that the breaches were pervasive;

- The lawsuits filed by U.S. Bank itself against the Warrantors alleging "pervasive" breaches of their representations and warranties;

- The Covered Trusts' unprecedented, extremely high, and prolonged Mortgage Loan default rates and huge losses;

- The OCC's "Worst Ten in the Worst Ten" list, identifying the areas of the United States with the highest foreclosure rates – rates that were from 13 to 22 times higher than historical rates – from loans originated at the same time as the Mortgage Loans by nearly all of the Covered Trusts' Warrantors and loan originators;

- Numerous governmental investigations of and actions against the Warrantors for lending abuses which rendered their representations and warranties false;

- U.S. Bank's review of the Mortgage Loan files in 2006 and 2007, which would have revealed many patent breaches of the Warrantors' representations and warranties about the Mortgage Loans, as held by two Washington state courts;

- U.S. Bank's filings in the Lehman bankruptcy, wherein U.S. Bank filed claims for every Mortgage Loan in 12 Covered Trusts, even though Lehman was not liable for breaches of representations and warranties for every Mortgage Loan in those trusts, and in fact many other Warrantors were liable for such breaches with respect to these Mortgage Loans;

- The FCIC Report detailing: (1) the huge numbers of loans the Warrantors were being required to repurchase because of breaches of their representations and warranties; (2) the fact that the Covered Trusts' Warrantors *intentionally* put defective loans that breached their representations and warranties into RMBS trusts just like the Covered Trusts as a matter of course; and (3) the routine practice of the Covered Trusts' Warrantors to engage in lending abuses and fraud that guaranteed their representations and warranties would be false; and

- The Senate Report demonstrating that the lending industry in which the Covered Trusts' Warrantors participated engaged in systematic lending abuses which would have rendered any representation or warranty by those Warrantors false; and the specific case study of WaMu and its subsidiaries which confirmed that representations and warranties about any Mortgage Loans in the WaMu Covered Trusts were false.

300.    Moreover, even after discovering the breaches of the representations and warranties by the Covered Trusts' Warrantors, U.S. Bank was grossly negligent and engaged in willful malfeasance by failing to act, and continuing to fail to act, in violation of the Governing Agreements and the TIA, thereby engaging in a continuing breach of the Governing Agreements and the TIA. U.S. Bank's failures to act caused the loss of the representation and warranty claims to the statute of limitations and damages to plaintiff, the class and the Covered Trusts.

### 2.    U.S. Bank Failed to Perform Its Duties with Respect to Events of Default as Required by the Governing Agreements and the TIA

301.    As previously alleged, U.S. Bank obtained actual knowledge that the Master Servicers and Servicers committed Events of Default with respect to the Mortgage Loans in the Covered Trusts yet failed to: (1) demand that the Master Servicers and Servicers cure such Events of

Default; (2) give notice of the Events of Default to plaintiff, the class and others; and (3) take other actions to remedy the Events of Default, such as terminating or replacing the defaulting Master Servicer or Servicer, all in breach of the Governing Agreements and the TIA.  Also, as previously alleged, U.S. Bank had actual knowledge of the Events of Default through:

- Numerous news reports, congressional testimony and governmental investigations indicating that there were systemic loan servicing abuses, including foreclosure fraud and robo-signing, throughout the loan servicing industry and the nation that were Events of Default under the Governing Agreements;

- Numerous news reports about and governmental investigations directed at nearly all of the specific Master Servicers and Servicers to the Covered Trusts concerning their improper loan servicing practices that were Events of Default under the Governing Agreements;

- The fact that U.S. Bank was a loan servicer itself and thus was very familiar with the industry and its widespread servicing abuses; and the fact that U.S. Bank was itself engaged in misconduct that amounted to Events of Default;

- U.S. Bank's firsthand experience with and observance of and/or participation in loan servicers' Events of Default through the many cases where U.S. Bank was a RMBS trustee in foreclosure actions, wherein the loan servicers and/or U.S. Bank made false statements or filed false affidavits or documents, such as in the *Ibanez* case and the many cases cited herein that occurred throughout the nation, in which U.S. Bank's foreclosures were delayed, invalidated or denied by courts as a result of such misconduct;

- U.S. Bank's awareness that loan servicers' Events of Default were systemic and were similarly affecting many other RMBS trustees;

- Numerous news reports implicating most of the specific Master Servicers and Servicers to the Covered Trusts in robo-signing;

- Numerous governmental enforcement actions against most of the specific Master Servicers and Servicers to the Covered Trusts for company-wide loan servicing abuses that were Events of Default;

- The disclosure of deposition transcripts of employees of the Master Servicers and Servicers which indicated that they engaged in company-wide robo-signing and loan servicing abuses which were Events of Default;

- The fact that many of the largest Master Servicers and Servicers to the Covered Trusts had to stop their foreclosures in October 2010 because of the uproar caused by their pervasive loan servicing abuses which were Events of Default;

- The huge reserves the Master Servicers and Servicers for the Covered Trusts were setting aside to deal with and pay for their Events of Default and other loan servicing abuses;

- The large number of Mortgage Loans in the Covered Trusts that were extremely delinquent because of delays caused by the Master Servicers' and Servicers' Events of Default;

- The huge losses being suffered by the Covered Trusts due to the Master Servicers' and Servicers' robo-signing, foreclosure frauds and delays (during which they improperly imposed additional excessive fees and costs on the Covered Trusts) which were Events of Default;

- The FCIC Report and Legal Services of New Jersey Report confirming nationwide Events of Default by the Master Servicers and Servicers to the Covered Trusts;

- The April 13, 2011 consent orders entered into by nearly all of the Master Servicers and Servicers to the Covered Trusts *and U.S. Bank*, in which they all essentially admitted that they committed Events of Default, and the Government Foreclosure Report which confirmed "*industrywide*" Events of the Default by the Master Servicers and Servicers to the Covered Trusts throughout the nation;

- The billions of dollars paid by many of the Covered Trusts' Master Servicers and Servicers to settle private and government claims that they engaged in company-wide loan servicing misconduct amounting to Events of Default, and the billions of dollars in principal reduction and other borrower relief they were required to provide for such Events of Default; and

- The numerous and continuing news reports and governmental actions after April 2011 indicating that the Master Servicers and Servicers to the Covered Trusts are continuing to engage in loan servicing misconduct amounting to Events of Default.

302. Moreover, even after obtaining actual knowledge of the Events of Default, and even after obtaining actual knowledge that such Events of Default were continuing, U.S. Bank was grossly negligent and engaged in willful malfeasance by failing to do any of the things required of it by the Governing Agreements, and continuing such failure to act. Therefore, U.S. Bank has engaged in a continuing breach of the Governing Agreements, as it has allowed the Events of Default to continue unabated.

     **3.**     **U.S. Bank Failed to Exercise All of Its Rights and Duties Under the Governing Agreements and Use the Degree of Care and Skill in Their Exercise as a Prudent Person Would in the Conduct of His or Her Own Affairs, as Required by the Governing Agreements and the TIA**

303.     As alleged above, when U.S. Bank became aware of the Events of Default, it was required by the Governing Agreements to use all of its rights and powers under the Governing Agreements to protect plaintiff's and the class' interests, as a prudent person would in protecting its own interests.  U.S. Bank failed to act as required in Government Agreements by:

- Failing to enforce the Warrantors' obligations to cure, substitute, or repurchase Mortgage Loans that breached the Warrantors' representations and warranties (or in the case of the WaMu Covered Trusts, ensuring the Servicers would do so), as a reasonable prudent person trying to protect his/her own interests, would; and

- Failing to discharge its duties upon the occurrence of an Event of Default, as a reasonable prudent person trying to protect his/her own interests, would.

304.     Moreover, U.S. Bank continued its failure to act while the Events of Default have continued unabated, and thus U.S. Bank has engaged in a continuing breach of the Governing Agreements and the TIA.  Such failures were grossly negligent and amounted to willful malfeasance.

     **4.**     **U.S. Bank Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class**

305.     As alleged above, U.S. Bank did not perform its duties required by the Governing Agreements because U.S. Bank desired to economically benefit from its ongoing business relationships with the Covered Trusts' Warrantors, loan originators and Master Servicers/Servicers. By doing so, U.S. Bank failed to avoid conflicts of interest with plaintiff and the class and thereby breached its duty of trust to plaintiff and the class.  U.S. Bank's actions, and failures to act, were grossly negligent and amounted to willful malfeasance.  U.S. Bank's continuing actions, and failures to act, also caused it to engage in a continuing breach of its duty of trust up to and through the present.

**E.      Plaintiff and the Class Have Suffered Significant Damages Due to U.S. Bank's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA**

306.    Because U.S. Bank has failed to act as required by the Governing Agreements, as alleged above, plaintiff, the class and the Covered Trusts have suffered billions of dollars in damages.

307.    U.S. Bank's failure to enforce the representation and warranty claims against the Warrantors for the thousands of breaching Mortgage Loans (or ensuring the Servicers would for the WaMu Covered Trusts) has caused plaintiff, the class and the Covered Trusts to suffer significant damages in the form of billions of dollars in cure, substitution and repurchase claims that could have been asserted against the Warrantors but were not.   U.S. Bank's failure to assert these claims (or ensure the Servicers would for the WaMu Covered Trusts) was a breach of the Governing Agreements and the TIA for which U.S. Bank could foresee that plaintiff, the class and the Covered Trusts would be damaged.   Moreover, U.S. Bank's continuing failure to act on those claims was a continuing breach of the Governing Agreements and the TIA, and U.S. Bank's continuing breach has now caused the claims against the Warrantors to be time-barred, also causing plaintiff and the class damages.   This was also a foreseeable event and consequence by U.S. Bank.

308.    U.S. Bank's failure to act as required by the Governing Agreements when Events of Default occurred, as alleged above, has caused plaintiff, the class and the Covered Trusts to suffer millions of dollars in additional damages.   U.S. Bank's failure to act to remedy the Events of Default have caused plaintiff and the class to sustain millions of dollars in damages due to the improper and imprudent servicing of the Mortgage Loans, including damages caused by delayed, denied and invalidated foreclosures, increased loan servicing costs to foreclose due to the Master Servicers/Servicers needing to correct prior shoddy, fraudulent or robo-signed foreclosures, increased attorney fees to correct or redo the improper and fraudulent foreclosures, extremely long

mortgage loan delinquencies causing extra "carrying" costs for the properties, excessive and improper fees charged by the Master Servicers and Servicers, and dispositions of the Mortgage Loans by the Master Servicers and Servicers that financially benefitted them but caused damages to plaintiff and the class.  The foregoing damages were foreseeable to U.S. Bank from its failures to act as required by the Governing Agreements and the TIA.

309.    U.S. Bank's failure to act prudently during the Events of Default also caused plaintiff, the class and the Covered Trusts to suffer damages.  If U.S. Bank had acted prudently as required by the Governing Agreements and the TIA, most, if not all of the damages to plaintiff and the class alleged above could have been avoided.  It was foreseeable to U.S. Bank therefore that plaintiff and the class would suffer such damages if it failed to act as required by the Governing Agreements and the TIA.

310.    Similarly, U.S. Bank's failures to act as required by the Governing Agreements and the TIA, as alleged above, and U.S. Bank's decision to not act and instead put its financial interests ahead of plaintiff's and the class' in breach of its duty of trust, caused plaintiff and the class to suffer damages.  These damages were also very foreseeable to U.S. Bank if it failed to act.

311.    By virtue of its breaches of the Governing Agreements and its common law duties, as well as its violations of the TIA, U.S. Bank has caused massive damages to plaintiff, the class and the Covered Trusts for which U.S. Bank is responsible.

**F.    Plaintiff May Sue U.S. Bank as Trustee**

312.    The Governing Agreements provide certain limitations on the rights of RMBS holders like plaintiff and the class which are not applicable to this lawsuit.  More specifically, the Governing Agreements may limit in part the rights of RMBS holders like plaintiff and the class to bring lawsuits relating to the Governing Agreements against the Depositor, the Securities Administrator, the Master Servicer or Servicer, or any successor to any such parties.

313.     However, the Governing Agreements do not so limit suit against U.S. Bank.  In fact, the Governing Agreements provide that "[n]o provision of this Agreement shall be construed to relieve the Trustee . . . from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misfeasance" and that U.S. Bank "shall . . . be liable . . . for the performance of such duties and obligations as are specifically set forth in this Agreement."  BAFC 2007-C PSA, §9.01(b).

314.     Additionally, under the TIA and New York law, "no action" clauses do not apply to actions by RMBS holders like plaintiff and the class against trustees like U.S. Bank for U.S. Bank's own wrongdoing.  This is not a situation where plaintiff and the class are demanding that U.S. Bank initiate a suit in its own name to enforce their rights and obligations under the Governing Agreements.  Rather, this is an instance where plaintiff and the class are bringing a direct action *against* U.S. Bank for breaching its statutory, contractual, and common law obligations under the Governing Agreements and the TIA.  Because this is not an "action, suit or proceeding" that U.S. Bank is capable of bringing in its own name as Trustee under the Governing Agreements, the "no action" clause of the Governing Agreements does not apply and does not bar plaintiff and the class from proceeding with this lawsuit.

## V.     CLASS ACTION ALLEGATIONS

315.     Plaintiff brings this action as a class action on behalf of a class consisting of all current and former investors who acquired the RMBS certificates in the Covered Trusts (the "class") and held such certificates at or after the time when U.S. Bank discovered breaches of the Warrantors' representations and warranties or U.S. Bank had actual knowledge of Events of Default by the Master Servicers and Servicers to the Covered Trusts, and suffered damages as a result of U.S. Bank's breaches of the Governing Agreements and violations of the TIA alleged herein. Excluded from the class are U.S. Bank, the loan originators, the Warrantors, the Master Servicers

and the Servicers of the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

316.    The members of the class are so numerous that joinder of all members is impractical. While the exact number of class members is unknown to plaintiff at this time and can only be ascertained though appropriate discovery, plaintiff believes that there are at least hundreds of members of the proposed class.  Record owners and other members of the class may be identified from records maintained by U.S. Bank and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

317.    Plaintiff's claims are typical of the claims of the members of the class as: they all acquired RMBS certificates in the Covered Trusts and held them at or after the time when U.S. Bank discovered breaches of representations and warranties concerning the Mortgage Loans by the Warrantors or U.S. Bank had actual knowledge of Master Servicer and Servicer Events of Default; all the claims are based upon the Governing Agreements substantially in the same form as the BAFC 2007-C PSA (*see* Ex. A) common law and the TIA; U.S. Bank's alleged misconduct was substantially the same with respect to all class members; and all class members suffered similar harm as a result.  Thus, all members of the class are similarly affected by U.S. Bank's statutory, contractual, and common law breaches and violations that are alleged of herein.

318.    Plaintiff will fairly and adequately protect the interests of the members of the class and has retained counsel competent and experienced in class action and mortgage-backed securities litigation.

319.    Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.  Among the questions of law and fact common to the class are:

- whether U.S. Bank breached its contractual and common law duties to plaintiff and the class under the Governing Agreements by:

  - failing to enforce representation and warranty claims against the Covered Trusts' Warrantors for breach of their representations and warranties when U.S. Bank discovered such breaches (or in the case of the WaMu Covered Trusts, failing to ensure the Servicers did so);

  - failing to demand that the Covered Trusts' Master Servicers and Servicers cure their Events of Default under the Governing Agreements when U.S. Bank obtained actual knowledge of such Events of Default;

  - failing to provide notice to plaintiff and the class of uncured Events of Default;

  - failing to terminate or replace Master Servicers and Servicers for uncured Events of Default;

  - failing to exercise the rights and powers vested in U.S. Bank by the Governing Agreements, and failing to use the same degree of care and skill a prudent person would under the circumstances and in the conduct of his or her own affairs; and

  - failing to avoid conflicts of interest with plaintiff and the class while advancing its own interests at the expense of plaintiff and the class and benefitting therefrom.

- whether U.S. Bank violated the TIA by:

  - prior to default, failing to perform the duties specifically assigned to it under the Governing Agreements;

  - failing to inform the class of defaults under the Governing Agreements within 90 days after their occurrence; and

  - after an event of default, failing to exercise its rights and powers under the Governing Agreement as a prudent person.

- whether and to what extent that members of the class have suffered damages as a result of U.S. Bank's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

320. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. There will be no difficulty in the management of this action as a class action.

## VI.    DERIVATIVE ACTION ALLEGATIONS

321.    Alternatively, plaintiff brings this case as a derivative action against U.S. Bank in the right and for the benefit of all of the Covered Trusts to redress losses suffered, and to be suffered, by the Covered Trusts as a direct result of U.S. Bank's continuing breaches of the Governing Agreements, the TIA and common law.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

322.    Plaintiff will adequately and fairly represent the interests of the Covered Trusts in enforcing and prosecuting their rights.  Plaintiff is and was the owner of RMBS in all of the Covered Trusts during all or a large portion of U.S. Bank's wrongful course of conduct alleged herein.  Moreover by operation of law, under N.Y. General Obligations Law §13-107, RPI obtained all rights and causes of action of all prior holders of such RMBS.

323.    Plaintiff did not make a pre-suit demand on U.S. Bank to pursue this action because such a demand would have been futile.  The wrongful acts alleged herein were committed by U.S. Bank itself and U.S. Bank would not agree to sue itself, particularly since it faces claims for losses by the Covered Trusts in excess of $6.7 billion.  In addition, since U.S. Bank itself committed the wrongdoing complained of herein, it therefore is not disinterested and lacks independence to exercise business judgment.  Moreover, U.S. Bank has benefitted from, and continues to benefit from, its wrongdoing alleged herein (*i.e.*, failures to act), as it has not enforced the Covered Trusts' rights against the Warrantors' for breaches of their representations and warranties, or remedied or declared Events of Default against the Master Servicers and Servicers, and thus U.S. Bank has maintained and preserved its good relationships with the Warrantors, Master Servicers and Servicers and has thereby continued to derive financial benefits for serving as Trustee to the Covered Trusts, and many other RMBS trusts, due to its continuing wrongdoing alleged herein.

- 213 -

324.    The Covered Trusts could only act through U.S. Bank since U.S. Bank was the Trustee of each Covered Trust.  When U.S. Bank failed to act, as it was required by the Governing Agreements, the TIA and common law, to protect the Covered Trusts and their assets – such as the Mortgage Loans – U.S. Bank caused the Covered Trusts to suffer massive losses.  U.S. Bank deliberately failed to perform the following duties required of it under the Governing Agreements, the TIA and common law which injured the Covered Trusts: (1) enforce the Covered Trusts' rights to pursue breach of representation and warranty claims against the Warrantors (or ensure the Servicer would do so for the WaMu Covered Trusts); (2) request that the Master Servicers and Servicers cure their Events of Default, provide notice of the Events of Default to plaintiff and the class, and take further steps, such as terminating or replacing the Master Servicers and Servicers or otherwise remedying uncured Events of Default; (3) act as a prudent person would in the conduct of its own affairs during the Events of Default; and (4) discharge its duty of trust to plaintiff, the class and the Covered Trusts.

325.    U.S. Bank's failures to act amounted to gross negligence and willful malfeasance on its part and caused the Covered Trusts to suffer losses in excess of $6.7 billion.  Plaintiff seeks to recover, for the benefit of the Covered Trusts: (i) the losses suffered by the Covered Trusts to date totaling in excess of $6.7 billion; (ii) all future losses caused by U.S. Bank's continuing failure to act as required by the Governing Agreements, the TIA and common law; and (iii) equitable relief preventing U.S. Bank from continuing to breach the Governing Agreements, the TIA and common law.

**COUNT I**
**Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa *et seq*.**

326.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

327.     Congress enacted the TIA, 15 U.S.C. §77aaa *et seq.*, to ensure, among other things, that investors in RMBS, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. §77bbb.  The Covered Trusts' Governing Agreements are "indentures" and U.S. Bank is an "indenture trustee" within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements, and the related RMBS. 15 U.S.C. §77ddd(a)(1).  U.S. Bank violated multiple provisions of the TIA.

328.     First, the TIA requires that, prior to default, the indenture trustee shall be liable for any duties specifically set out in the indenture.  15 U.S.C. §77ooo(a)(1).  As alleged above, U.S. Bank failed to comply, in good faith, with numerous duties specifically assigned to it by the Governing Agreements, including the duties to:

(a)     enforce the Warrantors' obligations to cure, substitute, or repurchase Mortgage Loans when U.S. Bank discovered breaches of the Warrantors' representations and warranties concerning such Mortgage Loans (or in the case of WaMu Covered Trusts, to give notice of such breaches to the Servicer and ensure the Servicers enforced such claims);

(b)     demand that the Master Servicers and Servicers cure their Events of Default within 90 days of obtaining knowledge of such Events of Default;

(c)     notify plaintiff, the class and others of Events of Default and of the Warrantors' defaults; and

(d)     exercise its rights and powers under the Governing Agreements to take further actions, including terminating or replacing a Master Servicer or Servicer that continued engaging in an uncured Event of Default.

329.     In addition, the TIA requires that U.S. Bank inform plaintiff and the class of all defaults under the Governing Agreements known to U.S. Bank within 90 days after their occurrence. 15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  As alleged herein, there were numerous Events of Default by the Master Servicers and Servicers under the Governing Agreements of which U.S. Bank was aware.  In addition, as alleged herein, U.S. Bank had knowledge of massive breaches of the Warrantors' representations and warranties, which were also defaults under the TIA.  U.S. Bank was required to provide notice of those defaults within 90 days.  By failing to provide such notice, U.S. Bank violated the TIA.

330.     Second, in case of default, the TIA requires that U.S. Bank exercise all of its rights and powers under the Governing Agreements as a prudent person would in the conduct of his/her own affairs. 15 U.S.C. §77ooo(c).  Given the obvious importance of the defaults set forth herein, any prudent person under those circumstances would have exercised all of his or her rights and powers to, among other things, compel and enforce the cure, substitution, or repurchase of defective Mortgage Loans that breached the Warrantors' representations and warranties, and taken actions to remedy the Master Servicer and Servicer Events of Default and notify plaintiff and the class, as a prudent person would have exercised those rights promptly.  Indeed, with the huge numbers of breaching and defaulting Mortgage Loans in the Covered Trusts, and the pervasive Events of Default that were and are occurring, plaintiff, the class and the Covered Trusts could have been protected in large part from the resulting damages they suffered only through U.S. Bank's prompt exercise of those rights.  By failing to exercise its rights in those circumstances, U.S. Bank violated the TIA.

331.     U.S. Bank is therefore liable to plaintiff, the class and the Covered Trusts for their actual losses and damages incurred as a result of U.S. Bank's violations of the TIA.

## COUNT II
## Breach of Contract

332.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

333.    As set forth in detail above, the Governing Agreements are contracts setting forth the duties U.S. Bank owed to plaintiff and the class with respect to their RMBS and the Mortgage Loans in the Covered Trusts.  As a matter of law, the Governing Agreements incorporate the provisions of the TIA.  Under the Governing Agreements and the TIA, U.S. Bank owed plaintiff and the class a duty to perform certain duties, including, without limitation, the duties to:

(a)    enforce the Warrantors' breaches of representations and warranties concerning the Mortgage Loans upon discovery, by seeking the cure, substitution, or repurchase of any and all defective Mortgage Loans (or in the case of the WaMu Covered Trusts, to give notice of such breaches to the Servicer and ensure the Servicer enforced such claims);

(b)    demand the cure of any Event of Default by any Master Servicer or Servicer within the period prescribed in the Governing Agreements upon obtaining knowledge of such default;

(c)    notify plaintiff, the class and others of Events of Default;

(d)    take further actions, including termination or replacement, against a Master Servicer or Servicer that failed to cure its Event of Default; and

(e)    exercise all of its rights and powers under the Governing Agreements during an Event of Default for the benefit of plaintiff and the class and as a reasonable prudent person would in the conduct of his or her own affairs.

334.    As alleged herein, U.S. Bank failed to perform the above duties required of it by the Governing Agreements and therefore breached the Governing Agreements.  U.S. Bank's breach of

its duties set forth in the Governing Agreements, as alleged therein, deprived plaintiff and the class of the consideration they bargained for, *i.e.*, they did not receive RMBS that were collateralized by Mortgage Loans that were represented and warranted to be of a certain credit quality, and breaches of these representations and warranties were not enforced as required by the Governing Agreements. These breaches of the Governing Agreements by U.S. Bank caused plaintiff and the class to suffer damages.

335.    In addition, plaintiff and the class did not receive the benefit of their bargain under the Governing Agreements when U.S. Bank failed to perform the obligations required of it by the Governing Agreements when U.S. Bank knew of uncured and ongoing Events of Default.  U.S. Bank's failure to act breached the Governing Agreements and caused plaintiff and the class to suffer damages.

336.    Furthermore, plaintiff and the class did not receive the consideration they bargained for, *i.e.*, that U.S. Bank would act as a prudent person and exercise all of its rights and powers under the Governing Agreements to protect plaintiff and the class as though it were seeking to protect its own interests, when U.S. Bank knew of Events of Default.  U.S. Bank's failure to so act breached the Governing Agreements and caused plaintiff and the class to suffer damages.

337.    U.S. Bank and its responsible officers discovered and/or had actual knowledge of the Warrantors' breaches of their representations and warranties and the Master Servicers' and Servicers' Events of Default, as they learned of them as alleged herein.

338.    As a result of U.S. Bank's breaches of the Governing Agreements alleged herein, U.S. Bank is liable to plaintiff and the class for the damages they suffered as a direct result of U.S. Bank's failure to perform its contractual obligations under the Governing Agreements.

339.     In addition, U.S. Bank has engaged in a continuing breach of the Governing Agreements by failing to act as alleged herein and has caused plaintiff and the class continuing damages.

**COUNT III**
**Breach of Trust**

340.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

341.     Under common law, U.S. Bank had a duty to plaintiff and the class to affirmatively avoid conflicts of interest with them.  Further, that duty also required U.S. Bank to refrain from advancing its own interests at the expense of plaintiff and the class, or benefitting therefrom.

342.     U.S. Bank breached its duty of trust owed to plaintiff and the class by advancing its own interests at the expense of plaintiff and the class, by failing to demand that the Warrantors cure, substitute, or repurchase Mortgage Loans that breached their representations and warranties (or ensuring the Servicers would do so with respect to the WaMu Covered Trusts); and by failing to act as required when it became aware of Events of Defaults by the Master Servicers and Servicers.  U.S. Bank failed to so act because it had relationships with the Warrantors and Master Servicers/Servicers from which it derived financial remuneration and U.S. Bank did not want to disrupt those relationships.  Thus, U.S. Bank did not act, to preserve those relationships and to continue benefitting financially from those relationships.

343.     By doing so, U.S. Bank put its own interests ahead of those of plaintiff and the class and benefitted therefrom.  U.S. Bank thereby failed to avoid conflicts of interest with plaintiff and the class and breached its duty of trust to plaintiff and the class.

344.     In addition, U.S. Bank has continued to fail to fulfill its duty of trust and has thereby engaged in a continuing breach of such duty up to the present time.

- 219 -

345. As a result of U.S. Bank's breach of its duty of trust, defective Mortgage Loans were not remedied, and Events of Default were not corrected and continued on unabated, causing plaintiff and the class to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing the undersigned as class counsel;

B.     Awarding damages and/or equitable relief in favor of plaintiff and the class against U.S. Bank for breaches of its statutory, contractual and common law duties, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff its reasonable costs and expenses incurred in this action, including counsel and expert fees;

D.     Alternatively, allowing this action to proceed as a derivative action on behalf and for the benefit of the Covered Trusts; and

E.     Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED:  April 11, 2014

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
ROBBINS GELLER RUDMAN
   & DOWD LLP
ARTHUR C. LEAHY
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

VERIFICATION

I, Thierry Buytaert, hereby declare as follows:

I am a Member of the Board of Directors of Royal Park Investments SA/NA ("RPI"), plaintiff in the within entitled action. RPI owns the RMBS in the Covered Trusts alleged herein and owned such RMBS at the time of most of the wrongdoing complained of herein. RPI further understands that it has acquired the rights and claims of the previous holders of the RMBS that held during the time of the wrongdoing complained of herein either contractually or by operation of New York General Obligations Law § 13-107. RPI has continuously held such RMBS since acquiring them. RPI has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of the Covered Trusts. I have read the Class Action and Verified Derivative Complaint for Breach of Trust Indenture Act, Breach of Contract, and Breach of Trust. Based upon discussion with, and reliance upon, my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

DATED: _8 April 2014_                    ROYAL PARK INVESTMENTS SA/NA

By: _____
                                    Thierry Buytaert
                                    Board Member