UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
ROYAL PARK INVESTMENTS SA/NV, :
Individually and on Behalf of All Others :
Similarly Situated, :
 :
      Plaintiff, :
  v. : Civil Action No. 14-cv-02590-VM-JCF
 :
U.S. BANK NATIONAL ASSOCIATION, :
as Trustee, :
 :
      Defendant. :
----------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFF ROYAL PARK INVESTMENTS SA/NV

MORGAN, LEWIS & BOCKIUS LLP

Tera M. Heintz*
Benjamin P. Smith*
Ashley A.K. Krupski*
One Market Street
San Francisco, CA 94114
Tel: (415) 442-1000
Fax: (415) 442-1001
tera.heintz@morganlewis.com
benjamin.smith@morganlewis.com
ashley.krupski@morganlewis.com
*admitted *pro hac vice*

Michael S. Kraut
101 Park Avenue
New York, NY  10178
Tel: (212) 309-6000
Fax: (212) 309-6001
michael.kraut@morganlewis.com

Attorneys for Defendant
U.S. Bank National Association, as Trustee

DB1/ 90748773.3

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................................1

II.   ARGUMENT .....................................................................................................................3

       A.    RPI's Failure to Produce Assignor's Valuation and Impairment Documents Substantially Prejudices U.S. Bank's Defense of RPI's Claims .........3

            1.    As an Assignee, RPI Cannot Stand in a Better Position Than That of Its Assignor ......................................................................................5

            2.    RPI's Assignor Identified Actual "Loss Events" Prior to the Trustee's Alleged Breaches, Which Could Not Be Caused by U.S. Bank ...................................................................................................6

            3.    Missing Valuation and Impairment Documents Likely Show That Further Losses Occurred Before Any Alleged Breaches by the Trustee ................................................................................................7

            4.    There is No Substitute for the Missing Valuation Documents ..................12

            5.    Missing Valuation Documents Are Critical to Rebut RPI's Arguments that Damages Can Be Determined on a Class-wide Basis and that RPI is an Adequate Plaintiff.............................................14

       B.    The Sanctions Requested Are Appropriate ..........................................................16

III.  CONCLUSION ................................................................................................................17

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                                          **PAGE(S)**

*ACE Secs. Corp. v. DB Structured Prods., Inc.*,
  25 N.Y.3d 581 (2015) ........................................................................................................... 5

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
  618 F.Supp. 2d 280 (S.D.N.Y. 2009) .................................................................................. 11

*Bronx Entertainment, LLC v. St. Paul's Mercury Ins. Co.*,
  265 F. Supp. 2d 359 (S.D.N.Y. 2003) ................................................................................... 5

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996) ................................................................................................. 11

*Lehman Brothers Holdings, Inc. v. Universal Am. Mortg. Co.*,
  __F.3d__, Nos. 14-1180 .................................................................................................. 6, 7

*Meda AB v. 3M Co.*,
  969 F. Supp. 2d 360 (S.D.N.Y. 2013) ................................................................................. 13

*Nat'l Mkt. Share Inc. v. Sterling Nat'l Bank*,
  392 F.3d 520 (2d Cir. 2004) ............................................................................................... 11

*Norman v. Arcs Equities Corp.*,
  72 F.R.D. 502 (S.D.N.Y. 1976) ........................................................................................... 16

*Olvera v. Blitt & Gaines, P.C.*,
  431 F.3d 285 (7th Cir. Ill. 2005) ........................................................................................... 5

*Poldon Eng'g & Mfg. Co. v. Zell Elec. Mfg. Co.*,
  1 Misc. 2d 1016 (1955) ......................................................................................................... 5

*Riley v. Marriott Int'l*,
  2014 WL 4794657 (S.D.N.Y. Sept. 25, 2014) ................................................................... 8, 9

**OTHER AUTHORITIES**

Corbin on Contracts § 51.1 (rev. ed. 2012) ................................................................................... 5

Rosenberg's Essential Dictionary of Investing & Finance (c. 2004) ............................................. 4

I. INTRODUCTION

It is now time for the axe to fall on the putative class action claims of Royal Park Investments SA/NV ("Royal Park" or "RPI"). RPI instituted this action against U.S. Bank National Association ("U.S. Bank" or "the Trustee")—and several others just like it against other trustees—as an alleged assignee of claims, seeking billions of dollars in purported damages. Since the beginning of discovery, RPI has attempted to dodge the production of documents held by its Assignors[1] that would expose RPI's damages claim for what it is – a *post hoc* fabrication.

RPI's Assignors never considered U.S. Bank or any other corporate trustee – mere administrators with circumscribed ministerial duties – to be the cause of any alleged losses on their RMBS certificates. Indeed, the available evidence shows that, with respect to at least three of the trusts now sued upon by RPI, one of RPI's Assignors recorded complete losses on their certificates long before U.S. Bank allegedly did anything wrong. This is fully consistent with the decisions of RPI's Assignors not to sue any corporate trustee, and explains RPI's belated decision to sue U.S. Bank only as an afterthought, years after RPI instituted dozens of other suits against other parties to the RMBS transactions.

Publicly available and case documents strongly suggest that Fortis recorded impairments, *i.e.,* recognized losses,[2] on nearly all RMBS certificates it held, including those at issue in this lawsuit. However, RPI has declined to produce evidence of such impairments to U.S. Bank, hampering U.S. Bank's ability to refute RPI's damages claims, which are premised on hypothesized losses rather than the actual losses RPI's Assignors suffered and recorded.

---

[1] The Assignors are Fortis Bank SA/NV, Cayman Branch; Fortis Bank SA/NV; Clifton I CDO Ltd.; Clifton I CDO LLC; Fortis Park Lane Ireland; Fortis Securities LLC; Pacific Pinnacle CDO Ltd.; and Nassau CDO I Ltd, (hereafter "Fortis"). *See* Declaration of Tera Heintz ("Heintz Decl."), Ex. B (Exhibit 1 to Plaintiff Royal Park Investment SA/NV's Responses and Objections to Defendant U.S. Bank National Association's First Set of Interrogatories).

[2] Impairment of an asset is the recognition by the owner that the value of that asset has declined. Thus, an impairment is a loss. *See* Heintz Decl., Ex. A (Declaration of Christopher M. James), ¶ 20.

As the Trustee has already established, RPI misled U.S. Bank and this Court into thinking it was doing everything in its power to obtain documents from its Assignors and that the Assignors' documents related to their Certificates would be forthcoming.  Only after this Court ordered RPI to produce Assignor documents did the truth finally come out: RPI knowingly relinquished the right to obtain documents from its Assignors back in 2013, in connection with RPI's settlement of claims with Fortis successor BNP Paribas Fortis ("BNPPF").

This Court already found that RPI "fully understood the importance of acquiring potentially discoverable documents from its assignors—and the risks of failing to do so." *Royal Park Investments SA/NV v. U.S. Bank Nat'l Assn.,* 1:14-cv-02590-VM-JCF, Memorandum and Order, Nov. 9, 2016, Dkt. # 141 ("Order").  This Court also already found that, whatever RPI's motivations for relinquishing its right to Assignor discovery, RPI's violation of this Court's order to produce such discovery was "willful and Royal Park must accept the consequences." *Id*. (emphasis added).

The only issue left unresolved by this Court's prior sanctions order is the nature and extent of prejudice to the Trustee.  As detailed in the accompanying declaration of Professor Christopher James (Heintz Decl., Ex. A), Assignor documents reflecting impairments taken and valuations assigned by the Assignors on Certificates at issue in this case ("Valuation Documents") are essential to any fair adjudication of this case.  As explained by Professor James, impairments reflect actual losses incurred by the Assignors whose claims RPI is pursuing.  To the extent these impairments were taken before the Trustee's alleged wrongdoing, as the available evidence strongly suggests, RPI's causation and damage theories fail because the claimed losses could not have been caused by the Trustee.

The Trustee is "hamstrung" in its defense of RPI's claims by RPI's failure to produce evidence of the Assignors' losses on the Certificates at issue before and leading up to the alleged breaches.[3] While RPI will undoubtedly claim that its experts can calculate the value of the Certificates, such opinions would be pure speculation, unmoored in reality, and riddled with hindsight bias. The impairments actually taken by the Assignors are real-time recognitions of specific losses at specific times, and account for specific conditions and expectations that existed at the time. The opinions of RPI's retained litigation experts offered years later are no substitute for such contemporaneous facts, and the Trustee should not be required to defend against expert opinions regarding value and damage without discovery of documents reflecting the investors' actual <u>fact</u> of value and damage (or lack thereof).

RPI seeks <u>millions</u> of dollars in alleged individual damages and <u>billions</u> in alleged class damages while willfully violating a Court order requiring it to produce documents likely to prove that RPI's claimed losses occurred long before any alleged breaches by the Trustee. RPI's willful discovery violations make it an inadequate class representative and prevent the Trustee from fully and fairly defending itself. The Trustee respectfully requests an order that RPI's damages be precluded and that it be precluded from serving as a class representative in this case.

## II. ARGUMENT

### A. RPI's Failure to Produce Assignor's Valuation and Impairment Documents Substantially Prejudices U.S. Bank's Defense of RPI's Claims

During discovery, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

---

[3] As set forth in several filings to this Court, unless RPI produces its Assignor's documents, U.S. Bank has no ability to obtain them because Belgium and Ireland are not signatories to the Hague Convention on taking evidence abroad. France is a signatory, but has opted out of the provision allowing pre-trial document discovery under Article 23. *See*, Motion to Compel, Dkt. 75.

-4-

. The taking of an impairment is a formal recognition in the financial statements that a loss has occurred and that the value of the asset has declined.  *See*, *e.g.*, Rosenberg's Essential Dictionary of Investing & Finance (c. 2004) (impairment defined as "the amount by which stated capital is reduced . . . by losses"); Heintz Decl., Ex. A, ¶ 20.  ▮ Heintz Decl., Ex. C at Annex 1 (pp. 8-11).  ▮ Heintz Decl., Ex. C at Annex 1 (pp. 9, 11).[5] ▮

This PSA reflects only one transaction covering a fraction of the RMBS owned by Fortis. Given Fortis' need to take impairments ▮, as well as Fortis' public reporting of widespread impairments across its portfolio, Fortis likely took substantial impairments on all or many other certificates at issue in this case.  Discovery of the Valuation Documents, which are likely to reflect additional impairments taken by the Assignors

---

[5] Fortis Bank SA/NV, Cayman Branch transferred its interest in SASC-2007 EQ1, SASC 2007-WF1 and BNCMT 2007-2 to Fortis Park Lane Ireland in June 2008 for a price of "0.00." Heintz Decl. Ex. C, Annex 1 (pp. 9, 11).  As this Court recognized in its prior sanctions order, "pursuant to the agreement governing the transfer, this represented the fair market value of the RMBS as of the date of the transfer."  Order at 22 (internal citations omitted).

on Certificates at issue in this case, is necessary and highly relevant to the Trustee's defenses. Additionally, as discussed below, these types of contemporaneous valuations are more probative than any *post hoc* opinion by RPI's litigation consultants.

### 1. As an Assignee, RPI Cannot Stand in a Better Position Than That of Its Assignor

RPI brings this case as an assignee of claims that accrued in January 2009, while the claims belonged to the Assignors. *See* RPI Class Certification Motion at p. 5; ¶¶71-72;[6] ¶ 28 (RPI acquired Certificates in May 2009, and February–June 2010); *see also ACE Secs. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 589 (2015) (breach of contract claim accrues at the time of breach). The law in New York is well settled that an assignee of claims brings any claim subject to any and all defenses good against the assignor, including with respect to damages. *See, e.g., Bronx Entertainment, LLC v. St. Paul's Mercury Ins. Co.*, 265 F. Supp. 2d 359, 361 (S.D.N.Y. 2003) (an assignee of a claim can only assert damages that an assignor incurred before assignment of the litigation claims, and not its own damages, based on "elementary ancient law that an assignee never stands in any better position than his assignor."); *Poldon Eng'g & Mfg. Co. v. Zell Elec. Mfg. Co.*, 1 Misc. 2d 1016, 1018 (1955) (plaintiff, as an assignee, "may not recover from the defendant any damages arising out of a breach of contract which it, the plaintiff, sustained; it is limited to those which [the assignor] suffered . . ."). This axiomatic rule prevents litigants from using assignments to game the system and bring claims for damages that could not have been brought by the original assignor. *See, e.g.,* Joseph M. Perillo, *Corbin on Contracts* § 51.1 (rev. ed. 2012) ("Among the axiomatic phrases in contract law, the clear victor in the law of assignments is, 'The assignee stands in the shoes of the assignor.' The phrase has been common over three different centuries of American contract law."); *Olvera v. Blitt & Gaines,*

---

[6] All unqualified "¶" citations are to the Complaint.

*P.C.*, 431 F.3d 285, 289 (7th Cir. Ill. 2005) ("the common law puts the assignee in the assignor's shoes, whatever the shoe size."); *see also Lehman Brothers Holdings, Inc. v. Universal Am. Mortg. Co.*, __F.3d__, Nos. 14-1180, et al., 2016 WL 325126, at *5 (10th Cir. Jan. 27, 2016) (an assignee of breach of contract claims arising out of ownership of RMBS certificates that did not own certificates at the time the alleged breach of contract claim accrued can only assert claims or damages standing in the shoes of the assignor, subject to all limitations and defenses against the assignor). Based on this rule of law, the damages RPI may recover for any breaches before it owned the Certificates, (May 2009 through June of 2010), are limited to the damages of the Assignors.

### 2. RPI's Assignor Identified Actual "Loss Events" Prior to the Trustee's Alleged Breaches, Which Could Not Be Caused by U.S. Bank

As explained by Professor James, Fortis' impairments of RMBS Certificates reflect actual losses incurred by the Assignors before the Trustee's alleged breaches of contract. Heintz Decl., Ex. A, ¶¶ 20-23. Under the laws that governed the Assignors, impairments of "for sale assets" were appropriate only if there was "objective evidence" of a loss event. *Id.*, ¶¶ 29-30. This means that prior to Fortis making a determination that its portfolio was impaired, it was required, by law, to gather objective evidence that a loss event had already occurred. *Id.* Thus, contrary to RPI's assertion, the impairments reflected in the June 2008 PSA were not simply "idiosyncratic valuations," but rather, actual recorded losses at a specific point in time. *Id.*, ¶ 30.

Just like any other loss, recognized impairments of RMBS Certificates such as those taken by the Assignors have a substantial impact on real-world business functions. By taking impairments on the Certificates at issue in this case, Fortis' borrowing ability and the ability to raise cash would have been impacted, which, ultimately, affects the availability of cash for business goals and operations. *Id.* ¶¶ 33-36. Specifically, the impairments would reduce Fortis'

profit or increase its loss on its income statement, and reduce the shareholder equity on its balance sheet. *Id*. ¶ 32. A reduction in a bank's reported assets has the effect of reducing shareholder's equity (also referred to as capital); and thus, its risk of insolvency increases. *Id*. ¶¶ 33, 34. Financial statements, including impairments, are used by creditors, investors and other stakeholders to analyze the financial condition and operating performance of a bank. *Id*. ¶ 32. These metrics would thus have had a direct real-world impact on how Fortis' performance was assessed.

Further, Fortis' impairments on these Certificates would have had a direct impact on Fortis' regulatory capital ratios. *Id*. ¶¶ 33-34. By law, Fortis was required to hold a minimum level of regulatory capital. *Id*. ¶ 33. This regulatory capital is designed to absorb losses and protect against insolvency. *Id*. Because impairments directly reduce assets, Fortis would have lower regulatory capital levels. *Id*. A decrease in regulatory capital is detrimental because of "risks of regulatory oversight," "risks to its own solvency," negative "market[] perception of the bank and its creditworthiness," and "impact [on] investors." *Id*. ¶ 34. This, in turn, can cause a cascade of negative effects that harm the financial health of the institution, detrimentally affect its investors even jeopardize the financial institution's survival. *See Id*. ¶¶ 32-36. Because of these negative impacts, all banks, and especially distressed banks like Fortis, had no incentive to take impairments against then-current income unless absolutely required. ¶¶ 35-36.

### 3. Missing Valuation and Impairment Documents Likely Show That Further Losses Occurred Before Any Alleged Breaches by the Trustee

The Valuation Documents are essential to the Trustee's defense against RPI's damages claims because they would likely show that most, if not all, of RPI's claimed damages occurred <u>before</u> the alleged breaches of contract and thus <u>could not have been caused by the Trustee</u>.

RPI's failure to obtain these Valuation Documents for the remaining 18 Trusts, showing precisely what impairments Fortis took and when it took them, prejudices the Trustee's defense.

To demonstrate prejudice warranting dismissal, preclusion, or the imposition of an adverse inference, the moving party need only show that "a reasonable trier of fact could infer that the . . . unavailable evidence would have been of the nature alleged by the party affected" by its unavailability. *Riley v. Marriott Int'l*, 2014 WL 4794657, *5 (S.D.N.Y. Sept. 25, 2014) (granting adverse instruction as discovery sanction). Additionally, when conducting this analysis, a court should not "hold [] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because this "would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." *Kronisch v. United* States, 150 F.3d 112, 128 (2d Cir. 1998). Here, that standard is easily met because documents that have been produced (as well as public announcements by Fortis) strongly indicate that the Assignors took widespread impairments across their RMBS portfolios, leading a reasonable person to believe that, if RPI obtained Valuation Documents from the Assignors, more impairments would almost certainly be shown.

As explained by Professor James, the limited evidence available in this case strongly supports an inference that Fortis took massive, if not <u>100%</u> impairments, on <u>all</u> of the Certificates at issue in this case. Heintz Decl., Ex. A, ¶¶ 27-28; *see also* ¶¶ 25-26. ██████████ ██████████ ██████████ ██████████ Even

██████████

more significantly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. This is significant because eight of RPI's Certificates in the 21 Trusts at issue in this case are mezzanine Certificates at an "M3" tranche or lower. Complaint ¶ 27. If Fortis similarly took a 100% impairment on these eight M3 or lower Certificates in this case, then Royal Park would not be able to show <u>any damages</u> on at least eight of the Certificates at issue even as of June 2008.[9]

Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Heintz Decl., Ex. A, ¶¶ 27-28; *see also* ¶¶ 25-26. Professor James conducted an analysis of factors that would likely impact the "Fair Value" determinations on which impairments are based and found that the Assignors' RMBS impairments likely were driven, at least in part, by factors that would apply to other Certificates at issue:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 20 Certificates at issue in this case, for which the Trustee does not have Fortis' valuation information, were assigned ratings of B1 or lower by Moody's by December 2008. *Id*. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[8] "M" refers to "Mezzanine," which are generally subordinate to higher rated senior tranches. Heintz Decl., Ex. A, ¶ 43, fn. 62. The Mezzanine tranches are further divided, with an M1 tranche being senior to an M2 tranche, an M2 tranche being senior to an M3 tranche, and so forth. *Id*.

[9] RPI's interests in these eight Certificates have an original face value of more than $22 million. ¶ 28.

- Moody's also rated three other at-issue Certificates as Ba2 or Ba3, which are considered "not prime." *Id*.

- The Covered Trusts containing the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ did not have default rates or net loss rates that greatly exceeded the other 18 Covered Trusts default or net loss rates. *Id*.

Based on Professor James' analysis, Fortis very likely took substantial impairments on other Certificates at issue in this case. As explained by Professor James, this is fully consistent with Fortis' generalized, public statements, which show that Fortis took over ten billion euros of impairments on its structured product portfolio, including US RMBS, throughout 2007 and 2008. *Id*. ¶¶ 25-26.

For example, Fortis recognized €2.4 billion in impairment losses on its structured credit portfolio in 2007 and €5.9 billion in 2008. *Id*. ¶ 25. Indeed, publically available information shows that Fortis determined that the portfolio it selected for sale to RPI had declined in value approximately €8.5 billion from the time Fortis purchased its interest until August of 2008. *Id*. Subsequently, between August 31, 2008 and December 31, 2008, Fortis continued to evaluate the assets it later transferred to Royal Park. *Id*. It reported that, between August 31, 2008 and December 31, 2008, the carrying value of the portfolio "decreased significantly . . . due to the further deterioration of the fair value of those assets." *Id*. Thus, Fortis' action on the 142 RMBS identified in the June 2008 PSA, coupled with its public statements, strongly supports the inference that took impairments across all of its structured finance portfolio, including the Certificates at issue here, by the end of 2008. ¶¶ 27-28, 25-26.

Although Fortis' Annual Reports are publicly available and reveal that Fortis incurred massive losses on the overall portfolio that it eventually transferred to Royal Park, these public

documents do not disclose the individual certificate-level impairments or impairments to CDOs taken by Fortis, nor the methodologies used by Fortis in taking the impairments. The documents also do not disclose the loss-causing events that triggered the impairments. *Id*. ¶¶ 29-30. The Trustee is significantly prejudiced by not having access to these documents, because they directly undermine an element of RPI's breach of contract claim. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (damages is an essential element of a breach of contract claim).

Indeed, these pre-2009 impairments by Fortis fundamentally undermine RPI's entire theory of damages. Heintz Decl., Ex. A, ¶ 21. Royal Park's theory of damages is that, "but-for" the Trustee's alleged failure to enforce known breaches of representations and warranties and servicing Events of Default after discovering the breaches in January 2009, "collateral losses would have been lower and collateral value would have been higher." Dalrymple Report, ¶ 54, Dkt., 152-1. In addition to the "direct write-downs of principal and cash-flow" associated with collateral loss, RPI also alleges that it was harmed in another way. According to Mr. Dalrymple, the alleged collateral losses could also reduce the amount of "subordination"[10] for Certificates, which in turn, could have caused "reductions in expected future cash flows." Dalrymple Report, ¶ 56. ███████████████████████████████████████████

███ however, that loss of value could not have been caused by breaches that allegedly occurred in 2009. Heintz Decl., Ex. A, ¶ 21; *see also Nat'l Mkt. Share Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages."); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 618 F.Supp. 2d 280, 292 (S.D.N.Y. 2009) (citing *Boyce v. Soundview Tech.*

---

[10] "Subordination" refers to the total value of the mortgage loans underlying each Trust that exceeds the value of the issued Certificates, which serves as a "cushion" to absorb losses incurred on mortgages in a Trust before the losses are allocated to the most junior Certificates pursuant to the allocation rules of each Trust. Heintz Decl., Ex. A ¶ 16.

*Group,*, 464 F.3d, 376 384) (2d Cir. N.Y. 2006) ("[i]t is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach.").

The Trustee is prejudiced by RPI's failure to produce the Valuation Documents because evidence of the impairments by Fortis on the Certificates, as well as the basis for such impairments, would show that loss <u>cannot</u> be attributed to the Trustee.  *See* Heintz Decl., Ex. A, ¶ 21.

### 4. There is No Substitute for the Missing Valuation Documents

The prejudice to the Trustee caused by RPI's willful discovery violations is compounded because there is no comparable substitute evidence for the Valuation Documents.  RPI has argued that evidence of Fortis' impairments is just one bank's "idiosyncratic" opinion regarding valuation, and that damages in this case should instead be based on its expert's opinion on damages.  This argument fails for numerous reasons.

First, as explained by Professor James, the impairments are evidence of <u>actual losses</u> incurred by Fortis, not just opinions of value by Fortis. *Id.* ¶ 30.  Evidence regarding losses that were actually recognized by the Assignors are facts that exist in the world; those facts cannot be ignored or simply recreated through an opinion suggesting alternative facts by Royal Park's expert.  *Id*.  Mr. Dalrymple concedes as much, acknowledging that without an understanding of the assumptions made and methodology used by the Assignors, he could not assume that his own "valuations" of the Certificates would explain or account for the valuations underlying the impairments taken by Fortis.  Heintz Decl., Ex. D (198:13-203:20).  Mr. Dalrymple also concedes that in order to verify that his damages approach is consistent with assumptions and valuations being made by investors such as Fortis, he would need access to their individual valuation methodologies.  *Id.*  These contemporaneous valuations are important to check the reliability of Mr. Dalrymple's proposed valuations against hindsight bias; U.S. Bank and the

Court should not be forced to accept Mr. Dalrymple's methods when contemporaneous valuations that were not litigation-driven exist. Heintz Decl., Ex. A, ¶¶ 38-51.

Second, as explained by Professor James, contemporaneous valuations, such as the Valuation Documents, are often more credible than *ex post* valuations because they are not biased by hindsight, and they take into consideration the expectations of the investors and the economic conditions that existed at the time. *Id*. ¶¶ 29-40, 49-51. Indeed, financial literature confirms Professor James's opinion, stating "a contemporaneous valuation results in the most reliable fair value estimate." *See Id*. ¶ 39 (citing *Accounting and Valuation Guide: Valuation of Privately-Held-Company Equity Securities Issued as Compensation*, section 11.02); *see also, e.g., Meda AB v. 3M Co*., 969 F. Supp. 2d 360, 387 (S.D.N.Y. 2013) ("Damages are to be judged based on what the parties would have done at the time of contract, and shall not be based on information learned through hindsight."). The Trustee must be allowed to analyze the Assignors' Valuation Documents in order to defend itself; RPI's failure to follow this Court's order cannot be used as a shield by RPI to protect itself from these contemporaneous valuations.

Third, RPI's failure to produce the Valuation Documents is especially prejudicial because there is very little trade data available for RPI's Certificates during the time period when the breaches allegedly occurred, making it difficult to accurately recreate valuations. As explained by Professor James, there are generally three different sources of valuation data that the industry relies upon in informing RMBS valuation determinations: actual trade data, Bloomberg, and IDC. Heintz Decl., Ex. A, ¶¶ 45-48. None of these sources, however, provides actual valuation methodologies. Actual valuation methodologies must be examined in order to determine which factors Fortis considered when valuing the Certificates and to challenge contrary valuations proffered by RPI. Further, each of these sources has huge gaps, representing nonexistent data

during key time periods, and there are significant conflicts in what little data is available. *Id*. Even the SEC noted that in late 2008, fair value measurement questions for RMBS were "particularly challenging" because of the lack of market data. *Id.* ¶ 41.

As explained by Professor James, RMBS trading dropped off during the financial crisis, particularly with respect to the types of junior Certificates that were held by RPI. *Id*. ¶¶ 41-43. Consistent with this, Bloomberg has no historical trade data from January 2008 until April of 2011 for any of the tranches owned by RPI. *Id*. ¶ 45. The trade runs (charts showing trading of a particular security) similarly do not have data for certificates for significant time periods. *Id*. ¶ 44. IDC likewise does not have historical trade data for a number of the Certificates at issue in this case. *Id*. ¶ 46. Additionally, the scant information available from IDC is inconsistent and contains significant discrepancies, making them an inappropriate substitution for contemporaneous valuation documents such as those prepared by Fortis. *Id*. The Trustee should not be forced to defend against RPI's opinions based on incomplete and apparently unreliable valuation data when actual Valuation Documents exist, and would be available to the Trustee, had RPI secured the documents from the Assignors in the first instance as it was obligated to.[11]

    **5.**    **Missing Valuation Documents Are Critical to Rebut RPI's Arguments that Damages Can Be Determined on a Class-wide Basis and that RPI is an Adequate Plaintiff**

RPI's expert contends that damages "can be" determined on a class-wide basis, and opines that these damages can be calculated by comparing the actual certificate values with hypothetical values in the "but-for" world. Dalrymple Report, ¶ 54. Although Dalrymple claims that the Valuation Documents are unnecessary to calculate class-wide damages; he nevertheless

---

[11] *See* Order at 12 ("the assignee of a claim in litigation has a duty to obtain and produce the same documents and information to which the opposing parties would have been entitled had the assignors brought the claim themselves.") *quoting Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 314 F.R.D. 341, 344 (S.D.N.Y 2016).

admits that real-world valuations, such as those from third-parties like Bloomberg and IDC, do not disclose the methods or assumptions supporting the prices, or whether prices are available during the relevant time periods.  Heintz Decl., Ex. D (231:13-232:11).  He never explains how he will determine the actual value of Certificates without information such as contained in the Valuation Documents.  In reality, this means Dalrymple is actually proposing to compare a hypothetical value to a hypothetical but-for value.  *Id.*, Ex. A, ¶¶ 49-51.

In contrast to Dalrymple's speculative approach, as explained by Professor James, the Valuation Documents could provide an independent and contemporaneous means by which to assess the reliability of economic damages.  *Id*.  Thus, even if this Court is not satisfied that the Valuation Documents are likely to show additional impairments of the Certificates at issue, the documents are still necessary to rebut Mr. Dalrymple's opinions.[12]  Specifically, Professor James opines that the Valuation Documents may include relevant information such as expected default rates, prepayments, loss severity, macroeconomic forecasts, illiquidity, and lack of third party pricing availability, all of which are relevant to the Trustee's assessment of possible damages, rebutting damages analyses, and analyzing the reliability of damages proposed by RPI.  *Id*. ¶ 48.  These factors would allow analysis of specific causes of losses, which Dalrymple's approach does not address.  *Id*.

Further, as set forth in the Trustee's Opposition to Class Certification, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that RPI cannot recover damages for these trusts for breaches that did not allegedly occur until

---

[12] Stated differently, the Valuation Documents should operate as a check on Dalrymple's damages analysis.  If Dalrymple assigns the certificates values that differ significantly from how Fortis valued them, that would provide fertile cross-examination material and ground for serious question of the reliability of Dalrymple's work.  RPI's inability or unwillingness to produce the Valuation Documents would rob U.S. Bank of the opportunity to defend the case in this way, causing it severe prejudice.

January 2009.  Opp. Memo., pp. 23-24.  These three Trusts exemplify the individualized nature of the damages analysis that must be undertaken here, and why damages cannot be ascertained on a class-wide basis.  The Valuation Documents will likely identify additional Certificates in other Trusts that the Assignors had written down or recognized as impaired (*Id.*, ¶ 28 ), which would further limit RPI's ability to recover individual damages, and would present unique defenses undermining RPI's ability to serve as a class representative.  *See* Opp. Memo., p. 31.

### B. The Sanctions Requested Are Appropriate

RPI's failure to obtain or produce the Valuation Documents regarding the certificates sued upon in this action compels, at the very least, an order precluding RPI's claim for damages of its Assignors and, as a result, an order precluding RPI from serving as a class representative.

The Trustee already possesses evidence sufficient to obtain summary judgment in its favor for three Certificates.  RPI's failure to produce valuation and impairment information regarding the other Certificates sued upon deprives the Trustee of that right for all other Certificates.  In addition, without preclusion of RPI's damages claim, the Trustee will be forced to defend against a damage claim that was made for litigation without the ability to access evidence capable of either rebutting RPI's claim in its entirety or, at the very least, keeping RPI's damages claim in check.

RPI's failure to produce essential evidence (and failing to do so intentionally) also proves that RPI has no business serving as a class representative.  *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976) ("One who will not comply wholeheartedly and fully with the discovery requirements of modern federal practice, is not to be regarded by this Court as one to whom the important fiduciary obligation of acting as a class representative should be entrusted.").

## III. CONCLUSION

For the reasons set forth above, the Trustee requests that the Court find that U.S. Bank has been and will be prejudiced by RPI's failure to produce Assignor documents, preclude RPI's damage claims for purportedly assigned claims, and preclude RPI from serving as a class representative.

DATED: March 3, 2017

MORGAN, LEWIS & BOCKIUS, LLP

By: _____
Tera M. Heintz

Attorneys for Defendant
U.S. Bank National Association,
As Trustee